# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HENRY DAVIS, DOUGLAS COLEMAN, AARON FILLMORE, JEROME JONES, DESHAWN GARDNER, and PERCELL DANSBERRY on behalf of themselves and all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>JOHN BALDWIN, Acting Director of the Illinois Department of Corrections, )<br><br>Defendant. | Case No.  3:16-cv-600<br><br>CLASS ACTION COMPLAINT |

## CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

**NATURE OF THIS ACTION**

1.      Plaintiffs are residents of the Illinois Department of Corrections ("IDOC") who seek to represent a class consisting of persons who are currently subjected to "extreme isolation" (as defined below) or who have been subjected to extreme isolation and are in immediate danger of being subjected to extreme isolation by the IDOC.

2.      "Extreme isolation" is the consensus term used by correctional experts, including corrections administrators, to describe segregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined to their cells for upwards of 22 to 24 hours a day, given only extremely limited or no opportunities for direct and normal social contact with other persons (*i.e.*, contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.  Haney, *The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful*, Prison Service Journal, 12 at n.1 (Jan. 2009); *see also*

Stephen Handelman, *Changing the Rules for Solitary*, The Crime Report (Jan. 15, 2016, 8:00 AM), http://www.thecrimereport.org/news/inside-criminal-justice/2016-01-changing-the-rules-for-solitary.  Extreme isolation includes, but is not limited to, double-celling inmates for updates of 23 hours a day or more in cells designed to hold only one person.  *Id*.  Double celling leads to inmates being "forced to interact with a cellmate under extremely close quarters that afford little or no privacy or respite."  Haney, *The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions*, 22 Wash. U. J. of L. & Pol. 265, 273 (2006).  Further, these inmates experience "constant and unavoidable violations of personal space, in an environment of forced closeness that affords them no respite from one another or opportunities to release the interpersonal tensions that inevitably result."  *Id.* at 11; *see also Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D. Cal. 1995) (prisoners held in extreme isolation "are severely deprived of normal human contact regardless of whether they are single or double celled"); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'v 325, 357–58 (2006) ("Confined groups comprising just two individuals may be the most pathogenic of all.").

3.     The practice of punishing incarcerated individuals by transferring them from the general prison population to extreme isolation has long been shown to cause a severe risk of grave physical and psychological harm.  For example, IDOC data shows that prisoners housed in segregation in Illinois prisons are *nine times* more likely to commit suicide than those in the general population.  That is an *800% increase* in suicides per person in segregation versus suicides per person in the general population.  Regardless of its label—solitary confinement, Disciplinary Segregation, Investigative Status, or Administrative Detention—extensive research shows that the practice of subjecting individuals to extreme isolation causes pain, suffering,

psychological and emotional trauma, physical injury, and, in extreme cases, death. Moreover, the practice of punishing incarcerated individuals by subjecting them to extended periods of extreme isolation has long been viewed by courts, prison authorities, bar associations, and United Nations commissions on torture as a practice to be avoided in all but the most limited cases where the individual presents a credible and continuing serious threat to others or himself. *See, e.g.*, Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, 66th Sess., UN Doc. A/66/268 (Aug. 5, 2011) (concluding that "prolonged solitary confinement" can produce harmful psychological effects and recommending that it be prohibited).

4. The IDOC, however, does not restrict the use of extreme isolation to limited cases where the individual presents a credible and continuing serious threat to others or himself. Instead, the Illinois Department of Corrections, as a matter of custom and practice, arbitrarily, capriciously, and routinely uses extreme isolation as means of punishing even the most minor prison infractions. Shockingly, as of June 30, 2013, approximately 2,300 residents of the IDOC were serving extreme isolation sentences. *See* Exhibit A, Segregation Housing Utilization and Population Dissemination, and Institution Population Chart, dated June 30, 2013. Of these 2,300 individuals, 680 individuals were serving extreme isolation sentences of more than a year, and 218 individuals were serving sentences of more than ten years. *See* Exhibit B, Segregation Sentence Imposed Compared to the Actual Length of Stay in Segregation, dated June 30, 2013. At Illinois' maximum security prisons, approximately 1,400 individuals, constituting approximately 15% of Illinois' maximum security prison population, were held in extreme isolation as of June 30, 2013. *See* Exhibit A. Of these 1,400 individuals, 654 individuals were

serving extreme isolation sentences of more than a year, and 208 individuals were serving sentences of more than ten years. *See* Exhibit B.

5.      The IDOC has subjected individuals such as Plaintiffs to extreme isolation in tiny, often windowless cages that are often smaller than even the already small general population cells.   In fact, the tiny cells holding these individuals for 23 or more hours each day are significantly smaller than the 50 square feet the Illinois legislature now requires for all new, remodeled, and newly designed cells.   *See* 730 ILCS 5/3-7-3.   Led in shackles to these tiny, filthy, cold, and barren cages, these individuals are held in isolation for 23 hours or more a day, with virtually around-the-clock surveillance, and are deprived of meaningful social interaction and any ability to engage in any meaningful or productive physical or mental activity, including educational programs.   Moreover, correctional officers under the supervision and control of the IDOC often impose additional punishment by depriving individuals in extreme isolation of what little remains—access to nourishment and edible food, exercise, showers, bedding, and personal effects (including their clothing) may all be arbitrarily denied and/or taken away.

6.      The IDOC's extreme isolation practices and policies are cruel, inhumane, offensive to basic human decency, and violate the Eighth and Fourteenth Amendments to the United States Constitution.   Accordingly, Plaintiffs (who themselves are currently held by IDOC in extreme isolation or have been recently held in extreme isolation and are at risk of being returned to extreme isolation) bring this civil rights action pursuant to 42 U.S.C. § 1983 individually and on behalf of all similarly situated persons.   In this action, Plaintiffs challenge the State of Illinois' policies and customs, which place every individual incarcerated in Illinois at risk of being subjected to extraordinarily long and severely harmful extreme isolation.   Plaintiffs

seek preliminary and permanent injunctive relief against the unconstitutional use of extreme isolation punishment.

**JURISDICTION AND VENUE**

7.     Plaintiffs and this class bring claims pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

8.     This Court has jurisdiction over claims seeking declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1331 and 1343, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

9.     Venue is proper in the United States District Court for the Southern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because some Plaintiffs reside at Menard Correctional Center ("Menard") and Lawrence Correctional Center ("Lawrence"), which are both located in this district, and a substantial part of the events or omissions giving rise to the claims bought by Plaintiffs and the class have occurred in this District.

**PARTIES**

10.    Named Plaintiffs Henry Davis, Douglas Coleman, Aaron Fillmore, Jerome Jones, DeShawn Gardner, and Percell Dansberry are individuals who are currently incarcerated at facilities under IDOC's custody and control.

11.    Plaintiff Henry Davis is a 42-year-old African-American man currently incarcerated and in extreme isolation at Lawrence.  Mr. Davis was sentenced to six months in Disciplinary Segregation after receiving a ticket for alleged gang leadership.  The IDOC expunged the ticket on April 11, 2014, yet Mr. Davis was not removed from Disciplinary Segregation until May 13, 2014, and instead of removing him back to general population, he was immediately placed in Administrative Detention, where he spent approximately six more months.  Mere months after being released from Administrative Detention, Mr. Davis was

recently placed back in Disciplinary Segregation, where he has been sentenced for six months, yet again for charges of gang leadership.  Mr. Davis, who is not a current member of any alleged gang, suffers gravely from lack of inmate privileges and complete confinement to his cell for nearly 24 hours a day.  Mr. Davis' earliest release date is 2048.

12.     Plaintiff Douglas Coleman is a 56-year-old African-American man currently incarcerated at Stateville Correctional Center ("Stateville").   Before Stateville, Coleman was incarcerated at Menard from 2000 to 2008 and spent at least six months in Disciplinary Segregation.  In 2008, Coleman was transferred to Stateville.  During his time at Stateville, he was sentenced to six months in Disciplinary Segregation, but ultimately spent eight months in Disciplinary Segregation after receiving 60 extra days because of two disciplinary tickets, discussed below, from 2013 to 2014.  He was housed in F House, cells 135 and 139.  During Mr. Coleman's time in Disciplinary Segregation, he suffered from unbearable living conditions and physical and psychological injuries which were exacerbated because authorities failed to accommodate his physical disabilities.  Mr. Coleman's earliest release date is 2059.

13.     Plaintiff Aaron Fillmore is a 41-year-old Caucasian man currently incarcerated and in extreme isolation at Lawrence,.  Mr. Fillmore has spent the last *17 years* in extreme isolation.  During that time, Mr. Fillmore has continuously been in Disciplinary Segregation, Administrative Detention, or Investigate Status, all of which constitute extreme isolation.  Mr. Fillmore has not been provided with a meaningful opportunity to defend himself against the charges which have consistently kept him in extreme isolation, and during much of this time, he has not even been given meaningful notice of what he did wrong to warrant such extreme and extended isolation.  While in extreme isolation, Mr. Fillmore has had little to no physical contact with other people.  He has had no access to IDOC programming and limited opportunities to

6

exercise.  Mr. Fillmore has suffered mentally as a result.  Mr. Fillmore's earliest release date is 2035.

14.     Plaintiff Jerome Jones is a 39-year-old African-American man of Moorish nationality.  He is currently incarcerated at Menard.  He spent a little over two years in Phase III Administrative Detention at Lawrence—meaning he did not violate any rules for many months.  Mr. Jones was removed from the general population of Stateville for reasons unknown to him on July 25, 2013, and was then transferred to Lawrence on August 30, 2013.  Despite not receiving a disciplinary ticket since 2001, Mr. Jones has never been able to successfully challenge the false accusation of his alleged gang association he later learned had put him in Administrative Detention in 2013 at Stateville.  Mr. Jones, not a current member of any alleged gang, suffered from an extreme lack of inmate privileges and complete confinement to his cell for nearly 24 hours each day.  Mr. Jones' earliest release date is 2038.

15.     Plaintiff DeShawn Gardner is a 44-year-old African-American man currently incarcerated and in extreme isolation at Lawrence.  Mr. Gardener has been in Administrative Detention since November 2013.  He was placed into Investigative Status while at Stateville.  He was later transferred to Lawrence and placed in Administrative Detention.  Mr. Gardener did not receive an opportunity to challenge his placement in Administrative Detention.  In fact, the first review of his Administrative Detention status occurred nearly six months after his initial placement.  He has suffered both mentally and physically in Administrative Detention by being cut off from the physical contact of loved ones and from IDOC's rehabilitative programs.  Mr. Gardner's earliest release date is 2040.

16.     Plaintiff Percell Dansberry is a 48-year-old African-American man currently incarcerated at Menard.   Mr. Dansberry was sentenced to three months of Disciplinary

Segregation at Pontiac Correctional Center ("Pontiac") after receiving a disciplinary ticket for alleged gang membership. After serving his three-month sentence and without notice, Mr. Dansberry was immediately transferred to Menard and placed in Administrative Detention. Despite not knowing the reason for his placement, Mr. Dansberry remained in Administrative Detention for almost two years. During that time, Mr. Dansberry suffered deplorable living conditions that included little to no physical human contact or mental stimulation for almost 24 hours a day. Mr. Dansberry's earliest release date is 2037.

17. Defendant John Baldwin is the Acting Director of IDOC. Acting Director Baldwin has final policy-making authority within IDOC, and is personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Plaintiffs. Acting Director Baldwin is sued in his official capacity for declaratory and injunctive relief.

**FACTS**

### Prisoners Housed In Extreme Isolation Suffer Both Present Harm and a Severe Increased Risk of Future Harm

18. IDOC's practice of punishing incarcerated individuals by transferring them from the general prison population to extreme isolation has long been shown to cause grave physical and psychological harm, and to dramatically increase the risk of future harm. Documented physical and physiological harms caused by forced extreme isolation include, at the most basic level, social isolation, sensory deprivation, deprivation of meaningful social contact and social interaction, and denial of basic human dignity, all of which are among the basic necessities of life.

19. IDOC's practice of punishing incarcerated individuals by transferring them from the general prison population to extreme isolation also dramatically increases the risk of physical harm, including suicide, self-harm, cardiovascular and genito-urinary complications,

tremulousness, gastro-intestinal impairment, heart palpitations, insomnia, migraines, loss of appetite, weight loss, deteriorated vision, sudden excessive perspiration, back and joint ailments, hypersensitivity to external stimuli, and lethargy.  As previously alleged, IDOC data shows almost a tenfold increase in the incidence of suicide for prisoners in extreme isolation versus prisoners in the general population.

20.     IDOC's practice of punishing incarcerated individuals by transferring them from the general prison population to extreme isolation also dramatically increases the risk of psychological harms, including post-traumatic stress disorder, hallucinations, severe and chronic depression, depersonalization, social withdrawal, confusion, apathy, anxiety, heightened nervousness, night terrors, panic attacks, irrational anger, rage, loss of impulse control, paranoia, claustrophobia, concentration and memory deficiencies, and perceptual distortions.  As Supreme Court Justice Anthony Kennedy stated, while speaking before the House Appropriations Subcommittee on Financial Services and Federal Government, "[s]olitary confinement literally drives men mad."  Lydia O'Connor, *Justice Anthony Kennedy: Solitary Confinement 'Literally Drives Men Mad,'* Huffington Post (Mar. 24, 2015, 5:46 PM), http://www.huffingtonpost.com/2015/03/24/anthony-kennedy-solitary-confinement_n_6934550. html?ir=Chicago&; *see also* Haney Expert Report at 12-14 ("[D]irect studies of prison isolation have documented an extremely broad range of harmful psychological reactions . . . includ[ing] increases in . . . negative attitudes and affect, anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.").

21.     The practice of double celling inmates does not mitigate the physical and psychological harms caused by extreme isolation.  Inmates housed in double cells are subject to forced interactions with a cellmate under extremely close quarters that afford little or no privacy or respite.  Double celling results in an environment of forced closeness that affords cellmates no respite from one another or opportunities to release the interpersonal tensions that inevitably result.  In fact, the presence of a cellmate does not significantly mitigate, and actually may aggravate, the stresses of extreme isolation.  *See Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D. Cal. 1995); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325, 257–58 (2006).

22.     For healthy individuals, the combined physical and psychological effects caused by forced isolation can result in grave harm even after short periods of segregated confinement.  When the duration of confinement extends beyond days and into weeks, months, or years, however, the consequences can be devastating, permanent, and even deadly.  The greatly enhanced risk of suicide and other self-harming behavior for people housed in extreme isolation is well documented.  This is particularly the case when individuals with preexisting physical and mental health conditions are subjected to extended periods of isolation.

***Many States (But Not Illinois) Recognize the Severe Harm Caused by Extreme Isolation and Have Adopted Policies and Standards to Protect Against Such Harm***

23.     Precisely because extreme isolation engenders such a significant risk of severe physical and psychological harm and stands as an affront to the basic notions of human dignity, many state authorities explicitly prohibit its imposition as punishment for a criminal offense.  Moreover, many states and bar associations have adopted policies to protect against the unnecessary physical and psychological harms caused by extreme isolation.  For example, after spending a night in a segregation cell, Colorado's Director of Corrections embarked on a

program to dramatically reduce the use of extreme isolation in Colorado's prisons.  As a result, Colorado now virtually bans the use of extreme isolation for all prisoners with a serious mental illness, and prohibits placement of women and youthful prisoners in extreme isolation. Rick Raemisch & Kellie Wasko, Open the Door—Segregation Reforms in Colorado, Colorado Dep't  Corrections (2015),  http://www.colorado.gov/pacific/cdoc/news/open-door-segregation-reforms-colorado.  As a result of these reforms, Colorado has reduced the percentage of its prison population in extreme isolation from over 7% of its prison population to 1.1%. The Arthur Liman Public Interest Program & Association of State Correctional Administrators, Time-In-Cell: The ASCA-Liman 2014 National Survey of Administrative Segregation in Prison (2015), at 7.

24.     In Maine, a government study determined that tighter controls were necessary to protect against the overuse of segregation.  Accordingly, the State enacted reforms that cut its segregation population in half and expanded access to social stimulation for prisoners placed in segregation.

25.     Correctional leaders in Michigan have also implemented programs to reduce the duration of extreme isolation sentences and the number of prisoners subject to extreme isolation.

26.     The State of New York agreed to severely limit both the reasons prisoners can be held in extreme isolation, and the length of time they can be kept in extreme isolation.  *See* Settlement Agreement in *Peoples v. Rischer*, 11-CV-2694 (S.D.N.Y.), filed Dec. 16, 2015, *available at* www.nyclu.org/files/releases/20151216_settlementagreement_filed.pdf.

27.      Also, the New York State Bar Association, noting the serious risk of physical and psychological harm caused by extreme isolation, has adopted a resolution advocating that, if segregated confinement is to be used at all, it should only be imposed for a number of days—not

years, months, or even weeks.  *New York State Bar Association Urges Reform of Solitary Confinement*, NYSBA (May 5, 2014), http://www.nysba.org/CustomTemplates/SecondaryStandard.aspx?id=48899.   The New York State Bar Association further found that long-term segregated confinement is a counterproductive, unnecessary infliction of pain.  *Id.*; *see also Stop Solitary – Standards and Resolutions*, ACLU, https://www.aclu.org/stop-solitary-standards-and-resolutions (last visited May 25, 2016).

### *National and International Authorities Have Also Adopted Standards and Policies to Protect Against the Harm Caused By Extreme Isolation*

28.    The American Bar Association has promulgated standards to ensure that prisoners are not unnecessarily subjected to the severe physical and psychological harm caused by extreme isolation.  As a threshold matter, the ABA standards require that prisoners be separated from the general population only after a finding that (1) the individual committed a *severe* disciplinary infraction in which safety or security was seriously threatened, or (2) the individual presents a *credible and continuing* serious threat to others or himself.  In order to protect against the unnecessary and unjustified harm caused by forced isolation, the ABA standards abolish extreme isolation under any circumstances, requiring that any isolation imposed on a prisoner be for the briefest term and under the least restrictive conditions possible.

29.    Human rights organizations and authorities have also found that adequate minimum safeguards are absolutely necessary to protect against the severe harms caused by extreme isolation.  The United Nations Special Rapporteur on Torture, for example, has concluded that the use of solitary confinement for punitive purposes can never be justified, given the disproportionate magnitude of suffering it imposes.  Furthermore, the UN Special Rapporteur has held that *more than 15 days* in solitary confinement amounts to torturous, cruel, and unusual

punishment.  For this reason, the UN Special Rapporteur recommends that such sentences be abolished in all cases, even where isolation is determined to be absolutely necessary for protecting the safety of prisoners and staff.  Similarly, the UN General Assembly has called for an "absolute abolition" of the use of extreme isolation as punishment, and the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment has recommended that, due to its potentially hazardous effects, extreme isolation only be used as punishment in exceptional cases and for the shortest period of time possible.

30.     Near the end of 2015, the U.N. General Assembly approved the first major revision of the Standard Minimum Rules for the Treatment of Prisoners ("SMRs") since the guidelines were originally drafted in 1955.  Renamed the "Mandela Rules," the revised rules state that, "[s]olitary confinement shall be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review."  The Mandela Rules forbid indefinite or prolonged use of solitary confinement (defined as anything more than 15 consecutive days) and restrict its use for people with mental or physical disabilities. Econ. & Soc.    Council    Res.    2015/20,    at    19    (Sept.    29,    2015), http://www.un.org/ga/search/view_doc.asp?symbol=A/C.3/70/L.3.

31.     As reflected by these various authorities and organizations, the national consensus standard is that if isolation is to be used at all, sufficient minimum protocols and safeguards are necessary to ensure that it is only used as a last resort and, even then, that it is only used for a short amount of time and under strict controls.

### *Illinois Is A Rogue Governmental Entity When It Comes To The Use of Extreme Isolation As A Means of Punishment*

32.     In derogation of national and international standards, Illinois uses extreme isolation as a disciplinary tool of the first resort with astonishing frequency and length for the

violation of any one of approximately 50 internal prison regulations, the majority of which can be classified as relatively minor offenses.  As of June 30, 2013, IDOC maintains over 3,000 segregation beds, which are used to separate individuals from the general prison population and subject them to punishing forms of extreme isolation and deprivation.  *See* Exhibit A. Approximately 2,300 of these segregation beds were occupied by individuals as of June 30, 2013.  *Id.*  Of these 2,300 individuals, 680 individuals were serving segregation sentences of more than one year and 218 individuals were serving segregation sentences of more than ten years.  *See* Exhibit B.  In fact, despite the closing of IDOC's Tamms Correctional Center, which eliminated 168 individuals from segregation, IDOC's overall segregation population increased by 257 individuals from June 30, 2012, to June 30, 2013.  *See* Exhibit A.

33.     The frequency with which IDOC uses extreme isolation as punishment is a direct consequence of the system-wide policies and customs governing the conduct and punishment of all individuals incarcerated throughout the Illinois prison system.  In contrast to the clearly defined standards and criteria discussed above, Illinois permits the use of extreme isolation as punishment for conduct that poses no threat to the safety of its prisoners or the security of its correctional facilities.   Illinois also imposes segregation sentences for extraordinary and disproportionate lengths of time that have no connection to any legitimate penological rationale or even to the seriousness of the offense committed.  Defendant Acting Director Baldwin was and is personally involved in authorizing and continuing the unconstitutional policies and customs described below.

34.     IDOC has promulgated numerous internal regulations governing every aspect of the behavior of individuals incarcerated in Illinois state prisons.  Disciplinary offenses are defined in Appendix A to Section 504.20 of Title 20 of the Illinois Administrative Code.  *See* 20

Ill. Admin. Code § 504.20 (West 2015).  These offenses cover a wide range of conduct from assault or possession of dangerous weapons to "disregarding basic hygiene" and include violations of facility rules.  20 Ill. Admin. Code § 504, App. A (West 2015).

35.     If one of IDOC's employees believes that an individual has violated any of these rules, he or she must prepare a "disciplinary report" or an "investigative report."  These reports document the alleged behavior and list any witnesses.  He or she may orally reprimand the individual if the offense is one of those listed in the 400 series of Appendix A.  *See* 20 Ill. Admin. Code § 504.30 (West 2015).

36.     Both before and after a disciplinary report or an investigative report is prepared, the shift supervisor can decide whether to place the individual in "temporary confinement" pending the issuance of a report or a disciplinary hearing. *See* 20 Ill. Admin. Code § 504.40 (West 2015).

37.     As a matter of practice, there is widespread disparity in the length of time that a prisoner spends in temporary confinement before an initial hearing across Illinois prisons.  For example, the median number of days between placement in temporary confinement and the initial hearing varies from one to ten.  The maximum number of days for each facility ranges from four to 194 days.  This widespread disparity in terms of the initial hearing is indicative of the arbitrary and capricious nature of IDOC policies and practices pertaining to extreme isolation and the widespread deprivations of liberty and proper due process considerations afforded to every prisoner under the Fourteenth Amendment.

38.     A "reviewing officer" is then assigned to (1) review the placement of an individual in temporary confinement, (2) interview those individuals receiving an investigative report, and (3) review an individual's disciplinary report.  When reviewing a disciplinary report,

a reviewing officer must determine whether the offense committed is "major or minor in nature." *See* 20 Ill. Admin. Code § 504.50 (West 2015).  All those offenses listed in the 100, 200, or 500 series of Appendix A are considered major offenses.  Those offenses listed in the 300 or 400 series may be designated as either minor or major offenses.  *See* 20 Ill. Admin. Code § 504.50(d)(3) (West 2015).

39.     All major offenses are assigned to the "adjustment committee" for a hearing while all minor offenses are assigned to the "program unit" for a hearing.  Those reports or offenses classified as major offenses are eligible for placement in segregation if found guilty.  A vast number of these "major" offenses involve nonviolent and non-disruptive behavior or actions that pose little to no threat to the safety of the prisoners or the security of the facilities. *See* 20 Ill. Admin. Code § 504.80(k)(4)(H).

40.     IDOC's policies and regulations offer minimal guidance to a reviewing officer's review of investigative and disciplinary reports as well as a prisoner's placement in temporary confinement.  IDOC's policies and regulations fail to provide incarcerated individuals with an explanation of the types of conduct that may result in more or less severe classification.  These same policies and regulations fail to provide notice to incarcerated individuals of the potential segregation sentencing ranges if found guilty of a violation of IDOC's rules, including facility rules.

41.     Individuals charged with major offenses are afforded an extremely limited "hearing," with minimal process, to adjudicate their guilt.  IDOC employees with many other work responsibilities often act as adjustment committee members.  With respect to adjudicating guilt, adjustment committee members are permitted to credit the testimony of correctional staff over that of a prisoner.  The prisoner can be denied the opportunity to present his own evidence.

The prisoner is routinely denied the right to question or confront adverse witnesses. The prisoner can even be denied the ability to know the identity of the witnesses. Prisoners can be, and frequently are, convicted of offenses based only on the disputed word of a single correctional officer following a "hearing" in the hallway outside the prisoner's cell.

42.     Extreme isolation is also imposed on individuals without a hearing and even without notice, as a form of "nondisciplinary status of confinement." 20 Ill. Adm. Code § 504.660 (West 2015). This status is referred to as "Administrative Detention." *Id.*

43.     Individuals are placed in Administrative Detention at the discretion of the Chief Administrative Officer (commonly known as "Warden") with almost no review or opportunity for the individual to contest the allegations. 20 Ill. Adm. Code §§ 504.660(a), (b), and (c).

44.     Review of the individual's placement in Administrative Detention need only be conducted every 90 days and individuals may remain in that status indefinitely. 20 Ill. Adm. Code §§ 504.660(a) and (c).

45.     IDOC's policies permit and encourage extreme isolation sentences for behavior that demonstrates no risk of harm to the general prisoner population or to IDOC's employees. A substantial number of extreme isolation sentences are for this type of behavior. For example, from January 1, 2008, to December 31, 2008, only 15% of sentences to extreme isolation involved offenses that implicated violent conduct or possession of dangerous contraband. *See* Exhibit C, Quantitative Findings on Use and Outcomes of Segregation in IL DOC, dated September 28, 2011. Furthermore, IDOC employees punitively imposed extreme isolation for the following behaviors:

a.     Over 500 segregation sentences involving "damage or misuse of property";

b.     Approximately 300 segregation sentences involving "intimidations or threats";

c.      Approximately 150 segregation sentences involving possession of "drugs or drug paraphernalia";

d.      Over 1,500 segregation sentences for "unauthorized movement";

e.      Over 1,300 segregation sentences involving "insolence";

f.      Over 800 segregation sentences for "non-dangerous contraband";

g.      Over 1,600 segregation sentences for "violation of rules";

h.      Over 1,500 segregation sentences for "disobeying a direct order"; and

i.      Approximately 500 segregation sentences for "failure to report." *Id.*

46.     IDOC's policies and customs regarding sentencing are a key factor in the arbitrary and inconsistent punishments that occur within IDOC's facilities.  IDOC's policies and regulations are plainly inadequate and fail to provide guidance in order to ensure consistent and proportionate disciplinary outcomes.

47.     With respect to sentence length, IDOC's policies provide no mandatory sentence ranges.  Instead, IDOC's policies provide for maximum penalties for each offense.  The maximum penalties, however, permit disproportionate and arbitrary sentencing to extreme isolation.  An individual in possession of a package of cigarettes, for example, could be sentenced to up to three months of extreme isolation.  *See* 20 Ill. Admin. Code § 504. Tbl. A (West 2015).  Furthermore, IDOC's policies fail to place any upper limit on the number of consecutive segregation sentences that an individual may be forced to serve.  *See* 20 Ill. Admin. Code § 504.110(b) (West 2015).  Thus, individual extreme isolation sentences of 30 days for nonviolent behavior may have the practical effect of ensuring that the prisoner spends months or even years confined in extreme isolation.  In addition, indeterminate periods of extreme isolation are frequently allowed and enforced.  *See* 20 Ill. Admin. Code § 504.115 (West 2015).

48.     IDOC's policies provide vague and generic guidance or criteria for when extreme isolation should be imposed as a disciplinary action.  There is no articulation of the rationale for imposing such extreme isolation or for the length of time of each sentence.  Instead, extreme isolation sentences are often routinely authorized and imposed without adequate explanations as a matter of policy and custom.  *See* 20 Ill. Admin. Code § 504.20(b) and 20 Ill. Admin. Code § 504.80(k)(4)(H) (West 2015).

49.     Moreover, IDOC's policies permit employees to impose extreme isolation as punishment without taking into account factors that might make such extreme isolation particularly disproportionate, painful, and harmful.  IDOC employees are permitted to impose extreme isolation sentences on the most vulnerable individuals, *e.g.*, individuals with a history of mental illness, individuals with daily medical needs, and the elderly.

50.     Once an individual begins serving his or her sentence, IDOC's policies allow lengthy confinements without any subsequent individualized reviews to determine whether it is still necessary to keep that individual in extreme isolation.  Nor do IDOC's policies require that officials periodically evaluate whether the extreme isolation may be causing the individual increasingly severe and grave harm.  Even indeterminate segregation sentences are only required to be reviewed once during the first year and once every 180 days thereafter.  *See* 20 Ill. Admin. Code § 504.115 (West 2015).

51.     IDOC's policies and customs governing post-sentencing review of disciplinary actions fail to ensure any consistent or meaningful relief from grossly disproportionate extreme isolation.  New proceedings are only granted if the original proceeding was found to be "defective" on four bases.  No further guidance is offered by IDOC's policies in making this determination of defectiveness.  *See* 20 Ill. Admin. Code § 504.90 (West 2015).  Furthermore,

requests to reduce an individual's time in extreme isolation can be unilaterally denied without any explanation.  *See* 20 Ill. Admin. Code § 504.120 (West 2015).

52.     All of the above policies work in conjunction with customs that have the force of formal policy throughout the IDOC system, tolerating and encouraging needlessly and purposefully harmful extreme isolation sentences for all forms of behavior, no matter how minor or nonthreatening.  Lacking any adequate policies and procedures, IDOC's employees impose unjustified and arbitrary punishments that are customarily authorized, ratified, and enforced system-wide.

53.     In combination, IDOC's policies and customs result in unjustified, inconsistent, and harmful extreme isolation sentences.  Individuals receive lengthy sentences that are grossly disproportionate as compared to the underlying misbehavior.  Similarly situated prisoners receive inconsistent, often vastly different sentences for similar misconduct.  African-American prisoners are more likely to receive extreme isolation sentences, and to receive longer sentences, as compared to individuals of other racial or ethnic groups.

54.     Acting Director Baldwin has final policy-making and supervisory authority within IDOC.  As director, and pursuant to Illinois law, he is aware of and has ultimate authority with regard to all of IDOC's internal rules, regulations, policies, procedures, and customs.  According to the IDOC's website, Acting Director Baldwin and his staff are "committed to operating a safe and secure prison system as well as enhancing prison-based treatment, prevention programs and the successful reentry of inmates into society, which will lead to lowering recidivism rates."

55.     Defendant Acting Director Baldwin was and is personally involved in authorizing and maintaining the disciplinary policies, procedures, and customs detailed in this complaint, and

their consequences and effects.   He has the responsibility to review and evaluate IDOC's disciplinary policies and the authority to adopt, amend, or revise them.

56.     Defendant Baldwin is aware of the harm caused by IDOC's existing disciplinary policies and customs.  Defendant Baldwin is aware that extreme isolation causes pain, suffering, mental deterioration, and physical injury.   IDOC had statistical evidence and data that demonstrate the arbitrary, inconsistent, and grossly disproportionate extreme isolation sentences caused by its inadequate policies and customs.  *See* Exhibits A, B, and C; *see also* Exhibit D, Various Segregation Charts, dated from September 30, 2009, to December 31, 2012.  Defendant is also aware that extreme isolation sentences are often imposed for offenses that pose no threat to prison safety or security, and for lengths of time that far exceed any legitimate punitive goal and do little more than inflict unnecessary pain and an unjustified risk of harm.  *Id.*

57.     Defendant is aware of the consequences of IDOC's policies and customs as the result of numerous communications to them from outside organizations and entities, including the study conducted by the Vera Institute of Justice ("Vera Institute") on or around September 2011.  *See* Exhibit E, Memorandum of Understanding Between the IDOC and The Vera Institute of Justice, dated May 2010, and Exhibit F, Reducing Prisoner Isolation: An Innovative Approach to Classification and Management of Segregation, Control Units, and Supermax, undated.

58.     Specifically, the Vera Institute, an independent, nonpartisan, nonprofit center for justice policy and practice, found, among other things, that (1) "[t]he conduct exhibited by prisoners admitted to [Disciplinary Segregation] and [Administrative Detention] warrants sanctions, but it is ***not clear that the types of placement and lengths of stay are proportionate to prior and current negative behavior***;" (2) "[t]he conditions of confinement in [Disciplinary Segregation] are ***not acceptable*** with respect to recreation, showers, mental health treatment, or

contacts with clinical-services staff, and are not in line with best or standard practices in other systems;" (3) [t]here is a ***need to standardize*** key policies and program attributes for [Disciplinary Segregation] and [Administrative Detention] across the system; (4) "[t]he proportion of women in [Disciplinary Segregation] is almost twice that of men;" and (5) "[a] signification portion of the [Disciplinary Segregation] population has segregation time that ***exceeds*** their time left to serve."  Exhibit G, IDOC Segregation Study Major Findings, undated (emphasis added).

59.     Defendant is also aware of a pattern of deficiencies through complaints that they have received through prisoner grievances and civil litigation.

60.     Defendant has long been aware that IDOC's disciplinary procedures fail to provide many of the minimum safeguards recommended by correctional, legal, mental health, and human rights experts.  The certainty that these policies and customs have and will continue to lead to unjustified and harmful extreme isolation sentences is plain from the lack of adequate guidance contained in IDOC's written policies themselves, and the fact that IDOC's employees customarily impose extreme isolation sentences far exceeding even the minimal guidance that is provided.

### *IDOC's Use of Extreme Isolation Serves No Legitimate Penological Purpose*

61.     The extraordinary length of extreme isolation sentences imposed by IDOC—approximately half of the sentences imposed on those in segregation as of June 30, 2013, were for more than three months, some five to ten times longer than the maximum allowable time recommended by mental health, legal, and human rights experts—serves no legitimate penological justification.  In fact, the overwhelming evidence from other state corrections systems, as well as the Vera Institute study, is that the use of punitive extreme isolation

exacerbates physical violence and psychological harms for both incarcerated individuals and correctional staff, and that it is counterproductive to legitimate penological goals such as prison safety, deterrence, and rehabilitation. *See* Exhibits A-G.

62. Implementing procedural safeguards, such as adopting adequate criteria designed to ensure proportionality and curtail the length of extreme isolation sentences, to avoid the risk of harm for vulnerable prisoners, and to provide notice to prisoners and staff of the length of extreme isolation that may be imposed as punishment for particular behaviors, would significantly protect against the risk of erroneous deprivations of the most fundamental constitutional rights, and would not unduly interfere with Defendant's legitimate interests.

63. Despite all of the above, Defendant personally authorized these policies and customs although he has the authority, ability, and ultimate responsibility to ensure that IDOC's policies and customs do not inflict unnecessary and avoidable harm on individuals incarcerated in Illinois prisons. By continuing these policies and practices, Defendant is responsible for the systemic and ongoing violations of the constitutional rights of individuals incarcerated in Illinois prisons, including the harms suffered by each of the Plaintiffs, as described below.

### Henry Davis

64. Mr. Davis is 42 years old and currently incarcerated at Lawrence. He was incarcerated in 2005 and is currently serving a 45-year sentence for murder.

65. Mr. Davis previously spent over two years in extreme isolation, which included time spent in Investigative Status, Disciplinary Segregation, and Administrative Detention. He was recently placed back in Disciplinary Segregation.

66. Mr. Davis was first placed in Investigative Status on or about July 29, 2011, and continued through about September 2011. Thereafter, he was again placed in Investigative

Status on November 7, 2013, for allegedly engaging in security threat group ("STG") activity. On December 5, 2013, IDOC issued a disciplinary report charging Mr. Davis with allegedly holding a leadership position in an STG.  A hearing was held on December 9, 2013, at which Mr. Davis was unable to call witnesses to refute the charge against him and IDOC refused to reveal or call their informant, preventing Mr. Davis from being able to question his accuser.  Mr. Davis was sentenced to six months in segregation.  He filed a grievance challenging the decision and on April 11, 2014, the ARB expunged the disciplinary report and ordered that Mr. Davis be released from segregation and restored to his previous grade.  Despite this clear mandate from the ARB, Mr. Davis continued to be held in segregation for an additional 31 days, after which he was immediately placed in Administrative Detention instead of being returned to general population.  On May 13, 2014, Mr. Davis received a memorandum, dated May 12, 2014, from Steve Duncan, the Warden at Lawrence, stating that he was being placed in Administrative Detention based on a review conducted on the same date.  No other information was provided to Mr. Davis.

67.     Mr. Davis remained in Administrative Detention until November 18, 2015.  On May 29, 2014, while in Administrative Detention, Mr. Davis filed a grievance regarding the extra 31 days that he was held in Disciplinary Segregation after the disciplinary report was expunged and he was supposed to be moved back to general population, as well as the decision to move him to Administrative Detention instead of general population.  On June 16, 2014, the Counselor responded that Mr. Davis' placement in Administrative Detention had nothing to do with the expunged disciplinary report.  The Counselor's response did not address the additional time that Mr. Davis was held in segregation after the expungement.  On February 3, 2015, the

grievance officer, Elizabeth Bare, recommended that the grievance be denied.  On July 13, 2015, the ARB denied Mr. Davis' grievance.

68.     On March 11, 2016, Mr. Davis received disciplinary report alleging the same offense that was expunged on April 11, 2014—leadership in a STG.  Again, IDOC refused to reveal its source and Mr. Davis was unable to call any witnesses to refute the charge against him. He was sentenced to another six months in Disciplinary Segregation.  On April 6, 2016, Mr. Davis filed a grievance challenging the March 11, 2016 disciplinary report.

69.     Mr. Davis has three children and two small grandchildren.  While in extreme isolation, Mr. Davis rarely, if ever, receives visits from his family because his visits are "no contact," held behind a glass wall, and limited to one hour.  While in general population, he would receive five visits each month.  He currently is not permitted any phone calls (other than to legal counsel), and this causes him to feel extremely isolated, particularly from his family. His mail is extremely delayed, such that if he does receive a letter from family, it often arrives over a month after it was sent.

70.     Prior to his time in extreme isolation, Mr. Davis had started to work toward obtaining his General Educational Development (G.E.D.).  Unfortunately, he has been unable to finish his G.E.D. preparation program because the classes are not allowed in extreme isolation. Mr. Davis is a practicing Christian and, while in general population, he would regularly participate in Bible study courses, as well as other Christian classes and services.  He has not been permitted to attend any of those religious classes or services while in extreme isolation.  He is also very limited in his ability to attend to his legal work in extreme isolation because the law library in extreme isolation contains torn and tattered books and has no staff or inmate helpers.

This is in stark contrast to the general population law libraries that have staff, inmate helpers, and both a better quality and greater quantity of books.

71.     Mr. Davis' food portions in extreme isolation are very small, and he is not allowed to supplement his diet with any food from the commissary.  The cells are bug-ridden and often freezing cold in the winter.

72.     Mr. Davis spends 23 to 24 hours a day confined to his cell.  He has been single-celled (without a cellmate) for most of his time in extreme isolation.  The extreme isolation cell doors are covered in a plexiglass, making communication with individuals outside the cell extremely difficult.  This is different from general population, where the doors contain bars but not a plexiglass wall.  Further, the guards in extreme isolation at times turn on an air-blowing machine that adds to the noise, making it even more difficult to meaningfully communicate with anyone and also making it colder in the winter, seemingly a form of additional, informal punishment.  Mr. Davis is only allowed outside in the yard approximately two hours each week, usually combined on the same day.  This extreme isolation from his family and others within Lawrence, including the inability to meaningfully communicate or to go outside for more than two hours a week, causes Mr. Davis severe emotional distress and desperation to the point of wanting to run his head into the wall.

### Douglas Coleman

73.     Mr. Coleman is 56 years old and is currently incarcerated at Stateville.  He is currently serving a 135-year sentence for murder and armed robbery.

74.     Mr. Coleman is currently housed in X house at Stateville.

75.     Mr. Coleman has endured at least three extreme isolation sentences during his incarceration (two times for having alcohol in his cell, and one from a positive drug test).

76.     Mr. Coleman entered the IDOC system in 1992.  From 2000 to 2008, Mr. Coleman was incarcerated at Menard.  During his time at Menard, Mr. Coleman was sentenced to Disciplinary Segregation for a positive drug test in or around 2001.

77.     Mr. Coleman experienced deplorable living conditions in Disciplinary Segregation.  The cells were filthy and had little air circulation.  His food portions were greatly diminished.  He was also denied timely access to his heart medicine.

78.     While in Disciplinary Segregation, Mr. Coleman was only permitted yard privileges once a week.  This caused him great anguish because he could not leave the cramped, dirty conditions of his cell, especially when disputes or frustrations with his cellmate arose.

79.     Towards the end of his time in Disciplinary Segregation, Mr. Coleman felt really sick.  Mr. Coleman suffered a stroke at Menard after leaving Disciplinary Segregation in September 2001.

80.     In 2008, Mr. Coleman was transferred to Stateville because a correctional officer was harassing and discriminating against him because of his stroke.  He was placed in the Health Care Unit upon his arrival at Stateville.

81.     The first time that he was placed in Disciplinary Segregation at Stateville was around 2011.  He spent six months in extreme isolation served in a cell within the Health Care Unit.  The second time Mr. Coleman spent eight months in extreme isolation from 2013 through early 2014.  His original 2013 sentence was for six months due to alcohol found in his cell, but Mr. Coleman ultimately spent a total of eight months in extreme isolation after receiving 60 extra

days because of two additional disciplinary tickets.  Mr. Coleman endured his second extreme isolation sentence in F-House, cells 135 and 139. [1]

82.     Mr. Coleman suffered extreme isolation in F-House, where the conditions included constant roaches, mice, and birds flying inside the unit.  The roaches were seen constantly and everywhere in F-House, including wherever there was a surface, such as the sink, walls, counter, toilet, and in the bed where they would crawl on him.  There were more roaches in F-House than the Health Care Unit.  There were even insects and mice in the food.  Mr. Coleman did not see any mice in general population cells.  He had to "sleep with one eye open" because of the mice.  There were also more cockroaches in F-House than in general population.  Birds would frequently fly around F-House, including over the trays of food, whereas Mr. Coleman did not see birds in general population.  Even when the food was not tainted by insects and rodents, it was of low quality and the inmates were given very small portions.  In winter, the cells were unbearably cold, which was made worse by broken/missing window panes letting frigid air spill directly into his cell.  It was so cold that, for one period of time, there was ice on the inside of Mr. Coleman's F-House cell wall.  He could not even keep himself warm against the frigid temperatures in his cell because he was not allowed to cover the broken/missing panes with a blanket to prevent cold air from coming into the cell; doing so would risk getting a disciplinary ticket.

83.     Although Mr. Coleman was housed with a cellmate in F-House, he had no meaningful ability to communicate with the inmates in the cells on either side of his.  He would have had to scream to get anyone's attention outside of his cell, and even that often did not work. Mr. Coleman felt that he was on a deserted island because it was so hard to get attention when he

---

[1] Mr. Coleman spent approximately one week in Health Care Unit segregation (out of the total of eight months) due to an injury that occurred while he was in F-House segregation.

needed help.  For part of his sentence, he was placed with an inmate known to be mentally disturbed.  Mr. Coleman feared the inmate and requested a single cell because he felt that he was in danger, but no action was taken.  Being confined for 24 hours a day with another person in such a tiny cell exaggerated the dire conditions of extreme isolation because there was constant tension with and fear of his cellmate.  In general population, social workers could be used to help resolve problems.

84.     While in F-House segregation for eight months, Mr. Coleman was confined to his cell approximately 24 hours a day.  He was forced to eat all of his meals in his cockroach-infested cell.  Mr. Coleman's F-House cells were extremely small, making it very difficult to take a single step in the small space between the wall and the bed.  The toilet was right against the bunk bed and toilets ran on timers every ten minutes or more.  Solid plexiglass covered the bars on the cell, making it extremely difficult to speak and be heard outside of the cell, as well as exaggerating the smell the toilet caused inside the cell.  This is very different than general population, where conversations are easy because there is no plexiglass.  Mr. Coleman was given one soiled or torn sheet in F-House segregation or a blanket, but not always both, whereas he was given two sheets and a blanket in general population.

85.     Confined to a wheelchair due to a stroke that occurred before he was placed in segregation, Mr. Coleman suffers from limited mobility, weakness in his legs, and balance issues, among other things.  Mr. Coleman also has a stoma and colostomy bag.  Yet, while in extreme isolation in F-House, Mr. Coleman was routinely denied use of a wheelchair, which was the only way he could often physically get to the shower.  Once there, the officers forced Mr. Coleman to clean the showers before and after using them.  This was difficult and dangerous because of Mr. Coleman's physical condition and led to painful falls.

86.     Mr. Coleman's access to many of the basic things he ordinarily would have had in general population was extremely limited or nonexistent while in F-House segregation.  For example, Mr. Coleman was not allowed phone calls.  Yard time was also reduced from three days a week in general population to one day a week in segregation.  Even with that, Mr. Coleman was unable to access the yard, in part because he was denied a wheelchair and in part because in general population, other inmates would help him walk to the yard but in extreme isolation he was alone, without any help.  Unlike in general population, Mr. Coleman had little or no access to religious programs, gymnasium, or his psychologist or social worker.  While in F-House segregation, he was only able to see his social worker approximately two times because the trip required access to his wheelchair, which he was often denied.  Mr. Coleman's visitations in extreme isolation were significantly decreased as compared to general population.  His arms would be chained to his waist, with a chain connected to his back to lead him like an animal, and he would be chained to the floor.  Visitations in extreme isolation were through a thick glass wall, making communication extremely difficult, if not impossible.  No physical contact with visitors was permitted or possible, unlike in general population.  In general population, Mr. Coleman could sit in the same room as the visitor, without any glass dividers, and Mr. Coleman and the visitor would be able to briefly touch, such as a short hug before leaving.

87.     On one occasion, after Mr. Coleman had gone weeks without showering due to being denied use of a wheelchair, Mr. Coleman finally became so physically uncomfortable with the acid around his stoma that he got himself to the shower where he ultimately fell in the shower and hit his head and back.  He laid on the floor in pain for approximately an hour and a half while the officers and health care workers joked and laughed at him.  The officers eventually dragged Mr. Coleman out of the shower and took him to the medical unit, where a nurse at first

refused to treat him.  Eventually, Mr. Coleman returned to his cell in terrible pain, and after his cellmate called for help, he was finally given pain relievers.  To date, Mr. Coleman has not received adequate medical attention despite still suffering from pain from the fall.

88.    As mentioned above, Mr. Coleman received two disciplinary tickets while in F-House, which extended his original six-month segregation sentence to eight months.  One of the tickets occurred after Mr. Coleman's slip and fall in the shower when he was taken to the HCU.  There, he was writhing in pain and having muscle spasms when a nurse handed him a pitcher that he was not able to hold.  He told the nurse that he could not hold the pitcher, but the nurse refused to help him.  As he was on his way out of the room, Mr. Coleman's back had a spasm and he dropped the pitcher in the opposite direction of the nurse.  However, the nurse claimed that Mr. Coleman threw the pitcher at him and Mr. Coleman received a disciplinary ticket sentencing him to an additional month in segregation.  Mr. Coleman received a "hearing" in his HCU cell, where he was placed after the injury.  At that time he was found guilty, even though he pleaded not guilty and provided an explanation.  He was not able to question the nurse involved in the incident.

89.    The second disciplinary ticket, for health and sanitation, occurred when Mr. Coleman attempted to dispose of his colostomy bag during the period of time when he was not able to make it to the shower after being denied use of a wheelchair.  He placed the bag outside of his cell where the porter indicated that he would pick it up.  Unfortunately, the porter did not do so before an officer returned and gave Mr. Coleman a disciplinary ticket resulting in an additional month in segregation.  Mr. Coleman had a brief "hearing" at his F-House cell.  Mr. Coleman pled not guilty but was found guilty anyway.

90.     Mr. Coleman has filed at least 15 grievances since 2012 complaining of the conditions in extreme isolation and the poor treatment he received from the officers in segregation.  For all 15 of the grievances, Mr. Coleman possesses documentation of denials by the Administrative Review Board ("ARB"), demonstrating that Mr. Coleman exhausted his remedies by appealing the denials as far as he could.  Nearly all decisions by the ARB stated that the issues were resolved or could not be resolved by the ARB.  Each decision was issued many months after the initial grievance and one decision came over 16 months after Mr. Coleman had filed the grievance.

91.     On August 1, 2013, Mr. Coleman filed a grievance stating that on that same day he had been told by an officer that he could not take a shower unless he cleaned the shower himself.  The officer also told him that he was not to have a wheelchair.  Although Mr. Coleman explained to the officer that he had a medical permit for the wheelchair to go to the shower, the officer denied him its use.  It also stated that Mr. Coleman needed to clean his stoma, but was afraid to do so for fear of angering his cellmate.  Mr. Coleman, therefore, requested a single cell. Finally, Mr. Coleman requested that the officers be held accountable for their actions.

92.     The grievance was denied on October 3, 2013, by the grievance counselor, who stated simply that Mr. Coleman did not have a permit for the wheelchair and that "[t]he showers are cleaned daily."  Mr. Coleman appealed this decision, and on December 18, 2014 (more than 16 months after Mr. Coleman filed the grievance), the ARB responded.  The ARB found that Mr. Coleman's grievance had been appropriately addressed by the grievance counselor.  Neither decision addressed the behavior by the officers.

93.     On August 21, 2013, Mr. Coleman filed a grievance alleging that on August 14, 2013, while he was trying to clean the shower in "F House" segregation, he slipped, hitting his

head and injuring his back.  Mr. Coleman had been told by the officers that if he did not clean the showers, he would not be allowed to take one.  Mr. Coleman had gone two weeks without taking a shower, but finally needed to clean his stoma and was forced to use the shower.  Lt. Bell, one of the officers in charge of the segregation unit, accused him of falling to get out of cleaning the shower.  Nurses made snide remarks and laughed and joked about Mr. Coleman's misfortune.  Mr. Coleman lay on the shower floor for what felt like an hour before the officers finally took him to the emergency room.  When they did so, the officers slammed Mr. Coleman to a gurney and roughly handcuffed him to it.  Mr. Coleman requested simply that a full investigation into the incident be done, that the officers responsible (including Lt. Bell) be punished, that he be compensated for his injuries, and that he be free from reprisals.  This grievance does not appear to have even been addressed by the counselor.

94.     The next day, Mr. Coleman filed a grievance alleging that on July 25, 2013, he had asked an F-House officer to allow him the use of his wheelchair so that he could make it to the shower.  The officer's response was "you can walk!"  Mr. Coleman requested merely to know who had made the decision that he was not to have a wheelchair.  The grievance counselor denied this grievance, stating that per the Health Care Unit ("HCU"), Mr. Coleman was not to have a wheelchair and that "[o]ffender is able to walk."  The same day, Mr. Coleman filed an additional grievance alleging disrespectful and threatening behavior by a nurse and requested a verbal apology.  This grievance does not appear to have even been addressed by the counselor or the ARB.

95.     On August 23, 2013, Mr. Coleman filed a grievance alleging that he stopped two officers and asked about getting a wheelchair.  One officer said that he was still looking for a wheelchair.  Mr. Coleman asked that they simply call HCU and ask for one, and the officers

responded rudely and walked away.  Mr. Coleman requested that the officers be trained in dealing with patients in line with the Americans with Disabilities Act.  The grievance counselor found that Mr. Coleman should not be issued a wheelchair.

96.     On August 30, 2013, Mr. Coleman filed a grievance stating that the day before, he had informed an officer that he wanted his medical shower and would like a wheelchair to make it to the shower.  The officer informed Mr. Coleman that he could walk.  Mr. Coleman detailed in the grievance that he was in pain and suffered from headaches, dizziness, and weakness in his legs such that he was unable to stand for more than a couple of minutes.  Mr. Coleman simply requested that a wheelchair be provided to allow him to make it to the shower.  The grievance counselor responded that Mr. Coleman was not assigned to a wheelchair.

97.     On December 18, 2014 (again about 16 months after the grievances were filed), the ARB issued a response to Mr. Coleman's appeals of the denials of his grievances from: August 22, 2013 (it is unclear whether this denial also addresses Mr. Coleman's August 21 grievance, which was filed together with the August 22 grievance); August 23, 2013; August 30, 2013; and September 27, 2013.  The response denied all four of Mr. Coleman's grievances, simply stating that Mr. Coleman's "grievance was appropriately addressed by HCU staff."

98.     On August 27, 2013, Mr. Coleman filed a grievance alleging that the segregation nurse had denied him the use of his quad cane, advising him that he could use a crutch instead. Mr. Coleman responded that he would be unable to use the crutch and advised the nurse that he had been prescribed the quad cane and issued a permit to use it.  The grievance counselor's response is dated October 8, 2013.  The counselor stated that this was a duplicate grievance and that the HCU had not authorized Mr. Coleman to have the quad cane.  On the side of the grievance, a note is written in what does not appear to be Mr. Coleman's handwriting.  The note

says "ST RECEIVED 03-01-14" (likely "FIRST RECEIVED 03-01-14" if not for a copying error).  On August 21, 2014, the ARB denied Mr. Coleman's appeal, stating that the grievance was "[n]ot submitted in the timeframe outlined in Department Rule 504; therefore, this issue will not be addressed further."  The response also stated that the ARB had previously addressed the issue.  This response was unfair to Mr. Coleman, considering that he filed the grievance the same day as the incident, and that the ARB appears to have received his grievance many months after it was filed, through no fault of Mr. Coleman.

99.     On September 27, 2013, Mr. Coleman filed a grievance stating that the officers ignored his medical pass to see the doctor.  Mr. Coleman also requested and was denied the use of a wheelchair to get to the shower.  At one time, Mr. Coleman had been able to hobble to the shower by clutching the railing, but was no longer able to do that since his fall when he was forced to clean the shower.  Mr. Coleman requested that he be provided access to the doctor when he had a pass, as well as use of a wheelchair to get to the shower.  The grievance counselor responded that "[n]o Stateville employee, security or non-security, can simply choose to cancel or ignore a medical pass."  The counselor also noted that the wheelchair request was a duplicated grievance and that Mr. Coleman did not have a permit for a wheelchair.  On December 14, 2014, the ARB responded to the grievance, saying that it was denied "in accordance with AD05.03.103A (Monetary Compensation for Inmate Assignments)," which is curious because Mr. Coleman did not request the relief of monetary compensation.  The response also noted that it "was verified offender was seen by Dr. Obaisi on 11/13/13 moot issue."  To sum up, the prison's response to officers denying Mr. Coleman access to medical treatment for which he had a pass was to inform him that Stateville employees cannot choose to ignore the pass and to declare the issue moot because he was able to see a doctor more than 45 days later.

35

100.    On October 26, 2013, Mr. Coleman filed a grievance alleging that he had asked an officer for a medical shower and had not received one.  The officers told him that he was being denied showers because he threw feces all over the shower.  Mr. Coleman suffers from a medical disorder necessitating the use of a colostomy bag.  His options for cleaning the bag (necessary to prevent infection) were to clean it in the shower or in his cell.  Doing so in his cell would anger his cellmate and result in unsanitary living conditions for both parties.  Yet the officers refused Mr. Coleman the use of the shower because he cleaned his bag there.  The grievance counselor responded to this grievance by stating that this was a "re-occuring (sic) theme in each grievance" and that a "copy is being sent to the HCU (again) for review and response."  The counselor stated that Mr. Coleman would get a response when the HCU responded.  On September 18, 2014, the grievance was denied by the ARB because it was "appropriately addressed by the grievance officer."  It is unclear what, if anything, the grievance officer did to address the grievance, as Mr. Coleman continued to have problems with access to the showers during his time in segregation.

101.    On December 18, 2013, Mr. Coleman filed a grievance alleging that he had requested a medical shower and did not receive it.  Mr. Coleman stated that he normally would have reminded Lt. Sullivan, but the last time he had done so, Lt. Sullivan had told him that he did not need to ask and that he would get his showers.  Mr. Coleman was afraid to ask again due to fear of reprisal.  For relief, Mr. Coleman requested that he be transferred to the HCU.  The grievance officer responded that every effort is made to ensure that offenders with special permits get their needs met but that "offender should remind staff early of scheduled movement."  The response did not address the fact that Mr. Coleman feared reprisal from the officers for doing what the counselor suggested to remedy the situation.  On December 18, 2014, the ARB

found that the grievance was properly addressed by the counselor and that cell assignment in the HCU is at the discretion of medical staff.

102.    On December 12, 2013, Mr. Coleman filed a grievance alleging that there was no heat in his segregation cell, causing it to be freezing cold.   The cold was such that ice accumulated on the cell windows.   The toilet seat froze; it was too cold to wash.   Mr. Coleman stated that this had been an issue since October.    When Mr. Coleman and his cellmate complained, they were told that the heat was on a timer.   On January 10, 2014, nearly a month later, the grievance counselor responded that a work order was submitted on the issue.

103.    On May 15, 2014, Mr. Coleman filed a grievance alleging that his personal property had been stolen while he was in segregation, including money from his commissary fund.   Mr. Coleman attached grievances from July 2013, while he was in segregation, requesting to be assured that his personal property was not taken because the proper procedures had not been filed in logging his property.    The grievance counselor responded that inmates receive copies of receipts of their commissary fund purchases and that the other property issues raised were untimely.   On September 30, 2014, the ARB filed a response denying the appeals of the grievances because they were not submitted within the proper timeframe.   This decision seems to have been directed at the July 2013 grievances that Mr. Coleman submitted as exhibits to his May grievance, and does not address the stolen or misplaced property.

104.    On June 8, 2014, Mr. Coleman filed a grievance alleging that he had underwent the colectomy in 2009 because prison doctor Dr. Singer had told him that it would be reversed after three to six months.   It had been over five years, and the doctors had refused to reverse the procedure and remove the colostomy bag.   Mr. Coleman requested that the prison doctors reverse the procedure due to the mental and physical pain he was suffering because of it.   Mr. Coleman

attached the August 21 grievance detailing the fall he had experienced in the shower that came about as a result of the officers' treatment of him because of the colostomy bag.  The grievance counselor did not appear to respond to this grievance.  On September 23, 2014, the ARB denied the grievance as untimely.  The denial seemed to stem from the fact that Mr. Coleman had attached the earlier grievance, which had been meant merely as an exhibit to further explain his complaint.  The ARB decision did not address Mr. Coleman's medical issues.

105.    Mr. Coleman has stated that his time in segregation made his anger problems worse.  Actions by the officers such as refusing to bring his wheelchair so that he can get to the shower have psychologically scarred and frightened Mr. Coleman.  He cannot trust the staff to keep him safe.  Mr. Coleman felt that he was doing better emotionally and psychologically before he suffered through segregation, but that things have since been much worse.  As a result of Mr. Coleman's time in extreme isolation, his depression has deepened.  Mr. Coleman now meets with a psychologist to deal with anger issues which have been exacerbated by his time in segregation.

### Aaron Fillmore

106.    Mr. Fillmore is 41 years old and is currently incarcerated at Lawrence.  He was initially incarcerated in June 1994 and is currently serving an 80-year sentence for murder, aggravated discharge of a firearm, and armed violence.

107.    During the past 17 years of his incarceration, Mr. Fillmore has continuously been either in Disciplinary Segregation, Administrative Detention, or Investigative Status, all of which are ultimately extreme isolation.

108.    In extreme isolation, Mr. Fillmore has had little to no physical contact with other human beings.  He is locked in a cell by himself at least 23 hours each day and has suffered both mentally and physically as a result.

109.    Mr. Fillmore was originally placed in extreme isolation 17 years ago when he was transferred from Stateville Correctional Center to Tamms Correctional Center ("Tamms") after an incident in which he and another prisoner were alleged to have non-fatally injured a guard. Although Mr. Fillmore pled guilty and received an additional sentence as a result, he also received indeterminate Disciplinary Segregation at that time.   After spending approximately five years in Disciplinary Segregation, Mr. Fillmore was immediately transferred to Administrative Detention.

110.    Despite an almost spotless disciplinary record since that alleged incident 17 years ago for which Mr. Fillmore has already been punished, he has continuously remained in extreme isolation with no hope of being placed back in the general population.

111.    Mr. Fillmore was eventually transferred to Lawrence after Tamms was closed. Notwithstanding this closure, Mr. Fillmore describes the conditions in extreme isolation at Lawrence as *worse* than those at Tamms.

112.    In extreme isolation at Lawrence, Mr. Fillmore is locked in a tiny, dirty cell for almost 24 hours a day.  No larger than two or three steps long and one and a half to two steps wide, Mr. Fillmore's cell barely gives him enough room to pace back and forth.  His toilet, sink, and bed are all located within inches of one another.  There is little to no access to natural light. A metal box covers the one and only window to his cell.  A large amount of bird feces prevents Mr. Fillmore from opening his window and allowing for air circulation.  The front of his cell is a solid steel door with a "chuck hole," which is locked closed except when unlocked by

correctional staff to serve food, and a small perforated slot made of Plexiglas approximately three inches wide and one foot long through which Mr. Fillmore can speak to correctional staff only when they come to his cell-front. The constant noise in his wing requires him to scream whenever he desires to communicate with his neighboring inmates.

113.    Mr. Fillmore is currently housed on C-wing at Lawrence. C-wing also houses mentally ill inmates who are in "crisis cells" and under 10-, 15-, or 30-minute suicide watch. These inmates often throw feces, urine, and spoiled food or milk, causing the entire wing to have a putrid smell. As a result, Mr. Fillmore suffers from severe headaches, loss of appetite, and dizziness. The mentally ill inmates on the C-wing also constantly yell, scream, and bang on their cell doors. Often times, Mr. Fillmore is unable to sleep because of the relentless noise. He suffers from loss of sleep and concentration.

114.    Mr. Fillmore leaves his cell on rare occasions: for meetings with his attorneys, an annual tuberculosis vaccination, and a weekly ten-minute shower. His shower is on a timer and he is not allowed to control the temperature of the water. When he is taken out of his cell, his hands are handcuffed and shackled to his waist. His feet are also shackled.

115.    Unlike general population, Mr. Fillmore eats his daily meals in his cramped cell. His food is delivered to him through the "chuck hole" in the solid steel door at the front of his cell.

116.    Mr. Fillmore's visits and phone calls are also drastically curtailed as compared to general population. In Disciplinary Segregation, he is only allowed two "no contact" visits per month, which requires him to be handcuffed and shackled to the floor. He cannot physically touch his visitors and must converse with them behind a glass partition. While in Disciplinary Segregation, he is not allowed to make any phone calls. While in Administrative Detention, he

is only allowed a maximum of one phone call per week for a maximum of thirty (30) minutes. This is in stark contrast to the unlimited phone calls for unlimited periods of time allowed in general population.

117.     Mr. Fillmore is frequently denied the minimum five hours of exercise afforded to inmates in general population and typically is only allowed an hour or two of yard time each week.  Whether in Disciplinary Segregation or Administrative Detention, Mr. Fillmore's "yard" is drastically different than that of general population.  It is a barren, single "dog cage" with a concrete floor, no exercise equipment, and no games or activities of any kind.  It measures approximately four steps wide and 15 steps long.  It is an empty space where Mr. Fillmore and the other inmates are forced to pace the short length of the single cage.

118.     During his many years in extreme isolation, Mr. Fillmore has had absolutely no access to any of IDOC's programming, including educational programs.  In fact, Mr. Fillmore has been denied books, catalogs, newspapers, and other materials from the library.  He has even been denied access to the law library.  In addition, Mr. Fillmore has been denied his other personal property, including legal materials and gloves in winter, even while in Administrative Detention.  His mail is frequently and consistently delayed by many weeks.

119.     Mr. Fillmore experiences depression, anxiety, fatigue, and nausea as a result of his many years of extreme isolation.  Despite his repeated requests, both oral and written, for mental health exams, screenings, and treatment, Mr. Fillmore has been denied access to mental health programs and services.  IDOC staff has informed Mr. Fillmore that there are no mental health treatment protocols for inmates in long-term Disciplinary Segregation or Administrative Detention.  Mr. Fillmore even witnessed an incident of another inmate in extreme isolation committing suicide.

120.    Furthermore, inmates in extreme isolation are routinely double-celled, often with mentally ill inmates.   While at Lawrence, Mr. Fillmore was forced to have a cellmate for approximately three months.   Having a cellmate caused Mr. Fillmore increased anxiety, panic attacks, and stress, essentially adding to and aggravating his mental health issues.   He recently reported in a grievance that the double-celling of inmates in Administrative Detention threatens his mental health because he has spent so much time in extreme isolation and lacks the necessary social skills to be in a confined space with someone for long periods of time.   Mr. Fillmore further reported that double-celling would cause irreparable harm to his mental state.   Mr. Fillmore stated that "due to long-term isolation, I suffer from serious mental health issues which are not being treated due to prison officials' deliberate indifference to my mental state."   IDOC did not conduct any screening or evaluation before Mr. Fillmore's double-celling assignment and it was done without regard to each inmate's physical and mental health.

121.    There are no religious programs in extreme isolation and the chaplain does not visit inmates in extreme isolation.   Mr. Fillmore has only seen the chaplain once at Lawrence in order to receive a copy of his kosher diet contract.   Mr. Fillmore has requested religious materials from the chaplain, but did not receive them.

122.    Mr. Fillmore has also suffered physically as a result of many years in extreme isolation.   His concentration and memory have been affected.   He also has suffered great weight loss, a loss of appetite, and a decrease in muscle mass.   He states that "there's nothing to do … [i]t's just hopelessness in an empty cell, 24 hours a day."

123.    Mr. Fillmore has filed at least 25 grievances since he was placed in segregation. Many of those grievances seek relief from his continuous placement in extreme isolation, as well as the deplorable conditions of extreme isolation and lack of due process afforded to him.   At

least five of the grievances have been denied by the ARB, demonstrating that Mr. Fillmore exhausted his remedies by appealing the denials as far as he could.  At least ten of Mr. Fillmore's grievances that were properly and timely submitted never received a response from the ARB. Mr. Fillmore wrote a letter to the ARB on January 11, 2015, about the grievances that have not been answered.  The ARB's lack of response to those grievances has denied Mr. Fillmore the ability to exhaust them.  Mr. Fillmore did all he could to appeal those grievances as far as he could despite the lack of response from the ARB.

124.    Mr. Fillmore describes the process afforded to him throughout his incarceration as "sham hearings" and "useless."  He is not allowed to present evidence or call his own witnesses. He is not told why he is being held in extreme isolation, what allegations were made against him or how he can rejoin general population.

125.    On July 27, 2007, Mr. Fillmore filed a grievance stating that the disciplinary report accusing him of having contraband was fabricated, that at the hearing his evidence was denied admittance, that the grievance officer did not review any evidence, and that his witnesses were not called—thus he was denied due process.  On November 11, 2007, he received a response from the ARB that his grievance would be addressed without a hearing.  The ARB confirmed the offenses and denied the grievance.

126.    On June 12, 2013, Mr. Fillmore filed a grievance requesting that a disciplinary report, which resulted in more time in extreme isolation, be expunged, reheard by the committee, and exonerating evidence be reviewed.  On June 10, 2014, Mr. Fillmore received a response from the ARB denying his grievance, finding no violation of due process and stating it was reasonably satisfied that Mr. Fillmore committed the offense in the report.

127.    On July 7, 2013, Mr. Fillmore filed a grievance about his transfer from Tamms to Pontiac on Administrative Detention status and without any review of his Administrative Detention and with no opportunity to defend against his continuous stay in Administrative Detention.  On June 25, 2014, Mr. Fillmore received a response from the ARB denying his grievance and stating that the issue was addressed by the facility.

128.    On November 12, 2013, Mr. Fillmore filed a grievance because he was transferred from Pontiac to Lawrence in Administrative Detention status.  He received no information as to why he was being transferred and did not receive a hearing.  Mr. Fillmore's Administrative Detention status was also not being reviewed.  His grievance requested that IDOC provide him with an Administrative Detention hearing and review of his Administrative Detention status, that he be provided a reason for transfer, a rule book, and that he be transferred out of Lawrence and released from Administrative Detention status, or at the very least given all Administrative Detention rights and privileges.  On June 5, 2014, Mr. Fillmore's counselor responded that the IDOC can assign offenders to any institution it wants and all privileges and amenities with its decision are an administrative decisions.  Further, the counselor reported that Mr. Fillmore's Administrative Detention status was reviewed, but he does not have a right to be present during that review.  Mr. Fillmore received a response to this grievance from the ARB on December 8, 2014, denying his grievance and stating that his grievance was appropriately addressed by the facility.

129.    In 2014, Mr. Fillmore was sentenced to yet another 365 days in extreme isolation, despite an almost spotless disciplinary record in recent years.  The reason was for alleged gang activity based on a series of telephone calls he allegedly made and from letters he allegedly wrote.  The IDOC claimed these messages and calls contained coded gang instructions.  Despite

Mr. Fillmore's requests for the IDOC to review his phone records to show that he did not make the calls on the dates alleged, the IDOC has refused to produce that information.  The IDOC has likewise refused to produce the letters allegedly containing coded gang messages.  Mr. Fillmore pled not guilty to the charge of gang activity and without being afforded an opportunity to review any phone records or alleged letters, the IDOC sentenced him to one year in Disciplinary Segregation.

130.   On November 3, 2015, Mr. Fillmore was notified that he would be placed back in Administrative Detention after the completion of his Disciplinary Segregation sentence.  On December 1, 2015, IDOC claimed to conduct a "review" of Mr. Fillmore's placement in Administrative Detention.  Mr. Fillmore was not allowed to attend that review.  He was not allowed to present any evidence or defend against his continued placement in extreme isolation. On December 7, 2015, Mr. Fillmore received a memorandum informing him that he would be placed in Phase I Administrative Detention indefinitely.

131.   Mr. Fillmore remains in extreme isolation, with no idea or hope as to what he can do to be released or as to when he will be released back into the general population.  As a result of this never-ending extreme isolation, Mr. Fillmore continues to suffer great mental and physical anguish.

### Jerome Jones

132.   Mr. Jones is 39 years old and is currently incarcerated at Menard.  He was originally incarcerated in 1993 and is currently serving a 70-plus-year sentence for armed robbery, murder, home invasion, felon in possession of a weapon, and aggravated battery. Notably, Mr. Jones has had no disciplinary tickets since 2001 and has had committed no violations involving violence since 1996.

133.    On July 25, 2013, Mr. Jones was removed from general population at Stateville for reasons unknown to him at the time, and placed in Administrative Detention.  Mr. Jones was subsequently transferred to Lawrence from Stateville in August 2013.

134.    On August 1, 2013, Mr. Jones filed a grievance after being removed from general population at Stateville.  In his grievance, Mr. Jones noted that he was not informed as to why he was placed in Administrative Detention and removed from general population.  Rather, Mr. Jones was simply told by a gallery officer that he was going to Administrative Detention and to pack his property.  He asked multiple IDOC staff why he was being placed in Administrative Detention, but they all responded that they didn't know.  The warden at Stateville even refused to notify Mr. Jones of the reason for his transfer.  Instead, he responded to Mr. Jones's inquiries, "You know why."

135.    On February 13, 2014, nearly seven months after his transfer, Marc Hodge, the Warden at Lawrence, wrote a memorandum to Mr. Jones that he was being moved to a lower phase of Administrative Detention based on a review of February 5, 2014.  No further details were provided and Mr. Jones still didn't know the reason for his initial placement in Administrative Detention.  It was not until a couple of months later that Mr. Jones was informed during a face-to-face review that he was put in Administrative Detention due to his active involvement in a gang or STG.  Specifically, Mr. Jones was accused of being a member of Gangster Disciples.

136.    Mr. Jones denied any association with a gang during his time at Stateville or during his time in Lawrence, but has never been given a meaningful opportunity to review the evidence against him or present any evidence in his defense.  Mr. Jones is currently not a member of any gangs or organizations which promote violence.  He was previously a member of

Gangster Disciples but formally "retired" in 2009, almost four years before he was removed from general population.  Around this time, IDOC allowed Mr. Jones to hold a job position in the kitchen.  He was also on the waiting list for other positions including working in the commissary, the clothing room, and the industries.

137.    The August 1, 2013 grievance was finally addressed without a formal hearing by the Administrative Review Board on March 3, 2014.  Without addressing why he was placed in extreme isolation or his decreased access to inmate privileges in extreme isolation, the Administrative Review Board merely ruled that he was permitted personal property "as approved by the CAO while in administrative detention."

138.    Despite being told that his placement in Administrative Detention was "non-disciplinary," Mr. Jones has had almost all of the rights and privileges afforded to inmates in general population taken away.  He was confined to a small, dark cell almost 24 hours per day.  The toilet in his cell was on a timer and could only be flushed in 15-minute intervals.  The window to his cell was covered by a steel shield.  Further, Mr. Jones was completely isolated from general population and was only allowed to eat meals in his cell.  Mr. Jones received his three daily meals at 3:00 a.m., 9:00 a.m. and 4:00 p.m. respectively.  The portion sizes of these meals were much smaller than those served in general population.

139.    Mr. Jones was only permitted "no contact," pre-approved two-hour visits "as security measures allow" in Administrative Detention.  During these visits, Mr. Jones was required to be shackled and chained to the floor.  He could not physically touch his visitors and had to speak to them through a glass partition.  Mr. Jones often told his family not to visit because he didn't want to visit them under those degrading conditions.  In contrast, general

population is generally allowed around six visits per month.  They can hug, touch, eat, and play games with their visitors.  General population visits are unlimited in time.

140.    Mr. Jones's phone privileges were also greatly decreased.    In Phase I Administrative Detention, Mr. Jones was only allowed one 30-minute phone call per month.  In Phase III, Mr. Jones was allowed one 30-minute phone call per week.  In contrast, general population is allowed unlimited phone calls for unlimited periods of time.

141.    While in Administrative Detention, Mr. Jones did not receive his full six hours of exercise per week.  He was allowed out in the "yard" approximately three times a week.  Unlike general population, however, the "yard" in Administrative Detention is a fenced-in concrete slab.  There was no access to a phone, basketball, or weights.  There was also no track on which to run.

142.    In 2014, Mr. Jones was forced to be double-celled.  Mr. Jones initially refused to be placed in a cell with another inmate because he feared for his safety.  After receiving a disciplinary ticket for his refusal, Mr. Jones complied with the double-cell assignment.  As a result, his disciplinary ticket was expunged.  He shared a tiny cell with another inmate for nearly a year.  During that time, Mr. Jones experienced increased stress and feelings of anger.  Mr. Jones did not consider his cellmate to be his peer and their conversations were not meaningful to him.  The toilet being on a timer often created issues between Mr. Jones and his cellmate.

143.    While Mr. Jones is Muslim and is an active member of the Moorish Science Temple of Americas, he was not allowed to attend religious services while in Administrative Detention.  He was also denied religious materials.  In general population, Mr. Jones attended religious services every Friday for two hours.  He also promoted a peaceful, nonviolent culture in prison.  He talked to other inmates about staying away from gangs and encouraged them to seek

more positive outlets.  Since he was isolated from the general population, Mr. Jones was unable to continue these efforts while in Administrative Detention.

144.    Mr. Jones was denied access to both the general and law libraries during his time in Administrative Detention.  For a period of time, his only access to the law library was to submit formal requests for the exact materials that he was looking for.  In addition, Mr. Jones was occasionally denied access to his personal property, including his clothing, Walkman, and television.

145.    Mr. Jones suffered from depression during his time in Administrative Detention due to his isolation from general population and lack of meaningful social contact, including participation in IDOC's various programming and classes.  Mr. Jones also suffered physically as a result of his isolation, increased stress, and lack of physical activity.  He has lost weight and has developed allergies.

146.    On October 20, 2015, Mr. Jones was informed that "[b]ased on an accelerated review conducted on 10/15/15, [he] will be released from Administrative Detention status."  No further explanation of IDOC's decision to release him from over two years of extreme isolation was given.

147.    On February 3, 2016, nearly four months after receiving an "accelerated review," Mr. Jones was released from Administrative Detention and transferred to general population at Menard.

148.    Despite an almost spotless disciplinary record for almost 20 years, Mr. Jones fears that he will again be arbitrarily placed in extreme isolation.

*DeShawn Gardner*

149.    Mr. Gardner is 44 years old and is currently incarcerated and in extreme isolation

49

at Lawrence.  He is currently serving an 85-year sentence for murder.

150.    Upon information and belief, Mr. Gardner is currently housed in Phase III Administrative Detention at Lawrence.

151.    From on or around January 27, 2006, to January 12, 2012, Mr. Gardner was housed at the Tamms.  He filed a grievance stating that his placement in Tamms was unjust and without cause.   He appealed the final decision of the Chief of Operations approving his placement at Tamms.

152.    Joseph Rose, Acting Chief Legal Counsel and designee for the Director, wrote to Mr. Gardner regarding his appeal on December 23, 2011.  He concluded that Mr. Gardner should be placed outside of Tamms.  From Tamms, he was eventually transferred to Menard.

153.    On or around May 8, 2013, Mr. Gardner got into a fist fight with another inmate at Menard.  He was sentenced to three months of Disciplinary Segregation, which he served at Pontiac.

154.    On or around September 13, 2013, Mr. Gardner was transferred to Stateville.  The facility was on level-1 lockdown when he arrived.  The lockdown lasted until on or around October 2013.

155.    On or around November 19, 2013, Mr. Gardner was placed in extreme isolation pending an investigation at Stateville.  He did not receive a disciplinary ticket at that time.  The investigative report only states "nature" as a reason for being placed in Investigative Status.

156.    Mr. Gardner never received an interview regarding his placement in Investigative Status, which is required within 14 days of placement.

157.    Mr. Gardner did not receive a meaningful opportunity to refute the "nature" charges made against him in the report.  In fact, Mr. Gardner never learned the reasons for his

placement in Investigative Status.

158.    On or around December 17, 2013, Mr. Gardner was told by a correctional officer that he was being transferred to Lawrence, 26 days after he received the investigative report.

159.    That same day, Mr. Gardner was transferred to Lawrence and placed in Administrative Detention without explanation.  He has been in Administrative Detention ever since his transfer to Lawrence.

160.    Mr. Gardner has progressed from Phase I to Phase III Administrative Detention twice while at Lawrence.  Phases I and II have significantly less privileges, access to yard, and visitations than Phase III, which is described in further detail below.

161.    Mr. Gardner was moved from Phase III Administrative Detention to Disciplinary Segregation for 30 days on or around September 28, 2014, for refusing to be double celled.

162.    Mr. Gardner did not want to have a cellmate in the cramped and miserable conditions of Administrative Detention because it would only make conditions worse.

163.    After being released from Disciplinary Segregation on or around October 28, 2014, Mr. Gardner was placed back in Phase I Administrative Detention .

164.    While in Phase III Administrative Detention, Mr. Gardner has had no access to IDOC's rehabilitative programs and has very little time outside of his cell.  He has had no access to educational programs, the law library, or religious services.  He feels extremely isolated in these conditions.

165.    When Mr. Gardner leaves his cell, his hands must be handcuffed behind his back or to a chain on his waist with shackles on his feet.  In general population, Mr. Gardner was able to move his limbs freely.

166.    In general population, Mr. Gardner was permitted to freely use the phone, but

now he is restricted to only three to four phone calls a month.

167.    Mr. Gardner's mail access is also restricted.  While in general population, he was able to obtain his mail without any delay or hassle from the correctional officers.

168.    In his small, cramped cell, Mr. Gardner's toilet flushes at 15-minute intervals, meaning he is unable to dispose of feces in a timely manner.  In general population, he had no restrictions on toilet flushing.

169.    The cells in the Administrative Detention wing are nearby or across from cells housing mentally ill inmates.  The mentally ill inmates constantly holler and scream and throw feces on the walls.  The smell is nauseating and the feces attract more bugs.

170.    Mr. Gardner misses having meaningful conversations and interactions with other inmates, which he enjoyed from the programming that was available to him in general population in other correctional facilities.

171.    He is Hebrew Israelite and is unable to practice his religion with others.

172.    While Mr. Gardner is permitted recreation time outside for two hours, three times a week it is in a cage with no activities.  The cage reeks of urine and spit.

173.    Mr. Gardner suffers great mental and emotional anguish because of his lack of access to rehabilitative programs and physical contact with his family members.  He wants to make himself a better person, but is denied these programs and feels extremely isolated.

174.    Mr. Gardner is only permitted to take meals in his cell.  His meal portions are smaller than the portions in general population, which makes him feel less nourished and more isolated.

175.    He is allowed four visitations a month, but they are behind glass and his hands are in chains.  He is no longer able to hold his six grandchildren and misses hugging his family

members.  He feels cut off from loved ones.

176.    Mr. Gardner's cell is in deplorable condition.  There is a constant stream of bugs in his cell.  He has to constantly monitor his cells for bugs in order to keep them from biting him or running into his food.

177.    He does not want to be double-celled while in Administrative Detention because it would cause extreme mental suffering to be in such a small cell with another inmate without an opportunity to leave the cell.  It would also cause more fights because they do not have an opportunity to cool down if a conflict arises.

178.    On or around January 15, 2014, while at Lawrence, Mr. Gardner filed a grievance relating to his initial and continued placement in Administrative Detention at Stateville.  Mr. Gardner specifically requested to be transferred back to general population.

179.    On June 2, 2014, six to seven months after his initial placement in Administrative Detention, Mr. Gardner received a hearing.  At the hearing, IDOC stated that he was placed in detention because of his role within the Black Disciples Security Threat Group.  There was no opportunity to be present.  Mr. Gardner has never been a part of the Black Disciples Security Threat Group.

180.    The Administrative Review Board denied Mr. Gardner's grievance relating to his placement in Administrative Detention on or around July 31, 2014.  The denial states that he was "placed in Administration Detention . . . privileges/pp limited transfer to Law."

181.    While Mr. Gardner has been provided with follow-up reviews, the IDOC continues to keep him in Administrative Detention and has added unrelated new charges.  The latest review from April 2016 states that he is active in the Black Disciples Security Threat Group within IDOC and has received disciplinary reports in the past, for which he has already

served time in Disciplinary Segregation.  These additional reasons were not listed on his first reviews in 2013.

### *Percell Dansberry*

182.    Mr. Dansberry is 48 years old and is currently incarcerated at Menard.  He is currently serving a 65-year sentence for murder and armed robbery.

183.    In or around August 2013, Mr. Dansberry was sentenced to three months of Disciplinary Segregation at Pontiac for his alleged membership in an STG.  Specifically, he was accused of being a member of the Maniac Latin Disciples after IDOC allegedly spoke with a confidential informant who identified Mr. Dansberry as a member.  Mr. Dansberry sent a grievance to the ARB contesting his alleged STG membership and IDOC's failure to verify the reliability of the informant but the grievance disappeared.  Of note, Mr. Dansberry has not been a member of the gang since on or around 2004.  Mr. Dansberry served three months in Disciplinary Segregation without incident.

184.    On December 4, 2013, Mr. Dansberry was transferred to Menard.  Mr. Dansberry believed that he would be returning to general population.  Immediately upon his arrival, however, he was taken to the segregation unit and placed in Phase I Administrative Detention.  Mr. Dansberry remained in Administrative Detention, eventually progressing to Phase III, for almost two years, until November 2015.

185.    Mr. Dansberry did not receive any notice prior to his placement in Administrative Detention.  He was not given notice of the charges made against him or the factual basis giving rise to his placement.  In fact, despite repeated requests, IDOC never provided Mr. Dansberry with a detailed reason for his continued placement in Administrative Detention.

186.    He also never received a meaningful opportunity to refute the charges against him.  Even when an informal hearing was granted in April 2014, almost 5 months after his initial placement, it was inadequate because IDOC continued to withhold the reason(s) for his continued placement in Administrative Detention.  After the hearing, Mr. Dansberry received a memorandum from IDOC merely stating that it was keeping him in Administrative Detention.  It did not contain any further details or reasons for his continued placement.

187.    While in Phase I, Mr. Dansberry was treated the same as if he were still in Disciplinary Segregation.  He even wore the same jumpsuit.  He was only allowed out of his cell to visit a small, barren "yard" once per week for five hours.  The "yard" consisted of a fenced in cage with a concrete ground.  During his time in Phases II and III, Mr. Dansberry was only allowed yard twice a week for two-and-a-half hours.

188.    Mr. Dansberry's cell was dark, cramped, and unsanitary.  He was housed behind a solid steel door with only a chuck hole for food and a small window so the guards could count him during rounds.  Most of the cells in the segregation unit had metal boxes covering the windows.  Mr. Dansberry's window faced the side of the prison and he could only see the brick of the prison wall.

189.    While in Administrative Detention, Mr. Dansberry was only provided one small cup of watered-down disinfectant to clean his cell.  He was not given any other cleaning supplies.  He often saw bugs, cockroaches, and mice in his cell.  The mice were so bad that many of the inmates in Administrative Detention, including Mr. Dansberry, were forced to plug the bottom of their cell doors in an attempt to block the mice from coming into the cells.

190.    The worn-down state of the window in his cell forced Mr. Dansberry to stuff tissue in the cracks in an effort to prevent drafts from coming into his cell during winter.  In the

summer, his cell was very hot and there was very little air circulation.  At one point, his cell became so hot that IDOC was forced to open up the chuck hole to try to circulate the air.  Mr. Dansberry described his cell as a "hot air coffin."

191.    Additionally, the heat in his cell didn't work properly.  In the winter, it was so cold in his cell that he frequently had to wear his coat in order to stay warm.  At one point, IDOC even passed out plastic to cover the windows.  Other times it was so cold that ice accumulated around the inside of his window.  At times, there was no hot water in his cell.

192.    The food portions given to Mr. Dansberry during his time in Administrative Detention were miniscule.  Mr. Dansberry described them as "portions for babies."  He was given potatoes for almost every meal.  The food had no seasoning and was flavorless.  The vegetables that he received were often overcooked and the rice undercooked.

193.    His visits in Administrative Detention were extremely limited in amount, duration, and quality.  He was allowed only two 1-hour visits per month in Phase I, three 2-hour visits per month in Phase II, and five 2-hour visits per month in Phase III.  All of his visits were "no contact."  In contrast, inmates in general population at Menard are allowed contact visits for unlimited amounts of time.  During these visits, general population inmates can use the vending machines and eat with their visitors.

194.    Mr. Dansberry was only permitted one 30-minute phone call per week.  This is in comparison to the unlimited number of calls permitted in general population.

195.    In addition, during Phase I, Mr. Dansberry lost his audio-visual privileges.  He had to wait 60 days before his television and Walkman were returned to him.

196.    While in Disciplinary Segregation and Administrative Detention, Mr. Dansberry could not participate in any educational opportunities, including the G.E.D. program.  He also

was not allowed to participate in any of IDOC's programming, including anger management programs, parenting classes, and communal church services. Access to his legal box was also restricted to once per month. His mail was regularly delayed or lost.

197. A few weeks after his placement in Administrative Detention Mr. Dansberry was assigned a cellmate. At first he refused this assignment because he didn't want to be isolated in a cage with someone else for almost 24 hours a day. He eventually accepted a cellmate due to the correctional officers' scare tactics. Being double-celled caused Mr. Dansberry a great amount of stress. He even got into a few altercations with his cellmate, but he did not make a record of it for fear of further disciplinary retaliation.

198. Overall, Mr. Dansberry has spent *over ten years* in extreme isolation while at Tamms, Pontiac, and Menard. He has suffered both mentally and physically as a result of his time in extreme isolation. Specifically, Mr. Dansberry continues to suffer from memory loss, anger, rage, paranoia and anxiety. He feels as though he has been "scarred" from his experience in extreme isolation. In fact, the conditions that he was forced to endure were so dire that Mr. Dansberry participated in two hunger strikes.

199. During the hunger strikes, IDOC ransacked Mr. Dansberry's cell and shook him down several times. IDOC also wrote him a ticket for unauthorized group activity. He didn't get any yard time and IDOC took his personal property including his personal food, coffee, and other items.

200. On January 15, 2014, and April 14, 2014, Mr. Dansberry submitted grievances complaining of his lack of due process and the deplorable conditions that he suffered during Administrative Detention including, but not limited to, the lack of notice provided to inmates placed in Administrative Detention, the lack of reasonable periodic review of continued

placement in Administrative Detention, the lack of audio-visual privileges, the lack of educational and work programs, unsanitary cell conditions, small food portions, the lack of hot water, and double-celling.

201.    On September 9, 2014, the Administrative Review Board denied both of Mr. Dansberry's grievances.  In its response, it stated that "policies and procedures are in place in accordance to [sic] IDOC Administrative Directives."

### Risk of Ongoing Harm to Named Plaintiffs and the Class

202.    The Plaintiffs and class members are incarcerated in Illinois prison facilities governed by uniform disciplinary policies and customs.  Incarcerated 24 hours a day, Plaintiffs and class members are in nonstop contact with correctional officers charged with broad discretion to enforce a list of approximately 50 vague internal prison disciplinary regulations, the majority of which can be classified as relatively minor offenses.  Plaintiffs and class members may be charged with an infraction, convicted, and sentenced to extreme isolation for any reason, or for no legitimate reason at all.

203.    As a matter of policy and custom, extraordinarily long and severely disproportionate extreme isolation sentences are often imposed on mere misunderstandings between prisoners and correctional officers or for good-faith mistakes in complying with one of IDOC's numerous regulations.  Moreover, prisoners can be, and are, sentenced to extreme isolation for mere hesitation in immediately complying with a correctional officer's order—a risk particularly significant for prisoners with mental health diagnoses, which make it more difficult to comply with correctional officers' demands instantaneously.  Since IDOC's policies and customs permit the contested testimony of a single correctional officer to be sufficient evidence of a disciplinary conviction, prisoners are often at risk of long-term segregated confinement for doing nothing culpable at all.  Once a prisoner is accused by a correctional officer of committing

a disciplinary infraction, it is a near certainty that the prisoner will be convicted, and it is more likely than not that extreme isolation will be imposed as punishment.

204. Moreover, IDOC's policies and customs advocate the imposition of extreme isolation sanctions when the prisoner's disciplinary hearing includes prior misbehavior reports and extreme isolation sentences. Thus, prisoners who have previously spent time in extreme isolation—which constitutes an astounding percentage—are at particular risk of being subjected to further extreme isolation sentences, which are often entirely disproportionate to the underlying misbehavior.

205. Finally, every person in an IDOC prison is at risk of being placed in long-term extreme isolation without being charged with any misconduct at all under either Investigative Status or Administrative Detention status, neither of which require a formal charge or a meaningful hearing.

206. Extreme isolation causes many prisoners to experience serious psychological and neurological harms which result in, among other things, loss of impulse control, depersonalization, and rage. These adverse effects may cause the prisoner to engage in atypical acts that IDOC staff will respond to with additional extreme isolation sanctions. Extreme isolation also causes severe depression and lethargy in many prisoners—effects which may subject prisoners to additional extreme isolation sanctions for failing to promptly obey orders.

207. The substantial and real risk of future extreme isolation sentences for all incarcerated individuals as a result of IDOC's policies and customs is exemplified by the unending and continuous extreme isolation of Mr. Fillmore with no apparent end or *meaningful* review of his status. Further, Mr. Fillmore may face additional time in extreme isolation that he

may be forced to withstand at an officer's discretion for any future misbehavior, no matter how minor.

208.   The IDOC policies and customs outlined in this complaint are uniformly applicable to Plaintiffs and the class, cause ongoing and systemic violations of clearly established rights afforded under the United States Constitution, and put all current and future prisoners at risk of future unjustified extreme isolation and constitutional rights violations.

## CLASS ACTION ALLEGATIONS

209.   Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), Plaintiffs seek to certify a class of all current and future prisoners under the jurisdiction of IDOC to obtain declaratory and injunctive relief.  All class members face a substantial risk of receiving arbitrary, disproportionate, harmful, and unjustified extreme isolation sentences as a result of IDOC's policies and customs in violation of the United States Constitution.

210.   All four of Rule 23(a)'s requirements are satisfied:

a.   *Numerosity*:  Joinder of all class members is impracticable because of the size of the class.  There are approximately 9,700 individuals held in IDOC maximum security facilities—with approximately 1,300 confined in extreme isolation at any given time—and all face a substantial risk of being subject to unconstitutional extreme isolation as a result of Defendant's system-wide policies and customs.  There are almost 40,000 other prisoners housed in minimum and medium security prisons, any one of which could be charged with a disciplinary infraction at any time, or could be placed in Temporary Confinement, Investigative Status, or Administrative Detention at any time with no charge at all.

b.   *Commonality*:  There are questions of law and fact common to all class members, including, but not limited to, whether Defendant's policies and procedures have

resulted in and continue to result in the use of extreme isolation in violation of the class members' Eighth and Fourteenth Amendment rights.

c.    *Typicality*:  The claims of the class representatives are typical of those of the class members.  All Plaintiffs—class representatives and class members—are individuals who have been or are currently transferred from general prison population into extreme isolation. All face substantial risk of being placed in extreme isolation in violation of their constitutional rights as a result of the challenged policies and procedures.

d.    *Adequacy of Representation*:  The class representatives and class counsel will fairly and adequately represent the interests of the class.  The named Plaintiffs are committed to obtaining declaratory and injunctive relief, which will benefit themselves and the class by abating the risk of constitutional harm caused by Defendant's current policies and customs, and their interests in this matter are not antagonistic to those of other class members. Class counsel has many years of experience with class action and civil rights litigation.

211.    A class seeking class-wide declaratory and injunctive relief is properly certified under Federal Rule of Procedure 23(b)(2) because Defendant has acted, and refused to act, on grounds generally applicable to the class as a whole.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION:

*Injunctive Relief for the Named Plaintiffs and the Class Members Against Defendant Acting Director Baldwin for Violations of the Eighth and Fourteenth Amendments to the United States Constitution*

212.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.  As a result of the foregoing policies and customs authorized and maintained by Defendant Baldwin, the named Plaintiffs and class members have suffered and continue to suffer extreme isolation sentences imposed in violation

of the Eighth and Fourteenth Amendments' protection against cruel and unusual punishment. In addition, the extremely cramped, ancient, airless, filthy cells in which prisoners in extreme isolation are housed deprive Plaintiffs and the class of basic human needs, and inflict needless mental and physical injuries. Defendant has violated prisoners' basic human dignity and their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

*Deprivation of Basic Human Needs*

213.    Specifically, Defendant has deprived Plaintiffs and the class of the minimal civilized measure of life's necessities. The cumulative effects of extreme isolation in tiny cages, without meaningful access to human contact and physical activity, constitute a serious deprivation of basic human needs. Extreme prolonged deprivation of these basic needs is currently imposing and will continue to impose serious psychological and physical pain and suffering and permanent psychological and physical injury on Plaintiffs and on the class they represent. Defendant has been deliberately indifferent to this pain and suffering caused by extreme isolation that they inflict on Plaintiffs and the class. Plaintiffs and members of the putative class therefore seek declaratory and injunctive relief remedying these ongoing and systemic constitutional violations.

*Disproportionate Punishment*

214.    Moreover, as a result of the foregoing policies and customs authorized and maintained by the Defendant, the named Plaintiffs and class members have suffered punishment disproportionate to any infraction that they may have committed. No legitimate security or other penological interest justifies punishment of extreme isolation for lengthy or indefinite periods of time that have no reasonable relationship to the infraction committed. Such disproportionate

sentencing violates the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiffs and members of the putative class therefore seek declaratory and injunctive relief remedying these ongoing and systemic constitutional violations.

## SECOND CAUSE OF ACTION:

### Declaratory and Injunctive Relief for Named Plaintiffs and the Class Members Against Defendant Acting Director Baldwin for Violations of the Fourteenth Amendment Due Process Clause

215.    As a result of the foregoing policies and customs authorized and maintained by Defendant Baldwin, the named Plaintiffs and class members have suffered extreme isolation, a significant and atypical hardship, without due process of law in violation of the Fourteenth Amendment's Due Process Clause.  The named Plaintiffs and members of the putative class therefore seek declaratory and injunctive relief remedying these ongoing and systemic constitutional violations.

216.    The ordinary incidents of prison life include multiple opportunities for meaningful social interactions with other people, multiple sensory inputs from a wide variety of sources, a large number of social interactions with prisoners and staff, and the chance to pursue life goals. Specifically, the ordinary incidents of prison life include access to educational programs, vocational training, and religious services; regular opportunities for recreation, including both indoor and outdoor facilities, with large groups of prisoners, recreation equipment such as weights, basketballs, handball courts, etc.; several hours a day of congregate activities including access to a dayroom for recreation, and to the dining hall for meals; access to telephones most days; and an opportunity for contact visits with friends and family.

217.    Defendant has deprived Plaintiffs and class members of a liberty interest without due process of law by denying them meaningful notice of the potential sentencing ranges and what types of offenses may result in more or less severe classifications and punishments.

Plaintiffs are also being denied adequate and meaningful hearings to adjudicate and determine their guilt as well as subsequent reviews of their long-term and often indefinite extreme isolation.

## REQUESTS FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court:

a.      Declare that Defendant's acts and omissions violated Plaintiffs' and the class members' rights under the Eighth and Fourteenth Amendments to the United States Constitution and that these acts and omissions continue to cause ongoing violations of these rights;

b.      Award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

c.      Enter preliminary and permanent injunctive relief, and other appropriate relief, requiring Defendant Acting Director Baldwin, as well as his officers, agents, servants, employees, and any other person who acted in concert or who participated in the imposition and enforcement of extreme isolation at IDOC facilities, to end the ongoing constitutional violations described above by implementing and conforming with the below standards, the language of which is modeled after the ABA Standards for Criminal Justice (Third Edition), Treatment of Prisoners (2010):

Standard 23-2.6 Rationales for Segregated Housing:

a)      Correctional authorities shall not place prisoners in segregated housing except for reasons relating to: discipline, security, ongoing investigation of misconduct or crime, protection from harm, medical care, or mental health care. Segregated housing shall be for the briefest term and under the least restrictive conditions practicable and consistent with the rationale for placement and with the progress achieved by the prisoner. Segregation for health care needs shall be in a location separate from disciplinary and long-term segregated housing. Policies relating to segregation for whatever reason shall take account of the special developmental needs of prisoners under the age of eighteen.
b)      If necessary for an investigation or the reasonable needs of law enforcement or prosecuting authorities, correctional authorities shall be permitted to confine a prisoner under investigation for possible criminal violations in segregated housing for a period no more than 30 days.

Standard 23-2.7 Rationales for Long-term Segregated Housing:

a)      Correctional authorities shall use long-term segregated housing sparingly and shall not place or retain prisoners in such housing except for reasons relating to:

i.      discipline after a finding that the prisoner has committed a very severe disciplinary infraction, in which safety or security was seriously threatened;

ii.      a credible continuing and serious threat to the security of others or to the prisoner's own safety; or

iii.      prevention of airborne contagion.

b)      Correctional authorities shall not place a prisoner in long-term segregated housing based on the security risk the prisoner poses to others unless less restrictive alternatives are unsuitable in light of a continuing and serious threat to the security of the facility, staff, other prisoners, or the public as a result of the prisoner's:

i.      history of serious violent behavior in correctional facilities;

ii.      acts such as escapes or attempted escapes from secure correctional settings;

iii.      acts or threats of violence likely to destabilize the institutional environment to such a degree that the order and security of the facility is threatened;

iv.      membership in a security threat group accompanied by a finding based on specific and reliable information that the prisoner either has engaged in dangerous or threatening behavior directed by the group or directs the dangerous or threatening behavior of others; or

v.      incitement or threats to incite group disturbances in a correctional facility.

Standard 23-2.8 Segregated Housing and Mental Health:

a)      No prisoner diagnosed with serious mental illness shall be placed in long-term segregated housing.

b)      No prisoner shall be placed in segregated housing for more than 1 day without a mental health screening, conducted in person by a qualified mental health professional, and a prompt comprehensive mental health assessment if clinically indicated. If the assessment indicates the presence of a serious mental illness, or a history of serious mental illness and depression in segregated settings, the prisoner shall be placed in an environment where appropriate treatment can occur. Any prisoner in segregated housing who develops serious mental illness shall be placed in an environment where appropriate treatment can occur.

c)      The mental health of prisoners in long-term segregated housing shall be monitored as follows:

i.      Daily, correctional staff shall maintain a log documenting prisoners' behavior.

ii.      Several times each week, a qualified mental health professional shall observe each segregated housing unit, speaking to unit staff,

reviewing the prisoner log, and observing and talking with prisoners who are receiving mental health treatment.

   iii.  Weekly, a qualified mental health professional shall observe and seek to talk with each prisoner.

   iv.  Monthly, and more frequently if clinically indicated, a qualified mental health professional shall see and treat each prisoner who is receiving mental health treatment. Absent an individualized finding that security would be compromised, such treatment shall take place out of cell, in a setting in which security staff cannot overhear the conversation.

   v.  At least every 90 days, a qualified mental health professional shall perform a comprehensive mental health assessment of each prisoner in segregated housing unless a qualified mental health professional deems such assessment unnecessary in light of observations made pursuant to subdivisions (ii)-(iv).

  Standard 23-2.9 Procedures for Placement and Retention in Long-term Segregated Housing:

   a)  A prisoner shall be placed or retained in long-term segregated housing only after an individualized determination, by a preponderance of the evidence, that the substantive prerequisites set out in Standards 23-2.7 and 23-5.5 for such placement are met. In addition, if long-term segregation is being considered either because the prisoner poses a credible continuing and serious threat to the security of others or to the prisoner's own safety, the prisoner shall be afforded, at a minimum, the following procedural protections:

   i.  timely, written, and effective notice that such a placement is being considered, the facts upon which consideration is based, and the prisoner's rights under this Standard;

   ii.  decision-making by a specialized classification committee that includes a qualified mental health care professional;

   iii.  a hearing at which the prisoner may be heard in person and, absent an individualized determination of good cause, has a reasonable opportunity to present available witnesses and information;

   iv.  absent an individualized determination of good cause, opportunity for the prisoner to confront and cross-examine any witnesses or, if good cause to limit such confrontation is found, to propound questions to be relayed to the witnesses;

   v.  an interpreter, if necessary for the prisoner to understand or participate in the proceedings;

   vi.  if the classification committee determines that a prisoner is unable to prepare and present evidence and arguments effectively on his or his own behalf, counsel or some other appropriate advocate for the prisoner;

   vii.  an independent determination by the classification committee of the reliability and credibility of confidential informants if material allowing such determination is available to the correctional agency;

   viii.  a written statement setting forth the evidence relied on and the reasons for placement; and

ix.      prompt review of the classification committee's decision by correctional administrators.

b)      Within 30 days of a prisoner's placement in long-term segregated housing based on a finding that the prisoner presents a continuing and serious threat to the security of others, correctional authorities shall develop an individualized plan for the prisoner. The plan shall include an assessment of the prisoner's needs, a strategy for correctional authorities to assist the prisoner in meeting those needs, and a statement of the expectations for the prisoner to progress toward fewer restrictions and lower levels of custody based on the prisoner's behavior. Correctional authorities shall provide the plan or a summary of it to the prisoner, and explain it, so that the prisoner can understand such expectations.

c)      At intervals not to exceed 30 days, correctional authorities shall conduct and document an evaluation of each prisoner's progress under the individualized plan required by subdivision (b) of this Standard. The evaluation shall also consider the state of the prisoner's mental health; address the extent to which the individual's behavior, measured against the plan, justifies the need to maintain, increase, or decrease the level of controls and restrictions in place at the time of the evaluation; and recommend a full classification review as described in subdivision (d) of this Standard when appropriate.

d)      At intervals not to exceed 90 days, a full classification review involving a meeting of the prisoner and the specialized classification committee shall occur to determine whether the prisoner's progress toward compliance with the individual plan required by subdivision (b) of this Standard or other circumstances warrant a reduction of restrictions, increased programming, or a return to a lower level of custody. If a prisoner has met the terms of the individual plan, there shall be a presumption in favor of releasing the prisoner from segregated housing. A decision to retain a prisoner in segregated housing following consideration by the classification review committee shall be reviewed by a correctional administrator, and approved, rejected, or modified as appropriate.

e)      Consistent with such confidentiality as is required to prevent a significant risk of harm to other persons, a prisoner being evaluated for placement in long-term segregated housing for any reason shall be permitted reasonable access to materials considered at both the initial and the periodic reviews, and shall be allowed to meet with and submit written statements to persons reviewing the prisoner's classification.

f)      Correctional officials shall implement a system to facilitate the return to lower levels of custody of prisoners housed in long-term segregated housing. Except in compelling circumstances, a prisoner serving a sentence who would otherwise be released directly to the community from long-term segregated housing shall be placed in a less restrictive setting for the final months of confinement.

Standard 23-3.8 Segregated Housing:

a)      Correctional authorities shall be permitted to physically separate prisoners in segregated housing from other prisoners but shall not deprive them of those items or services necessary for the maintenance of psychological and physical wellbeing.

b)      Conditions of extreme isolation shall not be allowed regardless of the reasons for a prisoner's separation from the general population. Conditions of extreme isolation generally include a combination of sensory deprivation, lack of contact with other persons, enforced idleness, minimal out-of-cell time, and lack of outdoor recreation.

c)      All prisoners placed in segregated housing shall be provided with meaningful forms of mental, physical, and social stimulation. Depending upon individual assessments of risks, needs, and the reasons for placement in the segregated setting, those forms of stimulation shall include:

     i.      in-cell programming, which shall be developed for prisoners who are not permitted to leave their cells;

     ii.      additional out-of-cell time, taking into account the size of the prisoner's cell and the length of time the prisoner has been housed in this setting;

     iii.      opportunities to exercise in the presence of other prisoners, although, if necessary, separated by security barriers;

     iv.      daily face-to-face interaction with both uniformed and civilian staff; and

     v.      access to radio or television for programming or mental stimulation, although such access shall not substitute for human contact described in subdivisions (i) to (iv).

d)      Prisoners placed in segregated housing for reasons other than discipline shall be allowed as much out-of-cell time and programming participation as practicable, consistent with security.

e)      No cell used to house prisoners in segregated housing shall be smaller than 80 square feet, and cells shall be designed to permit prisoners assigned to them to converse with and be observed by staff. Physical features that facilitate suicide attempts shall be eliminated in all segregation cells. Except if required for security or safety reasons for a particular prisoner, segregation cells shall be equipped in compliance with Standard 23-3.3(b).

f)      Correctional staff shall monitor and assess any health or safety concerns related to the refusal of a prisoner in segregated housing to eat or drink, or to participate in programming, recreation, or out-of-cell activity.

DATED:  June 2, 2016

By:    /s/ Kimball R. Anderson

Counsel for Plaintiffs
Kimball R. Anderson
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
312-558-5600 (tel)
312-558-5700 (fax)
kanderson@winston.com

Alan S. Mills
Uptown People's Law Center
4413 North Sheridan Road
Chicago, IL 60640
773-769-1411 (tel)
773-769-2224 (fax)
alan@uplcchicago.org

**OF COUNSEL:**
Alyssa E. Ramirez
Joanna F. Cornwell
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
312-558-5600 (tel)
312-558-5700 (fax)
aramirez@winston.com
jcornwell@winston.com