**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# EXHIBIT 1

**CERTIFIED COPY**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

EAST ST. LOUIS DIVISION

HENRY DAVIS, DOUGLAS                )
COLEMAN, AARON FILLMORE,
JEROME JONES, DESHAWN               )
GARDNER, and PERCELL
DANSBERRY on behalf of              )
Themselves and all others
Similarly situated,                 )

        Plaintiffs,        )

        vs.                ) No. 3:16-cv-0600-SCW

JOHN BALDWIN, Acting                )
Director of the Illinois
Department of Corrections.          )

        Defendants.        )


DEPOSITION OF RANDY SCOTT PFISTER

October 23, 2018


Jennifer L. Crowe, a CSR License No. 084.003786
443568

**BARKLEY**
*Court Reporters*
barkley.com
SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento    (800) 222-1231 Martinez    (702) 366-0500 Las Vegas    (800) 222-1231 Monterey
(951) 686-0606 Riverside    (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson    (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany    (914) 510-9110 White Plains
(312) 379-5566 Chicago    00+1+800 222 1231 Paris    00+1+800 222 1231 Dubai    001+1+800 222 1231 Hong Kong

Page 18

A. Yes, ma'am.

Q. Pontiac -- strike that.

Does Pontiac have inmates who are in administrative detention?

A. I believe so, but, again, I have not been there for a few years, but I'm pretty sure, yes.

Q. Okay. Did they while you were the Warden?

A. Oh, while I was there, yes, ma'am.

Q. And were there inmates in disciplinary segregation at Pontiac while you were Warden?

A. Yes, ma'am.

Q. Would you tour those areas of the facility?

A. Most certainly.

Q. Talk to inmates there?

A. Yes.

Q. What kind of things would you talk to the inmates about?

A. A lot of times it was just general BS because, like I said, a lot of them I pretty much grew up with them. I started with the department when I was 18, so a lot of them knew me for a long

Page 19

time. Anything that they wanted to talk about, any concerns, anything that -- any questions they had, anything that they asked me to follow up on.

Q. Sure.

A. Just the conversations were endless. We'd talk about literally anything.

Q. Yeah. I'm sure they knew you pretty well at that point?

A. Yes.

Q. Same thing at Stateville?

A. Yes.

Q. And would you talk to the inmates at Stateville who are in disciplinary segregation while you were Warden there?

A. Very much, yes.

Q. About how often would you say?

A. Special care units, and I refer to them as protective custody, segregation, administrative detention, they would draw my attention a little bit more than general population because, especially segregation, administrative detention, they don't have the movement that general population does. I can go to the dining rooms during the noon meals and see all of the general

Page 20

population guys.

So segregation and administrative detention are kind of -- I probably hit them more than the general population.

Q. I think you referred to them as special care units?

A. That's just terms we have been using in the department for 30 years because they're not really special care, but they require a little bit more involvement with clinical services, things of that nature.

Q. Okay.

A. I don't even know if that's a term that's in any books that we have.

Q. That's okay. If it is a term you use, I just want to make sure we are on the same page as to what you mean by that term.

A. Just that. I mean protective custody. Obviously that's kind of like a special unit because of the nature of protective custody. Segregation and administrative detention are just -- that's terms that I grew up with when I started many years ago.

Q. I am sure. So when you say special

Page 21

care units, that would include protective custody?

A. Yes.

Q. And it would include disciplinary segregation?

A. Again, these are my -- that's my term.

Q. Sure, yes, absolutely.

A. Okay.

Q. And would you include, in that term, administrative detention?

A. Most certainly.

Q. What about people who are in temporary confinement?

A. That's, that's a term that I very rarely ever use because to me, they're in segregation. Even though they are in temporary confinement, they are in the same area basically.

Q. Okay. What about investigative status?

A. Same thing.

Q. And investigative status -- strike that.

Inmates who are in investigative status, they would also be the same area as segregation?

A. Most cases.

Q. Most cases. What cases would they not

Page 22

be?

A. If there was an -- and understand it happened very rarely. If there had been times where, throughout my career, I have seen an individual placed under investigation status but left in his general population cell because the reason he is under investigation was not a detrimental safety risk to any other inmates or staff or the facility as a whole.

Q. Okay. But that would be the exception rather than the norm?

A. Oh, yeah, definitely. I don't know if I could think of -- in my entire career, I don't know if I can ever remember me personally being involved with anymore than five of them maybe.

Q. Okay. So I'm going to mark for identification Exhibit 1.

(Exhibit No. 1 marked for identification.)

Q. So this is a copy of the complaint that we filed in this case. As I mentioned, I represent the Plaintiffs. This is a class action complaint for declaratory and injunctive relief. It relates to, I think, what you would call as some of the

Page 23

special care units. Are you familiar with this lawsuit?

A. Vaguely.

Q. How are you familiar with it?

A. Just by reviewing some of the documents, the emails and things of that nature with my attorney.

Q. Okay. So have you read through this complaint?

A. I do not believe I have ever seen the actual complaint itself.

Q. Okay. That's fine. What is your knowledge of this lawsuit?

A. Very limited.

MS. BAUTISTA: I object to any questions inquiring into conversations with his attorney.

Q. (Ms. Lawson) Okay. And anything that I am asking you right now, I won't ask you to go into any conversations with your attorney or any advice you have given you -- any advice your attorney has given you. I am just trying to see if you have any kind of general impressions of what the lawsuit is about?

A. My impression is it pertains to

Page 24

administrative detention, segregation, maybe long-term segregation, things of that nature.

Q. Okay. And one thing that we define in this complaint, you will see it right here at paragraph 2, I know there is a lot of different terms in the Illinois Department of Corrections. So a term that we found that was used by correctional experts is the term "extreme isolation". We define that here in the complaint as any condition which is segregation from the mainstream prisoner population where prisoners are involuntarily confined to their cells for upwards of 22 to 24 hours a day; given only extremely limited or no opportunities for direct and normal social contact with other persons; and afforded extremely limited, if any, access to meaningful programming. Would you agree that there are inmates in the Illinois Department of Corrections right now who are confined in conditions of extreme isolation as I just defined it?

A. Could you repeat the question?

Q. Absolutely.

MS. LAWSON: Could you read it back?

(The reporter read the question.)

Page 25

A. I could agree with that.

Q. Okay. That's all of the questions that I have related to our complaint.

I would like to talk a little bit about Department Rule or Regulation 504. Do you know what I'm referring to when I say Rule 504?

A. I know the substance of what you are referring to and the disciplinary process.

Q. Yes, that is correct. So let's mark that as Exhibit 2.

(Exhibit No. 2 marked for identification.)

Q. Okay. What I handed you as Exhibit 2 is this Regulation 504. Do you recognize it as that regulation?

A. I recognize it as discipline and grievances, yes, ma'am. As far as specifically, I don't have a very good memory, so --

Q. Okay. That's fine.

A. I just recognize it, yes.

Q. And this is not a memory test. That's why I got it out.

A. Okay.

Q. So that we can all have it in front of

Case 3:16-cv-00600-MAB    Document 174-1    Filed 09/06/19    Page 5 of 6    Page ID
#771
HENRY DAVIS v.
JOHN BALDWIN
RANDY SCOTT PFISTER
October 23, 2018

Page 62

A. Well, it offered opportunity for guys, offered incentives.

Q. And the incentive was reduced segregation time, correct?

A. Most certainly.

Q. Why would that be an important incentive?

A. Well, because an individual would rather not be in segregation. I mean, they made the choice to go to segregation, but when they realize the error of their ways, they want to get out and try to get better.

Q. And without a program like this, if someone in segregation wanted to get out, what would their option be, just to serve their sentence in segregation?

A. Well, if I recall, counselors still do reviews and give them -- they have the option to give them seg cuts. And that's another thing that I tried to get involved with were counselors, if they continued to give an individual 30 days, 30 days, 30 days seg time cut, I told them, I said, "If a guy gets 30 this time, then the next time why don't you give him 60, and then the next time you

Page 63

give him 90 to build it instead of just giving them the same every time."

Q. Okay. So you found before that the seg cuts weren't really related to like progressively good behavior?

MS. BAUTISTA: Objection, mischaracterizes his testimony.

A. I'm not saying that at all. They were getting, still getting time. I just wanted to move it along quicker.

Q. And moving it along quicker, would that be like an increased incentive?

A. Well, see, that's what I'm saying. I mean, during the reviews, and I can't remember how -- for example, if I did a review July 1st, give a guy 30 days seg time cut, I review him again August 1st, give him another 30 days. I said nothing says we can't give him 60 days and the next month give him 90 days. Build on it. And if it is a guy with a lot of seg time, he is going to accumulate a lot of seg cuts if he continues with the good behavior.

Q. What would be a lot of seg time?

A. To me, and again, you got to realize how long I have been in the business. A lot of seg

Page 64

time to me depends on who the individual is.

Q. Are there individuals with years of seg time?

A. Used to be. I'm sure there still are, yes.

Q. What about more than five years?

A. Most certainly.

Q. More than ten?

A. Used to be. Used to be, yes.

Q. What about more than 15?

A. Yes.

Q. More than 20?

A. Yes.

Q. More than 30?

A. Now you are pushing it.

Q. Okay.

A. Probably. I can't remember the longest seg time guy that I have ever dealt with.

Q. And how do individuals that accumulate these long seg times, how does that happen?

A. If an individual assaults a staff member today, tomorrow he assaults them again, next day he assaults somebody else, and he can get up to a year on a serious staff assault. So that's how

Page 65

many of the old-timers accumulated all of that seg time. Continuously almost every other day, every day they would assault people.

Q. So this -- strike that.

Let's go to, go back to Exhibit 2 which should be Regulation 504. If you go to the back of the regulation, it is going to be Bates no. 34198. It is Table A of Maximum Penalties?

A. Okay.

Q. So I think this is what you were describing. For example, Offense 100 is violent assault of a person, and that could be a loss of privileges for one year, a year of C grade for one year, sentence credit revocation of one year, and then I see for segregation it is indeterminate.

So what would an indeterminate segregation sentence be?

A. Just what it states. They would be reviewed, I believe they're reviewed every six months or every year. It is just reviewed. There is no seg out date. It is based on behavior.

Q. Okay. And then let's use another one as an example. I see Offense No. 111, security threat Group or unauthorized organizational

Page 82

(Exhibit No. 8 marked for identification.)

Q. Okay. So Exhibit 8 is Administrative Directive No. 05.12.101. It looks like the subject of this administrative directive is administrative detention placement. Are you familiar with these types of directives?

A. Somewhat.

Q. Do you know what the difference between this and, like, Rule 504 would be?

A. Everything that's in our directives have to complement 504. We can't derive (sic) from that.

Q. And I guess I should have asked this earlier. Rule 504, does that apply to all Illinois Department of Corrections facilities?

A. I believe so.

Q. Okay. What about this administrative directives; would that also be facility wide?

A. Yes.

MS. BAUTISTA: Object to form.

Q. (Ms. Lawson) Okay. So if we turn to the back page of the administrative directive, it is Attachment A, it looks like these are the three

Page 83

phases of administrative detention.

So if someone is placed in administrative detention, I think you mention that they start in Phase I; is that correct?

A. I believe so.

Q. And it looks like this outlines the various privileges and/or restrictions that they have in that phase?

A. Was that a question?

Q. Yeah. I'm sorry. Let me rephrase that.

So in Attachment A under Phase I, would these be the restrictions and/or privileges that someone in Phase I of administrative detention would have?

A. Yes.

Q. And the same thing for Phase II?

A. Yes.

Q. And the same thing for Phase III?

A. Yes.

Q. Okay. Now, do you remember how someone would move out of Phase I into Phase II?

A. The Committee would make that recommendation.

Page 84

Q. Is that the Adjustment Committee?

A. The Administrative Detention Review Committee.

Q. Who is on that committee, if you know?

A. I always had the Assistant Warden, the Supervisor of the cell house, I think there was someone from clinical -- maybe even tell us in here who has got to be on that committee. I don't really recall specifically, but I always know that I had -- I don't know if the Assistant Warden is always required. I always had one.

Q. Okay. Now, if we turn to what's Bates stamped 10869 under General Provisions. I see that under 2, General Provisions, we have that offenders placed administrative detention shall be housed in the segregation units of the facility.

So offenders in administrative detention are in similar units to those who are in disciplinary segregation; is that correct?

A. Okay. Yes.

Q. And I see also that offenders are subject to double celling?

A. Yes.

Q. What does double celling mean?

Page 85

A. More than one person in a cell.

Q. And is that something that happens in administrative detention?

A. I did not start that -- I don't -- I didn't start that until -- I don't recall when they started that. I pretty much started it by taking volunteers because some guys like to have cellmates so they could play cards together and stuff like that. If I recall, I only had, when I departed Pontiac, I only -- I don't -- I didn't have very many people double celled because I wanted to take it slowly, but there were some that wanted to be celled with someone. If they weren't in the same security threat group or had no KSFs, I promoted that.

Q. Okay. So when you were Warden at Pontiac, would you double cell people primarily if they wanted to be double celled?

A. In administrative detention we are talking specifically?

Q. Specifically in administrative detention, correct?

A. Yeah, I -- we wanted to go to more double celling, but I wanted to take it slow. I