IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| HENRY DAVIS, *et al.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| | ) | |
|    vs. | ) | Case No. 3:16-cv-600-MAB |
| | ) | |
| ROB JEFFREYS, | ) | Judge Mark A. Beatty |
|     Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

<u>**TABLE OF CONTENTS**</u>

**Page**

INTRODUCTION.................................................................................................... 1

PROCEDURAL HISTORY ..................................................................................... 7

STATEMENT OF FACTS........................................................................................ 9

     IDOC'S Policies And Practices Deprive Prisoners In Its Custody Of Their
     Constitutionally-Guaranteed Due Process Rights ........................................ 11

     Inhumane and Unconstitutional Living Conditions in Extreme Isolation ................... 13

     IDOC is Aware That the Conditions in Its Prisons Are Inhumane and
     Unconstitutional And Still Refuses to Take Reasonable Steps to Remedy Its

     Unconstitutional Policies And Practices................................................... 16

LEGAL STANDARD ............................................................................................. 19

ARGUMENT ......................................................................................................... 20

I.     THE CLASS IS TOO NUMEROUS FOR JOINDER TO BE PRACTICAL ............ 20

II.    IDOC'S UNCONSTITUTIONAL POLICIES AND PRACTICES PRESENT
      QUESTIONS OF FACT AND LAW THAT ARE COMMON TO THE CLASS ...... 23

     A.    IDOC Systematically Exposes the Class to Inhumane Conditions that
         Constitute Cruel and Unusual Punishment.................................. 27

          1.    IDOC's Extreme Isolation Practices Expose Class Members to
             Significant Risks of Physical and Mental Harm................................ 27

          2.    IDOC Staff Subjects the Class to Persistent, Excessive Physical and
             Verbal Abuse.................................................................. 34

     B.    IDOC's Hearing and Review Policies Violate the Class's Due Process
         Rights ......................................................................... 35

          1.    IDOC's Use of Extreme Isolation Interferes with the Class's
             Protected Liberty Interest.................................................... 35

          2.    The Hearing and Review Procedures for the Class in Extreme
             Isolation Fail to Meet the Minimum Requirements of Due Process .... 37

III.   PLAINTIFFS ARE TYPICAL OF THE CLASS....................................... 40

    A.      Henry Davis ............................................................................... 41

    B.      Douglas Coleman ....................................................................... 43

    C.      Aaron Fillmore .......................................................................... 46

    D.      Jerome Jones ............................................................................. 47

    E.      DeShawn Gardner ...................................................................... 49

    F.      Percell Dansberry ...................................................................... 50

IV.     NAMED PLAINTIFFS AND THEIR COUNSEL WILL ADEQUATELY
       REPRESENT THE CLASS ............................................................... 52

V.      FINAL INJUNCTIVE RELIEF AGAINST IDOC IS APPROPRIATE
       RESPECTING THE CLASS AS A WHOLE ........................................... 54

CONCLUSION .................................................................................................. 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. City of Chicago,*
  828 F. Supp. 543 (N.D. Ill. 1993) ........................................................................20

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,*
  133 S. Ct. I184 (2013) ..........................................................................................19

*Arenson v. Whitehall Convalescent & Nursing Home,*
  164 F.R.D. 659 (N.D. Ill. 1996) ...........................................................................22

*Arreola v. Godinez,*
  546 F.3d 788 (7th Cir. 2008) ................................................................................52

*Barragan v. Evanger's Dog & Cat Food Co.,*
  259 F.R.D. 330 (N.D. Ill. 2009) .......................................................................20-21

*Boundas v. Abercrombie & Fitch Stores, Inc.,*
  280 F.R.D. 408 (N.D. Ill. 2012) ...........................................................................23

*Brand v. Comcast Corp., Inc.,*
  302 F.R.D. 201 (N.D. Ill. 2014) ...........................................................................23

*Butler v. Suffolk Cnty.,*
  289 F.R.D. 80 (E.D.N.Y. 2013) ............................................................................24

*Chief Goes Out v. Missoula Cnty.,*
  No. 12-Civ-155, 2013 WL 139938 (D. Mont. Jan. 10, 2013) ........................24, 26

*Copeland v. Washington,*
  162 F.R.D. 542 (N.D. Ill. 1995) ...........................................................................54

*Earl v. Racine County Jail,*
  718 F.3d 689 (7th Cir. 2013) ..................................................................................8

*Farmer v. Brennan,*
  511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ..................................7, 27

*Fields v. Maram,*
  No. 04-C-0174, 2004 WL 1879997 (N.D. Ill. Aug. 17, 2004) .............................22

*U.S. ex rel. Green v. Peters,*
  153 F.R.D. 615 (N.D. Ill. 1994) ...........................................................................22

*Grieveson v. Anderson*,
538 F.3d 763 (7th Cir. 2008) ......................................................................7-8

*Helling v. McKinney*,
509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) ...............................7

*Holmes et al. v. Godinez*,
311 F.R.D. 177 (N.D. Ill. 2015).............................................. 21, 22, 24, 25

*Hughes v. Judd*,
No. 12 Civ. 568, 2013 WL 1821077 (M.D. Fla. Mar. 27, 2013).........................24

*Imasuem v. Moyer*,
No. 91 C 5425, 1992 WL 26705 (N.D. Ill. Feb. 7, 1992) ....................................54

*Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r. Indiana Dep't of Corr.*,
No. 08 Civ. 1317, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012) .........................24

*Jackson et al. v. Sheriff of Cook Cnty.*,
No. 06 C 0493, 2006 WL 3718041 (N.D. Ill. Dec. 14, 2006) .........................21, 24

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) ...............................................................19

*Lacy et al. v. Cook Cnty.*,
897 F.3d 847 (7th Cir. 2018) ...........................................................23-25

*Lewis v. Tully*,
96 F.R.D. 370 (N.D. Ill 1983)...............................................................54

*Lippert et al. v. Baldwin et al.*,
No. 10-C-4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017)........................21, 24

*Love v. City of Chi.*,
No. 96 C 396, 1997 WL 120041 (N.D. Ill. Mar. 11, 1997)....................................54

*Madrid v. Gomez*,
889 F. Supp. 1146 (N.D. Cal. 1995) .............................................. 1, 33

*Marion v. Columbia Correction Inst.*,
559 F.3d 693 (7th Cir. 2009) ...............................................................8

*Mitchell v. Cate*,
No. 08-CV-1196 TLN EFB (E.D. Cal.) .......................................... 1, 33

*N.B. v. Hamos*,
26 F. Supp. 3d 756 (N.D. Ill. 2014) .......................................................23

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) ........................................................................40

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ................................................................ 24, 26

*Patrykus v. Gomilla*,
    121 F.R.D. 357 (N.D. Ill. 1988) ...................................................................54

*Phipps v. Sheriff of Cook Cnty.*,
    249 F.R.D. 298 (N.D. Ill. 2008) ...................................................................40

*Priutt v. City of Chicago*,
    472 F.3d 925 (7th Cir. 2006) ........................................................................20

*Rasho v. Walker*,
    07-1298-MMM, 2016 WL 11514940 (C.D. Ill. Feb. 8, 2016) .............................21

*Riordan v. Smith Barney*,
    113 F.R.D. 60 (N.D. Ill. 1986) .....................................................................52

*Rodriquez v. Vill. of Montgomery*,
    No. 08 C 1826, 2009 WL 310893 (N.D. Ill. Feb. 9, 2009) .................................54

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ......................................................................52

*Rosas v. Baca*,
    No. 12 Civ. 428, 2012 WL 2061694 (C.D. Cal. June 7, 2012).............................24

*Sandin v. Conner*,
    515 U.S. 472 (1995) ...................................................................................55

*Scruggs v. Jordan*,
    485 F.3d 934 (7th Cir. 2007) ........................................................................35

*In re Sulfuric Acid Antitrust Litig.*,
    2007 WL 898600 (N.D. Ill. Mar. 21, 2007) ....................................................53

*Townsend v. Fuchs*,
    522 F.3d 765 (7th Cir. 2008) ................................................................ 7-8, 27

*Turley v. Lashbrook*,
    No. 08-07-SCW, 208 WL 758236 (S.D. Ill. Sept. 28, 2016)........................ 16, 17

*Turley v. Lashbrook*,
    No. 3:08-cv-00007-GCS (S.D. Ill. Sept. 26, 2018)..................................... 27, 34

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ......................................................................................55

*Wal-Mart Stores Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................................. 20, 23-24

*Westefer et al. v. Snyder et al.*,
   Nos. 00-162-GPM, 00-708-GPM, 2006 WL 2639972 (S.D. Ill. Sept. 12, 2006).............21, 24

*Wilkinson v. Austin*,
   545 U.S. 209 (2005).......................................................................... 35-36, 55

*Williams v. Lane*,
   129 F.R.D. 636 (N.D. Ill. 1990)............................................................................52

*Young v. Cnty. of Cook*,
   No. 06 C 552, 2007 WL 1238920 (N.D. Ill. Apr. 25, 2007) ....................................40

**Statutes**

730 ILCS 5/3-2-3 (West 2018) ............................................................................11

730 ILCS 5/3-6-2(a) (West 2019)..........................................................................11

730 ILCS 5/3-7-2 ..................................................................................................18

730 ILCS 5/3-7-3 ............................................................................................5, 18

42 U.S.C. § 1983 ...................................................................................................7

**Other Authorities**

20 Ill. Admin. Code § 504 .............................................................................. 18, 25

20 Ill. Admin. Code § 504 Tbl. A.............................................................. 33, 39, 41

20 Ill. Admin. Code § 504.12 ...............................................................................12

20 Ill. Admin. Code § 504.20 ......................................................................... 21, 37

20 Ill. Admin. Code § 504.30 ......................................................................... 21, 37

20 Ill. Admin. Code § 504.40 ......................................................................... 12, 37

20 Ill. Admin. Code § 504.50 ...............................................................................37

20 Ill. Admin. Code § 504.115 ................................................................... 19, 32, 39

20 Ill. Admin. Code § 504.130 ....................................................................... 11, 30

20 Ill. Admin. Code § 504.610 ................................................................ 11, 26

20 Ill. Admin. Code § 504.620 ................................................................ 26, 30

20 Ill. Admin. Code § 504.670 ................................................................ 12

20 Ill. Admin. Code § 504.670(a) ........................................................ 11, 31, 32

20 Ill. Admin. Code § 504.690 ........................................................ 12, 18, 21, 26, 39

Fed. R. Civ. P. 12(b)(6) .......................................................................... 7

Fed. R. Civ. P. 23 ............................................................................ *passim*

Grassian, Stuart, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. &
   Pol'y 325 (2006) ............................................................................ 1

Handelman, Stephen, *Changing the Rules for Solitary*, The Crime Report (Jan. 15,
   2016), http://www.thecrimereport.org/news/inside-criminal-justice/2016-01-
   changing-the-rules-for-solitary ............................................................ 1

Haney, *The Social Psychology of Isolation: Why Solitary Confinement is
   Psychologically Harmful*, Prison Service Journal, 181:12 (Jan. 2009) .................... 1

Haney, *The Wages of Prison Overcrowding: Harmful Psychological
   Consequences and Dysfunctional Correctional Reactions*, 22 Wash. U. J. of
   L. & Pol. 265 (2006) ...................................................................... 32

Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or
   Degrading Treatment of Punishment, 66th Sess., UN Doc. A/66/268 ¶ 84
   (Aug. 5, 2011) ............................................................................ 3

Kupers, T., *Isolated Confinement: Effective Method for Behavior Change or
   Punishment for Punishment's Sake?*, The Routledge Handbook of
   International Crime and Justice Studies (2013) ............................................ 28

*Operations and Management Report (OMR) Key Variables, Fiscal Year 2020*,
   Illinois Department of Corrections 2 (July 2019),
   https://www2.illinois.gov/idoc/reportsandstatistics/Documents/JHA ....................... 21

*Solitary Confinement: Ending the Over-Use of Extreme Isolation in Prison and
   Jail,* New York, Sept. 30-Oct. 1, 2015. http://johnjaypri.org/category/research-
   and-publications/ ......................................................................... 1

U.S Const. amend. VIII ...................................................................... *passim*

U.S Const. amend. XIV ....................................................................... *passim*

Vera Institute of Justice, About page, www.vera.org/about .................................. 9

Plaintiffs Henry Davis, Douglas Coleman, Aaron Fillmore, Jerome Jones, DeShawn Gardner, and Percell Dansberry submit this Memorandum of Law in support of their motion pursuant to Federal Rule of Civil Procedure 23 to certify a class of all prisoners who are now or will be incarcerated in adult correctional facilities by the Illinois Department of Corrections ("IDOC") and thus who are at risk of being subjected to extreme isolation or who are currently subjected to extreme isolation ("the Class").[1]

## **INTRODUCTION**

Plaintiffs filed their Class Action Complaint For Declaratory And Injunctive Relief [Dkt.

---

[1] "Extreme isolation" is the consensus term used by correctional experts, including corrections administrators, to describe segregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined to their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (*i.e.*, contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind. *See, e.g., Solitary Confinement: Ending the Over-Use of Extreme Isolation in Prison and Jail,* New York, September 30 - October 1, 2015. http://johnjaypri.org/category/research-and-publications/; *Wilkinson v. Austin,* 545 U.S. 209, 223 (2005) (finding incarceration at a prison that practiced a restrictive form of solitary confinement to be "synonymous with extreme isolation"); Haney, *The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful,* Prison Service Journal, 181:12 at n.1 (Jan. 2009); *see also* Stephen Handelman, *Changing the Rules for Solitary,* The Crime Report (Jan. 15, 2016, 8:00 AM), http://www.thecrimereport.org/news/inside-criminal-justice/2016-01-changing-the-rules-for-solitary. Extreme isolation includes, but is not limited to, double-celling prisoners for updates of 23 hours a day or more in cells designed to hold only one person. *Id.* Double celling leads to prisoners being "forced to interact with a cellmate under extremely close quarters that afford little or no privacy or respite." Record in *Mitchell v. Cate,* No. 08-CV-1196 TLN EFB (E.D. Cal.), Dkt. 189, at 10. Further, these prisoners experience "constant and unavoidable violations of personal space, in an environment of forced closeness that affords them no respite from one another or opportunities to release the interpersonal tensions that inevitably result." *Id.* at 11; *see also Madrid v. Gomez,* 889 F. Supp. 1146, 1230 (N.D. Cal. 1995) (prisoners held in extreme isolation "are severely deprived of normal human contact regardless of whether they are single or double celled"); Stuart Grassian, *Psychiatric Effects of Solitary Confinement,* 22 Wash. U.J.L. & Pol'y 325, 357–58 (2006) ("Confined groups comprising just two individuals may be the most pathogenic of all."). As demonstrated herein, IDOC currently houses prisoners in extreme isolation. Ex. 1 Pfister Dep. 24:3–25:1; Ex. 2 Taylor Dep. 20:9–21:14. Professor Haney and Mr. Vail refer to extreme isolation as "restrictive housing" in their declarations to be consistent with the Illinois Department of Corrections' terminology.

1] because IDOC's use of extreme isolation subjects thousands of prisoners – 13,231 prisoners in 2016, 12,201 prisoners in 2017, and 9,136 prisoners in 2018 – to inhumane conditions in extreme isolation, with many in extreme isolation for years and in some cases decades, without even the semblance of their Constitutionally-guaranteed due process rights or a substantive means to return to the general prison population. *See* DalSanto Decl. ¶¶ 6–9. IDOC's extreme isolation practices are an outlier even among the most egregious state prison systems in the nation as detailed in the expert reports of Plaintiffs' retained experts, Professor Craig Haney and Mr. Eldon Vail. *See* Ex. 3 Haney Report ¶ 24 ("[IDOC] subject[s] prisoners to conditions and forms of treatment that go beyond being painful, unpleasant, and potentially harmful to being outright dangerous to prisoners' mental health and well-being."); Ex. 4 Vail Report ¶ 20 ("[Mr. Vail] conclude[s] that the conditions of confinement for prisoners in IDOC's restrictive housing unnecessarily deprive the prisoners of freedom and privileges that are afforded to prisoners who are not in restrictive housing in IDOC as well as those in other state prison systems who are in restrictive housing or general population" and further notes that "the conditions of IDOC's restrictive housing units are stark and horrific and far below the standards of other state prison systems.").

The practice of punishing incarcerated individuals by transferring them from the general prison population to extreme isolation has long been shown to cause a severe risk of grave physical and psychological harm regardless of the condition of the prisoner prior to entry. Ex. 3 Haney Report ¶ 24. Numerous studies have conclusively shown that the suicide risk is much higher for prisoners placed in extreme isolation as opposed to those housed in the general population. Ex. 4 Vail Report ¶ 69 (citing study of New York prisons that found that nearly half of all potentially fatal self-harm was committed by the 7.3% of inmates placed in solitary confinement); Ex. 3 Haney Report ¶ 56 ("self-mutilation and suicide are more prevalent in isolated, punitive housing units

such as administrative segregation and security housing where prisoners are subjected to solitary-like conditions of confinement"). Regardless of the technical label placed on extreme isolation—solitary confinement, disciplinary segregation, investigative status, or administrative detention—extensive research shows that the practice of subjecting individuals to extreme isolation causes psychological pain and suffering as well as long-lasting emotional trauma, physical injury, and, in extreme cases, death. Ex. 3 Haney Report ¶ 32; Ex. 4 Vail Report ¶¶ 18–20. Moreover, the practice of punishing incarcerated individuals by subjecting them to extended periods of extreme isolation has long been viewed by courts, prison authorities, bar associations, and United Nations commissions on torture as a practice to be avoided in all but the most limited cases where the individual presents a credible and continuing serious threat to others or himself.[2] And even in those limited cases where extreme isolation may be arguably warranted, the conditions in which the prisoners are kept should be humane and habitable.

IDOC, however, does not restrict the use of extreme isolation to limited cases where the individual presents a credible and continuing serious threat to others or himself. Instead, IDOC as a matter of custom and practice, arbitrarily, capriciously, and routinely sanctions prisoners with extreme isolation for months at a time for even the most minor prison infractions, including disrupting group sessions,[3] refusing to cuff up,[4] and misusing toilet paper.[5]

---

[2] *See, e.g.*, Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, 66th Sess., UN Doc. A/66/268 ¶ 84 (Aug. 5, 2011) (concluding that "prolonged solitary confinement" can produce harmful psychological effects and recommending that it be prohibited).

[3] Ex. 5 Doc. 0198765 (T.B. was sentenced to 1 month in segregation and 1 month C grade for tearing up papers during a group session).

[4] Ex. 6 Doc. 0325698 (S.K. was sentenced to 3 months in segregation and 3 months C Grade for refusing an order to cuff up).

[5] Ex. 7 Doc. 0156324 (B.B. was sentenced to 45 days in segregation for covering his cell window with toilet paper); Ex. 8 Doc. 0316306 (H.B. was sentenced to one

According to the assignment history data produced by IDOC, as of December 31, 2018, approximately 1,619 prisoners in the custody of IDOC were serving extreme isolation sentences. *See* DalSanto Decl. ¶ 9. Of these 1,619 individuals, over 59.6% had spent more one year or more in extreme isolation, 43.8% had spent two years or more in extreme isolation, 23.9% had spent more than five years in extreme isolation, 15.8% had spent more than seven years in extreme isolation, and 4.8% had spent more than ten years in extreme isolation.[6] *See id.* 32.2% of the total prison population at Pontiac Correctional Center, for example, is in extreme isolation. DalSanto Decl. ¶ 10.  If the medium security unit is excluded, 48.1% of Pontiac's prisoners in the maximum security unit are in extreme isolation. *Id.* However, these statistics likely grossly underestimate the time spent in extreme isolation. For example, the assignment history dataset produced by IDOC shows Mr. Aaron Fillmore, a named plaintiff who was first placed in extreme isolation in 1998, was only first placed in extreme isolation in 2010. *Id.*; *see also* Ex. 25 at 45-46.

IDOC has subjected individuals such as Plaintiffs to extreme isolation in tiny, often windowless cages with little to no ventilation necessary to account for the lack of climate control; cages that are far smaller than the already small general population cells.  In fact, the tiny cells

---

month in segregation for possessing excess property, including toilet paper).

[6] G.A. was placed in segregation on June 23, 1994 and has been in segregation continuously since that time. *See* Ex. 9 Doc. 277774. For a stretch of more than six years, from December 8, 2001 through at least February 2008, G.A. did not receive a single disciplinary ticket, yet remained in segregation. *See* Ex. 10 Doc. 0278396. G.A. has been sentenced to serve time in segregation until 2031, which would result in 33 years of continuous time served in segregation. *Id.* H.B. was placed in segregation on March 9, 1998 and has been in segregation continuously since that time, a period of more than 21 years. *See* Ex. 11 Doc. 0316415; Ex. 12 Doc. 0316470. Henry Davis's file showed that he had no mental health issues until he was placed in extreme isolation on November 7, 2013. *See* Ex. 13 Doc. 237000. Mr. Davis has been kept in segregation or administrative detention since that time—a period of nearly six years—for alleged STG activity. During that period, he has experienced severe depression and anxiety that he attributes to extreme isolation. *See, e.g.*, Ex. 14 Doc. 237178.

holding these individuals for 23 or more hours each day are substantially smaller than the 50 square feet per person which the Illinois legislature now requires for all new, remodeled, and newly designed cells.[7] *See* 730 ILCS 5/3-7-3; *see also* Ex. 3 Haney Report ¶ 229; Ex. 4 Vail Report ¶ 39; Ex. 16 Doc. 037851. Led in shackles to these tiny, filthy, cold, and barren cages, these individuals are held in isolation for 23 hours or more a day, and are deprived of meaningful social interaction and any ability to engage in any meaningful or productive physical or mental activity, including educational programs. *See, e.g.*, Ex. 3 Haney Report ¶¶ 29, 93; Ex. 4 Vail Report ¶ 70. Examples of these segregation "cages" at IDOC's prison in Menard, Illinois, are shown below in photos taken in late 2018 during Professor Craig Haney's and Mr. Eldon Vail's inspections.



---

[7] Many of these cells were remodeled to replace the traditional bars with solid doors, which not only further restrict light and fresh air, but also violates current Illinois requirements regarding statutory size requirement. *See* Ex. 3 Haney Report ¶ 88; Ex. 4 Vail Report ¶¶ 40–42.



Moreover, correctional officers under the supervision and control of IDOC often engage in practices which impose additional punishment beyond what is allowed under the policies governing placement in extreme isolation by depriving these prisoners of what little sustenance remains—access to nourishment and edible food, exercise, showers, bedding, and personal effects (including their clothing) may all be arbitrarily denied and/or taken away without regard to their constitutional due process rights. Ex. 4 Vail Report ¶¶ 14–20; *infra* Section II.A.

IDOC's indifference to prisoners' due process rights is evident in the conduct of prison officials at all levels of IDOC. For example, IDOC's Chief of Operations was informed that the disciplinary report that led named Plaintiff Henry Davis to be placed in administrative detention had been expunged.  Ex. 17 Doc. 052472–74.  The Chief of Operations responded that Davis would be placed in administrative detention regardless, and a Deputy Commander for IDOC Intelligence agreed with the placement, commenting that the expungement "***doesn't change who he is or what he did***." *Id.* (emphasis added).

IDOC's extreme isolation policies and practices are cruel, inhumane, offensive to basic human decency, and in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiffs, who are or have been held by IDOC in extreme isolation, bring this civil rights action pursuant to 42 U.S.C. § 1983 individually and on behalf of all prisoners who are now or will be incarcerated in adult correctional facilities by IDOC and thus who are at risk of being subjected to extreme isolation or who are currently subjected to extreme isolation. Plaintiffs challenge IDOC's policies and practices, which place every individual incarcerated in an IDOC facility at risk of being subjected to extraordinarily long and severely harmful extreme isolation without constitutionally required due process. Consequently, Plaintiffs seek injunctive relief against the unconstitutional use of extreme isolation by IDOC. As demonstrated herein, the Rule 23 requirements for certifying a class action are satisfied.

## **PROCEDURAL HISTORY**

Plaintiffs filed this action on June 2, 2016.  Dkt. 1.  Thereafter, Defendant moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 22; Dkt. 23. After receiving briefs from the parties, this Court denied Defendant's Motion to Dismiss. Dkt. 71.

In regard to Plaintiffs' alleged conditions of confinement, this Court noted:

The Eighth Amendment requires a minimum standard for treatment of prisoners including that prisoners are provided with humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). Inmates must be provided with "adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* (citations omitted).  In order to succeed on a claim for inhumane conditions of confinement, an inmate must establish: (1) that he was housed under conditions that were "'sufficiently serious' so that 'a [jail] official's act or omission results in the denial of the minimal civilized measure of life's necessities'", and (2) the defendant was deliberately indifferent to that risk. *See Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008); *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008). In order to prove deliberate indifferen[ce], the plaintiff must show that the officials actually knew of the

condition but refused to take reasonable steps to resolve it. *Townsend*, 522 F.3d at 773; *Grieveson*, 538 F.3d at 775.

*Id.* at 9–10.

In regard to Plaintiffs' alleged deprivation of liberty interests, this Court observed:

[M]ore recent Seventh Circuit cases have found that other forms of detention beyond disciplinary segregation can implicate a liberty interest, depending on the length of and conditions in detention. *Compare Townsend*, 522 F.3d at 722 ("established position that inmates have no liberty interest in avoiding placement in discretionary segregation") *with Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697–98 (7th Cir. 2009) (distinguishing from *Townsend* case noting that it involved a relatively short period of segregation); *Earl v. Racine County Jail*, 718 F.3d 689, 691 (7th Cir. 2013) (although finding that inmate's placement on suicide watch did not implicate a liberty interest, the Seventh Circuit noted that when an inmate is placed in more restrictive conditions, whether through protective custody or discretionary administrative segregation, "his liberty is affected only if the more restrictive conditions are particularly harsh compared to ordinary prison life or if he remains subject to those conditions for a significantly long time.").

*Id.* at 14.

After denying Defendants' Motion To Dismiss, this Court entered a series of case management schedules with discovery deadlines. Dkt. 28, 84, 121, 136, 168. The Scheduling and Discovery Orders entered by this Court permitted a "preliminary inquiry into the merits of the case" and stated that "priority shall be given to discovery on class issues." *See, e.g.*, Dkt. 168. In order to conduct this preliminary inquiry, Plaintiffs requested and Defendant produced a sample of master files of 5% of randomly-selected prisoners who are currently in extreme isolation. Plaintiffs also took the depositions of six current or former IDOC employees, two current or former employees of the Vera Institute, and one inmate currently in extreme isolation in Illinois prisons. Additionally, Plaintiffs issued requests for the production of IDOC documents and retained two expert witnesses to prepare expert declarations in support of our motion for class certification after reviewing the record evidence, touring certain prisons, and interviewing prisoners in extreme isolation. Defendant also deposed the six named Plaintiffs about their conditions of confinement.

## STATEMENT OF FACTS

IDOC has known that its policies, customs, and practices are unconstitutional for years, but has failed to remedy its systematic constitutional violations. In 2009, IDOC retained the Vera Institute of Justice[8] to study IDOC's segregation policies and to make recommendations for reform. Ex. 18 Austin Dep. 25:20–27:25.   The Vera Institute, in turn, retained Dr. James Austin, a renowned authority on correctional planning and research, to conduct the study.[9] Dr. Austin visited IDOC's prisons across the State of Illinois, interviewed IDOC staff, and studied IDOC's policies. Among other things, he observed that 70 people in the IDOC prison in Pontiac, Illinois were subjected to disciplinary segregation sentences in excess of 10 years, *id.* at 188:1–11, and that the average segregation sentence imposed in Pontiac was 1,652.7 days. *Id.* at 187:13–18.   One individual at Pontiac had been sentenced to 32,219 days in segregation, which was 76.5 years beyond their release date. *Id.* at 192:7–10.

After studying IDOC's segregation facilities and policies, Dr. Austin presented IDOC with his "major findings" in 2010. *Id.* at 85:4–90:17, Dep. Ex. 8; Dkt. 115 at 2–3.   Dr. Austin's findings included:

1. "[A]s a general rule, those persons who were in segregation at the Illinois Department of Corrections were subject to degraded conditions of confinement versus those who were in the general population." *Id.* at 92:24–93:5.

2. "[A] lack of uniformity between the types of [segregation] placements and the lengths of stay on the one hand, and the prior and current negative behavior on the other." *Id.* at 101:9–13.

---

[8] The Vera Institute of Justice is a nationally-recognized not-for-profit organization dedicated to improving justice systems.  www.vera.org/about.

[9] Dr. Austin has a Ph.D. in sociology from the University of California, Davis and over 25 years of experience in correctional planning and research. Ex. 18 Austin Dep. 9:17–10:22. He has served as the director of several large U.S. Department of Justice ("DOJ") funded research and evaluation programs relating to correctional issues. *Id.* at 11:3–20.

3. "Prisoners in minimum custody who receive a major ticket receive [disciplinary segregation] rather than a change in custody." *Id.* at 109:5–15.

4. "There appears to be no formal policies standardizing wardens' authority to reduce the amount of time in [disciplinary segregation] for good behavior based on an agreed-upon plan, nor is there a structured re-entry process for prisoners returning to general population from [disciplinary segregation]." *Id.* at 110:19–111:7.

5. "[T]he conditions of confinement in [disciplinary segregation] are not acceptable with respect to recreation, showers, mental health treatment or contacts with clinical services staff and are not in line with best or standard practices in other systems." *Id.* at 117:7–20.

6. "The use of the step-down program from [administrative disciplinary segregation] is extremely limited." *Id.* at 118:25–119:14.

7. "Compared to other states, IDOC has a higher number of people in [disciplinary segregation] status, about 4 percent." *Id.* at 124:20–125:3. "4 percent is very high for a state to have in disciplinary segregation." *Id.* at 125:20–21.

8. "Illinois is an outlier compared to other states in the union." *Id.* at 125:22–24.

In January 2013, Dr. Austin delivered to IDOC the Vera Institute's Recommendations. *Id.* at 154:5–25, Dep. Ex. 13. Vera Institute made 16 recommendations necessary to overhaul IDOC's segregation policies. *Id.* at 160:1–14, Dep. Ex. 13; Dkt. 115 at 2–3. In the end, IDOC only accepted and implemented one of the 16 recommendations that related to prison transfers.[10] *Id.* at 160:1–14. As of his deposition on October 2, 2017, Dr. Austin was not aware of any additional steps IDOC had taken to implement any of the remaining 15 reform recommendations. *Id.* at 162:7–163:13. IDOC's lack of commitment to Vera Institute study and recommendations is apparent and caused Dr. Austin to express the "sentiment that if the [IDOC] was not going to be totally committed to the project, [he] certainly could work somewhere else." *Id.* at 172:23–173:9.

More than six years later and after three years of discovery in the present matter nothing

---

[10] IDOC adopted Vera's recommendation to "[r]equire the Regional Deputy Director and the Chief of Operations to approve all transfers to and from Pontiac and Tamms." Ex. 18 Austin Dep. 160:1–161:4, Dep. Ex. 14 at 3.

much has changed. IDOC currently operates 25 prison facilities throughout the State of Illinois that house 1,479 prisoners in disciplinary segregation and in administrative detention, and 133 in investigative status or temporary confinement. DalSanto Decl. ¶ 10.[11] IDOC administers the prison facilities and their operations pursuant to the regulations in the Illinois Administrative Code as executed by Director Jeffreys and his staff, who also oversee the wardens, or chief administrative officers, of each of the facilities. 730 ILCS 5/3-2-3 (West 2018); 730 ILCS 5/3-6- 2(a) (West 2019). The prison wardens oversee the operations of their assigned prison facilities in accordance with IDOC policies and procedures. 730 ILCS 5/3-6-2(a).

### IDOC'S Policies And Practices Deprive Prisoners In Its Custody Of Their Constitutionally-Guaranteed Due Process Rights

A prisoner may be placed in disciplinary segregation after a disciplinary hearing has been held. 20 ILL. ADMIN. CODE § 504.610 (West 2017). Prisoners who are placed in disciplinary segregation are automatically demoted to "C" grade, which renders them ineligible to receive institutional privileges, except yard time, as well as imposes restrictions on their commissary access and personal visits. 20 ILL. ADMIN. CODE § 504.130; Ex. 20 Atchison Dep. 84:6–16. In addition to "C" grade demotion, prisoners in disciplinary segregation also have yard restrictions limiting their time to eight hours per week that is to be distributed over the course of two or more days. 20 ILL. ADMIN. CODE § 504.670.

---

[11] These numbers are necessarily imprecise. Not only does the number of people held in extreme isolation change on a daily basis, but defendants have provided wildly different numbers at different points in this case. For example, the statistics produced by the defendants on February 28, 2019 list the population in extreme isolation as 1,619, while Defendant Baldwin testified at his deposition that 2,800 people were held in restrictive housing. DalSanto Decl. ¶¶ 2, 9; Ex. 19 Baldwin Dep. 44:4–16. Finally, the defendants have created new labels for extreme isolation, including "room restriction" where people are not moved to a different cell, but their out of cell time and other privileges are reduced to the point that they are indistinguishable from disciplinary segregation.

Prisoners can also be placed in Administrative Detention, which is allegedly "a nondisciplinary status of confinement that removes an offender from general population or restricts the individual's access to general population." *Id*. § 504.690.[12] Because administrative detention is supposedly "nondisciplinary," a prisoner need not be found to have violated any department rule to be placed in extreme isolation under this label. However, the standards governing living conditions for prisoners in administrative detention are in all meaningful respects the same as those for prisoners in disciplinary segregation. *Id*.; *see also* Ex. 21 Funk Dep. 36:9–38:16.

Investigative status is defined as "a confinement status in which an offender's movement may be restricted while an incident or matter is being investigated." 20 ILL. ADMIN. CODE § 504.12. Similarly, temporary confinement is defined "a confinement status in which an offender may be placed until a determination is made as to whether a disciplinary report or investigative report is to be issued, or pending a disciplinary hearing." *Id*. In general, prisoners housed in one form of extreme isolation in IDOC are held in the same areas and cells as those held in other| forms of extreme isolation.[13]

Prisoners are not afforded meaningful procedural rights to properly defend themselves against being placed in extreme isolation. At disciplinary hearings, IDOC officials routinely present no evidence on the basis of "confidentiality" concerns, refuse prisoners' request to call witnesses to testify on their behalf, do not allow prisoners to question the witnesses who testify against them (and sometimes they are not even allowed to know who those witnesses are), and in many cases are not even allowed to view the evidence used to find them guilty.[14] Before the

---

[12] The "general population" refers to those prisoners who are not given any specific treatment.
[13] Ex. 1 Pfister Dep. 21:21–22:15; Ex. 2 Taylor Dep. 88:9–12; 20 ILL. ADMIN. CODE § 504.40.
[14] Ex. 4 Vail Report ¶¶ 103–126; Ex. 22 Davis Dep. 19:15–20, 21:2–22:3, 22:13–24; Ex. 23 Coleman (10.21.2015) Dep. 81:14–85:11; Ex. 24 Coleman (06.27.2018) Dep. 34:8–36:2; Ex. 25

hearing, prisoners are not often provided with notice sufficient to allow them to prepare a defense.[15] After the hearing, they are not provided with an explanation of why they were found guilty or why a specific sentence of extreme isolation was imposed.[16] For placement in administrative detention, temporary confinement, and investigative status, there is no initial hearing, and prisoners are routinely placed in these forms of extreme isolation based off of "confidential" information.[17] Before being placed in extreme isolation, prisoners are not allowed to properly defend themselves. Ex. 4 Vail Report ¶¶ 103–126.

### Inhumane and Unconstitutional Living Conditions in Extreme Isolation

The conditions in extreme isolation differ drastically from those in general population. Cells housing prisoners in extreme isolation are less than five-by-ten feet with up to two prisoners housed in each cell.[18] And prisoners in extreme isolation can be left in their cells for 24 hours a day with literally nothing to do.[19]

Prisoners in extreme isolation face almost the complete deprivation of meaningful social interaction. Decades of research have shown that social interaction is fundamental to the physical and mental well-being of all human beings and just as necessary to survival as shelter, fresh air,

---

Fillmore (10.8.2015) Dep. 14:16–17:14; 49:16–55:24, 87:15–88:15; Ex. 26 Doc. 0162826 (P.A. requested four witnesses at his disciplinary hearing and the request was denied).

[15] Ex. 4 Vail Report ¶¶ 103–126; Ex. 22 Davis Dep. 21:2–22:3, 22:13–24, Ex. 23 Coleman (10.21.2015) Dep. 81:14–85:11; Ex. 25 Fillmore (10.8.2015) Dep. 14:16–17:14; 49:16–57:6, 87:15–88:15.

[16] Ex. 4 Vail Report ¶¶ 103–126; Ex. 22 Davis Dep. 13:1–4, 14:13–15:4, 20:11–20, 23:9–24:3, 26:24–27:12; Ex. 23 Coleman (10.21.2015) Dep. 81:14–85:11; Ex. 27 Coleman (10.28.2015) Dep. 122:20–131:11; Ex. 25 Fillmore (10.8.2015) Dep. 14:16–17:14; 49:16–57:6, 87:15–88:15.

[17] Ex. 4 Vail Report ¶¶ 72–73, 132–135; Ex. 28 Dansberry Dep. 16:14–17:23.

[18] Ex. 20 Atchison Dep. 102:2–24.

[19] Ex. 27 Coleman (10.28.2915) Dep. 110:6–111:6; Ex. 28 Dansberry Dep. 32:22–35:14; Ex. 25 Fillmore (10.8.2015) Dep. 19:7–20:4; Ex. 29 Gardner Dep. 10:13–11:4; Ex. 30 Shearrill Dep. 51:13–52:20.

and food and water. Ex. 3 Haney Report ¶¶ 51–67, 69, 76, 78, 79, 83.

Prisoners in extreme isolation are denied basic privileges afforded to those in the general population. This includes limited to no out of cell time, poor yard conditions, limited to no visitation, no-contact visitation, and limited to no phone privileges.[20] Recreation time can be spent isolated in barren "individual recreation pods" that IDOC's Chief of Operations agreed could fairly be characterized as cages. Ex. 21 Funk Dep. 61:14–63:2.

Prisoners in extreme isolation are also not given access, or at least meaningful access, to GED programs, religious programs or a Chaplain, mental health programs, medical treatment, or a law library.[21]

There is no limit on the amount of time a prisoner can be assigned to extreme isolation.[22] Within IDOC, there are currently more than 387 prisoners who have been in extreme isolation for more than five years and 78 prisoners who have been in extreme isolation for over 10 or more years. DalSanto Decl. ¶ 3, 9. There are even eleven documented prisoners who have been in extreme isolation for 20 or more years. *Id*. It is the "norm" in IDOC to sentence prisoners to back-to-back extreme isolation sanctions, a practice that makes it possible to hold prisoners in extreme isolation indefinitely.[23]

---

[20] Ex. 4 Vail Report ¶¶ 21–71; Ex. 22 Davis Dep. 37:17–38:9, 64:21–65:4, 65:11–66:13, 76:11–19, 77:3–17; Ex. 23 Coleman (10.21.2015) Dep. 19:20–22:20, 40:8–11, 53:3–5, 54:18–55:4, 55:20–56:9; Ex. 27 Coleman (10.28.2015) Dep. 112:2–24, 113:1–11, 137:13–141:10; Ex. 24 Coleman (6.27.2018) Dep. 37:15–23; Ex. 25 Fillmore (10.8.2015) Dep. 19:7–20:4, 21:25–23:1, 57:22–59:5, 67:24–70:7; Ex. 31 Fillmore (6.26.2018) Dep. 13:1–19:4; 34:6–35:11; Ex. 29 Gardner Dep. 11:5–21, 19:21–21:19, 38:9–39:22; Ex. 28 Dansberry Dep. 33:9–18.
[21] Ex. 22 Davis Dep. 58:13–59:5, 60:4–61:3, 61:18–63:4, 63:8–16; Ex. 27 Coleman (10.28.2015) Dep. 113:1–11; Ex. 25 Fillmore (10.8.2015) Dep. 20:8–21:8, 70:16–72:19; Ex. 31 Fillmore (6.26.2018) Dep. 30:10–32:7, 36:21–38:15, 64:2–20; Ex. 29 Gardner Dep. 12:7–13:20, 16:13–17:5, 22:16–24:5, 27:9–29:4; Ex. 28 Dansberry Dep. 30:14–31:5.
[22] Ex. 19 Baldwin Dep. 66:11–67:2; DalSanto Decl. ¶¶ 3–10.
[23] Ex. 20 Atchison Dep. 196:5–197:6; *see also* Ex. 4 Vail Report ¶¶ 78–81.

The conditions of extreme isolation cause and worsen existing psychological issues.[24] Despite IDOC's knowledge that prolonged stays in extreme isolation cause and exacerbate existing physical and psychological issues,[25] It has been estimated that 80% of prisoners in extreme isolation are mentally ill. Ex. 3 Haney Report ¶ 29.

Beyond this fundamental deprivation of meaningful social contact with other human beings, prisoners in Illinois' extreme isolation cells are also deprived of adequate food, shelter, and fresh air.

Shelter: Cell fixtures—such as toilets and sinks—are not properly maintained, with prisoners having to wait long periods of time for maintenance requests to be fulfilled.[26] The cells are often infested with bugs, mice, and birds.[27] The extreme isolation cells and areas surrounding the cells are not kept clean, and IDOC officials do not provide prisoners with appropriate cleaning supplies and do not clean showers and other common areas.[28]

Ventilation: Prisoners in extreme isolation also suffer from cells getting overheated in the summer and too cold in the winter, something caused by not having any air conditioning system at all, and inadequate heating systems, coupled with a complete lack of ventilation to provide air

---

[24] Ex. 4 Vail Report ¶ 71; Ex. 3 Haney Report ¶¶ 51–80, 203, 225; Ex. 23 Coleman (10.21.2015) Dep. 92:4–93:19, 94:3–24; Ex. 27 Coleman (10.28.2015) Dep. 118:22–119:20, 120:2–122:4; Ex. 24 Coleman (06.27.2018) Dep. 38:20–42:22, 50:18–51:8, Ex. 32 Jones Dep. 25:4–26:24.

[25] Ex. 19 Baldwin Dep. 87:14–89:1; Dkt. 115.

[26] Ex. 4 Vail Report ¶¶ 22–30.

[27] *Id.*; Ex. 22 Davis Dep. 38:16–20, 40:19–43:7; Ex. 23 Coleman (10.21.2015) Dep. 35:22–36:24, 37:1–16, 38:20–39:10, 41:1–43:4; Ex. 27 Coleman (10.28.2015) Dep. 104:7–9, 135:23–136:2; Ex. 24 Coleman (06.27.2018) Dep. 17:10–12, 29:8–30:16, 52:9–16; Ex. 28 Dansberry Dep. 17:24–18:19.

[28] Ex. 4 Vail Report ¶¶ 22–30 (noting that while touring IDOC facilities, he observed small black specs in the water, mattresses with blood stains and many that were soiled and beyond their useful life, and toilets that could not be flushed immediately or were broken); Ex. 23 Coleman (10.21.2015) Dep. 42:14–43:4; Ex. 28 Dansberry Dep. 17:24–22:21.

movement in extreme isolation cells.[29] IDOC officers also use the poor ventilation to "freeze out"

prisoners, as a form of punishment, by drastically decreasing the temperatures.[30]

Food: Prisoners are also given low-quality food and reduced portions, while in extreme

isolation.[31]

### IDOC is Aware That the Conditions in Its Prisons Are Inhumane and Unconstitutional And Still Refuses to Take Reasonable Steps to Remedy Its Unconstitutional Policies And Practices

IDOC has been on notice that the conditions of segregation violate prisoners' constitutional

rights from the Vera study, its employees working in these facilities every day, and by this Court

issuing an injunction after reviewing the conditions at Menard Correctional Facility. During

Director Baldwin's watch, this Court in *Turley v. Lashbrook*, No. 08-07-SCW, 208 WL 758236

(S.D. Ill. Sept. 28, 2016) permanently enjoined Jacqueline Lashbrook, then the warden of Menard

Correctional Center and one of Director Baldwin's subordinates, from double-celling (a practice

of housing two or more prisoners) resident Turley in a single segregation cell. This Court found

that the segregation cells in Menard's North 1 cell house are:

> shockingly small. They measure 4'8" wide by 10' 8" long. This provides total floor
> space of 49.68 square feet. The cells are walled on three sides and barred on the
> side of the cell entry. They were originally designed to house a single inmate. The
> cells are equipped with a bunk bed 6' 2" long by 31" wide and a toilet, sink, and
> TV stand on the far end of the cell. The height of the top bunk in relation to the
> bottom bunk makes it impossible for an average sized male to sit upright on the
> bottom bunk.

*Id.* at *2. "The only real activity that can be performed in this space is standing." *Id.* at *3.

---

[29] Ex. 4 Vail Report ¶¶ 46–56; Ex. 22 Davis Dep. 44:3–13, 46:3–7, 49:3–50:11; Ex. 33 Doc. 0312281 (M.C., an inmate in segregation, told a clinician that "[t]he heat doesn't work. See, it's about 30 degrees. I'm freezing").
[30] Ex. 4 Vail Report ¶ 51; Ex. 22 Davis Dep. 46:3–24.
[31] Ex. 24 Coleman (06.27.2018) Dep. 12:7–23; Ex. 31 Fillmore (6.26.2018) Dep. 10:14–12:24, 40:7–41:22; Ex. 29 Gardner Dep. 50:21–51:18, 52:2–53:11; Ex. 28 Dansberry Dep. 17:24–18:19, 26:9–28:1.

The Court further observed:

> On a good day, [Mr. Turley] will be out of his cell for four and ½ hours. On a bad day—one hour. During lockdowns, he won't leave his cell at all. In fact, during those periods, the inmates are confined to their cells 24 hours a day with the exception of one shower per week. In the past, the frequency and extent of the lockdowns was much worse.  Mr. Turley testified that they could last 30 to 60 days.

*Id.*

And the Court continued:

> In the summertime, the cells are unbearably hot due to high temperatures and humidity in Southern Illinois and the poor ventilation and lack of air conditions in the cells. At such times the stench from human body odors can be overwhelming. Mr. Turley described it as akin to living in a bathroom. Another prisoner testified it was similar to the odor of an indoor enclosure at a zo

*Id*.

The Court concluded that these conditions failed to meet the "minimal civilized measure of life's necessities." *Id.* at *4. These conditions are so extreme that they also cause an excessive risk to prisoners' mental and physical health.  *Id.*

The discovery taken in the instant action, including the accompanying reports of Plaintiffs' experts Dr. Craig Haney and Eldon Vail, confirm that Mr. Turley's extreme isolation, as found by this Court in *Turley v. Lashbrook* is consistent with that of the class representatives in this action and that of IDOC extreme isolation population generally.  The extreme isolation imposed by IDOC on the prisoners in its care violates both the Eighth Amendment and the Due Process Clause. Prisoners are placed in conditions unsuitable for human beings and denied basic privileges, without being afforded any meaningful process. All prisoners placed in any form of extreme isolation suffer the same violations of their Constitutional liberties.

Despite this lawsuit alleging that his agency is engaged in the unconstitutional and inhume treatment of the people in its custody, Defendant and IDOC Acting Director John Baldwin, who had been on the job since 2015, had not even read the Complaint in this action as of his deposition

on October 17, 2018. Incredibly, he had not investigated any of the Complaint allegations against him, and he had not instructed any of his subordinates to do so.[32]

Director Baldwin even admitted that the "extreme isolation" conditions alleged in Plaintiffs' Complaint are accurate descriptions of IDOC facilities.[33] Kim Butler, a retired Chief of Programs at IDOC and former Warden at Menard, concurs.[34]

Willfully ignorant, Director Baldwin testified that he was unaware of:

- The specific number of prisoner in administrative detention or segregation(but estimated that approximately 2,800 prisoners are in extreme isolation).[35]

- The number of prisoners cycling between disciplinary segregation and administrative housing.[36]

- 730 ILCS 5/3-7-3, which requires new and remodeled cells to be at least 50 square feet.[37]

- Any separate documents or policies outside of Rule 504 that govern the use of administrative detention.[38]

- Whether administrative detention is subject to the policies governing disciplinary segregation (504.690).[39]

- Whether prisoners in administrative detention and prisoners in disciplinary segregation are housed in the same housing units.[40]

---

[32] Ex. 19 Baldwin Dep. 33:11–35:4.

[33] *Id.* at 45:12–49:21.

[34] *See* Ex. 34 Butler Dep. 43:7–44:24 (testifying that the Complaint's description of "extreme isolation" is generally what takes place at Menard).

[35] Ex. 19 Baldwin Dep. 44:4–16; *see supra* note 8.

[36] Ex. 19 Baldwin Dep. 80:6–84:14.

[37] *Id.* at 164:11–165:3.

[38] *Id.* at 56:13–57:1. Other provisions governing the use of administrative detention include 730 ILCS 5/3-7-2 (setting forth basic provisions that IDOC facilities must provide for each inmate) and 730 ILCS 5/3-7-3 (mandating that IDOC facilities "shall be cleaned regularly and properly maintained" and requiring that facilities "provide at least 50 square feet of cell" space).

[39] Ex 19 Baldwin Dep. 54:23–56:11.

[40] *Id.* at 57:2–22.

- Any rule prohibiting stacking of disciplinary segregation time.[41]

- Any upper limits on the length of time a prisoner can be placed in extreme isolation.[42]

- Any disciplinary segregation time limits other than those in Rule 504 Table A, or any administrative detention time limits.[43]

- Whether the requirements of 504.115 (Indeterminate and Long Term Segregation Placement) are being followed.[44]

- Any document or policy governing double celling.[45]

Director Baldwin was aware that the Vera Institute had worked with IDOC in 2010, but he never asked to see any of the results and no IDOC employees ever showed him the 2010 findings and recommendations.[46] As for Vera's conclusions as memorialized in the June and July 2010 Exit Meetings as well as the "Policy Checklist" that Vera created, Baldwin testified that his deposition in 2018 was the first time he had seen any of these documents.[47]

## **LEGAL STANDARD**

Courts have "broad discretion" to determine whether to certify classes. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998) (internal quotations and citations omitted). This determination involves some consideration of the merits: "[m]erits questions may be considered to the extent - but only to the extent - that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. I184, 1994–95 (2013). For a class to be certified, it must satisfy the requirements of Federal Rule

---

[41] *Id.* at 78:5–79:3, 86:6–17.
[42] *Id.* at 65:6–67:17.
[43] *Id.* at 86:1–5, 94:9–17.
[44] *Id.* at 72:7–76:24.
[45] *Id.* at 94:18–96:7.
[46] *Id.* at 192:11–195:4; Dkt. 115 at 4–5.
[47] Ex. 19 Baldwin Dep. 192:11–195:4, 207:7–209:19; Dkt. 115 at 4–5.

23(a), and qualify as one of the three types of classes authorized by Federal Rule 23(b).

To satisfy Rule 23(a), the proposed class must meet four requirements: (1) the class must be "so numerous that joinder of all members is impracticable"; (2) there must be "questions of law or fact common to the class"; (3) the claims or defenses of the named plaintiffs must be "typical of the claims and defenses of the class"; and (4) "the representative parties will fairly and adequately protect the interest of the class." FED. R. CIV. P. 23(a).

Once the requirements of Federal Rule 23(a) are met, a class action may be maintained under Federal Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). "When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute." *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 362–63 (2011).

## ARGUMENT

## I.   THE CLASS IS TOO NUMEROUS FOR JOINDER TO BE PRACTICAL

The proposed Class in this case satisfies the numerosity requirement for class certification because the proposed class includes tens of thousands of putative class members, who reside or will reside in IDOC prisons, have limited resources, and whose claims may arise over time. A class may be certified under Federal Rule of Civil Procedure 23 if it is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The numerosity inquiry does not turn on whether the class includes some specific threshold number of members. *See Allen v. City of Chicago*, 828 F. Supp. 543, 550 (N.D. Ill. 1993). Instead, the class must be composed of enough members for their joinder to be impracticable. *See Priutt v. City of Chicago*, 472 F.3d 925, 926–27 (7th Cir. 2006); *Barragan v. Evanger's Dog & Cat Food Co.*, 259 F.R.D. 330, 333 (N.D. Ill.

2009).  In cases where—as here—a class of prisoners challenges specific prison policies, the Class satisfies the numerosity requirement because the significant size of the prisoner population affected by each prison policy renders joinder virtually impossible.[48]

Here, joinder of all putative class members' claims is impracticable because of the size of the proposed Class.  There are approximately 38,000 prisoners held in IDOC facilities.  *Operations and Management Report (OMR) Key Variables, Fiscal Year 2020*, ILLINOIS DEPARTMENT OF CORRECTIONS 2 (July 2019), https://www2.illinois.gov/idoc/reportsandstatistics/Documents/JHA %20OMR%20JULY%20FY20.pdf.  Currently, there are around 1,600[49] prisoners confined in extreme isolation throughout IDOC on a daily basis with around 10,000 prisoners held in extreme isolation for some period of time each year. DalSanto Decl. ¶¶ 5–9, 10; *see also* Ex. 19 Baldwin Dep. 44:8–45:11 (testifying that there are 2,860 inmates who face some restriction on their privileges and movement while incarcerated). And the risk of being charged with a disciplinary infraction at any time leading to placement in temporary confinement, investigative status, or disciplinary segregation is not limited to prisoners housed in maximum-security prisons, the risk is also present for prisoners in minimum- and medium-security prisons. *See* 20 ILL. ADMIN. CODE §§ 504.20, 504.30. Further, any prisoner in any IDOC facility could be placed in administrative detention at any time with no charge at all. *Id.* § 504.690.

In addition to the sheer number of individuals in the putative Class, judicial economy, location of class members, and the inability of class members to bring their own individual actions

---

[48] *See Holmes et al. v. Godinez*, 311 F.R.D. 177, 217 (N.D. Ill. 2015); *Jackson et al. v. Sheriff of Cook Cnty.*, No. 06 C 0493, 2006 WL 3718041, at *3 (N.D. Ill. Dec. 14, 2006); *Westefer et al. v. Snyder et al.*, Nos. 00-162-GPM, 00-708-GPM, 2006 WL 2639972, at *3 (S.D. Ill. Sept. 12, 2006); *Lippert v Baldwin*, 10 C 4603, 2017 WL 1545672, at *2 (N.D. Ill. April 28, 2017); *Rasho v. Walker*, 07-1298-MMM, 2016 WL 11514940, at *1 (C.D. Ill. Feb. 8, 2016).
[49] See *supra* note 8 for caveat as to the accuracy of the population figures.

supports a finding that the numerosity requirement has been met. Without class treatment, each putative class member would need to bring an individual suit against IDOC addressing the same or very similar legal claims, resulting in indefinite future litigation and a waste of judicial resources. Even if the claims were joined, it would be nearly impossible for class members to coordinate their efforts meaningfully or to participate in the prosecution of their claims because prisoners are incarcerated in various facilities throughout the State of Illinois and cannot readily travel to participate in litigation. *See Holmes*, 311 F.R.D. at 217; *Arenson v. Whitehall Convalescent & Nursing Home*, 164 F.R.D. 659, 663 (N.D. Ill. 1996) (holding that factors such as "judicial economy, geographic diversity of the class members, and the ability of class members to institute individual lawsuits" can support a finding that a class is too numerous for joinder to be practical). Likewise, virtually all of IDOC prisoners lack the financial resources necessary to support the pursuit of their claims on an individual basis, even if joined together in the same action. *See Fields v. Maram*, No. 04-C-0174, 2004 WL 1879997, at *5 (N.D. Ill. Aug. 17, 2004).

Joinder is also impracticable here because membership in the Class is not static—the Class necessarily includes prisoners who are not yet—but will be—housed in extreme isolation or at risk for being housed in extreme isolation under the same policies and practices in the future. *See U.S. ex rel. Green v. Peters*, 153 F.R.D. 615, 618 (N.D. Ill. 1994) ("There is no question that a class of 300 is such that joinder is impracticable—and when the class is also fluid as it is here (with new members constantly meeting the class definition as time passes), the true impracticability of joinder is reinforced."). Further, the proposed Class seeks injunctive relief from the application of various unconstitutional IDOC policies and practices related to assignment in extreme isolation. A decision on these claims will necessarily affect the rights of class members who cannot be joined to the instant action.

## II. IDOC'S UNCONSTITUTIONAL POLICIES AND PRACTICES PRESENT QUESTIONS OF FACT AND LAW THAT ARE COMMON TO THE CLASS

Plaintiffs satisfy Rule 23's "commonality" requirement because their claims raise questions of fact and law that are common to all members of the proposed Class. *See* Fed. R. Civ. P. 23(a)(2). Class members' claims must "depend upon a common contention" that is "capable of classwide resolution" to establish commonality. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Brand v. Comcast Corp., Inc.,* 302 F.R.D. 201, 218 (N.D. Ill. 2014). "What matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. This standard can be met by providing "significant proof" that the defendant operated under a general policy of harm shown through a direct statement or action generally applicable to the entire proposed class despite the fact that there is necessarily "some degree of factual variation." *Id.* at 353; *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 413 (N.D. Ill. 2012).

Specifically, Plaintiffs' claims satisfy the commonality requirement because they seek to remedy the systematic violations of class members' Eighth and Fourteenth Amendment rights stemming from IDOC's policies and practices related to the use of extreme isolation. Courts in this Circuit and elsewhere routinely certify classes where "overarching systematic deficiencies" in a government agency create "risk of harm" for all putative class members. *See N.B. v. Hamos*, 26 F. Supp. 3d 756, 773 (N.D. Ill. 2014) (finding the *Wal-Mart* and the Seventh Circuit "specifically allow[]" for the finding of commonality "where a 'systemic failure' or an 'illegal policy' is alleged; the policy is the 'glue' that unites otherwise individual claims"). This is especially true in cases where, as here, plaintiffs seek class-wide injunctive relief from unconstitutional prison policies,

practices, and conditions. *See Lacy et al. v. Cook Cnty.*, 897 F.3d 847, 866 (7th Cir. 2018).[50]

"[N]umerous courts have concluded that the commonality requirement can be satisfied by proof of the existence of systemic policies and practices that allegedly expose inmates to a substantial risk of harm." *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014) (citing *Chief Goes Out v. Missoula Cnty.*, No. 12-Civ-155, 2013 WL 139938, at *5 (D. Mont. Jan. 10, 2013)).[51] Plaintiffs claim, and intend to prove at trial, that IDOC's policies and practices concerning extreme isolation violate the Eighth and Fourteenth Amendments of the Constitution. By its own admission, IDOC's policies, including those related to extreme isolation, apply generally to all prison facilities and prisoners in IDOC's system.  *See* Ex. 1 Pfister Dep. 82:14-20; Ex. 19 Baldwin Dep. 167:5–168:6.

Class action treatment is appropriate in this case because the class claims revolve around common questions of fact and law, the answers to which will confirm that IDOC is systematically violating the Constitutional rights of the named plaintiffs and all members of the class. *See Wal-Mart*, 564 U.S. at 350. With regard to Plaintiffs Eighth Amendment claim, the common questions

---

[50] *See also Lippert et al. v. Baldwin et al.*, No. 10-C-4603, 2017 WL 1545672, at *3–4 (N.D. Ill. Apr. 28, 2017) (certifying a class of prisoners challenging nine IDOC policies and practices concerning treatment of serious medical conditions that exposed all class members to the substantial risk of harm); *Holmes et al. v. Godinez*, 311 F.R.D. 177, 218–19 (N.D. Ill. 2015) (certifying a class of deaf prisoners in IDOC and finding commonality where Plaintiffs alleged and "sufficiently proved the existence of the statewide policies and practices"); *Jackson et al. v. Sheriff of Cook Cnty.*, No. 06-C-0493, 2006 WL 3718041, at *4 (N.D. Ill. Dec. 14, 2006) (certifying a class of prisoners who complained of STD screening procedure that precluded valid consent); *Westefer et al. v. Snyder et al.*, Nos. 00-162-GPM, 00-708-GPM, 2006 WL 2639972, at *4 (S.D. Ill. Sept. 12, 2006) (certifying a class with the "chief questions presented by the case [being] whether Plaintiffs and the class [had] a liberty interest in avoiding assignment to Tamms and, if so, what procedures are constitutionally required to safeguard that interest").

[51] *See also Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013); *Hughes v. Judd*, No. 12 Civ. 568, 2013 WL 1821077, at *23 (M.D. Fla. Mar. 27, 2013); *Rosas v. Baca*, No. 12 Civ. 428, 2012 WL 2061694, at *3 (C.D. Cal. June 7, 2012); *Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r. Indiana Dep't of Corr.*, No. 08 Civ. 1317, 2012 WL 6738517, at *18 (S.D. Ind. Dec. 31, 2012).

permeating the class's Eighth Amendment claims include, but are not limited to:  whether IDOC's policies and practices regarding extreme isolation resulted in harm, and may result in serious future harm, to prisoners in their care; whether the dangerous conditions resulting from IDOC's policies and practices of extreme isolation deprive class members of their basic human needs; whether IDOC was deliberately indifferent to the harm that extreme isolation causes; and whether Defendant Jeffreys, in his official capacity at IDOC, has violated the Constitution by subjecting prisoners to unwarranted and unacceptable extreme isolation.

The Class's Fourteenth Amendment claims also turn on common questions, including, but not limited to: whether IDOC prisoners are, as a matter of policy or practice, subjected to disproportionately unfair extreme isolation sentences; whether IDOC's policies regarding the use of extreme isolation are vague and arbitrary; whether the length of disciplinary segregation sentences are arbitrary and subject to abuse; whether the severe conditions the class members face in extreme isolation implicate a constitutionally protected liberty interest; whether IDOC's disciplinary hearing policies and procedures afford prisoners due process to address the allegations brought against them; whether the long-term use of extreme isolation as punishment results in harm to individuals; and whether IDOC's practices and policies violate the Fourteenth Amendment by depriving prisoners of their rights to equal protection of the laws.

Any factual variances between the conditions at the different prisons does not defeat commonality because the common questions and answers are directly derived from IDOC's policies and practices.  *See Lacy*, 897 F.3d at 865–66; *Holmes et al. v. Godinez*, 311 F.R.D. at 218–20.  Even if the extreme isolation conditions in one prison are slightly better than the conditions in another, Rule 504 and IDOC's administrative directives apply to all facilities, and the commonality

of the class is derived from those policies and practices.[52] Additionally, IDOC's policies and practices apply equally to all inmates—including those who are single-celled and double-celled, which is allowed under Rule 504.[53] The Class faces the same constitutional violations caused by IDOC's policies and practices.

Further, IDOC's use of different terminology for temporary confinement, investigative status, disciplinary segregation, and administrative detention does not defeat commonality because the conditions of confinement of each housing status constitute extreme isolation, and IDOC houses prisoners in extreme isolation pursuant to the same set of policies, customs, practices, and conditions. *Id.*; Ex. 2 Taylor Dep. 88:9–12; 20 ILL. ADMIN. CODE § 504.620 (governing the "[s]tandards for living conditions in segregation," defined to include "[t]emporary confinement pending a disciplinary hearing or investigation" and "[d]isciplinary segregation resulting from a disciplinary hearing" in Section 504.610); 20 ILL. ADMIN. CODE § 504.690(d) (requiring "[l]iving conditions in administrative detention [to] meet, at minimum, the standards set forth in Section 504.620"). The policies and practices of IDOC are systemic and widespread, uniting prisoners through the common question of whether these policies and procedures violate the Constitution. *Chief Goes Out v. Missoula Cnty.*, No. CV 12-155-M-DWM, 2013 WL 139938, at *5 (D. Mont. Jan. 10, 2013) ("[C]ourts have long recognized that, in prison condition cases . . . the injury is the [deprivation] itself, not just the negative effects resulting from the [deprivation.]"); *Parsons*, 754 F.3d at 681 (9th Cir. 2014).

Because class treatment will produce common answers to the Class members' common questions of law and fact and the Class seeks injunctive and declaratory relief which will resolve

---

[52] *See* Ex. 1 Pfister Dep. 82:14–20.
[53] *See* 20 ILL. ADMIN. CODE § 504.620(a); Ex. 21 Funk Dep. 49:9–16.

each Class member's rights and claims, a class action is the sole and appropriate way to remedy IDOC's violations and the commonality requirement is satisfied.

**A.    IDOC Systematically Exposes the Class to Inhumane Conditions that Constitute Cruel and Unusual Punishment**

The inquiry into whether IDOC's policies and practices governing extreme isolation expose Plaintiffs and the proposed class members to inhumane and dangerous conditions that violate the Eighth Amendment's prohibition against cruel and unusual punishment will involve questions of fact and law common to all class members. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (holding that prison officials may violate the Eighth Amendment when they act with "more than ordinary lack of due care for the prisoner's interests or safety") (internal quotations omitted). The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide inmates with "adequate food, clothing, [and] shelter," and "take reasonable steps to guarantee the safety of inmates." *Id.* at 832–33. Accordingly, to prevail on an Eighth Amendment claim based on confinement conditions, "an inmate must establish: (1) that he was housed under conditions that were sufficiently serious so that a jail official's act or omission results in the denial of minimal civilized measures of life's necessities, and (2) that defendant was deliberately indifferent to that risk." *See* Opinion and Injunction, at 3, *Turley v. Lashbrook*, No. 3:08-cv-00007-GCS (S.D. Ill. Sept. 26, 2018), Dkt. 370 (internal quotations omitted) (citing *Farmer*, 511 U.S. at 834–37; *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008); *Grievson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008)).

**1.    IDOC's Extreme Isolation Practices Expose Class Members to Significant Risks of Physical and Mental Harm**

There is broad consensus in the corrections field and in the academic literature that the placement of prisoners in segregation, as opposed to general population, creates a significant risk of harm, both for those prisoners who are already mentally ill and those who are not. Ex. 3 Haney

Report ¶¶ 51–83. As Professor Haney explains, social isolation is a significant risk factor for depression, extreme anxiety, and significantly reduced cognitive function even for those who are not predisposed to psychological disorders. *Id.* ¶ 41. Persistent isolation also contributes to psychosis, paranoia, and suicidal behavior. *Id.* Indeed, extreme isolation "destabilizes prisoners by undermining their sense of self or social identity and eroding their connection to a shared social reality." *Id.* ¶ 77. "Isolated prisoners have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context." *Id.* Dr. Terry Krupers, one of the nation's foremost experts on the effects of isolation on prisoners, explains:

> It's predictable that prisoners' mental state deteriorates in isolation. Human beings require at least some social interaction and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality. In the absence of social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts. Disorganized behaviors emerge. Internal impulses linked with anger, fear and other strong emotions grow to overwhelming proportions.[54]

For people who already suffer from psychological problems, the effects of isolation can be even more debilitating. Ex. 3 Haney Report ¶ 79. "For prisoners prone to serious mental illness, time served in isolation and idleness exacerbates their mental illness and too often results in suicide."[55] Many of the IDOC prisoners Haney interviewed displayed symptoms of severe psychological and psychopathological harm as a result of the time spent in isolation.[56] At their depositions, the named Plaintiffs testified extensively about the disturbing and unsanitary

---

[54] Kupers, T., *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?*, The Routledge Handbook of International Crime and Justice Studies (2013), p. 5.
[55] *Id.* at p. 4.
[56] Ex. 3 Haney Report ¶ 27.

infestation problems that pervaded their cells during their segregation sentences at IDOC's various facilities. [57] These issues are common across IDOC facilities, and they can persist for weeks or even months before IDOC takes any steps to correct them.[58]

Further, cell temperature and poor ventilation were severe issues at every facility Mr. Vail inspected, with temperatures reaching extremes in the summer and winter months. According to one prisoner's testimony, temperatures were so frigid in the winter that prison administrators distributed plastic and tape for prisoners to cover the windows.[59] Indeed, in the harshest months, the temperatures would be nearly the same in the cell and outside the prison.[60]

In a disturbing and inhumane practice known to prisoners as "freezing out," IDOC corrections officers use frigid temperatures as a way of further punishing people housed in extreme isolation. "Freezing out" refers to corrections officers' routine use of large fans to blow freezing cold air through the cell blocks where individuals are housed in extreme isolation for hours at a time.[61]

Loss of Basic Privileges.   Prisoners who are housed in extreme isolation lose a variety of basic privileges that are afforded to those held in the general population, and the loss of these privileges exacerbates the deleterious physical and psychological effects stemming from severely limited interactions with the world outside their cells. The cells are specifically designed to limit a prisoner's contact with other prisoners and guards.  *See* Ex. 3 Haney Report, Ex. 3 thereto at *e.g.,*

---

[57] *See* Ex. 23 Coleman (10.21.2015) Dep. 35:22–43:4; 104:7–9, 135:23–136:2, Ex. 27 Coleman (10.28.2015) Dep. 17:10–12, 29:8–30:8; Ex. 28 Dansberry Dep. 17:24–18:19; Ex. 22 Davis Dep. 38:10–20, 40:19–43:7.
[58] *See* Ex. 4 Vail Report ¶¶ 24, 28–29.
[59] Ex. 4 Vail Report ¶¶ 49, 52; Ex. 28 Dansberry Dep. 18:9–13.
[60] *See, e.g.*, Ex. 4 Vail Report ¶ 46; Ex. 30 Shearrill Dep. 28:5–24.
[61] Ex. 4 Vail Report ¶ 51; Ex. 22 Davis Dep. 44:3–48:13.

134919, 134792, 134797, 0349447, 134670 and 034244. People housed in extreme isolation take their meals inside their cells, and receive decreased quantities of nutritionally sufficient food, which can itself be exposed to insects and rodents.[62]

Those held in extreme isolation also lose essential privileges, including the ability to make regular phone calls to friends or family, or regularly receive visitors.[63] 20 ILL. ADMIN. CODE §§ 504.130, 504.620(i). Prisoners' access to basic religious and educational programming is also either nonexistent or significantly diminished while in extreme isolation.[64] Further, prisoners held in extreme isolation are generally not permitted to spend time outside their cells in congregate spaces such as yards or day rooms, and they are generally not allowed to hold jobs within the prison that would otherwise be opportunities for meaningful social interaction. All of these basic privileges and opportunities, which prisoners lose near total access to in extreme isolation, are widely available to prisoners housed in the general population. Consequently, those in extreme isolation do not have the meaningful opportunities for simple social interaction afforded to the general population. *See* Ex. 4 Vail Report ¶¶ 14, 20, 69.

Out of Cell Time.  Time afforded to prisoners outside of their cells is essential to their wellbeing, but people held in extreme isolation are confined to their cells for upwards of 23 hours per day. As Professor Haney explains, one of the primary reasons out of cell time is so important is due to the stress of social isolation and physical limitations that come with living in segregation. Ex. 3 Haney Report ¶¶ 92–93. Yet, under IDOC's policies, access to recreation time is extremely limited and the conditions prisoners face outside their cells can be similarly inadequate.  IDOC's

---

[62] *See, e.g.*, Ex. 27 Coleman (10.28.2015) Dep. 12:1–15:18; Ex. 22 Davis Dep. 51:12–52:10, 52:16–53:8.
[63] *See, e.g.*, Ex. 23 Coleman (10.21.2015) Dep. 54:18–55:4, 55:20–56:9, 137:13–141:10.
[64] *See, e.g.*, Ex. 23 Coleman (10.21.2015) Dep. 19:20–22:20, 40:8–11, 113:1–11.

current policy provides, "[o]ffenders in segregation status shall be afforded the opportunity to recreate outside their cells a minimum of eight hours per week distributed in increments over no less than two days per week." 20 ILL. ADMIN. CODE § 504.670(a). However, IDOC officials at each prison can distribute the allotted time at their discretion leading to allotments that only exacerbate the effects of extreme isolation. *Id.* §§ 504.670(b)–(g). For example, prisoners can receive access to the "yard" as little as two to three times per week. Because that recreation requirement can be met without an opportunity for "congregate" recreation (i.e., recreation with other human beings), moreover, that time out of cell can be spent confined alone to a different cell, "a pod that has wire metal walls," and nothing else.[65] Further, despite regulations to the contrary, all prisoners who were deposed indicated that they routinely receive less than the eight hours provided by IDOC's policy.[66]

When prisoners are permitted to take recreational time, the yard conditions are unsanitary and unsafe. Access to toilets and water in recreation areas is inconsistent, if it exists at all.[67] At certain prisons, recreational areas consist of small, concrete square confinements that are fenced in like "dog cages."[68] Prisoners are left outside on a bare slab of concrete with nothing to occupy their time and no equipment with which to physically exercise.[69] Further, supervision on the collective yards is often limited or nonexistent, which creates the severe risk of violence and physical harm from other prisoners leading many to decline yard time even when it is offered for

---

[65] Ex. 21 Funk Dep. 54:1–16, 61:14–62:14.
[66] Ex. 4 Vail Report ¶ 61; Ex. 23 Coleman (10.21.2015) Dep. 110:6–112:1; Ex. 28 Dansberry Dep. 32:22–36:25; Gardner Dep. 11:5–21.
[67] Ex. 4 Vail Report ¶ 61.
[68] Ex. 25 Fillmore (10.8.2015) Dep. 19:7–20:4; 21:9–19; Ex. 3 Haney Report, Ex. 3 thereto at *e.g.,* pages 0349276, 0349289, and 0349303.
[69] Ex. 34 Butler Dep. 40:22–43:6, 50:3–18; Ex. 31 Fillmore (6.26.2018) Dep. 13:1–19:4, 34:6–35:11; Ex. 29 Gardner Dep. 19:21–21:19.

fear of assaults by other prisoners.[70]

Individuals held in extreme isolation are permitted to leave their cells to shower—a fundamental aspect of basic hygiene—as little as once a week.[71] 20 ILL. ADMIN. CODE § 504.670(g). Unfortunately, the shower facilities in the extreme isolation housing units are dysfunctional and unsanitary. *See* Ex. 3 Haney Report, Ex. 3 thereto at *e.g.,* 134930, 134952, 134955, 134810 and 134811. During his visits to Menard, Pontiac, and Statesville, Vail observed that the shower and hygiene facilities were dilapidated and filthy, appearing to be cleaned and maintained only rarely.[72] The showers at these prisons had visible rust and dirt caked on their surfaces, and showers at certain facilities lacked fixtures meant to ensure basic privacy.[73]

<u>Double Celling.</u>  The debilitating psychological effects of confinement in extreme isolation are further exacerbated for IDOC prisoners who are subjected to "double celling": housing multiple prisoners in the same cell. Double celling is permitted at all IDOC facilities. 20 ILL. ADMIN. CODE § 504.115; Ex. 34 Butler Dep. 32:8–33:23 (double celling is a "routine practice"); Ex. 20 Atchison Dep. 100:8–101:18; Ex. 19 Baldwin Dep. 95:14–96:7. Double celling leads to prisoners being "forced to interact with a cellmate under extremely close quarters that afford little or no privacy or respite."[74] Further, these individuals experience "constant and unavoidable violations of personal space, in an environment of forced closeness that affords them no respite

---

[70] Ex. 4 Vail Report ¶¶ 61–64.

[71] The named Plaintiffs consistently testified that while they were supposed to be allowed to shower three times a week, but in many cases, access to showers was even more limited. *See* Ex. 23 Coleman (10.21.2015) Dep. 62:1–63:3, 64:1–70:1, 72:7–78:1; Ex. 27 Coleman (10.28.2015) Dep. 49:18–50:17; Ex. 28 Dansberry Dep. 32:22–36:25; Ex. 22 Davis Dep. 36:19–37:12, 58:9–12; Ex. Ex. 25 Fillmore (10.8.2015) Dep. 21:25–23:1; 67:24–70:7; Ex. 29 Gardner Dep. 13:21–16:12.

[72] *See* Ex. 4 Vail Report ¶¶ 31–38.

[73] *See id.*

[74] Haney, *The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions*, 22 Wash. U. J. of L. & Pol. 265, 273 (2006).

from one another or opportunities to release the interpersonal tensions that inevitably result."[75]

Generally, IDOC does not have separate cells for double celling inmates, and prisoners may be double-celled in the same units described above, which are unfit for even a single occupant. Ex. 21 Funk Dep. 49:9–19 (testifying that there are no set limits on the size of cells used in double celling); Ex. 4 Vail Report ¶¶ 39–45. One prisoner at the Menard Correctional Facility explained that there is not even enough room in these cells for both prisoners to be on the floor of the cell at the same time.[76] If a prisoner protests being double celled, IDOC considers the prisoner to be disobeying a direct order, resulting in further loss or restriction of privileges. Ex. 34 Butler Dep. 89:15–90:8; 20 Ill. Admin. Code § 504 Tbl. A.

Many members of the putative class are double-celled. But this does not ameliorate the harm caused by social isolation. To the contrary, it makes it worse. The mental health of those held in extreme isolation depends on access to meaningful social interaction. On the other hand, forced proximity with for extended periods of time, with no privacy, does not amount to meaningful social interaction, but instead makes matters worse.

Double-celling significantly exacerbates the psychological effects of confinement in extreme isolation. The practice fosters forced, strained interactions between prisoners on a nearly constant basis.[77] In fact, under these harsh, strained conditions, the forced presence of another person may become an additional stressor and source of tension or conflict.[78] In Professor Haney's

---

[75] Record in *Mitchell v. Cate*, No. 08-CV-1196 TLN EFB (E.D. Cal.), Dkt. 189, at 11; *see also Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D. Cal. 1995) (prisoners held in extreme isolation "are severely deprived of normal human contact regardless of whether they are single or double celled").

[76] Ex. 4 Vail Report ¶ 39.

[77] *See* Ex. 3 Haney Report ¶ 91.

[78] *Id.*

and Mr. Vail's experience, assaults—and even lethal violence—between cellmates becomes more frequent in cases where prisoners are double celled in extreme isolation.[79]

This Court recently addressed IDOC's practice of double celling at Menard and found the practice to be inhumane and unconstitutional. *See Turley v. Lashbrook*, Dkt. 370, No. 3:08-cv-00007-GCS, at 9 (S.D. Ill. Sept. 26, 2018). As Judge Williams determined, even assuming that prisoners "receive all scheduled recreation, programming, and meals outside of the cell," double celling "provides [] inmates with inadequate living space to meet the 'minimal civilized measure of life's necessities.'" *Id.* "These conditions are so extreme that they also cause an excessive risk to inmates' mental and physical health." *Id.*

### 2.    IDOC Staff Subjects the Class to Persistent, Excessive Physical and Verbal Abuse

The overwhelming majority of the segregation prisoners Mr. Vail interviewees reported, without him inquiring, that they had suffered from or witnessed acts of extreme physical abuse or force by prison guards in extreme isolation.[80] Of the fifty-four prisoners Mr. Vail interviewed, thirty-six reported being physically abused or witnessing beatings of other prisoners.  This was the case for "77% at Pontiac, 73% from Dixon, and 100% of the prisoners at Menard."[81] Prisoners detailed a litany of beatings at the hands of IDOC prison guards, which often took place outside the view of security cameras. African American prisoners also described IDOC personnel's regular use of racially epithets and slurs.[82] To Vail, these reports portray a toxic culture among

---

[79] *Id.*

[80] *See* Ex. 4 Vail Report ¶¶ 152–157.

[81] *Id.* Notably, Vail was not explicitly seeking this information in its interviews. Nevertheless, it emerged as a consistent theme of inmates' experience in IDOC's segregation units. Ex. 4 Vail Report ¶¶ 152–157.

[82] Ex. 4 Vail Report ¶ 155.

IDOC's segregation administrators, which was confirmed by a Major at Lawrence, who described the prison's segregation facility as "the septic tank of IDOC."[83]

B.   <u>**IDOC's Hearing and Review Policies Violate the Class's Due Process Rights**</u>

Common issues of fact and law exist concerning the nature of IDOC's procedures for placing individuals in extreme isolation, conducting disciplinary hearings, and reviewing detention status, and whether those procedures comport with the requirements of the Fourteenth Amendment's Due Process Clause. To prevail on a due process claim, an inmate must establish that "(1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." Memorandum and Order re: Defendant's Motion to Dismiss, Dkt. 71 (S.D. Ill. Mar. 10, 2017), at 12 (citing *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007)).  A prison transfer can implicate a protected liberty interest "if the transfer imposes atypical and significant hardships on the inmate in relation to the ordinary incidents of prison life." Memorandum and Order re: Defendant's Motion to Dismiss, Dkt. 71 (S.D. Ill. Mar. 10, 2017), at 12 (citing *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005)).

Here, there are common questions of fact and law concerning (1) whether prisoners have a protected liberated interest in avoiding placement in extreme isolation, and (2) whether IDOC's hearing and review procedures for placing prisoners in extreme isolation meet the minimum requirements of the Fourteenth Amendment's Due Process Clause.

1.   **IDOC's Use of Extreme Isolation Interferes with the Class's Protected Liberty Interest**

Holding prisoners in extreme isolation interferes with a protected liberty interest because

---

[83] *Id.*

it "imposes atypical and significant hardships on the inmate in relation to the ordinary incidents of prison life." Mot. to Dismiss Mem. and Order, at 12 (S.D. Ill. Mar. 10, 2017), Dkt. 71 (citing *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005)). Although there is no bright line rule for what constitutes "atypical and significant hardships," exposure to a confluence of factors including limited human contact, inhumane housing conditions, and limited out-of-cell time or access to exercise facilities for some extended period of time can amount to interference with a protected liberty interest. *See Wilkinson*, 545 U.S. at 223–24.

As described above, the record fully supports the conclusion that extreme isolation infringes upon a protected liberty interest for all members of the proposed class. Indeed, this Court has already held that Plaintiffs have plausibly alleged the infringement of a protected liberty interest. *See* Mot. to Dismiss Mem. and Order, at 12–15 (S.D. Ill. Mar. 10, 2017), Dkt. 7. IDOC systematically exposes those in extreme isolation to severe hardships and significant risks of psychological and physical harm, as well as a drastically reduced set of basic privileges, all of which fall well below the minimum quality of life available to prisoners in the general population.[84] In addition to significantly worse cell conditions, rodent and insect infestations are more rampant in isolation units than in general population units.[85] Access to clean water is significantly diminished, as are the portions and nutritionally quality of the food IDOC provides to inmates in isolation as compared to those in the general population.[86] Likewise, IDOC places extra limits on extreme segregated prisoners' ability to make phone calls, visit the law library,

---

[84] *See* Ex. 4 Vail Report ¶¶ 14, 69; Ex. 3 Haney Report ¶¶ 232–39.
[85] *See* Ex. 23 Coleman (10.21.2015) Dep. 35:22–36:24, 41:7–12, 104:7–9; Ex. 27 Coleman (10.28.2015) Dep. 17:10–12, 29:8–30:8; Ex. 29 Gardner Dep. 52:2–53:11.
[86] *See* Ex. 27 Coleman (10.28.2015) Dep. 30:23–32:18, 53:11–16; Ex. 29 Gardner Dep. 50:21–51:18.

receive visitors, participate in religious and educational programming, and take advantage of recreational time and activities, all of which is typically available to inmates housed in general population.[87] As Vail and Haney conclude, prisoners in extreme isolation suffer myriad deprivations that vastly exceed what is typical for prisoners housed in the general population, and this results in a much greater likelihood of psychological trauma.[88] Consequently, common questions of fact and law exist concerning whether IDOC's policies and practices frustrate prisoners' protected liberty interest not being subjected to the cruel and unusual conditions extreme isolation.

### 2. The Hearing and Review Procedures for the Class in Extreme Isolation Fail to Meet the Minimum Requirements of Due Process

IDOC's policies and procedures surrounding extreme isolation are, at best, vaguely defined and broadly applied[89] in a manner that violates the Due Process Clause of the Fourteenth Amendment. Disciplinary offenses are listed in Appendix A to Section 504.20 of Title 20 of the Illinois Administrative Code. *See* 20 ILL. ADMIN. CODE § 504.20. If an IDOC employee believes that an individual has committed any of these offenses, he or she prepares a "disciplinary report" or an "investigative report." *Id.* at § 504.30. The shift supervisor can place the individual charged with committing the offense into investigative status or temporary confinement (in other words, in extreme isolation) pending the preparation of the report or while waiting for a disciplinary hearing to be held. *Id.* at § 504.40. A "reviewing officer" is then assigned to review the temporary confinement placement, interview the inmate, and review the disciplinary report. *Id.* at § 504.50.

---

[87] *See* Ex. 23 Coleman (10.21.2015) Dep. 51:12–52:6, 53:3–5, 54:18–55:4, 55:20–56:9, 137:13–141:10; Ex. 29 Gardner Dep. 16:13–17:5; 25:2–26:3; 28:6–29:4.

[88] *See* Ex. 4 Vail Report ¶¶ 16, 69; Ex. 3 Haney Report ¶ 61.

[89] IDOC's use of segregation differs from other states with similar programs. Ex. 4 Vail Report ¶¶ 20, 74.

Major offenses (listed in the 100, 200, or 500 series of Appendix A) are assigned to the "adjustment committee" for hearing and minor offenses (offenses listed in the 200 or 300 series) are assigned to the "program unit" for hearing. *Id.* Both major and minor offenses include offenses that are nonviolent and non-disruptive, posing little to no threat to the safety of the prisoners.[90] Most prisoners in long-term disciplinary segregation are there for minor offenses.[91]

The hearings afforded prisoners accused of committing major offenses are extremely limited and provide no significant opportunity for a prisoner to challenge the relevant allegations. Ex. 4 Vail Report ¶ 16 ("The disciplinary hearing process in the IDOC is flawed and does not provide prisoners with the necessary opportunities to contest the facts of the incidents or other bases for placing the prisoners in restrictive housing"). IDOC administrators effectively possess unchecked discretion to prohibit prisoners from calling witnesses. *See, e.g.*, Ex. 4 Vail Report ¶ 110 (finding that IDOC officials exercise unchecked authority to call or not call witnesses, and the reasoning for their decisions are routinely omitted from the record); *see also, e.g.*, Ex. 25 Fillmore (10.8.2015) Dep. 17:10–14 (testifying that he "wasn't given any details on who I could call for witnesses, what evidence I could bring to dispute whatever's being alleged against me"). In fact, the consensus among prisoners is that the hearing process is "bogus" because requests for witness appearances are routinely refused, and the hearing process does not involve any legitimate

---

[90] Indeed, Vail interviewed and reviewed the files of numerous prisoners who were placed in extreme isolation for nonviolent, non-disruptive offenses, examples of which include:  Impairment of Surveillance by covering cell windows (Ex. 35 Doc. 0181049); Damage or Misuse of Property for tying a food hatch open with a bedsheet (Ex. 36 Doc. 0181053); Damage or Misuse of Property and Insolence for the prisoner refusing to remove his arm from a food hatch (Ex. 4 Vail Report ¶ 84; Ex. 37 Doc. 0181250); Damage or Misuse of Property for kicking toilets and cell doors—even where no damage was noted in the prisoner's file (Ex. 4 Vail Report ¶ 99, Ex. 38 Doc. 0181256; Ex. 39 Doc. 0161127); and the Possession of Dangerous Contraband for the possession of bobby pins by a transgender prisoner (Ex. 21 Funk Dep. 104:4–106:18).
[91] Ex. 34 Butler Dep. 104:12–105:23.

investigation whatsoever. Ex. 4 Vail Report ¶¶ 107, 111, 113. Indeed, as Mr. Vail points out, the current IDOC policy does not require the prison officials conducting the hearing to review any video footage, recordings, or photographs that might be available of the relevant incident. Ex. 4 Vail Report ¶ 119.

The hearings can be conducted in the hallways outside of cells, and afford no substantive process to the prisoners charged with minor offenses. Ex. 4 Vail Report ¶ 109. If a prisoner is found guilty of the offense, he or she can be placed in disciplinary segregation for an almost indefinite period of time. 20 Ill. Admin. Code § 504 Tbl. A. Additionally, there is no upper limit on the number of consecutive segregation sentences that an individual can serve and indeterminate periods of segregation are permitted. *Id*. at § 504.115; *see* Ex. 1 Pfister Dep. 63:22–64:15 (testifying that there are prisoners with as many as **20 to 30 years** of segregation time). There is no clear explanation of the rationale for the length of segregation sentences. Further, an individual sentenced to disciplinary segregation can be in extreme isolation for long periods of time without any subsequent individualized reviews to determine whether the person should be removed from extreme isolation. Ex. 20 Atchison Dep. 82:9–83:15 (testifying that a review of a prisoner's status usually resulted from the prisoner asking for a review, but prisoners typically do not know they have that ability).

Extreme isolation is also imposed on individuals without a hearing and even without notice. Ex. 4 Vail Report ¶¶ 128–134. This practice, referred to as administrative detention, is ordered by the Chief Administrative Officer of the prison typically with no review process or opportunity to contest the allegations cited for the administrative detention. Administrative detention need only be reviewed every 90 days. Individuals in administrative detention may remain in isolation indefinitely. 20 Ill. Admin. Code §§ 504.690(a), (c). IDOC uses administrative detention as a

workaround, to keep prisoners in extreme isolation even when there is no disciplinary reason to do so. For instance, Plaintiff Davis filed a grievance challenging a disciplinary report that resulted in his placement in disciplinary segregation. Upon review, the Administrative Review Board expunged the disciplinary report and ordered that Mr. Davis be released from segregation.[92] Mr. Davis was held in disciplinary segregation another 31 days, after which he was released to Administrative Detention, where he remained for about six months.[93] An email chain between IDOC personnel discussing review of Mr. Davis' administrative placement reveals that he was kept him in extreme isolation in spite of the Review Board's decision because the decision "doesn't change who he is or what he did."[94]

## III.  PLAINTIFFS ARE TYPICAL OF THE CLASS

The claims of the named Plaintiffs are identical to the claims of other class members and, thus, the Class satisfies Rule 23(a)(3)'s requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The typicality requirement is "meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (internal quotation marks omitted).

In prisoner cases, factual distinctions between the named plaintiffs and class members do not defeat typicality. *See Young v. Cnty. of Cook*, No. 06 C 552, 2007 WL 1238920, at *6 (N.D. Ill. Apr. 25, 2007) ("The likelihood of some range of variations in how different groups of new detainees were treated [related to strip searches] does not undermine the fact that the claims of each class share common factual basis and legal theory."); *Phipps v. Sheriff of Cook Cnty.*, 249

---

[92] Ex. 40 Doc. 000831; Ex. 22 Davis Dep. 12:4–8, 13:1–4, 14:13–15:4, 17:8–18:4, 26:24–27:7.
[93] Dkt. 76 at 6; Ex. 22 Davis Dep. 12:4–8, 13:1–4, 14:13–15:4, 17:8–18:4, 26:24–27.
[94] Ex. 17 Doc. 052472–4.

F.R.D. 298, 301 (N.D. Ill. 2008) ("That the particular conditions may differ slightly from one cell block to the next, or that there are factual distinctions between the actual injuries suffered by [the named plaintiff] and the class members, does not defeat typicality under Rule 23(a)(3).") (citation omitted).

The claims of Plaintiffs Henry Davis, Douglas Coleman, Aaron Fillmore, Jerome Jones, Deshawn Gardner, and Percell Dansberry are typical of the Class as a whole because they arise from IDOC's conduct in applying system-wide policies and establishing or permitting practices that subject both Plaintiffs and the Class to a substantial risk of confinement in extreme isolation. This case is not about whether any prisoner in particular deserves discipline of some kind, but whether the nature of the discipline Defendant has chosen is cruel and unusual and whether Defendant imposes it without due process. What Plaintiffs individually did or did not do therefore has no bearing on the typicality analysis, for they are typical in the crucial respect of being subject to Defendant's unconstitutional policies. Defendant uses extreme isolation as a disciplinary tool with astonishing frequency and duration given the approximately 50 prison regulations that permit placement in extreme isolation, the majority of which can be classified as relatively minor offenses. *See, e.g.*, 20 ILL. ADMIN. CODE § 504 Tbl. A (West 2010). These offenses include conduct that poses no threat to the safety of other prisoners or the security of the correctional facilities. Ex. 4 Vail Report ¶ 14 ("[Mr. Vail] conclude[d] that the 'sanction grid' for the disciplinary process punishes prisoners with [disciplinary segregation] time for offenses that do not create a serious threat to institutional security and do not otherwise arrant deprivation of such freedoms and privileges."). IDOC thus subjects Plaintiffs and all putative class members to the substantial risk of serious harm resulting from unconstitutional confinement in extreme isolation.

## A. **Henry Davis**

Henry Davis is a 46-year-old man currently housed in extreme isolation at Lawrence

Correctional Center.[95] Mr. Davis has spent significant time in extreme isolation, including extended time spent in Investigative Status and Administrative Detention.[96] Mr. Davis has repeatedly been accused of being in a Security Threat Group ("STG"), but has never been told what IDOC officials are relying on for these accusations.[97] When he has received a disciplinary ticket, he has been given a hearing.[98] Yet at these hearings, he could not call witnesses or question his accusers, and when he could provide evidence, it was not properly considered[99] nor was the reasoning behind his guilty finding explained.[100]

After one hearing, Mr. Davis filed a grievance to challenge the disciplinary report that resulted in his placement in disciplinary segregation. Upon review, the Administrative Review Board expunged the disciplinary report and ordered that Mr. Davis be released from segregation.[101] Yet Mr. Davis was held in disciplinary segregation another 31 days, after which he was released to Administrative Detention, where he remained for about six months.[102]

While in extreme isolation, Mr. Davis is forced to live in unbearable conditions and denied basic privileges given to prisoners housed in general population. For example, he rarely can receive visits from his family.[103] When he does, there is no contact allowed and visits are

---

[95] Dkt. 76 at 6; Ex. 22 Davis Dep. 11:3–12.

[96] Ex. 22 Davis Dep. 10:12–11:12, 23:22–24:3.

[97] *Id.* at 10:12–12:21, 23:22–24:16.

[98] *Id.* at 12:4–8, 19:12–20, 20:11–20, 21:2–22:3, 23:9–21, 27:4–16.

[99] Mr. Davis has been repeatedly accused of being a member of a STG, and in subsequent hearings after his disciplinary ticket was expunged, Mr. Davis noted that IDOC officials presented "even less[] than what they had before that [he] had expunged and [he] was found guilty and placed in segregation again." *Id.* at 19:5–20. When Mr. Davis challenged the conclusory statement that he was a member of a STG without supplying any supporting evidence, no IDOC official present replied to him, and he was sentenced to disciplinary segregation. *Id.* at 26:4–27:1.

[100] *Id.* at 12:4–8, 19:15–20, 21:2–22:3, 25:19–27:1.

[101] Ex. 40 Doc. 000831; Ex. 22 Davis Dep. 12:4–8, 13:1–4, 14:13–15:4, 17:8–18:4, 26:24–27:12.

[102] Dkt. 76 at 6; Ex. 22 Davis Dep. 12:4–8, 13:1–4, 14:13–15:4, 17:8–18:4, 26:24–27:12.

[103] Ex. 22 Davis Dep. 64:21–65:4, 65:11–66:3, 76:11–77:17.

conducted behind glass barriers for a maximum of one hour.[104] He also is not allowed the same phone privileges as those in the general population.[105] He cannot meaningfully work towards his GED because he is only sent his homework and class materials, without any verbal instructions, ability to work with other prisoners, or any other form of assistance.[106] While in segregation, he is also not made aware of any religious programs, and even though he has asked, he is not allowed to see the prison's Chaplain.[107] There is no law library in disciplinary extreme isolation.[108] Further, he is given small amounts of food, not given access to the commissary, and his cell is bug- ridden, often freezing cold during the winter, and overly hot during the summer.[109] He spends nearly 24 hours a day in his cell, where he cannot easily communicate with others outside his cell because of the plexiglass on the cell door.[110] He is only allowed two hours of yard time per week, usually on the same day.[111] At one point in 2013, Mr. Davis was even double celled.[112] Mr. Davis has not experienced a difference in conditions between disciplinary segregation and administrative detention.[113] Mr. Davis' earliest release date is 2048.[114]

### B.   <u>Douglas Coleman</u>

Douglas Coleman is a 59-year-old man currently incarcerated at Western Illinois Correctional Facility.[115] Mr. Coleman has been housed in extreme isolation at both Stateville and

---

[104] *Id.* at 76:20–77:17.
[105] *Id.* at 66:4–13.
[106] *Id.* at 58:13–59:5, 61:18–63:4.
[107] *Id.* at 60:4–61:3.
[108] *Id.* at 63:8–16.
[109] *Id.* at 15:5–17:4, 38:10–20, 40:19–43:7, 44:3–20, 46:3–47:7, 48:7–20, 49:3–50:11.
[110] *Id.* at 56:11–58:8, 74:5–17.
[111] *Id.* at 37:17–38:9.
[112] *Id.* at 39:5–7.
[113] *Id.* at 75:3–7.
[114] Dkt. 76 at 6.
[115] Coleman's Resp. to Def.'s First Set of Interrogs. 9; Ex. 24 Coleman (06.27.2018) Dep. 10:7–

Menard Correctional Center.[116]

During his time in extreme isolation, Mr. Coleman has experienced unbearable living conditions and a deprivation of basic privileges afforded to prisoners housed in the general population. The cells he has been confined in are often filthy with little air circulation.[117] His cell was constantly infested with mice, roaches, and even birds – conditions far worse than he has ever experienced while housed in the general population.[118] He also received significantly reduced food portions compared to what he received when he was housed in the general population.[119] Mr. Coleman was only given yard privileges once a week for the entire time he was in segregation,[120] and he was generally confined to his cell for about 24 hours a day.[121]

He was also deprived of other basic privileges, such as phone calls, access to religious or educational programs, the gym, and a psychologist or social worker.[122] When he was allowed visitation, which happened sparingly, it was through glass only.[123] At one point, he was double celled for eight months, and one of his cellmates was a prisoner who was known to be mentally

---

[116] *See* Dkt. 76 at 7; Ex. 24 Coleman (06.27.2018) Dep. 11:2–6.

[117] Ex. 23 Coleman (10.21.2015) Dep. 37:1–16, 38:20–39:10, 41:1–43:4; Ex. 27 Coleman (10.28.2015) Dep. 104:7–9, 135:23–136:2; Ex. 24 Coleman (06.27.2018) Dep. 17:10–12, 29:8–30:16, 52:9–16.

[118] Ex. 23 Coleman (10.21.2015) Dep. 35:22–36:24, 37:1–16, 38:20–39:10, 41:1–43:4; Ex. 27 Coleman (10.28.2015) Dep. 104:7–9, 135:23–136:2; Ex. 24 Coleman (06.27.2018) Dep. 17:10–12, 29:8–30:16, 52:9–16.

[119] Ex. 24 Coleman (06.27.2018) Dep. 12:1–15:18.

[120] This is an example of IDOC not following its own rules in practice. Only receiving yard privileges once a week is a direct violation of IDOC's policy requiring prisoners in segregation to receive a *minimum* of eight hours per week of time recreate outside their cells spread over no less than two days. Ex. 4 Vail Report ¶ 60.

[121] Ex. 27 Coleman (10.28.2015) Dep. 110:6–14, 112:2–24, 113:1–11.

[122] Ex. 23 Coleman (10.21.2015) Dep. 40:8–11, 51:12–52:6, 53:3–5; Ex. 27 Coleman (10.28.2015) Dep. 113:1–11; Ex. 24 Coleman (06.27.2018) Dep. 37:15–23.

[123] Ex. 23 Coleman (10.21.2015) Dep. 54:18–55:4, 55:20–56:9; Ex. 27 Coleman (10.28.2015) Dep. 137:13–141:10.

ill.[124]

His time in extreme isolation has exacerbated his anger management problems, and he is psychologically scared and frightened because of how he has been treated.[125] Mr. Coleman suffered a stroke and became seriously ill around the time he was first placed in extreme isolation, however, Mr. Coleman's disabilities stemming from his stroke are not properly accommodated in extreme isolation where he remains.[126] For example, Mr. Coleman is regularly not given his heart medication, not allowed to use a wheelchair, and not allowed to sanitarily clean or use his colostomy bag.[127] Because of this, Mr. Coleman has suffered from physical and psychological injuries, which are only further exacerbated by his continued time in extreme isolation.[128]

Mr. Coleman had hearings for his disciplinary tickets but they provided him with nothing that remotely resembles due process.[129] He was not allowed to question witnesses, provide a proper defense, and was found guilty despite there being a complete lack of evidence against him.[130]

Accordingly, Mr. Coleman has filed many grievances about his treatment while in extreme

---

[124] Ex. 23 Coleman (10.21.2015) Dep. 47:1–48:8, 56:18–57:13, 58:1–19; Ex. 27 Coleman (10.28.2015) Dep. 117:8–118:21; Ex. 24 Coleman (06.27.2018) Dep. 36:6–20; Coleman's Resp. to Def.'s First Set of Interrogs. 9.

[125] Ex. 23 Coleman (10.21.2015) Dep. 92:4–93:19, 94:3–24; Ex. 27 Coleman (10.28.2015) Dep. 118:22–119:20, 120:2–122:4; Ex. 24 Coleman (06.27.2018) Dep. 38:20–42:22, 50:18–51:8.

[126] Ex. 24 Coleman (06.27.2018) Dep. 12:24–14:20.

[127] Ex. 23 Coleman (10.21.2015) Dep. 69:5–79:4; Ex. 27 Coleman (10.28.2015) Dep. 101:11–102:23.

[128] Coleman (10.21.2015) Dep. 94:3–95:2; Coleman (10.28.2015) Dep. 119:4–20, 120:2–121:4, 137:10–138:11; Coleman (06.27.2018) Dep. 27:5–7, 38:17–41:15.

[129] Ex. 23 Coleman (10.21.2015) Dep. 81:14–85:11; Ex. 27 Coleman (10.28.2015) Dep. 122:20–131:11; Ex. 24 Coleman (06.27.2018) Dep. 34:8–36:2.

[130] Ex. 23 Coleman (10.21.2015) Dep. 81:14–85:11; Ex. 27 Coleman (10.28.2015) Dep. 122:20–131:11; Ex. 24 Coleman (06.27.2018) Dep. 34:8–36:2.

isolation.[131] Yet, none of his grievances have been properly addressed. Mr. Coleman's earliest release date is 2059.[132]

### C.     Aaron Fillmore

Aaron Fillmore is a 44-year-old man who is currently incarcerated in extreme isolation at Lawrence Correctional Center.[133] Mr. Fillmore has spent almost 20 years in extreme isolation.[134] During that time, he has been continually confined in disciplinary segregation or administrative detention.[135] Mr. Fillmore has not been provided with a meaningful opportunity to defend himself against the charges which have consistently kept him in extreme isolation, such as meaningful notice of what he did wrong to warrant such extreme and extended isolation.[136] For the hearings he had, he was never informed of who he could call as a witness or given prior notice the hearings would happen, which would have given him an opportunity to prepare.[137] Mr. Fillmore's status  in Administrative Detention is periodically reviewed, but he is generally not allowed to attend the review and is only informed of the results after a determination has been made.[138]

While in extreme isolation, Mr. Fillmore is denied most privileges afforded to those housed in the general population. He has little to no physical contact with other people.[139] He is locked up in his cell for 24 hours a day and cannot go anywhere without being handcuffed and shackled.[140]

---

[131] Ex. 23 Coleman (10.21.2015) Dep. 89:24–93:19; Ex. 27 Coleman (10.28.2015) Dep.  132:17–133:5.
[132] Dkt. 76 at 7.
[133] *Id.* at 8.
[134] Ex. 25 Fillmore (10.8.2015) Dep. 45:23–47:3.
[135] Fillmore's Supp. Resp. to Def.'s First Set of Interrogs. 6.
[136] Ex. 25 Fillmore (10.8.2015) Dep. 14:16–17:14; 49:16–57:6.
[137] *Id.* at 14:16–17:9, 49:16–57:6, 87:15–88:15.
[138] *Id.* at 80:22–83:1.
[139] Fillmore's Resp. to Def.'s First Set of Interrogs. at 5.
[140] Ex. 25 Fillmore (10.8.2015) Dep. 19:16–24.

While he is allowed minimal yard time, it is in a single cage.[141] He is not allowed to participate in any educational or mental health programs.[142] Nor does he receive proper medical treatment, and is only allowed one shower per day.[143] Mr. Fillmore was also double celled for a period of at least three months with no mental health screening.[144] During his time being double-celled, Mr. Fillmore suffered from panic attacks related to not having physical contact with another human being for 16 years.[145] He is not allowed access to the main library, and he has been repeatedly denied access to the law library further complicating his ability to obtain due process.[146] He also receives substantially lower quality food compared with the food that prisoners in general population receive.[147] He is not given access to any religious programs or a chaplain.[148] He has limitations placed on his ability to make phone calls.[149] As a result, Mr. Fillmore has suffered psychologically, primarily severe anxiety related to feelings of hopelessness, nervousness, frustration, discomfort, and physical symptoms, such as sweats and shakes.[150] His earliest release date is 2035.[151]

D. **Jerome Jones**

Jerome Jones is a 42-year-old man who is currently incarcerated in Pinckneyville

---

[141] *Id.* at 21:25–23:1, 67:24–70:7; Ex. 31 Fillmore (6.26.2018) Dep. 13:1–19:4; 34:10–35:11.

[142] Ex. 31 Fillmore (6.26.2018) Dep. 30:10–32:7, 36:21–38:15, 64:2–20.

[143] Ex. 25 Fillmore (10.8.2015) Dep. 26:4–29:16; Ex. 31 Fillmore (6.26.2018) Dep. 8:21–12:24, 21:20–22:16; 59:12–64:1.

[144] Ex. 25 Fillmore (10.8.2015) Dep. 38:21–45:22, 77:22–80:10; Fillmore's Resp. to Def.'s First Set of Interrogs. 9.

[145] Fillmore (06.26.2018) Dep. 20:5–12; Fillmore's Resp. to Def.'s First Set of Interrogs. 9.

[146] Ex. 25 Fillmore (10.8.2015) Dep. 20:8–21:8.

[147] Ex. 31 Fillmore (6.26.2018) Dep. 11:2–12:8, 39:19–41:22.

[148] Ex. 25 Fillmore (10.8.2015) Dep. 70:16–72:19; Ex. 31 Fillmore (6.26.2018) Dep. 31:22–32:7, 36:21–37:16, 64:2–20.

[149] Ex. 25 Fillmore (10.8.2015) Dep. 57:22–59:5.

[150] *Id.* at 29:4–30:21; Ex. 31 Fillmore (6.26.2018) Dep. 19:5–21:1.

[151] Dkt. 76 at 8.

Correctional Center.[152] Mr. Jones spent a little over two years in Phase III Administrative Detention at Lawrence Correctional Center and Stateville Correctional Center.[153] Before being in Phase III Administrative Detention at Lawrence, Mr. Jones was removed from the general population at Stateville Correctional Center for reasons unknown to him and then transferred to Lawrence about a month later.[154]

Despite not receiving a disciplinary ticket since 2001, Mr. Jones has never been able to challenge the accusation of his alleged STG membership successfully, which he later learned was the reason for IDOC putting him in extreme isolation.[155] Mr. Jones is not currently a member of any STG.[156] While in extreme isolation, Mr. Jones has been denied the basic privileges afforded to prisoners in the general population, such as decreased phone privileges, inability to attend religious programs, and limited, no-contact visitation.[157] Mr. Jones "has [also] been deprived of human contact, physical activity, quality light, quality food, quality water, quality heat, and quality air" while he has been in extreme isolation.[158] He has also been confined to his cell for nearly 24 hours a day.[159] Mr. Jones was also double-celled for nearly a year, which increased his stress and feelings of anger.[160] Because of his confinement in segregation and loss of basic privileges, Mr. Jones suffers from major depression.[161] While Mr. Jones is currently in the general population, he

---

[152] Jones's Supp. Resp. to Def.'s First Set of Interrogs. 13; Dkt. 76 at 8.
[153] Jones's Resp. to Def.'s First Set of Interrogs. 6; Jones's Supp. Resp. to Def.'s First Set of Interrogs. 8–9, 14–15.
[154] Jones's Supp. Resp. to Def.'s First Set of Interrogs. 4–5.
[155] *Id.*
[156] *Id.* at 5.
[157] Jones's Resp. to Def.'s First Set of Interrogs. 8; Jones's Supp. Resp. to Def.'s First Set of Interrogs. 6–7.
[158] Jones's Resp. to Def.'s First Set of Interrogs. 4.
[159] *Id.* at 5.
[160] Jones's Supp. Resp. to Def.'s First Set of Interrogs. 8–9.
[161] Ex. 32 Jones Dep. 25:4–26:24.

fears being placed back in segregation.[162] The last time Mr. Jones was placed in administrative detention he was not informed of the reason, and he "was doing everything [he] was supposed to do to avoid those types of situations."[163] Mr. Jones' earliest release date is 2038.[164]

###### E.     **DeShawn Gardner**

DeShawn Gardner is a 47-year-old man currently incarcerated in extreme isolation at Lawrence Correctional Center.[165] In 2013, he was placed into investigative status while at Stateville Correctional Center, and then later transferred to Lawrence to be placed in administrative detention.[166] Mr. Gardner never received a hearing or opportunity to challenge his placement in Administrative Detention.[167] The first review of his conferment in Administrative Detention occurred almost six months after his initial confinement despite the regulations requiring a review every 90 days.[168]

While in extreme isolation, Mr. Gardner has suffered both mentally and physically.[169] He is locked in his cell for 24 hours a day and forced to inhale the putrid smell of feces from the gallery reeking as well as having his cell infested with insects and bugs.[170] He lacks access to religious services.[171] And while he has access to a "satellite law library," its utility is extremely limited, unlike the full law library available to the general population.[172] He is allowed yard time

---

[162] *Id.* at 19:16–21:13.
[163] *Id.* at 19:19–21.
[164] Dkt. 76 at 8.
[165] *Id.* at 9.
[166] Ex. 29 Gardner Dep. 41:2–24.
[167] Gardner's Resp. to Def.'s First Set of Interrogs. 6.
[168] *See id.*
[169] Ex. 3 Haney Report ¶ 184.
[170] Ex. 29 Gardner Dep. 11:5–21, 22:16–24:5, 27:9–28:5, 47:8–24, 48:3–14.
[171] *Id.* at 16:13–17:5.
[172] *Id.* at 12:7–13:20, 22:16–24:5, 27:9–28:5, 28:6–29:4.

once per week for about two and half hours.[173] His only allowed visits are through Plexiglas cutting him off from any physical contact with his loved ones.[174] As with other prisoners in extreme isolation, he receives low-quality food compared with the prisoners in the general population.[175] Mr. Gardner's earliest release date is 2041.[176]

### F.   **Percell Dansberry**

Percell Dansberry is a 51-year-old man currently incarcerated at Pontiac Correctional Center.[177] Mr. Dansberry was originally sentenced to three months of disciplinary segregation at Pontiac Correctional Center, after receiving a disciplinary ticket for membership in a STG.[178] After serving his three-month sentence, Mr. Dansberry was immediately transferred without notice to Menard and placed in administrative detention.[179] Without being told the reason for his placement, Mr. Dansberry remained in Administrative Detention for almost two years.[180] Mr. Dansberry maintains that he cannot adequately defend himself because IDOC has never fully informed him of the reasons for his placement in extreme isolation.[181]

During his time in extreme isolation, Mr. Dansberry suffered from unbearable living

---

[173] *Id.* at 11:5–21, 19:21–21:19. Here is yet another example of IDOC not following its own rules in practice. Only receiving yard privileges once per week for only two-and-a-half hours is a clear violation of IDOC regulation require that prisoners receive a *minimum* of eight hours per week to recreate outside their cells spread over at least two days. Ex. 4 Vail Report ¶ 60.

[174] Ex. 29 Gardner Dep. 38:9–39:22.

[175] *Id.* at 50:21–51:18, 52:2–53:11.

[176] Dkt. 76 at 9.

[177] *Id.*

[178] Dkt. 76 at 9; Dansberry's Resp. to Def.'s First Set of Interrogs. 6.

[179] Dkt. 76 at 9; Dansberry's Resp. to Def.'s First Set of Interrogs. 6.

[180] Ex. 28 Dansberry Dep. 11:8–16. Since his deposition, Mr. Dansberry was transferred to Western Illinois Correctional Center, but then was returned to Pontiac, allegedly based on conduct he engaged in at Menard—conduct of which was the subject of a prior disciplinary report, which had, in turn, been expunged.  This is yet another example of a prisoner being punished after having been found not guilty.

[181] *Id.* at 16:14–17:23.

conditions and denial of basic privileges, which he did not suffer from when housed in the general population. In his cell, there were rodent infestations, no hot water, lack of heat in the winter, insects, cockroaches, and no basic cleaning supplies rendering his cell uninhabitable.[182] He was given substantially less food compared to what prisoners in general population receive.[183] He was not allowed to participate in any programs, and he was only allowed in the yard for a limited time each week.[184] He also was only allowed one shower per week.[185] In sum, Mr. Dansberry lived in squalor with little to no physical contact or mental stimulation for almost 24 hours a day.[186] Mr. Dansberry's earliest release date is 2037.[187]

*      *      *      *      *

The named Plaintiffs and the proposed Class seek the same declaratory and injunctive relief from IDOC's extreme isolation policies. These policies and practices effect a systematic deprivation of the basic human needs of Plaintiffs and the putative Class, and amount to a disproportionate punishment meted out without Due Process. Consequently, Plaintiffs will ask the Court to declare that IDOC's acts and omissions stemming from its extreme isolation policies uniformly violate the rights guaranteed to them and the putative Class by the Eighth and Fourteenth Amendments of the United States Constitution. Plaintiffs will also seek an injunction that bars IDOC from further constitutional violations and requires IDOC to implement policies that conform its practices to constitutional standards. Because named Plaintiffs and the putative Class seek the same relief and the risk of injury arises to Plaintiffs and the Class from the same system-wide

---

[182] *Id.* at 17:24–22:21.
[183] *Id.* at 17:24–18:19.
[184] *Id.* at 29:7–30:13, 33:3–36:23.
[185] *Id.* at 33:23–34:6.
[186] *Id.* at 32:22–36:25.
[187] Dkt. 76 at 9.

policies and practices, the Plaintiffs' claims are typical of the Class.

### IV. NAMED PLAINTIFFS AND THEIR COUNSEL WILL ADEQUATELY REPRESENT THE CLASS

Plaintiffs meet Rule 23(a)(4)'s "adequacy of representation" requirement because they "will fairly and adequately protect the interest of the class." FED. R. CIV. P. 23(a)(4). The "adequacy of representation" standard weighs the adequacy of both the named plaintiffs and class counsel. In addition to the requirements of Rule 23(a)(4), Rule 23(g) requires courts to evaluate and appoint class counsel based on the determination that they will sufficiently represent the interests of the entire class. Here, both Plaintiffs and their counsel are well situated to fairly and adequately represent the interests of absent class members.

Plaintiffs are adequate representatives of the absent class members because they are similarly situated and have no conflicts of interest. To determine whether named plaintiffs are adequate class representatives, courts look to whether the named plaintiffs have "sufficient interest in the outcome to ensure vigorous advocacy." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Conversely, the named plaintiffs should not have any interests "antagonistic to the interests of the class." *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986). The interests of named plaintiffs and the absent class members are best aligned when the named plaintiffs have suffered significant harm as a result of the policies or procedures being challenged. *See Arreola v. Godinez et al.*, 546 F.3d 788, 798 (7th Cir. 2008). Here, the named Plaintiffs share the same interests with the Class because they have suffered harm stemming from IDOC's existing policies, and would benefit from changes to the policies regarding extreme isolation. Likewise, the injunctive relief sought in this action will apply to all present and future class members equally, which reduces the likelihood that any material conflicts of interest will arise. *Williams v. Lane*, 129 F.R.D. 636, 640 (N.D. Ill. 1990) ("Because members of the plaintiff class have homogenous interests as to the

injunctive relief, their interests are sufficiently protected by the Rule 23(a)(4) requirement that the court must determine that the class representative will 'fairly and adequately protect the interests of the class.'" Consequently, the named Plaintiffs will serve as more than adequate class representatives.

Plaintiffs' counsel also satisfy Rule 23(a)(4)'s adequate representation requirements and should be appointed class counsel pursuant to Rule 23(g)(1). Under Federal Rule of Civil Procedure 23(a)(4), class counsel must be "qualified, experienced and able to conduct the proposed litigation." *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600, at *5 (N.D. Ill. Mar. 21, 2007). Likewise, to appoint class counsel under Rule 23(g), courts must consider proposed counsel's qualifications. *See* FED. R. CIV. P. 23(g)(1)(A). This inquiry looks at several factors, including counsel's efforts to investigate potential claims, counsel's experience in handling class actions and other complex litigation, and claims of the type asserted in the present action. *Id.* Courts should also consider class counsel's knowledge of the applicable law and the resources that counsel will commit to prosecuting the claims of the class. *Id.*

Here, Plaintiffs' counsel is qualified, experienced in similar matters, and will conduct the proposed litigation vigorously and competently to promote the interests of the Class as a whole. Plaintiffs are represented by a group of attorneys from Winston & Strawn LLP and the Uptown People's Law Center. Plaintiffs' counsel have collectively brought numerous cases challenging the constitutionality of various IDOC policies over a number of years, and are experienced in litigating class actions and other complex litigations. Plaintiffs' counsel have also spent over four years investigating and developing Plaintiffs' claims. In doing so, counsel has spent a substantial amount of time and attorney resources investigating the facts of the case, conducting factual and legal research, propounding and responding to discovery requests, drafting pleadings, and

deposing IDOC personnel.[188]

Plaintiffs' counsel have devoted and will continue to devote significant resources to the pursuit of Plaintiffs' claims, and thus satisfy the requirements of Rule 23(a)(4) and Rule 23(g)(1). Because counsel is qualified, experienced, and fully able to conduct the class litigation, counsel are well-qualified to represent the Class.

## V.  FINAL INJUNCTIVE RELIEF AGAINST IDOC IS APPROPRIATE RESPECTING THE CLASS AS A WHOLE

Along with satisfying Rule 23(a), a party seeking class certification must also meet one of the requirements under Rule 23(b). Plaintiffs seek to certify a class for injunctive and declaratory relief under Rule 23(b)(2); they are not seeking monetary damages. Under Rule 23(b)(2), class certification is allowed where "the party opposing the class has acted or refused to act on groups that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). Rule 23(b)(2) is "particularly appropriate to vindicate alleged violations of constitutional rights based on a government practice applied to numerous individuals." *Rodriquez v. Vill. of Montgomery*, No. 08 C 1826, 2009 WL 310893, at *4 (N.D. Ill. Feb. 9, 2009); *see also Love v. City of Chi.*, No. 96 C 396, 1997 WL 120041, at *5 (N.D. Ill. Mar. 11, 1997); *Patrykus v. Gomilla*, 121 F.R.D. 357, 362–63 (N.D. Ill. 1988); *see also Copeland v. Washington*, 162 F.R.D. 542, 543 (N.D. Ill. 1995); *Imasuem v. Moyer*, No. 91 C 5425, 1992 WL 26705, at *3 (N.D. Ill. Feb. 7, 1992); *Lewis v. Tully*, 96 F.R.D. 370, 378 (N.D. Ill 1983).

Here, record evidence along with expert evidence offered by Dr. Haney and Mr. Vail establish that IDOC's system-wide policies and practices regarding placement and stays in extreme

---

[188] Please see attached Ex. 41 for additional detail regarding trial counsel for Winston & Strawn LLP and UPLC's experience as lead and/or trial counsel in other class action cases.

isolation "'impose[] 'atypical and significant hardship[s] on the inmate[s] in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545 U.S. 209, 210 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 472 (1995)). This implicates a common liberty interest among all putative class members. Further, all class members face the same violations of the Eighth and Fourteenth Amendments' protection against cruel and unusual punishment as well as failure to provide due process in violation of the Fourteenth Amendment's Due Process Clause. Class certification under Rule 23(b)(2) is appropriate here because "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011). In particular, Plaintiffs ask this Court to grant declaratory relief and enter an injunction requiring Defendant Director Jeffreys, as well as his officers, agents, servants, employees, and any other person who acted in concert or who participated in the imposition and enforcement of extreme isolation at IDOC facilities, to end the ongoing constitutional violations, as well as require implementation of and conformation to revisions to IDOC policy pursuant to Mr. Vail's recommendations.  This injunction would provide the necessary relief to the entire class, including prisoners that are currently or will be subject to IDOC's extreme isolation policies.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court to certify a Plaintiff Class to seek declaratory and injunctive relief under Federal Rule 23(b)(2) and designate the undersigned attorneys as class counsel.

Dated: September 6, 2019.

Respectfully submitted,

By: /s/ Kimball R. Anderson

Kimball R. Anderson
Matthew R. DalSanto
Reid F. Smith
ARDC No. 6308794
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
kanderso@winston.com
mdalsanto@winston.com
rfsmith@winston.com

Alan S. Mills
Elizabeth Mazur
Nicole Schult
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan Road
Chicago, Illinois 60640
Telephone: (773) 769-1411
Facsimile: (773) 769-2224
alan@uplcchicago.org
liz@uplcchicago.org
nicole@uplcchicago.org

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

The undersigned counsel for Plaintiffs hereby certifies that on this 6th day of September, 2019, he caused a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION to be served by CM/ECF to all parties and counsel of record.

Dated: September 6, 2019         By:   /s/ Kimball R. Anderson
                                    Attorney for Plaintiffs

                                    Kimball R. Anderson
                                    WINSTON & STRAWN LLP
                                    35 West Wacker Drive
                                    Chicago, Illinois 60601-9703
                                    Telephone: (312) 558-5600
                                    Facsimile: (312) 558-5700
                                    kanderso@winston.com