**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# EXHIBIT 3
# REDACTED

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

HENRY DAVIS, *et al.*,                      )
            Plaintiffs,              )
                       )     Case No.  3:16-cv-00600-MAB
      v.                               )
                       )     Hon. Mark A. Beatty
ROB JEFFREYS**,**                           )
            Defendant.             )
                       )

**DECLARATION OF CRAIG HANEY, PH.D., J.D. IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page

I.   Expert Qualifications ............................................................................. 1

II.   Assignment ........................................................................................... 4

III.   Materials Reviewed ............................................................................. 5

IV.   Summary of Conclusions ..................................................................... 7

V.   The Adverse Psychological Effects of Solitary Confinement ................................. 12

   A.   The Scientific Status of Social Isolation ................................................. 13

   B.   Research on the Adverse Effects of Solitary Confinement Per Se ...................... 23

   C.   The Exacerbating Effects of Isolation on Mental Illness ................................. 35

VI.   The Use of Solitary Confinement/Restrictive Housing in the Illinois Department of Corrections ........................................................................................... 40

   A.   Conditions of Confinement ..................................................................... 42

   B.   IDOC's Restrictive Housing Classifications ............................................. 45

   C.   Summary of Facility-by-Facility Observations and Issues ............................ 50

   D.   Prisoner File Review and Individual Cases ............................................. 94

VII.   Longstanding Awareness of the Significant Risk of Serious Harm to IDOC Prisoners in Restrictive Housing ................................................................. 104

VIII.   Conclusion ........................................................................................... 111

I, Craig Haney, Ph.D., J.D., declare:

## I.      **Expert Qualifications**

1.      I am a Distinguished Professor of Psychology and was named the 2015-2018 UC Presidential Chair at the University of California, Santa Cruz. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods.

2.      I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University. I have been the recipient of a number of scholarship, fellowship, and other academic awards (including being named Distinguished Faculty Lecturer and a UC Presidential Chair).

3.      I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the backgrounds and social histories of persons accused of violent crimes, the psychological effects of imprisonment, and the nature and consequences of solitary or "supermax"-type confinement.[1] In addition to these scholarly articles and book chapters, I have published two books: Death by Design: Capital Punishment as a Social Psychological System (Oxford University Press, 2005), and Reforming Punishment: Psychological Limits to the Pains of Imprisonment (American Psychological Association Books, 2006).

4.      In the course of my academic work in psychology and law, I have lectured and given invited addresses throughout the country on the role of social and institutional

---

[1] The terms "solitary or 'supermax'-type" confinement are defined later in this Declaration.

1

histories in explaining criminal violence, the psychological effects of living and working in institutional settings (typically maximum security prisons), and the psychological consequences of solitary confinement. I have given these lectures and addresses at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.

5.      I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations on jail- and prison-related issues. Those agencies and organizations include the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the United States Department of Justice, the Department of Health and Human Services ("HHS"), the Department of Homeland Security, and the White House (under both the Clinton and Obama Administrations). In 2012, I testified as an expert witness before the Judiciary Committee of the United States Senate and was appointed as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States.

6.      A copy of my curriculum vitae is attached to this Declaration as **Exhibit 1**.

7.      My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student. I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be

regarded as a "classic" study in the field, demonstrating the power of institutional settings to change and transform the people who enter them.[2]

8.      Since then I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, and specialized correctional housing units (such as solitary and "supermax"-type confinement).  In the course of that work, I have toured and inspected numerous maximum security state prisons and related facilities (in Alabama, Arkansas, Arizona, California, Florida, Georgia, Idaho, Illinois, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Utah, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado), and prisons in Canada, Cuba, England, Hungary, and Mexico. I also have conducted numerous interviews with correctional officials, guards, and prisoners to assess the impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.[3]

---

[2] For example, *see* Craig Haney, Curtis Banks & Philip Zimbardo, Interpersonal Dynamics in a Simulated Prison, 1 International Journal of Criminology and Penology 69 (1973); Craig Haney & Philip Zimbardo, The Socialization into Criminality:  On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society:  Psychological and Legal Issues. (J. Tapp and F. Levine, eds., 1977); and Craig Haney & Philip Zimbardo, Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse, Personality and Social Psychology Bulletin, 35, 807-814 (2009).

[3] For example, Craig Haney & Philip Zimbardo, The Socialization into Criminality:  On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society:  Psychological and Legal Issues (pp. 198-223). (J. Tapp and F. Levine, eds., 1977); Craig Haney, Infamous Punishment: The Psychological Effects of Isolation, 8 National Prison Project Journal 3 (1993); Craig Haney, Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law, Psychology, Public Policy, and Law, 3, 499-588 (1997); Craig Haney, The Consequences of Prison Life: Notes on the New Psychology of Prison Effects, in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing (2008); Craig Haney, On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence, University of Missouri-Kansas City Law Review, 77, 911-946 (2009); Craig Haney,

9.     I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Alabama, Arkansas, California, Georgia, New Mexico, Pennsylvania, Texas, and Washington, and in numerous state courts, including courts in Arizona, Colorado, Florida, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Utah, and Wyoming as well as, in California, the Superior Courts of Alameda, Calaveras, Kern, Los Angeles, Marin, Mariposa, Monterey, Orange, Sacramento, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz, Shasta, Tulare, Ventura, and Yolo counties. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the United States Supreme Court.[4]

10.     In the last four years, I have testified at trial and/or in deposition in the following cases: *BCCLA v. Canada*; *Braggs v. Dunn*; *Brazeau v. Attorney General*; *Gumm v. Ward; Johnson v. Wetzel*; *State v. Luis Bracamontes*; *United States v. Jessie Con Ui*; and *United States v. Donald Fell*.

## II.     Assignment

11.     I have been retained by counsel for the plaintiffs in *Davis et al. v. Baldwin* (Case No. 16-cv-600-MAB) to provide expert opinions on two inter-related topics: a) a summary of what is known about the negative psychological consequences of what I will term throughout as "restrictive housing" (which in Illinois includes "disciplinary

---

Demonizing the "Enemy": The Role of Science in Declaring the "War on Prisoners," Connecticut Public Interest Law Review, 9, 139-196 (2010); Craig Haney, The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement, American Criminal Law Review, 48, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), Readings in Race, Ethnicity, Gender and Class. Sage Publications (2012)]; and Craig Haney, Prison Effects in the Age of Mass Imprisonment, The Prison Journal, 92, 1-24 (2012).

[4] For example, *see Brown v. Plata*, 563 U.S. 493 (2011); *see also* Exhibit 1 for a list of cases citing my work.

segregation," "administrative detention," "temporary confinement," and "investigative status") for both non-mentally ill and mentally ill persons; and b) based on the case-specific discovery that I have obtained directly, been provided, and reviewed, the extent to which prisoners in restrictive housing in the Illinois Department of Corrections ("IDOC") are subjected to conditions of confinement that place them at a serious risk of psychological harm.

12.    I am being compensated at a rate of $250/hr, and $125/hr for non-work travel time. My compensation in this case is independent of the ultimate opinions I render.

13.    I reserve the right to amend my opinions based on additional information that may come to light while retained by plaintiffs' counsel to opine on these matters.

### III.    Materials Reviewed

14.    My opinions on these topics are based on a number of sources. In addition to my own direct experience interviewing and evaluating prisoners housed in conditions of restrictive housing in the IDOC, I reviewed the extensive published literature that addresses the psychological effects of solitary confinement. In addition, I requested and have been provided with a set of official documents that pertain to the use of restrictive housing within the IDOC. The discovery documents that I reviewed include: various official IDOC documents (including administrative regulations pertaining to disciplinary segregation, administrative detention, temporary confinement, and investigative status) and operational memoranda; portions of the prisoners' institutional files (including the mental health records and disciplinary records) and documents for the prisoners whom I interviewed at each facility I toured, as well as a random sampling of prisoners from the other IDOC facilities; and several overview reports (including materials produced by the Vera Institute of Justice pertaining to their consultation with IDOC on how to reduce its use of solitary

confinement/restrictive housing,[5] and several reports of the court appointed monitor in the *Rasho v. Baldwin* case[6]). A document index that contains a detailed list of all of the documents I have reviewed is attached to this Declaration as **Exhibit 2**.

15.      In addition, I toured and inspected all areas of a number of IDOC facilities where prisoners are subjected to conditions of restrictive housing.[7] Specifically, on July 23, 2018, I toured and inspected the Stateville Correctional Center and interviewed a sample of prisoners there; on July 24 and 25, 2018, I toured and inspected the Pontiac Correctional Center and interviewed a sample of prisoners there; and on July 26 and 27, 2018, I toured and inspected the Dixon Correctional Center and interviewed a sample of prisoners there. I returned to Illinois in September, 2018 to conduct additional tours and interviews. Specifically, on September 24 and 25, 2018 I toured and inspected the Menard Correctional Center, and interviewed a sample of prisoners there; on September 26 and 27, 2018, I toured and inspected the Lawrence Correctional Center and interviewed a sample of prisoners there; and, finally, on September 27 and 28, 2018, I toured and inspected the Logan Correctional Center and interviewed a sample of prisoners there.[8] During the course of these facilities tours I identified several areas to be photographed at a later date, a sample of these photographs is attached as **Exhibit 3**.

---

[5] For example: Suzanne Agha, James Austin, & Angela Browne, Quantitative findings on use and outcomes of segregation in IL DOC. New York: Vera Institute of Justice, September 11, 2011.

[6] For example: Pablo Stewart, Second Annual report of Monitor Pablo Stewart, M.D., *Rasho v. Baldwin*, No. 1-07-CV-1298-MMM-JEH, June 8, 2018.

[7] This term will be used throughout this Declaration to collectively refer to and denote the conditions of confinement in which IDOC prisoners in disciplinary segregation, administrative detention, temporary confinement, and investigative status are housed. The relatively minor differences between them will be acknowledged where they are relevant to the opinions expressed.

[8] I should note that I previously toured and inspected several of these facilities and conducted interviews with prisoners housed in them in conjunction with litigation that was pending several years earlier, *Rasho v. Baldwin*, No. 1:07-CV-1298-MMM-JEH (C.D. Ill., Peoria Div.).

16.     In the course of each of these facility visits, in addition to touring and inspecting the facilities themselves, I generally conducted multiple kinds of interviews with prisoners, including brief "cell-front" interviews with the prisoners whom I encountered in the course of the inspections. At each of these facilities I was also often able to question staff regarding operations, practices and policies.

17.     In addition to the briefer interviews conducted cell-front with prisoners, I conducted separate confidential interviews, in a private setting, with individual prisoners whom I selected. The face-to-face interviews with IDOC prisoners in restrictive housing were conducted in all of the various institutions that I toured, and they included prisoners housed in disciplinary segregation, administrative detention, and investigative status.

**IV.     Summary of Conclusions**

18.     It is my expert opinion that being housed in solitary confinement/restrictive housing produces a number of negative psychological effects that place prisoners at significant risk of serious psychological harm. I believe that these effects are now well understood and described in the scientific literature. Scientific knowledge of these effects derives from numerous empirical studies. The findings are "robust"—that is, they come from studies that were conducted by researchers and clinicians from diverse backgrounds and perspectives, were completed and published over a period of many decades, and are empirically very consistent. With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm that they confront.

19.     In addition, the empirical conclusions drawn from direct studies of solitary confinement/restrictive housing are entirely consistent with an extensive scientific literature generated outside the context of prison. That is, numerous studies have

established the importance of social contact, social interaction, and social activity and have documented the wide range of harmful psychological and even physical effects that people suffer when they are deprived of these things.

20.     Thus, what we know about the harmful effects of solitary confinement/restrictive housing should be interpreted in the larger context of this empirically well-documented and theoretically sound scientific framework. The fact that social deprivation and isolation are known to produce adverse psychological and physical effects in contexts other than prison underscores how and why these conditions and experiences produce similar outcomes in correctional settings (where, if anything, the social deprivation and isolation are far more extreme and forcefully and pejoratively applied).

21.     There are also sound theoretical reasons to expect that prisoners who suffer from serious mental illness ("SMI") would have a more difficult time tolerating the painful experience of solitary confinement/restrictive housing. This is in part because of the greater vulnerability of the mentally ill in general to stressful, traumatic conditions, and in part because some aspects of solitary confinement/restrictive housing have direct adverse impacts on the particular symptoms from which mentally ill prisoners suffer (such as depression) or directly aggravate aspects of their pre-existing psychiatric conditions.

22.     It is also my opinion that the conditions of confinement in restrictive housing in the various IDOC units that I observed clearly constitute what is meant by "solitary confinement" in the scientific, legal, and human rights literature as well is in common correctional parlance. I reached this conclusion based on what I saw directly in the various restrictive housing units I toured and inspected, what I read about them in the

8

documents that I reviewed (including various applicable IDOC policies and practices), and what was described to me in the interviews of IDOC prisoners and staff that I conducted. These IDOC units subject prisoners to <u>exactly</u> the type of conditions that my own research and professional experience and the scientific studies conducted by others over a period of many decades indicate are hurtful and harmful. They place all prisoners at significant risk of serious harm, regardless of their pre-existing mental health status.

23.     The IDOC subjects prisoners to restrictive housing under several different rubrics. By far the largest group of restricted housing prisoners are designated "disciplinary segregation" prisoners. For example, according to June 2018 data, of the 1,612 prisoners in the IDOC subjected to restrictive housing, 1,390 were assigned to disciplinary segregation. [9] The remaining groups—"administrative detention," "temporary confinement," and "investigation status"—each have fewer than a hundred prisoners in them. With relatively minor differences in living conditions and daily routine between prisoners in different designations and between prisoners housed in different prisons (as noted in greater detail later in this Declaration), the conditions of confinement and the nature of the practices and procedures in all IDOC restrictive housing units are essentially the same. They are problematic and dangerous in much the same ways.

24.     In addition, many of the solitary confinement/restrictive housing units that I observed within IDOC are especially severe. They subject prisoners to conditions and forms of treatment that go beyond being painful, unpleasant, and potentially harmful to being outright dangerous to prisoners' mental health and well-being.

---

[9] Declaration of Matthew R. DalSanto, paragraph 10.

25.     As a result, all IDOC prisoners subjected to solitary confinement/restrictive housing are at significant risk of serious psychological harm as a result of the conditions, practices, and policies to which they are subjected. Indeed, the restrictive housing units that I observed and where I interviewed prisoners subjected them to severe forms of social deprivation. In addition, these units subject prisoners to a range of other harsh living conditions, severe restrictions, and additional deprivations that exacerbate the harmful effects of social isolation.

26.     Not surprisingly, the prisoners whom I encountered in the course of my facility tours and inspections—both those briefly interviewed cell-front and those with whom I conducted longer, confidential interviews—reported that they are suffering under the harsh conditions and forms of treatment to which they are subjected in restrictive housing. There were frequent and consistent complaints about the draconian and degraded conditions of confinement in which prisoners are forced to live, the profound levels of idleness and inactivity to which they are subjected and, in the case of mentally ill prisoners, the lack of meaningful (or, in some instances, any) mental health care. These complaints surfaced repeatedly in the cell-front interviews and were corroborated and amplified in the individual, confidential interviews I conducted.

27.     The data I obtained through the confidential interviews that I conducted produced evidence that there is a high prevalence of problematic psychological symptoms among IDOC prisoners in solitary confinement/restrictive housing, including symptoms associated with toxic levels of stress and the psychopathological effects of isolation (which I will elaborate on later in this Declaration).

28.     It is important to acknowledge that a prison system's use of solitary confinement/restrictive housing does not occur in a vacuum. Instead, it is typically related to other forms of correctional dysfunction, including overcrowding, a lack of funding for positive programming, a substandard mental healthcare delivery system, a combination of these things, or some other deeper systemic problem or set of problems. The use of solitary confinement/restrictive housing is a reflection of those problems and is sometimes employed in an ill-advised attempt to solve them. The IDOC is no exception.

29.     Although the overall population in the IDOC has slowly decreased over the last decade, and the total number of prisoners in restrictive housing has correspondingly declined somewhat,[10] the percentage of mentally ill prisoners in restrictive housing is extremely high. Based on the most current data to which I have access, an estimated 80% of prisoners in IDOC solitary confinement/restrictive housing units are mentally ill.[11] The combination of widespread problematic conditions, lack of adequate programming and service, and the high concentration of mentally ill prisoners in solitary confinement/ restrictive housing appears to be related to the continuing dysfunctionality that plagues the IDOC's mental health care system-wide.[12]

30.     The opinions expressed herein are based on a reasonable degree of professional certainty.

---

[10] According to documents produced to counsel in *Rasho v. Walker*, 07-cv-1298, in November 2017 there were 1105 prisoners in segregation in Illinois Department of Corrections, in July 2018 there were 1132 prisoners in segregation in Illinois Department of Corrections.

[11] According to documents produced to counsel and present in court in *Rasho v. Walker*, 07-cv-1298 in 2017 there were 1105 prisoners in segregation in the Illinois Department of Corrections, 897 of whom were considered mentally ill.

[12] For example, *see Rasho v. Walker*, 2018 WL 2392847 (C.D. Ill. 2018).

## V.    <u>The Adverse Psychological Effects of Solitary Confinement</u>

31.    "Solitary confinement" and "restrictive housing" are terms of art in correctional practice and scholarship. In this case, as I noted above, I will use the terms together and synonymously. Conditions of confinement and the policies and practices that govern restrictive housing in the IDOC are essentially what is meant by the more conventional term, solitary confinement. Both terms refer to conditions of severe (but not total) isolation from others. For perhaps obvious reasons, total and absolute solitary confinement—literally complete isolation from any form of human contact—does not exist in prison and never has.

32.    Solitary confinement/restrictive housing is presumably designed to limit and control disciplinary infractions and violence by keeping prisoners isolated from one another. Unfortunately, research indicates that it often fails to accomplish its ostensible goals.[13] It also comes at a significant price: it subjects prisoners to especially harsh and deprived conditions of isolated confinement that place them at a significant risk of serious psychological harm. As a general matter, psychologists have long known from numerous studies conducted in settings outside prison that social isolation, social exclusion, and loneliness in general are potentially very harmful and can cause irreparable damage to a person's overall psychological and physical functioning.[14] Of course, there is no reason to believe that these conditions and experiences, which are known to be extremely harmful outside prison, are any less harmful inside. In fact, there are many reasons to believe that,

---

[13] There is no reliable empirical evidence that the use of solitary confinement/restrictive housing reduces violence or gang activity or has any positive effects on the behavior of prisoner subjected to it.

[14] I will discuss this literature in the next section of this Declaration.

all other things being equal, the harsh, forceful ways that social deprivation is involuntarily imposed in correctional settings and the other restrictions that typically accompany it will result in even more psychological trauma and other impairments.

### A.   The Scientific Status of Social Isolation

33.    Although solitary confinement/restrictive housing is often discussed as if it existed in an empirical and theoretical vacuum, it does not. In fact, what we know about the negative psychological effects of prison isolation is actually situated in an even larger scientific literature about the harmful effects of social isolation and exclusion in society more generally. That is, there is now a wealth of scientific knowledge about the harmful effects of social isolation and exclusion in contexts and settings outside of prison. Absent the security-related and other constraints that prison researchers often face, scientists in the world outside prison have been able to conduct a vast number of studies on the effects of social isolation and exclusion. Thus, that much larger scientific literature forms the empirical and theoretical framework in which the results of research on solitary confinement/restrictive housing in prison can and should be understood and interpreted.

34.    In fact, there has been a great deal of methodologically sophisticated research – much of it done in the last two decades – that has produced an extremely impressive scientific database very carefully documenting what many of us who have been studying prison solitary confinement already knew – namely, that meaningful social contact is a fundamental human need whose deprivation can result in serious and negative psychological and even physical effects.

35.    The scientific database on the negative effects of isolation is too extensive to comprehensively review in this Declaration. Instead, I will summarize a representative sample of the research and its most important conclusions. Even this brief summary

13

establishes that there is a larger empirical and theoretical scientific framework through which the nature and significance of the adverse effects of solitary confinement/restrictive housing in the IDOC can and should be understood.

36.     The need to belong, to be socially connected, and to have social contact with others has been recognized for several decades in psychology and other behavioral sciences. [15] Psychologists have long known that social contact is fundamental to establishing and maintaining emotional health and well-being. Years ago, social psychologist Herbert Kelman argued that denying persons contact with others was a form of dehumanization.[16] As one researcher put it more recently: "Since its inception, the field of psychology emphasized the importance of social connections."[17] "Affiliation" – the opportunity to have meaningful contact with others – helps us reduce anxiety in the face of uncertainty or fear-arousing stimuli.[18]

37.     Indeed, one of the ways that people determine the appropriateness of their feelings – how we establish the very nature and tenor of our emotions – is through contact with others.[19] Thus, prolonged social deprivation is painful and destabilizing, in part

---

[15] For example, *see* Baumeister, R., & Leary, M. (1995). The need to belong: Desire for interpersonal attachments as a fundamental human motivation. Psychological Bulletin, 117, 497-529.

[16] Kelman, H., Violence Without Restraint: Reflections on the Dehumanization of Victims and Victimizers. In G. Kren & L. Rappaport (Eds.), Varieties of Psychohistory (pp. 282-314). New York: Springer (1976).

[17] DeWall, C., Looking Back and Forward: Lessons Learned and Moving Forward, in C. DeWall (Ed.), The Oxford Handbook of Social Exclusion (pp. 301-03). New York: Oxford University Press (2013), at p. 301.

[18] For example, *see* Stanley Schachter, The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness. Stanford, CA: Stanford University Press (1959); Irving Sarnoff & Philip Zimbardo, Anxiety, Fear, and Social Affiliation, Journal of Abnormal Social Psychology, 62, 356-363 (1961); Philip Zimbardo & Robert Formica, Emotional Comparison and Self-Esteem as Determinants of Affiliation, Journal of Personality, 31, 141-162 (1963).

[19] For example, *see* A. Fischer, A. Manstead, & R. Zaalberg, Social Influences on the Emotion Process, in M. Hewstone & W. Stroebe (Eds.), European Review of Social Psychology (pp. 171-202). Volume 14. Wiley Press (2004); C. Saarni, The Development of Emotional Competence. New York: Guilford Press (1999); Stanley Schachter & Jerome Singer, Cognitive, Social, and Physiological Determinants of Emotional State,

because it deprives persons of the opportunity to ground their thoughts and emotions in a meaningful social context – to know what they feel and whether those feelings are appropriate.

38.     Not surprisingly, then, numerous scientific studies have established the psychological significance of social contact, connectedness and belongingness. They have concluded, among other things, that the human brain is literally "wired to connect" to others.[20] Thwarting this "need to connect" not only undermines psychological well-being, but also increases physical morbidity and mortality. Indeed, in part out of recognition of the importance of the human need for social contact, connection, and belongingness, social psychologists and others have written extensively about the harmful effects of its deprivation – what happens when people are subjected to social exclusion and isolation.

39.     Some of the most dramatic demonstrations of the harmful effects of social deprivation have been found in animal research, where certain kinds of more intrusive scientific procedures and controls are possible to employ. Numerous animal studies have documented the neurological consequences of social isolation, measured in ways that they could not be in humans. They have found that social isolation actually has the capacity to alter the brain's neurochemistry, structure, and function. Thus, social isolation leads to anxiety-like behavior in animals, impairs their working memory, and disrupts their brain activity,[21] as well as altering their neuroendocrinal responses in ways that that exacerbate

---

Psychological Review, 69, 379-399 (1962); L. Tiedens & C. Leach (Eds.), The Social Life of Emotions. New York: Cambridge University Press (2004); and S. Truax, Determinants of Emotion Attributions: A Unifying View, Motivation and Emotion, 8, 33-54 (1984).

[20] Lieberman, M., Social: Why Our Brains Are Wired to Connect. New York: Random House (2013).

[21] For example, see Zorzo, C., Mendez-Lopez, M., Mendez, M., & Arias, J. (2018). Adult social isolation leads to anxiety and spatial memory impairment: Brain activity pattern of COx and c-Fos. Behavioural Brain Research, 365, 170-177.

the effects of stress.[22] Social isolation represents a chronic stressor that also changes animal brain chemistry in ways that negatively affect the cellular mechanisms of aging,[23] precipitates depression-like behavior in mammals,[24] and suppresses the animal immune response to illness.[25]

40.     In fact, the damaging effects of social isolation on laboratory animals are so well-documented that they have led governmental and scientific funding organizations— for example, the National Institute of Health—to prohibit researchers from placing them in completely isolated conditions for prolonged periods. It is considered unethical to do so and a basis for denying or revoking funding to scientists who violate this prohibition. As a result, university research facilities that conduct animal research have "institutional animal care and use committees" that promulgate guidelines for conducting animal research, virtually all of which include limitations on the degree to which laboratory animals can be subjected to any form of social isolation.[26]

---

[22] For example, *see* Frietas, B., Antoniazzi, V., dos Santos, C., et al. (2019). Social isolation and social support at adulthood affect epigenetic mechanisms, brain-derived neurotrophic factor levels and behavior of chronically stressed rats. *Behavioural Brain Research, 366*, 36-44.

[23] For example, *see* Stevenson, J., McMahon, E., Boner, W., & Haussmann, M. (2019). Oxytocin administration prevents cellular aging caused by social isolation. Psychoneuroendocrinology, 103, 52-60.

[24] For example, *see* Gong, Y., Tong, L., Yang, R., et al. (2018). Dynamic changes in hippocampal microglia contribute to depressive behavior induced by early social isolation. Neuropharmacology, 135, 223-233.

[25] For example, *see* Wu, W., Yamaura, T., Murakami, K., et al. (2000). Social isolation stress enhances liver metastasis of murine colon 26-L5 carcinoma cells by suppressing immune response in mice. Life Sciences, 66, 1827-1838.

[26] For example, the Emory University's guidelines mandate "environmental enrichment" for nonhuman primates used in research. The enrichment is aimed at "identifying and providing the environmental stimuli necessary for psychological and physiological wellbeing." The Emory guidelines mandate that "all nonhuman primates must be housed with one or more members of the same species." Any exception to this policy requires advanced approval and is "reviewed by the Attending Veterinarian every 30 days." http://www.iacuc.emory.edu/documents/policies/360_Environmental_Enrichment_for_Nonhuman_Primates.pdf

41.     Of course, the results of animal studies are not directly transferable to human populations. However, literally hundreds of studies done with human participants have reached many of the same conclusions. For example, scientists have established that social isolation in society at large is a significant risk factor for depression and anxiety among adolescents and adults,[27]  and is related as well to psychosis,[28] paranoia,[29] and suicidal behavior.[30] It also can lead to reduced cognitive functioning.[31] Among people who already have been diagnosed or identified as mentally ill in settings outside prison, isolation

---

[27] For example, *see* Ge, L., Chun, W., Ong, R., & Heng, B. (2017). Social isolation, loneliness and their relationship with depressive symptoms: A population-based study. PLoS ONE, 12(8), e0182145. https://doi.org/10.1371/journal.pone.0182145; Hafner, S., et al., Association Between Social Isolation and Inflammatory Markers in Depressed and Non-depressed Individuals: Results from the MONICA/KORA Study, Brain, Behavior, and Immunity, 25, 1701-1707 (2011); Richardson, C., Oar, E., Fardouly, J. et al. (2019). The moderating role of sleep in the relationship between social isolation and internalising problems in early adolescence. Child Psychiatry & Human Development, 1-10 https://doi.org/10.1007/s10578-019-00901-9; van Beljouw, I. M., van Exel, E., de Jong Gierveld, J., Comijs, H. C., Heerings, M., Stek, M.L., et al. (2014). "Being all alone makes me sad": Loneliness in older adults with depressive symptoms. International Psychogeriatrics, 9, https://doi.org/10.1017/S1041610214000581 1-11.1; Wang, J., Lloyd-Evans, B., Giacco, D. et al. (2017). Social isolation and mental health: A conceptual and methodological review. Social Psychiatry and Psychiatric Epidemiology, 52, 1451-1461.

[28] For example, *see* DeNiro, D. (1995). Perceived alienation in individuals with residual-type schizophrenia. Issues in Mental Health Nursing, 16(3), 185-200.*

[29] For example, *see* Butter, S., Murphy, J., Shelvin, M., & Houston, J. (2017). Social isolation and psychosis-like experiences: A UK general population analysis. Psychosis: Psychological, Social and Integrative Approaches, 9(4), 291-300.

[30] For example, *see* Goldsmith, S., Pellmar, T., Kleinman, A., & Bunney, W. (2002). Reducing suicide: A national imperative. Washington, DC: National Academy Press.

[31] For example, *see* Fratiglioni, L., Wang, H., Ericsson, K., Maytan, M., & Winblad, B. (2000). Influence of social network on occurrence of dementia: A community-based longitudinal study. Lancet, 355, 1315-1319; Shankar, A., Hamer, M., McMunn, A., & Steptoe, A. (2013). Social isolation and loneliness: Relationships with cognitive function during 4 years of follow-up in the English Longitudinal Study of Ageing. Psychosomatic Medicine, 75, 161-170;

has been implicated in the maintenance of delusional or psychotic beliefs,[32] a lack of insight into one's psychiatric symptoms,[33] and a higher rate of hospital usage.[34]

      42.    In addition, social isolation also adversely impacts the functioning of the human immune system[35] and undermines health outcomes in general.[36] Not surprisingly, it has been linked to higher rates of mortality; that is, the experience of social isolation literally lowers the age at which people die.[37] In fact, researchers have concluded that the

---

[32] For example, *see* Garety, P., Kuipers, E., Fowler, D., Freeman, D., & Bebbington, P. (2001). A cognitive model of the positive symptoms of psychosis. Psychological Medicine, 31(2), 189-195, who wrote about the way that social marginalization contributes to beliefs about the self as "vulnerable to threat, or about others as dangerous" (p. 190) and the way that "social isolation contributes to the acceptance of… psychotic appraisal by reducing access to alternative move normalizing explanations" (p. 191).

[33] For example, *see* White, R., Bebbington, P., Person, J., Johnson, S., & Ellis, D. (2000). The social context of insight in schizophrenia. Social Psychiatry and Psychiatric Epidemiology, 35(11), 500-507.

[34] For example, *see* Mgutshini, T. (2010). Risk factors for psychiatric re-hospitalization: An exploration. International Journal of Mental Health Nursing, 19(4), 257-267; and Thornicroft, G. (1991). Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, British Journal of Psychiatry, 158, 475-484.

[35] For example, *see* Pressman, S., Cohen, S., Miller, G., et al., (2005). Loneliness, social network size, and immune response to influenza vaccination in college freshmen. Health Psychology, 24, 297-306; and

[36] For example, *see* Beller, J., & Wagner, A. (2018). Loneliness, social isolation, their synergistic interaction, and mortality. Health Psychology, 37(9), 808-813; Fiorillo, D., & Fabio Sabatini, F. (2011). Quality and Quantity: The Role of Social Interactions in Self-Reported Individual Health. Social Science & Medicine, 73, 1644-1652.

[37] For example, *see* Coyle, & Dugan, (2012); and Elovainio, M., Hakulinen, C., Pulkki-Raback, L., et al. (2017). Contribution of risk factors to excess mortality in isolated and lonely individuals: An analysis of data from the U.K. Biobank cohort study. The Lancet Public Health, 2, e260-e266; Hawkley, L., & Cacioppo, J. (2010). Loneliness matters: A theoretical and empirical review of consequences and mechanisms. Annals of Behavioral Medicine, 40, 218-227; Heinrich, L., & Gullone, E. (2006). The clinical significance of loneliness: A literature review. Clinical Psychology Review, 26, 695-718; Marcus, A., Illescas, A., Hohl, B., & Llanos, A. (2017). Relationships between social isolation, neighborhood poverty, and cancer mortality in a population-based study of US adults. PLoS ONE, 12(3), e0173370. doi: 10.1371/journal.pone.0173370; Pantell, M., Rehkopf, D., Jutte, D., et al. (2013). Social isolation: A predictor of mortality comparable to traditional clinical risk factors. American Journal of Public Health, 30, 241-256; and Tanskanen, J., & Anttila, T. (2016). A prospective study of social isolation, loneliness, and mortality in Finland. American Journal of Public Health, 106(11), 2042-2048.

health risk of social isolation on mortality rates is comparable to that caused by smoking cigarettes.[38]

43.     In part because of its dramatic, life-shortening effects, social isolation is increasingly recognized as a serious public health concern. For example, the social isolation of older adults was the focus of two of the Canadian National Seniors Council most recent reports.[39] The negative effects of social isolation on psychological and physical well-being in general have led to it being targeted internationally in major public health initiatives.[40]

44.     There is a closely related and well-developed body of literature on "social exclusion" – what happens when people are involuntarily separated from others (as they are in most prison solitary confinement/administrative segregation units). These studies, too, show that being separated from others produces a host of serious negative consequences. Researchers have documented the fact that excluding persons from contact with others is not only "painful in itself," but also "undermines people's sense of belonging,

[38] For example, *see* Holt-Lunstad, J., Smith, T. B., & Layton, B. (2010). Social relationships and mortality risk: A meta-analytic review. PLoS Medicine, 7, 1–20. Holt-Lunstad, J., Smith, T. B., Baker, M., Harris, T., & Stephenson, D. (2015). Loneliness and social isolation as risk factors for mortality: A meta-analytic review. Perspectives on Psychological Science, 10, 227–237.

[39] *See* National Seniors Council. (2014). Report on the social isolation of seniors 2013-2014. Retrieved from http://www.seniorscouncil.gc.ca/eng/research_publications/social_isolation/page00. shtml
National Seniors Council. (2017). Who's at risk and what can be done about it? A review of the literature on the social isolation of different groups of seniors. Retrieved from https://www. canada.ca/en/national-seniors-council/programs/publications-reports/2017/review-social-isola tion-seniors.html

[40] For example, *see* Leigh-Hunt, N., Bagguley, D., Bash, K., et al. (2017). An overview of systematic reviews on the public health consequences of social isolation and loneliness. Public Health, 152, 157-171. In fact, an international commission formed by former French President, Nicholas Sarkozy, and led by Nobel Prize winners Joseph Stiglitz and Amartya Sen and economist Jean-Paul Fitoussi to identify key indicators of social progress, quality of life, and well-being identified social connectedness as one of the key dimensions that nations should take into account. Stiglitz, J., Sen, A., Fitoussi, J., et al. (2008). Report by the Commission on the Measurement of Economic Performance and Social Progress. Paris, France: The Commission http://ec.europa.eu/eurostat/documents/118025/118123/Fitoussi+Commission+report

control, self-esteem, and meaningfulness, reduces pro-social behavior, and impairs self-regulation."[41] Indeed, the subjective experience of social exclusion results in what has been called "cognitive deconstructive states" in which there is emotional numbing, reduced empathy, cognitive inflexibility, lethargy, and an absence of meaningful thought.[42]

45.    Social exclusion has been shown to heighten people's feelings of physical vulnerability and the expectation that they will experience physical harm in the future,[43] and may precipitate aggressive behavior – "action-oriented coping" – in response.[44] As two authors noted in summarizing these overall effects:

> Social exclusion is detrimental and can lead to depression, alienation, and sometimes even to violent behaviour. Laboratory studies show that even a brief episode of exclusion lowers mood, causes social pain, which is analogous to physical pain, and elicits various behavioural responses, such as aggressive behaviour or affiliation-seeking behavior.[45]

46.    In fact, the editor of an authoritative *Oxford Handbook of Social Exclusion* concluded the volume by summarizing the "serious threat" that social exclusion represents to psychological health and well-being, including "increased salivary cortisol levels… and

---

[41] Bastian, B., & Haslam, N. (2010). Excluded from Humanity: The Dehumanizing Effects of Social Ostracism. Journal of Experimental Social Psychology, 46, 107-113, p. 107, internal references omitted.

[42] Twenge, J., Catanese, K., & Baumeister, R. (2003). Social Exclusion and the Deconstructed State: Time Perception, Meaninglessness, Lethargy, Lack of Emotion, and Self Awareness. Journal of Personality and Social Psychology, 85, 409-423 (2003).

[43] For example, *see* Dean, K., Wentworth, G., & LeCompte, N. (2016). Social exclusion and perceived vulnerability to physical harm. Self and Identity, 18(1), 87-102.

[44] Reiter-Scheidl, K., Poapousek, I., Lackner, H., et al. (2018). Aggressive behavior after social exclusion is linked with the spontaneous initiation of more action-oriented coping immediately following the exclusion episode. Physiology & Behavior, 195, 142-150

[45] Syrjamaki, A., & Hietanen, J., (2018). The effects of social exclusion on processing of social information— A cognitive psychology perspective. British Journal of Social Psychology, DOI:10.1111/bjso.12299 (internal citations omitted). See, also: DeWall, et al. (2011). Belongingness as a Core Personality Trait: How Social Exclusion Influences Social Functioning and Personality Expression, Journal of Personality, 79, 979-1012.

blood flow to brain regions associated with physical pain," "sweeping changes" in attention, memory, thinking, and self-regulation, as well as changes in aggression and prosocial behavior. As he put it: "This dizzying array of responses to social exclusion supports the premise that it strikes at the core of well-being."[46]

47.     In addition to subjecting prisoners to social isolation and social exclusion, solitary confinement/restrictive housing often greatly limits or completely deprives them of the opportunity to give and receive caring human touch. Isolated prisoners may go for days, weeks, months, or even years without ever touching another person with affection. This, too, is an established area of scientific study in which researchers outside of the prison context has accumulated extensive data on harmful effects.

48.     Thus, psychologists have long known that: "Touch is central to human social life. It is the most developed sensory modality at birth, and it contributes to cognitive, brain, and socioemotional development throughout infancy and childhood."[47] The need for caring human touch is so fundamental that early deprivation is a risk factor for neurodevelopmental disorders, depression, suicidality, and other self-destructive behavior.[48] Later deprivation is associated with violent behavior in adolescents.[49]

---

[46] DeWall, *supra* note 17, at p. 302. See, also: Johan Karremans, et al. (2011). Secure Attachment Partners Attenuate Neural Responses to Social Exclusion: An fMRI Investigation. International Journal of Psychophysiology, 81, 44-50 (2011).

[47] Hertenstein, M., Keltner, D., App, B., Bulleit, B, & Jaskolka, A., Touch Communicates Distinct Emotions. Emotion, 6, 528-533 (2006), at p. 528. See also: Hertenstein, M., & Weiss, S. (Eds.), The Handbook of Touch: Neuroscience, Behavioral, and Health Perspectives. New York: Springer (2011).

[48] For example, *see* Cascio, C., Somatosensory Processes in Neurodevelopmental Disorders, Journal of Neurodevelopmental Disorders, 2, 62-69 (2010); Field, S., Touch Deprivation and Aggression Against Self Among Adolescents, in Stoff, D. & Susman, E. (Ed.), Developmental psychobiology of aggression (117-140). New York: Cambridge (2005).

[49] Field, T., Violence and Touch Deprivation in Adolescents, Adolescence, 37, 735-749 (2002). Recent theory and research now indicate that "touch is a primary platform for the development of secure attachments and cooperative relationships," is "intimately involved in patterns of caregiving," is a "powerful means by

Conversely, a number of experts have argued that caring human touch is so integral to our well-being that it is actually therapeutic. Thus, it has been recommended to treat a host of maladies including depression, suicidality, and learning disabilities.[50]

49.     If anything, the kind of social isolation, social exclusion, and the deprivation of caring touch that occurs in solitary confinement/restrictive housing in prisons and jails is far more stressful, harmful, and dangerous than in the larger society where these deleterious effects have been elaborately documented. Prison and jail isolation is enforced isolation (indeed, prisoners are often forcibly removed from their cells and taken to solitary confinement/restrictive housing), it is pejoratively imposed (i.e., there is stigma and often gratuitous humiliation associated with it), and it is accompanied by a host of additional deprivations beyond the sheer deprivation of meaningful social contact. Those deprivations commonly include the lack of positive environmental stimulation, severe restrictions on property, and a dearth or complete absence of meaningful activity and programming.

50.     Thus, there is every reason to believe that the adverse psychological and physical effects of social isolation and exclusion and the deprivation of caring touch that

---

which individuals reduce the suffering of others," and also "promotes cooperation and reciprocal altruism." Goetz, J., Keltner, D., & Simon-Thomas, E., Compassion: An Evolutionary Analysis and Empirical Review, Psychological Bulletin, 136, 351-374 (2010), at p. 360. The uniquely prosocial emotion of compassion "is universally signaled through touch," so that persons who live in a world without touch are denied the experience of receiving or expressing compassion in this way. Stellar, J., & Keltner, D., Compassion, in Tugade, M., Shiota, M., & Kirby, L. (Eds.), Handbook of Positive Emotions (pp. 329-41). New York: Guilford (2014). Researchers have found that caring human touch mediates a sense of security and place, a sense of shared companionship, of being and nurturing, feelings of worth and competence, access to reliable alliance and assistance, and guidance and support in stressful situations. Weiss, R., The Attachment Bond in Childhood and Adulthood, in C. Parkes, J. Stevenson-Hinde, & P. Marris (Eds.), Attachment Across the Life Cycle (66-76). London: Routledge (1995).

[50] For example, see Dobson, S., Upadhyaya, S., Conyers, I., & Raghavan, R., Touch in the Care of People with Profound and Complex Needs, Journal of Learning Disabilities, 6, 351-362 (2002); Field, T., Deprivation and Aggression Against Self Among Adolescents. In D. Stoff & E. Susman (Eds.), Developmental Psychobiology of Aggression (pp. 117-40). New York: Cambridge (2005).

occur in the course of solitary confinement/restrictive housing in correctional settings are far worse than in society at large, where those effects have proven to be severe.

### B.   Research on the Adverse Effects of Solitary Confinement Per Se

51.   In addition to the extensive research conducted <u>outside</u> of prison settings, there is a large and growing direct literature on the many ways that solitary confinement/restrictive housing per se can very seriously damage the overall mental and physical health of prisoners. The long-term absence of meaningful human contact and social interaction, the enforced idleness and inactivity, and the oppressive security and surveillance procedures (and the weapons, hardware, and other paraphernalia that go along with them) all combine to create starkly deprived conditions of confinement. These conditions predictably impair the psychological functioning of many prisoners who are subjected to them.[51]  There is a wide range of measured effects that include forms and degrees of cognitive, emotional, and behavioral impairments. For some prisoners, these impairments can be permanent and life-threatening.

---

[51] For example, *see* Bruce Arrigo & J. Bullock, The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change, <u>International Journal of Offender Therapy and Comparative Criminology</u>, <u>52</u>, 622-640 (2008); Kristin Cloyes, David Lovell, David Allen & Lorna Rhodes, Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample, <u>Criminal Justice and Behavior</u>, <u>33</u>, 760-781 (2006); Stuart Grassian, Psychiatric Effects of Solitary Confinement, <u>Washington University Journal of Law & Policy</u>, <u>22</u>, 325-383 (2006); Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement. <u>Crime & Delinquency</u>, <u>49</u>, 124-156 (2003); Craig Haney, Restricting the Use of Solitary Confinement, <u>Annual Review of Criminology</u>, <u>1</u>, 285-310 (2018); Craig Haney & Mona Lynch, Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement, <u>New York Review of Law & Social Change</u>, <u>23</u>, 477-570 (1997); and Peter Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in Michael Tonry (Ed.), <u>Crime and Justice</u> (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006). There are a few outlier studies that purport to find few if any negative effects. For a detailed discussion of the serious methodological flaws that plague these studies, see: Craig Haney, The Psychological Effects of Solitary Confinement: A Systematic Critique, <u>Crime and Justice</u>, <u>47</u>, 365-416 (2018).

52.     As I alluded to in passing above, direct research on the effects of solitary confinement/restrictive housing is challenging to conduct. This is largely because access to places and people in these units is greatly restricted and control over where people are housed and for how long is exercised for correctional rather than research reasons. In the admitted absence of a single "perfect" study of the phenomenon,[52] the substantial body of published literature clearly documents the distinctive <u>patterns</u> of psychological harm that can and do occur when persons are placed in solitary confinement/restrictive housing. These broad patterns have been consistently identified in personal accounts written by persons confined in isolation, in descriptive studies authored by mental health professionals who worked in many such places, and in systematic research conducted on the nature and effects of solitary confinement/restrictive housing. The studies span a period of over many decades, and were conducted in locations across several continents by researchers with different professional expertise, ranging from psychiatrists to sociologists and architects.[53]

53.     For example, mental health and correctional staff who have worked in solitary confinement/restrictive housing units have reported observing a range of

---

[52] The "perfect" study of the effects of solitary confinement is relatively straightforward to design but impossible to implement. It would include: dividing a representative sample of prisoners (who had never been in solitary confinement) into two groups by randomly assigning half to either a treatment condition (a significant period in solitary confinement) or a control condition (the same length of time residing in a typical prison housing unit), and conducting longitudinal assessments of both groups (i.e., before, during, and after their experiences), by impartial researchers skilled at gaining the trust of prisoners (including ones perceived by the prisoner-participants as having absolutely no connection to the prison administration), in a fashion that minimized or eliminated "practice effects" (that come about as a result of repeated testing). Unfortunately, the realities of prison life and the practical and ethical challenges of conducting research in prisons render such a study impossible to ever conduct. Moreover, any prison system that allowed truly independent, experienced researchers to perform even a reasonable approximation of such a study would be, almost by definition, so atypical as to call the generalizability of the results into question. Keep in mind also that the assessment process itself—depending on who carried it out, how often it was done, and in what manner—might well provide the solitary confinement participants with more meaningful social contact than they are currently afforded in a number of such units with which I am familiar, thereby significantly changing (and improving) the conditions of their confinement.

[53] For example, see the studies referenced in the review articles listed in footnote 51 above.

problematic symptoms manifested by the prisoners confined in these places.[54] The authors of one of the early studies of solitary confinement/restrictive housing summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[55]

54.     A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation.[56] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, and a build-up of physiological and psychic tension that led to incidents of self-mutilation.[57] Professor Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[58]

---

[54] Here, too, discussions of and citations to these studies appear in the review articles listed in footnote 51 above.

[55] Bruno Cormier & Paul Williams, Excessive Deprivation of Liberty, Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, & George Scott, Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement, Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott & Paul Gendreau, Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison, Canadian Psychiatric Association Journal, 12, 337-341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, Effect of Solitary Confinement on Prisoners, American Journal of Psychiatry, 119, 771-773 (1963).

[56] Hans Toch, Men in Crisis: Human Breakdowns in Prisons. Aldine Publishing Co.: Chicago (1975).

[57] Id. at 54.

[58] Ibid.

55.     More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.[59]

---

[59] In addition to the numerous studies cited in the articles referenced *supra* at note 51, there is a significant international literature on the adverse effects of solitary confinement. For example, *see* Henri Barte, L'Isolement Carceral, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, Einzelhaft: Eine Literaturubersicht (Solitary confinement: A literature survey), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept in solitary confinement); Boguslaw Waligora, Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization").  See, also, Ida Koch, Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration,

56.    In addition, there are correlational studies of the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units such as administrative segregation and security housing where prisoners are subjected to solitary-like conditions of confinement. For example, clinical researchers Ray Patterson and Kerry Hughes attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" that are generated by the "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[60] These authors reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[61] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence are also more prevalent in these units.[62]

---

"inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, Long-Term Mental Sequelae of Political Imprisonment in East Germany, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

[60] Raymond Patterson & Kerry Hughes, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004, Psychiatric Services, 59, 676-682 (2008), at p. 678.

[61] Ibid. See also Lindsay M. Hayes, National Study of Jail Suicides: Seven Years Later. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, Vulnerability and Prison Suicide, British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, Prison Suicide and Prisoner Coping, Crime and Justice, 26, 283-359 (1999).

[62] For example, see Howard Bidna, Effects of Increased Security on Prison Violence, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital, Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, Felon Self-Mutilation: Correlate of Stress in Prison, in Bruce L. Danto

57.     The painfulness and damaging potential of solitary confinement/restrictive housing is underscored by the fact that extreme forms are used in so-called "brainwashing" and certain forms of torture. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder ("PTSD") and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture techniques.[63]

58.     The prevalence of psychological symptoms (that is, the extent to which prisoners who are placed in these units suffer from these and related symptoms) is often very high. For example, in the early 1990s I conducted a study of a representative sample of one hundred prisoners who were housed in the Security Housing Unit ("SHU") at Pelican Bay Prison in California. I found that every symptom of psychological distress that I measured but one (fainting spells) was suffered by more than half of the prisoners who

---

(Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators, Criminal Justice and Behavior, 13, 286-296 (1986); Peter Kratcoski, The Implications of Research Explaining Prison Violence and Disruption, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, A Prison Environment: Its Effect on Health Care Utilization, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, Managing Violent Individuals in Correctional Settings, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, Using Situational Factors to Predict Types of Prison Violence, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

[63] Solitary confinement is among the most frequently used psychological torture techniques. In D. Foster, Detention & Torture in South Africa: Psychological, Legal & Historical Studies, Cape Town: David Philip (1987), Psychologist Foster listed solitary confinement among the most common "psychological procedures" used to torture South African detainees (at p. 69), and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (at p. 136). See also: Matthew Lippman, The Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Boston College International & Comparative Law Review, 27, 275 (1994); Tim Shallice, Solitary Confinement—A Torture Revived? New Scientist, November 28, 1974; F.E. Somnier & I.K. Genefke, Psychotherapy for Victims of Torture, British Journal of Psychiatry, 149, 323-329 (1986); and Shaun R. Whittaker, Counseling Torture Victims, The Counseling Psychologist, 16, 272-278 (1988).

were interviewed.[64] Many of the symptoms were reported by two-thirds or more of the prisoners assessed in this isolation housing unit, and some were suffered by nearly everyone. Well over half of the Pelican Bay isolated prisoners in this study reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that is commonly associated with hypertension.

59.     With respect to a separate set of symptoms—those that have been identified in the literature as direct psychopathological effects of isolation—I also found that almost all of the prisoners whom I evaluated reported ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

60.     I have replicated this same procedure with representative samples of prisoners in solitary confinement/restrictive housing units in a number of states in jurisdictions across the country and found very similar results—high prevalence rates among isolated prisoners on most of the symptoms of psychological distress and the psychopathological effects of isolation.

---

[64] See discussions of these data in Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement (2003), and more recent data collected at the same facility, showing much the same pattern of results, Craig Haney, Restricting the Use of Solitary Confinement (2018), both of which were cited in footnote 51 above.

61.     In addition, in a subsequent study that I conducted at the Pelican Bay SHU some two decades after my original study in the early 1990s, I found that very similar symptom patterns were not only equally or more prevalent among a sample of extremely long-term isolated prisoners, but also were experienced at much higher levels and greater intensities compared to a sample of long-term general population prisoners. Using the same structured interview and systematic assessment format as before, this study compared the prevalence and intensity of symptoms of psychological stress, trauma, and isolation-related psychopathology in a randomly selected sample (N=41) of long-term SHU prisoners (i.e., who had spent ten years or more in continuous solitary confinement at the facility) with a randomly selected sample (N=25) of long-term general population ("GP") prisoners (i.e., who were housed in the adjoining maximum security prison and had spent ten years or more of continuous imprisonment).[65] No prisoner in either sample was suffering from diagnosed mental health problems at the time the study was conducted.[66]

62.     An additional factor that added to the stringency of this comparison was the fact that many GP prisoners had spent long periods (some, years) confined in one or another solitary confinement unit before their current GP housing assignment. For some of them, this included previously having spent time in the SHU unit that was under study. As an aside, many of GP prisoners I interviewed acknowledged the lasting aftereffects of their time in isolation, attributing at least some of their current problems and symptoms to the

---

[65] Access to both groups was permitted pursuant to a court order in *Ashker v. Governor of California* (2014). All of the prisoners in both groups were otherwise mentally healthy; that is, no one from either group was currently on the prison system's mental health caseload.

[66] Largely as a result of a federal court decision, *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D. Cal. 1995), no prisoner on the California Department of Corrections and Rehabilitation's mental health caseload was permitted to be housed in the Pelican Bay SHU. To ensure comparability of the samples in this respect, no long-term GP prisoner currently on the mental health caseload was included in the study.

time that they had spent in solitary confinement. They described their struggle to overcome these effects once released from isolation, and acknowledged varying degrees of success in doing so. The GP prisoners who had been in solitary confinement also reported that the discomfort they felt in the presences of others had not necessarily dissipated quickly; they felt that it continued to interfere with some of their social relations and left them "lonely" in ways that approximated the feelings of the prisoners who were still in SHU (although to a much lesser degree).

63.     Given the severity of the overall conditions to which both groups of prisoners were subjected, it was not surprising to learn that they all acknowledged some degree of suffering and distress. Yet there was absolutely no comparison in the levels reported by the GP versus the SHU prisoners. On nearly every single specific dimension measured, the prisoners in SHU were in significantly more pain, were more traumatized and stressed, and manifested far more isolation-related pathological reactions.[67] They also differed dramatically in terms of the intensity with which they were bothered by these symptoms. The mean intensities of the reported symptoms were not only significantly different between the groups but were nearly or more than double for the SHU prisoners compared to those prisoners housed in GP.[68]

---

[67] Here, of the 25 specific symptoms, the currently isolated long-term SHU prisoners were significantly more likely than long-term GP prisoners to report experiencing 18 of them, including 11 of the 13 symptoms of isolation-related pathology. In fact, the SHU prisoners reported significantly more symptoms overall ($M$=15.30 vs. 7.75, $t$=6.44, df=62, p<.001, Cohen's $D$ = 1.65), including significantly more stress and trauma related symptoms ($M$=6.88 vs. 3.58, $t$=5.36, , df=62, p<.001, Cohen's $D$ = 1.36), and significantly more isolation-related indices of pathology ($M$=8.44 vs. 4.24, $t$=6.63, , df=64, p<.001, Cohen's $D$ = 1.66). In addition to the highly statistically significant nature of these differences, the orders of magnitude were quite large—nearly twice as many symptoms overall as well as for the two separate categories of symptoms were suffered by SHU prisoners as opposed to those in GP.

[68] With the exception of headaches (which were reported at reasonably high levels of intensity for both groups), the only symptoms on which there were not significant differences between the SHU and GP prisoners pertained almost exclusively to symptoms that were reported very infrequently by both groups (e.g., fainting, suicidality). Thus, the long-term SHU prisoners reported suffering much greater stress- and trauma-

64.     Although these specific symptoms of psychological stress and the psychopathological reactions to isolation are numerous and well-documented in these studies and the others to which I have referred, and certainly provide one index of the magnitude of the risk of harm that being placed in solitary confinement/restrictive housing presents, they do not encompass all of the psychological pain and dysfunction that the experience can incur, the magnitude of the negative changes it may bring about, or even the full range of the risk of harm it represents. Among other things, such extreme deprivation of social contact can undermine an individual's social identity, destabilize his or her sense of self, and ultimately destroy one's ability to function normally in free society.

65.     In a broader sense, the social deprivation and social exclusion imposed by solitary confinement/restrictive housing engenders forms of *social pathology* – necessary adaptations that prisoners must make to live in an environment that is devoid of normal social contact – that is, to exist and function in the absence of meaningful interaction and closeness with others. In this socially pathological environment, prisoners have no choice but to adapt in socially pathological ways. Over time, they gradually change their patterns of thinking, acting and feeling to cope with the profoundly asocial world in which they are forced to live, accommodating to the absence of social support and the routine feedback that comes from normal, meaningful social contact.

66.     Solitary confinement/restrictive housing is a socially pathological environment that forces long-term inhabitants to develop their own socially pathological adaptations—ones premised on the absence of meaningful contact with people—in order to function and survive. As a result, prisoners gradually change their patterns of thinking,

---

related symptom intensity ($M$=17.7 vs. 7.79, $t$=5.7, df=62, $p$<.001, Cohen's $D$ = 1.53), and much greater intensity of isolation-related pathology ($M$=21.66 vs. 9.00, $t$=7.46, df=64, $p$<.001, Cohen's $D$ = 1.91).

acting and feeling to cope with their largely asocial world and the impossibility of relying on social support or the routine feedback that comes from normal contact with others. Clearly, then, these adaptations represent "social pathologies" brought about by the socially pathological environment of isolation. However, although they are functional and even necessary under these circumstances, they can become especially painful and disabling if taken to extremes, or if and when they are internalized so deeply that they persist long after time in isolation has ended.

67.     For example, some prisoners cope with the asociality of their daily existence by paradoxically creating even more. That is, they socially withdraw further from the world around them, receding even more deeply into themselves than the sheer physical isolation of solitary confinement and its attendant procedures require. Others move from initially being starved for social contact to eventually being disoriented and even frightened by it. As they become increasingly unfamiliar and uncomfortable with social interaction, they are further alienated from others and made anxious in their presence.

68.     Although social deprivation is at the core of solitary confinement/restrictive housing, and what seemingly accounts for its most intense psychological pain and the greatest risk of harm, prison isolation units also deprive prisoners of more than social contact. Thus, there are characteristically high levels of repressive control, enforced idleness, reduced positive environmental stimulation, and physical and material deprivations that also lead to psychological distress and can create even more lasting negative consequences. Indeed, most of the things that we know are beneficial to prisoners—such as increased participation in institutional programming, visits with

persons from outside the prison, physical exercise, and so on[69]—are either functionally denied or greatly restricted in solitary confinement/restrictive housing units. In addition to the social pathologies that are created by the deprivation of normal, meaningful social contact, these other stressors also can produce additional negative psychological effects.

69.     In addition, of course, people require a certain level of mental and physical activity in order to remain healthy. The near total lack of movement and opportunity for exercise experienced by most prisoners in isolation unquestionably impacts their mental health.  Simply put, human beings need movement and exercise to maintain healthy mental functioning—without the possibility for such normal and necessary human activity, prisoners in isolation suffer a risk of serious mental harm.

70.     Apart from the profound social, psychological, and physical deprivations that solitary confinement/restrictive housing imposes, prisoners placed in these units experience prolonged periods of monotony and idleness. Many of them experience a form of sensory deprivation—there is an unvarying sameness to the physical stimuli that surround them, they exist within the same limited spaces and are subjected to the same repetitive routines, and there is little or no external variation to the experiences they are permitted to have or can create for themselves. This loss of perceptual and cognitive or mental stimulation may result in the atrophy of important related skills and capacities.[70]

71.     Of course, not literally every isolated prisoner will experience all or even necessarily most of the range of adverse reactions that I have described above. But the

---

[69] John Wooldredge, Inmate Experiences and Psychological Well-Being, <u>Criminal Justice and Behavior</u>, <u>26</u>, 235-250 (1999).

[70] *See* the articles cited in the reviews referenced in footnote 51. In addition, see: Stanley Brodsky & Forrest Scogin, Inmates in Protective Custody: First Data on Emotional Effects, <u>Forensic Reports</u>, <u>1(4):</u> 267-289 (1988)

nature and magnitude of the negative psychological consequences themselves underscore the stressfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the risk of harm that is created by isolation and its broad range of severe stressors and deprivations. The devastating effects of the conditions typically found in isolation units are repeatedly played out in the characteristically high numbers of suicide deaths and incidents of self-harm and self-mutilation.

72.     Given the years of sustained research on solitary confinement/restrictive housing and the observable outcomes produced by this form of incarceration across time and locality, there can be no doubt that the negative psychological impact of confinement in these environments is often severe and, for some prisoners, sets in motion a set of cognitive, emotional, and behavioral changes that are long-lasting. Indeed, they can persist beyond the time that prisoners are housed in isolation and, for some, will prove irreversible.

## C.     The Exacerbating Effects of Isolation on Mental Illness

73.     Although isolated confinement creates obvious risks of harm for all, most experts acknowledge that the adverse psychological effects of solitary confinement/restrictive housing vary as a function not only of the specific nature and duration of the isolation (such that more deprived conditions experienced for longer amounts of time are likely to have more detrimental consequences), but also as a function of the characteristics of the prisoners subjected to it. Unusually resilient prisoners may be able to withstand even harsh forms of solitary confinement/restrictive housing with few or minor adverse effects. Conversely, some prisoners are especially vulnerable to the psychological pain and pressure of solitary confinement.

74.     Mentally ill prisoners are particularly at risk in these environments and have been precluded from them precisely because of this.[71] This is of particular significance in a prison system such as the IDOC, where, for example, at Dixon, Menard, and Pontiac, there were 582 prisoners who had been categorized as seriously mentally ill ("SMI") at the some point during 2018.[72] Of these 582 SMI prisoners, 460 SMI prisoners were in restrictive housing for 1 or more days in 2018, 410 SMI prisoners were in restrictive housing for 30 or more days in 2018, 306 SMI prisoners were in restrictive housing for 90 or more days in 2018, 226 SMI prisoners were in restrictive housing for 180 or more days in 2018, 169 SMI prisoners were in restrictive housing for 270 or more days in 2018, and 132 SMI prisoners were in restrictive housing for all of 2018.[73]

75.     There are several explanations for why mentally ill prisoners are especially vulnerable to solitary confinement/restrictive housing. For one, as I have noted, isolation is significantly more stressful and psychologically painful than other forms of prison confinement. Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the benign and socially supportive atmosphere that mental health clinicians seek to create within therapeutic environments. Not surprisingly, mentally ill prisoners generally deteriorate and decompensate when they are placed in isolation units.

---

[71] For example, *see Madrid v. Gomez*, 889 F.Supp. 1146 (N.D. Cal. 1995); *Ruiz v. Johnson*, 37 F.Supp.2d 855 (S.D. Tex. 1999); *Jones'El v. Berge*, 164 F. Supp.2d 1096 (W.D. Wisc. 2001); and *Ind. Protection and Advocacy Comm'n v. Comm'r, Ind. Dep't of Corr.*, No. 1:08-CV-01317-TWP, 2012 WL 6738517 (S.D. Ind. 2012).

[72] Declaration of Matthew R. DalSanto in Support of Plaintiffs' Motion for Class Certification, September 6, 2019, paragraph 11.

[73] *Ibid.*

76.     Some of the exacerbation of mental illness that occurs in solitary confinement/restrictive housing comes about as a result of the critically important role that social contact and social interaction play in maintaining psychological equilibrium. The esteemed psychiatrist Harry Stack Sullivan once summarized the clinical importance of meaningful social contact by observing that "[w]e can't be alone in things and be very clear on what happened <u>to</u> us, and we… can't be alone and be very clear even on what is happening <u>in</u> us very long—excepting that it gets simpler and simpler, and more primitive and more primitive, and less and less socially acceptable."[74] Social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality.

77.     For this reason, one of the most fundamental ways that solitary confinement/restrictive housing psychologically destabilizes prisoners is by undermining their sense of self or social identity and eroding their connection to a shared social reality. Isolated prisoners have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[75]

---

[74] Harry Stack Sullivan, The Illusion of Personal Individuality, <u>Psychiatry</u>, <u>12</u>, 317-332 (1971), at p. 326.

[75] Compare, also, Margaret Cooke & Jeffrey Goldstein, Social Isolation and Violent Behavior, <u>Forensic Reports</u>, <u>2</u>, 287-294 (1989), at p. 288.

78.     In extreme cases, a related pattern emerges: isolated confinement becomes so painful, so bizarre, and so impossible to make sense of that some prisoners create their own reality—they live in a world of fantasy instead of the intolerable one that surrounds them.

79.     Finally, many of the direct negative psychological effects of social isolation are themselves very similar if not identical to certain symptoms of mental illness. Even though these specific effects are typically thought to be less chronic or persistent when produced by the prisoner's conditions of confinement than those that derive from a diagnosable mental illness, when they occur in combination they are likely to exacerbate not only the outward manifestation of the symptoms but also the internal experience of the disorder.

80.     For example, many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depressed mood. For clinically depressed prisoners, these situational effects are likely to exacerbate their pre-existing chronic condition and lead to worsening of their depressed state. Similarly, the mood swings that some prisoners report in isolation would be expected to amplify the emotional instability that prisoners diagnosed with bi-polar disorder suffer. Prisoners who suffer from disorders of impulse control would likely find their pre-existing condition made worse by the frustration, irritability, and anger that many isolated prisoners report experiencing. And prisoners prone to psychotic breaks may suffer more in isolated confinement due to conditions that deny them the stabilizing influence of social feedback.

81.     As a result of the special vulnerability of mentally ill prisoners to the psychological effects of solitary confinement/restrictive housing, corrections officials and

courts that have considered the issue have prohibited them from being placed in such units.[76] In addition, mental health staff in most prison systems with which I am familiar are charged with the responsibility not only of screening prisoners in advance of their possibly being placed in isolation (so that the mentally ill can be excluded), but also of monitoring prisoners who are currently housed in solitary confinement for signs of emerging mental illness (so that they, too, can be removed).

82.     For example, one court that was presented with systematic evidence of the psychological risk of harm that solitary confinement entailed concluded that the seriously mentally ill must be excluded from such environments. Thus, the court noted that those prisoners for whom the psychological risks were "particularly"—and unacceptably—high included anyone suffering from "overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions in [solitary confinement]."[77] The court elaborated on this conclusion by noting that those who should be excluded from solitary confinement/ restrictive housing included:

> [T]he already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in [isolated confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable."[78]

83.     The accumulated weight of the scientific evidence that I have cited to and summarized above demonstrates the negative psychological effects of confinement

---

[76] *See* the cases cited in footnote 71.

[77] *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995) (citation omitted).

[78] Ibid.

confinement/restrictive housing—what happens to people who are deprived of normal social contact for extended periods of time. This evidence underscores the dangers that social isolation creates for human beings; it produces mental pain and suffering and increases tendencies towards self-harm and suicide.  This evidence further underscores the psychological importance of meaningful social contact and interaction, and in essence establishes these things as identifiable human needs. Over the long-term, they may be as essential to a person's psychological well-being as adequate food, clothing, and shelter are to his or her physical well-being.

## VI.    The Use of Solitary Confinement/Restrictive Housing in the Illinois Department of Corrections[79]

84.    As I noted above, the adverse psychological effects of restrictive housing are thought to vary as a function of the specific nature and duration of the isolated conditions to which prisoners are exposed. In this regard, there are better and worse restrictive housing units, including some that seek to ameliorate the harsh conditions that they impose and try minimize the harm that they inflict on prisoners. As I also noted, there are more and less resilient prisoners, including some who seem able to withstand the painfulness of these environments and to recover from the experience with few if any lasting effects. But neither of these facts undercuts the overall consensus that has emerged on the harmful effects of long-term isolation and the serious risk of such harm that this form of prison confinement poses for all prisoners who are subjected to it.

85.    Although the different categories of restrictive housing within IDOC may differ in the duration of the isolation and the purpose for which someone is subjected and

---

[79] From this point forward in this Declaration, I will use the term "restrictive housing," with the understanding that it means the same thing as "solitary confinement" and that the two terms can be used interchangeably.

the exact place where it occurs, all of the variations in the nature of isolated confinement in the Illinois prison system are similar in a number of very basic and very problematic respects: they all deprive prisoners of meaningful social contact and impose other extremely harsh restrictions, varying primarily only in terms of the length of time to which prisoners are subjected to them.[80] Moreover, it should be noted that in some instances prisoners classified as disciplinary segregation and prisoners classified as administrative detention are not separated into different units; they are all housed in the same restrictive housing units regardless of classification. And, even when prisoners in different categories of restrictive housing were housed in different units, I found that the conditions of confinement in those units were substantially the same.

86.     The conditions of confinement in all of the restrictive housing units that I toured are severe. Although they vary considerably in age (primarily because two of the prisons – Pontiac and Menard – are extremely old and in various stages of dilapidation. Although Stateville is almost as old, it houses fewer prisoners in restrictive housing), and vary somewhat in terms of exactly how inhospitable their living conditions are, the physical plants of each of the housing units is similar in design, in terms of the level of social

---

[80] For example, based on the IDOC February, 2019 Assignment History File, 1396 prisoners spent 180 or more days in restrictive housing in 2017. A total of 607 spent 365 days in restrictive housing during that same year. Based on the same data file, in 2018 there were 1,175prisoners who spent 180 days or more in restrictive housing. A total of 529 spent 365 days in restrictive housing in 2018. See Declaration of Matthew R. DalSanto in Support of Plaintiffs' Motion for Class Certification, September 6, 2019, paragraphs 7-8. These data appear to reflect a reduction in the average length of stay in restrictive housing. While reducing time in isolation is a positive step, it is insufficient to ameliorate the myriad risks of harm that I have identified in the present Declaration. The severity of the conditions, the practice of isolating vulnerable prisoners, and the still-extended duration of isolation continue to pose serious risks of harm for the prisoners subjected to extreme isolation in the IDOC.

isolation and environmental deprivation inflicted on prisoners housed in them, and in the practices and procedures by which the units themselves operate.[81]

87.     In all of the restrictive housing units that I viewed, in all of the prisons I toured, the units are severe and isolating, the cells are small and most afford the prisoners very little interior space (despite the fact that they confined in them nearly around-the-clock),[82] many of them are inadequate for even a single prisoner to be confined for such extended periods of time but are double-celled nonetheless, the programming space and programming itself is sparse or non-existent, and the recreation areas that I saw were concrete-floored, fenced-in cages with little or no exercise equipment inside them that were "yards" in name only.[83] Again, except for the extreme age and disrepair of several of the prisons, one would be hard-pressed to distinguish the harsh, deprived, and inhospitable living conditions that exist in any one of these severe restrictive housing units from another.[84]

## A.     Conditions of Confinement

88.     Description of cells – The restrictive housing cells that I saw throughout the facilities that I inspected severely limited a prisoner's contact with other prisoners and with staff.  In some cases, the cell doors were solid or covered with sheets of plexiglass, not

---

[81] *See* generally Exhibit 3, Photographs of Solitary Restrictive Housing units at Stateville, Pontiac, Dixon, Menard, Lawrence, and Logan. Specifically, see 134920 and 134947 (Stateville), 134689 and 134797 (Pontiac), 134669 and 134676 (Dixon), 039220 and 0349224 (Mendard), 134668 (Lawrence), 135022 and 135153 (Logan), which are photographs of individual cells in which prisoners on restrictive housing reside.

[82]*See* generally Exhibit 3, Photographs of Solitary Restrictive Housing units at Stateville, Pontiac, Dixon, Menard, Lawrence and Logan.

[83] *See* Exhibit 3. Photographs of the outdoor recreation areas for the prison facilities toured, specifically 134898 (Stateville), 134854 (Pontiac), 0347227 and 0349281 (Menard), 0125012 (Logan).

[84] *See* generally Exhibit 3.

only impeding social contact but also air flow. Some had no windows.  Many prisoners reported that their restrictive housing cells became unbearably hot in the summer months.

89.    All of the restrictive housing cells at every facility that I toured impeded communication with persons who were outside of the cells. Among other things, this interfered with the nature and quality of staff's monitoring of prisoners, and compromised the "cell front" contacts I was told mental health staff routinely used in lieu of individual, confidential, out-of-cell evaluations and treatment. I personally experienced these impediments as I attempted to interview prisoners in the course of my facility tours.

90.    Cell size – The cells in the restrictive housing unit at the six facilities that I toured varied in size, but they are all extremely small, allowing the prisoner little or no ability to move about their cell. Restrictive housing prisoners in the IDOC are confined nearly around-the-clock in their cells. The small cells not only add to the limited movement and activity they can engage in but prevent them from physically separating their normal daily routines (i.e., eating, sleeping, and defecating). Prisoners housed in these confined spaces report feeling claustrophobic, anxious, and degraded.

91.    Despite the small cell sizes, many prisoners in restrictive housing were "double-celled"— housed with another prisoner.[85] Double-celling does not mitigate, and indeed may significantly exacerbate, the psychological impact of isolated confinement.[86] The kind of forced and strained "interactions" that take place between prisoners who are confined nearly around-the-clock in a small cell does not constitute meaningful social contact. In fact, under these harsh and deprived conditions, the forced presence of another

---

[85] A photograph of a double-cell in a restrictive housing unit at Menard Correctional Center is contained in Exhibit 3, at 0349224.

person may become an additional stressor and source of tension (and even precipitate physical conflict); it can worsen the negative psychological effects of the other deprivations to which prisoners in restrictive housing are subjected. In fact, in my experience, double-celling in restrictive housing units increases the risk of assaults and sometimes lethal violence.[87]

92.     Lack of meaningful social interaction – Restrictive housing obviously significantly limits or eliminates prisoners' ability to have meaningful social contact with one another. However, restrictive housing in the IDOC also limits prisoners' meaningful social contact in other ways. For example, as explained in greater detail below, prisoners in restrictive housing in the IDOC lose the ability to make regular phone calls to friends or family, or regularly receive visitors.[88]  In some cases, they are limited to no-contact visits, taking away their only real opportunity to experience caring human touch. Further, a number of the prisoners to whom I spoke reported that they actually discouraged their relatives from visiting because of the conditions their relatives are subjected to during the visits.

93.     Lack of meaningful programming – Prisoners in IDOC restrictive housing have very limited or no access to religious, educational, or vocational programming.[89] For perhaps obvious reasons, programming in prison is essential to prisoner well-being. Programming not only allows prisoners to engage in productive forms of self-improvement

---

[87] In fact, this type of violence has already occurred in IDOC restrictive housing units where individuals are double-celled and a death resulted.  For example, on November 19, 2015 Davis Sessions killed his cellmate, Bernard Simmons, at Menard.

[88] 20 Ill. Admin. Code §§ 504.130, 504.620(i).

[89] *See, e.g.*, Davis Dep. 60:4-61:3; Shearrill Dep. 38:8-40:9; Coleman Oct. 21, 2015 Dep. 19:20-22:20, 40:8-11; Coleman Oct. 28, 2015 Dep. 113:1-11; Gardner Dep. 10:13-11:4.

or rehabilitation but also provides them with mental and physical activities in which to engage that, in turn, can help prevent debilitation and atrophy. The prisoners I spoke with during my tours consistently expressed their desire to participate in meaningful programming.

### B.    IDOC's Restrictive Housing Classifications

94.    As noted earlier, "restrictive housing" in the IDOC encompasses primarily two separate designations: disciplinary segregation and administrative detention.[90]

95.    Disciplinary segregation can be imposed when a prisoner has been found guilty of certain disciplinary infractions, and the range of penalties are set forth in the formal Administrative Regulation 504.[91] However, this regulation establishes only the maximum penalty for each infraction. Separate incidents can and typically do result in consecutive time to be served and, in extreme cases, the "stacking" of segregation time can result in decades being spent in disciplinary segregation.[92] Indeed, during my on-site interviews I encountered many prisoners who reported spending extremely long periods of time—months and years—in these severe conditions.

96.    In addition, all prisoners in disciplinary segregation are also placed in "C Grade," the restrictions of which are also set out in Administrative Regulation 504.[93] They are subjected to onerous restrictions on their property and privileges, including limited

---

[90] Although there are two other restrictive housing designation within IDOC, temporary confinement and investigative status, I focus on the two most commonly used and abused designations, disciplinary segregation and administrative detention, in this Declaration.

[91] *See* 20 Ill. Admin. Code Sec. 504, Table A, online at:
http://www.ilga.gov/commission/jcar/admincode/020/02000504ZZ9998aR.html

[92] Deposition of Randy Pfister at 67:8-68:5.

[93] *See* 20 Ill. Admin. Code Sec. 504.130(a)(3), available on line here:
http://www.ilga.gov/commission/jcar/admincode/020/020005040A01300R.html

access to commissary, visits, and yard. They do not have the right to a television or radio or access to programs and rehabilitative services other than whatever can be obtained in-cell.

97.    Disciplinary segregation prisoners are confined to their cells for extreme amounts of time. They are afforded only eight (8) hours a week of out-of-cell yard time, divided over no fewer than two days.[94] This means that they can be confined in their cells continuously for several days at a time. In addition, there are a host of additional restrictions on yard time that may be employed, including when yard-related disciplinary infractions have been alleged.

98.    Per the *Rasho v. Walker* settlement agreement, mentally ill prisoners who spend longer than 60 days in disciplinary segregation are supposed to be afforded slightly more unstructured out-of-cell or yard time (ten hours instead of eight) and an additional ten hours of "structured" time out of their cell (e.g., in group therapy). In the course of my interviews at various facilities, there were consistent reports by mentally ill prisoners that this amount of out-of-cell time was not being afforded and that, when it did occur, "structured" out-of-cell time was typically unrelated to any discernable therapeutic purpose or goal. Even in the Dixon STU, which allegedly houses individuals with mental illness so acute that they require a residential level of care, access to congregate programming or socialization activity of any kind is extremely limited both in practice and under the operative policies.

99.    All visits for prisoners in restrictive housing are conducted on a non-contact basis, through a window, often via a phone. Disciplinary segregation prisoners are kept in

---

[94] *See* 20 Ill. Admin. Code Sec. 504.670(a).

leg and hand restraints throughout the visits, despite being in secure areas. Generally, the policy is that disciplinary segregation offenders get two visits a month, lasting only an hour. Administrative detention prisoners' visits are based upon their particular administrative detention phase. Generally they get more visits a month and their hands are not restrained, but their visits are still limited to an hour in duration.

100.   <u>Administrative detention</u> prisoners are supposedly subjected to a "nonpunitive" placement that is based on an administrative judgment that they require separation from the mainline prison population, as set out in Administrative Regulation 504.[95] The criteria by which this determination is made are extremely vague, referencing such things as the "safety and security of the facility," "the offender's behavioral and disciplinary history," "reports and recommendations concerning the offender," "institutional order," and "[o]ther legitimate penological interests." There is no more precision or specificity required or typically provided. In addition to the vagueness of the criteria for placement into administrative detention, there are no criteria specified for whether or how a prisoner can or should be removed from this kind of onerous confinement, where living conditions are required to be "at least" the same as disciplinary segregation.[96]

101.   In the course of my visits to various IDOC facilities, I conducted cell-front interviews with literally dozens prisoners and also interviewed over 50 prisoners on an

---

[95] *See* 20 Ill. Admin. Code Sec. 504.690.

[96] Although not a part of the formal regulations, there is a "three phase" system where one can gain additional privileges. This includes an increase in the number of hours on the yard, the ability to briefly hug a visitor before the visit, and other small incentives. Prisoners in administrative detention must progressively complete all three phases, reverting back to phase 1 if they receive a disciplinary ticket. In addition, they can remain "stuck" in phase 3 indefinitely.

individual, confidential basis. Some of the prisoners I interviewed confidentially are named plaintiffs in this action. The descriptions of the prisoners' experiences in restrictive housing in IDOC and the harms they have suffered there were consistent in nature and extreme in degree. The information that I obtained from the more in-depth confidential interviews was cross-corroborated in the dozens of random cell-front interviews that I also conducted during the tours and by many of the official IDOC documents that I reviewed.

102.    Prisoner after prisoner voiced a host of very serious, very similar concerns. Many of them described the painfulness of their confinement and the psychological harm to which they were being subjected. Their complaints and concerns appeared to me to be genuine and heartfelt, justified by the severity of the conditions and levels of deprivation to which they were being subjected. They were entirely consistent with those I have documented from prisoners in harsh solitary confinement units elsewhere in the country. A number of the IDOC prisoners whom I interviewed also complained about the length and indefinite nature of their confinement. Although the lengths of stay can vary widely among prisoners in the IDOC's restrictive housing units, most of the units contain prisoners who been subjected to isolation for extremely long periods of time. I encountered more than a few prisoners who had spent many years in one or another form of IDOC restrictive housing.

103.    Virtually all of the prisoners in solitary confinement/restrictive housing in IDOC with whom I spoke complained about the severe levels of idleness to which they were subjected. Many prisoners I interviewed told me they were on the prison's mental health caseload, were taking psychotropic medications (typically as treatment for very serious forms of mental illness, including schizophrenia, psychosis, bi-polar disorder,

major depression, and PTSD). These prisoners complained about severity of the isolated conditions under which they were living, the constant stress, and the lack of consistent, meaningful mental health treatment.

104.    A number of them told me about (and showed evidence of) past incidents of self-harm and self-mutilation as well as reporting past suicide attempts. Yet they remained confined in these harsh and deprived restrictive housing units. These prisoners also voiced virtually unanimous complaints about the nature and amount of mental health treatment they received.

105.    Similarly, even the Special Treatment Center ("STC") at the Dixon Correctional Center appears to be run very much like a traditional, very harsh restrictive housing unit. There was little or no movement in the unit on the day I was there and prisoners seemed mostly confined to their cells (which they told me was not uncommon). The outdoor exercise areas, which are the same kind as those used by prisoners in the regular restrictive housing unit, were small, fenced-in rec cages with concrete floors that hardly resemble an actual outdoor "yard." I saw no evidence of adequate, out-of-cell clinical treatment space. Prisoners reported very little active group programming or sufficient non-clinical out-of-cell time for the population with SMI and none was apparent the day I toured. Instead, as I say, the conditions on the unit appeared to be the same or very nearly the same as those for prisoners in the restrictive housing units.[97]

---

[97] Commonalities of conditions of confinement within and between restrictive housing units in the various facilities that I toured and inspected are illustrated in the photographs contained in Exhibit 3.

C.    **Summary of Facility-by-Facility Observations and Issues**

106.    Below are summaries of some of the specific observations and problematic issues that I identified in each of the restrictive housing units of the six facilities that I toured and inspected and where I interviewed prisoners cell-front and individually on a confidential basis.

107.    Stateville Correctional Center. The Stateville Correctional Center is a very large maximum-security prison that houses approximately 2,500 prisoners overall (approximately 1,200 in the main prison and 1,300 in the adjacent receiving unit[98]). The physical plant is very old—the prison first opened in 1925—and foreboding; many of the housing units are antiquated and deteriorated. It has a relatively small restrictive housing unit that holds approximately 50 prisoners who are serving disciplinary segregation sentences. The restrictive housing unit is grim and highly restrictive.[99]

108.    The Stateville restrictive housing unit where prisoners in disciplinary segregation are housed (X House) has barred cell doors, some of which are covered with a plexiglass exterior. The cells are especially small and fitted with two bunks each.[100] Some of the prisoners are double-celled. The majority of disciplinary segregation prisoners are serving comparatively short (90 days or less) terms in this unit, although I learned that some prisoners have stayed for a year or more.

---

[98] I did not tour the receiving unit; therefore, my comments are limited to the main prison.

[99] There is also a small protective custody section of the unit that is not part of this lawsuit.

[100] Photographs of some of the Stateville cells that are used for prisoners in restrictive housing are contained in Exhibit 3, at 134920, 134931, 134947, and 134965. A cell with an exterior Plexiglas covering is depicted at 134919.

109.    Prisoners suffer significant deprivations in the unit. The prisoners complained that they were not given cleaning materials and that the unit was infested with roaches and rodents. One (R.S.) told me that the roaches come out when it gets dark, that the water smells like sewage, and that prisoners were not given proper changes of clothes. Several prisoners told me that they had to take precautions (such as stuffing their ears with toilet paper when they slept) to prevent the roaches from entering body cavities. Prisoners are escorted to showers on the unit floor. The metal on the doors are rusted and shower floor appears difficult to keep clean.[101] The unit does not have air conditioning and, especially the second tier, was extremely hot the day I toured (even though the outside temperature was not). Another prisoner in the unit (Mr. S.) had many complaints about the way he and others were being treated there, including the fact that there was excrement in his cell. He said the situation in the unit was "hopeless," and that the only way to get proper attention was the "threaten to kill yourself."

110.    Except for SMI prisoners (whom I was told have access to groups that meet daily for two hours), there is no meaningful programming. The prisoners are not allowed televisions or radios, and cannot supplement their diet with commissary. They get no phone calls if they are in disciplinary segregation and only two 20-30 minute phone calls per month if they are in administrative detention, and two visits per month of one hour each. A number of the prisoners reported that they suffered from very serious forms of mental illness, including some (e.g., J.T.) who had come directly out of the Illinois supermax, Tamms, when it was closed.

---

[101] Photographs of some of the showers in the restrictive housing unit at Stateville are contained in Exhibit 3, at 134930, 134952, and 134955.

111.    I was shown a bizarre "bullpen" area that I was told is used by mental health clinicians to see prisoners on a confidential, individual basis. However, in order to do this, prisoners are taken to a larger open room. The clinician stands in an adjoining room on the other side of a wall and converses with the prisoners through an opening with thick metal bars.[102] For some reason, this procedure is used in lieu of the clinician sitting in the same room with the prisoner. A mental health "group room" is located in the housing unit in an area that I was told by staff used to be the execution chamber at the prison. There is a mural on the wall that reads: "You are in control of your own destiny." Prisoners sit on long wooden benches with fittings on the bottom that allow them to be handcuffed to the benches during groups.[103]

112.    Prisoners in the segregation housing unit have access to a fenced-in outdoor exercise area. The prisoners are escorted to these "yards" (with their hands cuffed behind their back), a distance of about 100 yards from the housing unit.[104] Once inside the sally port entrance to the fenced-in yards, the cuffs are removed. All of the "yards" have concrete floors and are surrounded with high chain link fences with barbed wire at the top.[105]  They have no exercise equipment. Except for a basketball hoop, they are otherwise barren, lacking even benches or chairs to sit on; there are no toilets. Our correctional escort officer told me that as many as 16 prisoners could be out there at one time, but that many of the

---

[102] Photographs of the room in which the clinician stands, and the bars through which he or she converses with prisoner/patients, are contained in Exhibit 3, at 134972 and 134973.

[103] Photographs of the way the room is configured are contained in Exhibit 3, at 134936 and 134939.

[104] A photograph depicting this procedure is contained in Exhibit 3, at 134893.

[105] A photograph of the outdoor "yard" used by restrictive housing prisoners at Stateville is depicted in Exhibit 3, at 134898.

mentally ill prisoners did not use the area at all. Prisoners told me that they get offered outdoor exercise two days a week for as much as five hours at a time, but that most typically decline because of the harsh conditions and procedures, including the fact that all they are able to do is stand in the pens and they are not able use a bathroom during the entire five-hour period they are out there.

113.    While I was in the yard area, I observed a group of prisoners from the restrictive housing unit being escorted to the healthcare unit. They were all restrained with belly chains and leg restraints and chained together, so that they moved in a single group, and very slowly.[106] The healthcare unit also contains several "watch cells" where prisoners who are in crisis or under suicide watch are located.[107]

114.    The segregation visiting room is located in the administration building, about 100 yards away from the housing unit itself. It could not be more inhospitable. It was intolerably hot inside the day I visited (although, as I noted above, the outside temperature was warm but not unbearably hot). In the individual, confidential interviews I conducted later, prisoners told me that they would not allow loved ones to visit there and I understood why. One prisoner told me that his mother is asthmatic and could not tolerate it at all. The individual visiting booths are open and separated by concrete partitions. The visits themselves are all non-contact and are conducted over the phone and through glass; visitors and prisoners all sit on small stationary metal stools while visiting.[108] Prisoners are required

---

[106] A photograph of this procedure is contained in Exhibit 3, at 134893.

[107] Photographs of the Stateville "watch cells" where restrictive housing prisoners can be taken are contained in Exhibit 3, at 134890 and 134993.

[108] The inside of the visiting area, the phones and glass partitions, and the stools on which restrictive housing prisoners sit at Stateville are contained in Exhibit 3, at 135007, 135002, 135004 respectively.

to enter their "pin numbers" on the phone apparatus before they can begin talking to their visitors, which serves as a reminder that their visits are being recorded.

115.     When I conducted individual, confidential interviews at Stateville, prisoners complained consistently about what they believed were the trivial and unsubstantiated nature of the infractions that led to their placement in the restrictive housing unit, about the severe isolation itself, and the lack of meaningful activity of any kind. Whether or not they were on the mental health caseload, a number of the restrictive housing prisoners I interviewed reported suffering greatly in this deprived environment.

116.     For example, one (C.K.) told me that he had a significant psychiatric history in the freeworld that included being hospitalized in a mental health facility for several months before his current incarceration. He said that he is currently on several psychotropic medications and has been diagnosed with bi-polar disorder and schizophrenia. He said that he sees a mental health provider for no more than about 15-20 minutes every two weeks and goes to groups when they are offered. But he described the groups as "useless," in large part because the people who run them "don't even know my problems—not even my mental health therapist does—doesn't seem like she knows me, [she] just says, 'how are you feeling today?'" He reported constant anxiety, and frequent ruminations, depression, feelings of deterioration, and social withdrawal.

117.     Another prisoner (L.J.) whom I confidentially interviewed at Stateville told me that he, too, had a very significant psychiatric history that dated from early childhood, when he was given psychotropic medications while living with foster parents. He is currently diagnosed as SMI for major depression, takes several psychotropic medications, and has two prior suicide attempts in prison. He described his

time in restrictive housing as "making me worse… in seg, you don't have anything, no TV, radio, phone calls [only] two times a month, and they hold on to your mail." He told me that the Stateville unit in which he is currently housed is a "frightening place to live," and said "I have no energy and no focus and no motivation. I have nothing but time to sit in my cell to think about being depressed." He reported being constantly nervous and on edge, feeling that he was on the verge of a breakdown, ruminating ("you are stuck in your mind like we are stuck in these cells"), and feeling depressed.

118.   The above paragraphs provide illustrative examples of the numerous complaints voiced, suffering described, and very serious psychological symptoms acknowledged by the sample of the Stateville prisoners whom I confidentially interviewed.

119.   Pontiac Correctional Center. The Pontiac Correctional Center is a large, sprawling maximum-security prison complex that houses nearly 1500 prisoners, approximately 375 of whom are kept in restrictive housing.[109] The prison has several different cellblocks or "houses" that are devoted to some form of isolated confinement, including disciplinary segregation and administration detention. Each of the three houses that are devoted primarily to segregation—West House, North House, and South House—are very large and very old facilities. The cellblocks do not appear to have been created for isolated confinement but rather have been converted for that purpose. They are ill-suited to the task. All three housing units are extremely problematic, and deprive prisoners housed there of meaningful social contact and positive environmental stimulation. The prisoners housed in each of these restrictive housing units are at significant risk of serious

---

[109] Declaration of Matthew R. DalSanto in Support of Plaintiffs' Motion for Class Certification, September 6, 2019, paragraph 10.

psychological harm. I discuss each of the Pontiac housing units below, in the order in which they were visited.

120.     West House is an old, extremely large and noisy cellblock. The cellblock itself is huge—five tiers high—with a rifle-toting correctional officer on a catwalk that rings the outside of the cellblock wall. Prisoners are housed in barred cells that face out to the walls of the cellblock.[110] They are all the same except for the first floor, where the doors are fitted with mesh screens. The insides of the cells are in various states of disrepair, deterioration, and dishevelment.[111] The atmosphere on the upper tier was especially disturbing.[112] It housed many prisoners who appeared to be in obvious distress, sitting on the bunks in their disheveled cells, staring vacantly. Prisoners complained that despite being placed on the IDOC mental health caseload, they were being denied adequate treatment. Areas off the stairwells on several floors in the building contain makeshift treatment spaces where prisoners are placed in individual cages,[113] including a "telepsychiatry" room in which prisoners are restrained and placed inside individual cages where they talk to the psychiatrist on the television screen.[114] The healthcare area of West Block was cleaner and also contained some group therapy spaces where prisoners were

---

[110] Photographs of the five tier West Block housing unit where restrictive housing prisoners are confined, the gunwalk on the exterior wall of the cellblock, and the "gunshots warning" sign are contained in Exhibit 3, at 134761, 134762, 134771.

[111] Photographs of some of the cells in the West Block at Pontiac where restrictive housing prisoners are confined are contained in Exhibit 3, at 134689, 134692, 134693, and 134768.

[112] A photograph of the upper tier in West Block is contained in Exhibit 3, at 134773.

[113] Photographs of some of these West Block "treatment spaces" are contained in Exhibit 3 at 134695 and 134996.

[114] Photographs of the "telepsychiatry" arrangement used for restrictive housing prisoners in West Block are contained in Exhibit 3, at 134743, 134745, and 134747.

chained to benches or tables during their sessions.[115] Some prisoners said that the amount of mental health treatment that they had received in comparison to past years had actually been reduced, and was now limited to only a single group and two generic movies (that lacked psychological content) per week. They also complained that "we have no education, no nothing back here."

121.    One West House prisoner (D.H.) to whom I spoke cell-front told me that he had been housed in some form of restrictive housing for nine years. He showed me cuts on his arm from recent acts of self-mutilation (that still had staples in them). Another (G.F.) said that he had been in the prison for over ten years and was having serious problems there. He told me, "I bug up [and] when I do, then they beat on me and write me up, which keeps me here… I'm SMI and they don't care."

122.    The next housing unit I toured and inspected was North House. It is also a very old housing unit. This is where most of the disciplinary segregation prisoners who are housed at Pontiac are confined (on the odd side galleries 1, 3, 5, and 7), as well as administrative detention prisoners (in galleries 2 and 4). Although the tier floors were relatively clean, there was a great deal of noise in the large, several level-high cellblock.[116] The cell doors in North Block have metal screens on them.[117] Combined with the noise in the unit, the screens on the cell doors made it very difficult to converse with prisoners. It was also nearly impossible to see into the prisoners' cells.

---

[115] Photographs of some of the rooms where restrictive housing prisoners in West House can be taken for group therapy are contained in Exhibit 3, at 134732 and 134740. The apparatus used to chain them to the tables during therapy is depicted in 134739.

[116] A photograph of the exterior wall of the large North House is contained in Exhibit 3, at 134778.

[117] Photograph of the screened cell doors in North House is contained in Exhibit 3, at 134792 and 134797.

123.    As we entered through the north entrance, I saw a prisoner in a restraint cage and clothed in a suicide smock.[118] He was nearly incoherent, but was able to confirm for me that he was on suicide watch. He could not tell me how long he had been there or when he had been last checked on by mental health staff. There was a "one-on-one" counseling session taking place nearby, in which a counselor sat talking to a prisoner in a restraint cage located in a corner, under a stairwell. There were a number of individual treatment cages located in various parts of North Block; with the exception of the one in use under the stairwell, none were in use during the time we were in the unit.[119]

124.    Upstairs, on the third tier, there was a "group" counseling session underway—five prisoners in a large cage, chained behind their backs, sitting on a bench. A mental health staff member sat outside the cage on a bench, conversing with the prisoners. One prisoner (P.U.) told me that he had been attacked by a gang member, had Prison Rape Elimination Act ("PREA") complaint pending, and continuing safety concerns, but did not know what his rights were.

125.    The shower stalls in the middle of the first tier were in terrible condition.[120] In addition, many of the cells were completely dark inside, making it impossible to see in them or to observe what the prisoners were doing. Other cells in North House had solid

---

[118] A "suicide smock" is a special form of clothing prisoners on suicide watch are typically placed in, instead of their normal prison clothing. It is typically one piece, gown-like, and made out of tear proof material.

[119] Photographs of some of the treatment cages in North House are contained in Exhibit 3, at 134819 and 134823.

[120] Photographs of the Gallery 1 North House showers are contained in Exhibit 3, at 134810 and 134811.

steel doors and small windows.[121] A number of the cells in certain units had "food tray extenders" protruding from the cell doors.

126.     There were 12 "crisis cells" located on the bottom tier of the unit. One of the prisoners there (M.E.) appeared to be very psychologically disturbed. He showed me cuts on his arms from self-mutilation. He told me that he had come from West House and was not supposed to be in segregation. He complained about what he described as a total lack of programming: "I'm not getting any counseling, no yard, no soap, no toothpaste, no group." As he put it, "I am just back here, deteriorating." He said that he was being given daily cell-front checks, but no other treatment.

127.     On the administrative detention side of North House, there was a large open room on the first floor that I was told was used for counseling groups. There were five restraint cages with two fixed stools arranged on the outside of the cages (where the counselors sat). In another configuration, a table was located in front of the cages and the counselor sat behind it.[122] One prisoner told me that he had been in segregation for four years, two of which were spent in North House. One of the prisoners (D.D.) told me that other than yard (three times a week for three hours at a time) and one parenting class (that lasts no more than an hour), he had access to no other programming. He complained that yard was difficult because prisoners could not use the toilet during the three-hour period they were out there. In addition, he described participating in a church

---

[121] Photographs of some of the cell configurations in North House are contained in Exhibit 3, at 134797 and 134833.

[122] A photograph of one "group therapy" spaces used for restrictive housing prisoners in North House is contained in Exhibit 3, at 134820.

group once a month, during which time "we sit in cages and [the] religious person sits on a stool."

128.    As we left this building to head to South House, we passed men on administrative detention status who were in the yard. There are several configurations for the outdoor rec "yards" used by North House prisoners. Some are brightly painted wire cages while others are concrete areas that are fenced in. All have concrete floors, are completely enclosed, and lack exercise equipment.[123] One of the prisoners I spoke to (R.R.) complained to me that he was being held indeterminately in administrative detention on the basis of a write up that was nearly two decades old. He said he was given no other explanation for his continued retention in the unit and had no apparent pathway out. Another (Mr. F.) told me that he was designated SMI, but was nonetheless housed in administrative detention.

129.    The final housing unit was "South House Mental," where extensive construction was underway. Around the corner from where the construction was taking place, on the first floor, there were suicide watch cells that were currently in use. A prisoner (P.R.) in one of them told me that he had been on suicide watch since June 7th (approximately six weeks earlier). He told me that, despite his serious diagnosed mental illnesses (bi-polar and explosive disorder) he had been physically mistreated by a guard.

130.    Many of the cells on the first floor of the unit I toured had plexiglass shields on them, making it especially difficult to speak with prisoners inside. (Unlike similar cells in North House, however, they were better lit and easier to see into.) Many of them had

---

[123] Photographs of the different kinds of rec cages/yards used by restrictive housing prisoners in North House are contained in Exhibit 3, at 134836 and 134838.

food tray extenders protruding from the cell doors.[124] However, other units in South House had metal screens on the outside of the doors, making it more difficult to see into the cells.[125] When we moved up to the second tier of the unit, I was told that it was "mental health segregation."[126]

131.     One prisoner (Mr. T.) in this mental health/isolation unit told me that he was "going home tomorrow," released directly from prison after having been in segregation for over a year. He said Pontiac was "awful," and that he was still "suffering and depressed." He said he avoided groups because he feared getting another write-up and more segregation time. He described very serious mental health problems (that included diagnoses of bi-polar disorder, schizophrenia, and PTSD), and listed many psychotropic medications he had been prescribed. He also explained that he had been on suicide watch just two months earlier, and showed me multiple cuts on his arm. Yet, as I say, he was apparently being released directly out of segregation to go home the next day.[127]

132.     Another prisoner in the unit (E.B.) appeared to be extremely unstable and distressed. He told me that he had stopped taking his medications earlier and "I lost control of my mind." He explained that he had been diagnosed schizophrenic, bi-

---

[124] Photographs of the first floor of this South House unit are contained in Exhibit 3, at 134853 and 134854.

[125] Photographs of this South House cell configuration are contained in Exhibit 3, at 134860 and 134864.

[126] A photograph of this South House gallery is contained in Exhibit 3, at 134868.

[127] For perhaps obvious reasons, releasing prisoners directly from restrictive housing back to the freeworld is an extremely problematic and potentially dangerous practice. The transition from living in isolation to surviving and adjusting in the intensely social world of free society is extremely difficult and even traumatic. Unless they have an extremely conscientious support system (and sometimes even if they do), these prisoners are at high risk of failure. For many, the transition entails high levels of psychological distress. For some, the attempted adjustment will be unmanageable and can result in self harm, substance abuse, and reoffending behavior.

polar, and cognitively impaired, was prescribed numerous psychotropic medications in prison, and had a long and serious mental health history that dated back to when he was on the streets. He complained about a lack of treatment: "I need real help here." He said he went to groups when they were offered, but complained that the prison had "stopped all one-on-ones" (i.e., individual treatment or therapy sessions) and that he had no treatment plan. Another prisoner (M.C.) told me that he did not go to the counseling groups offered in the unit because they required prisoners to be handcuffed behind his back for an hour and a half and "it hurts."

133.    There were several kinds of arrangements for "group therapy" that I saw in South House. In one configuration, prisoners were placed inside a large cage and handcuffed to the wall or floor. In another, they sat on stools connected to a metal table and were handcuffed to the floor. Both were located in inhospitable settings that had a makeshift quality to them.[128] Before leaving South House, I saw another room where group counseling took place and I was able to talk briefly with prisoners who were waiting for a session to start. They told me that the groups were relatively free form—the "nurse or whoever sits on the stool and does their thing" and that today's group was focused on "world events."

134.    In the course of the individual, confidential interviews that I conducted at Pontiac, I was struck by how many of the restrictive housing prisoners appeared to be profoundly mentally ill, with very significant psychiatric histories, and who reported deteriorating significantly in the course of their sometimes very lengthy periods of restrictive housing. In addition to suffering in the face of the social isolation and other

---

[128] Photographs of the "group therapy" configurations that are used for restrictive housing prisoners in South House are contained in Exhibit 3, at 134875, 134876, 134886, and 134887.

deprivations to which they were subjected, the prisoners voiced serious complaints about the minimal or non-existent mental health care that they received.

135.    For example, one prisoner (D.F.) whom I interviewed from North House told me that his psychiatric history dated back to when he was 12 years-old and included mental hospitalization. He said that he had come into the prison system at age 17, and suffers from PTSD from exposure to extreme forms of violence in the freeworld. He told me that he has spent most of his 12 years in prison in restrictive housing, and that he was at Tamms when it was closed. He said that, despite being designated SMI, "they have no programs here, [you] get no help for your problems," and noted that "I haven't had a treatment plan since I got here." He reported that he was rarely able to sleep, felt anxious all the time, sometimes had panic attacks in which he could not breathe, and that he often suffered from every one of the psychopathological symptoms of isolation (including suicidality).

136.    Another prisoner (M.M.) was interviewed from South House told me that he had been in some form of isolated confinement for most of the 28 years he had been in prison. He was very disoriented and had a difficult time focusing on my questions. He told me that he had tried to kill himself many times in many different ways, including a few months earlier when he attempted to hang himself and lost consciousness. He said that he had been diagnosed with schizophrenia and was taking Haldol shots. He reported suffering frequently from many of the symptoms of psychological stress and most of the psychopathological symptoms of extreme isolation, including depression and thoughts of suicide (because, he said, "seg makes you hopeless"). He told me that "God is

holding me here so I can have this place shut down. It is the gate between heaven and hell. When it is shut down, there will be peace, but it's hard to do."

137.    Another prisoner (D.H.) who was housed in West House at the time I confidentially interviewed him described a similarly desperate plight and voiced serious complaints that were consistent with those of other prisoners at Pontiac. He told me that he was an SMI prisoner with many serious psychiatric diagnoses (including bi-polar disorder), suffered from many mental health symptoms (including auditory hallucinations), and had been placed on psychotropic medication by the prison mental health staff. He described coming into the prison system with only an 18-month sentence but, because of his inability to adjust to confinement, he received extensive additional time (so that his current release date is 2052). He claimed that correctional officers harass him, and described an incident at Menard in which they attempted to kill him by putting mace in a bag and putting it over his face. He showed me very serious scars that he said came from times when he had bit himself, and said that he began cutting himself for the first time in his life when he was placed in restrictive housing. He reported being constantly on edge and anxious, feeling on the verge of a breakdown, and rarely if ever has normal sleep patterns. He also reported suffering nearly all the time from most of the psychopathological symptoms of isolation, including hallucinations, ruminations, irrational anger, and depression. He told me, "I cry in my cell because of what they [the staff] do to me. I want to go home but I don't know how."

138.    The above paragraphs provide illustrative examples of the numerous complaints voiced, suffering described, and very serious psychological symptoms acknowledged by the sample of the Pontiac prisoners whom I confidentially interviewed.

139.   <u>Dixon Correctional Center</u>. Dixon Correctional Center is a large medium-security prison that houses over 2000 general population prisoners, as well as a small segregation unit that holds approximately 50 prisoners. Opened in the early 1980s, it is architecturally very different from the previous two prisons. It is newer and configured with a number of smaller, separate housing units spread across the prison grounds. In addition, the Dixon Psychiatric Unit (the state's primary forensic mental health facility) and the Special Treatment Center ("STC") for mental ill and/or developmentally disabled prisoners are located on the grounds of the prison. The STC also holds approximately 50 mentally ill prisoners in restrictive housing. Specifically, restrictive housing SMI prisoners at Dixon are housed on two wings of X House.

140.   The first unit I toured and inspected at Dixon was the segregation unit that the prison uses for its mainline prisoners (separate from the STC where SMI prisoners are placed in restrictive housing). It is a relatively small housing unit with approximately 50 cells (some of which contained double bunks), arranged on three separate hallways or wings. [129] There is a relatively large outside rec "yard," with a concrete floor and basketball hoop, surrounded by a tall chain link fence and with barbed wire at the top.[130]

141.   Inside the unit, there is a very small area that I was told could be used for "groups," but it was not clear whether or how well it could be used for this purpose. The correctional officer escort told me that "mostly, counseling takes place at the doors" of the cells. The cells have solid doors with windows on them and did not appear to be quite as small in size or in as great state of disrepair as some of the other IDOC restrictive housing

---

[129] Photographs of the hallway down the wings are contained in Exhibit 3, at 039463, 0349465, and 3049486.

[130] Photographs of the yard are contained in Exhibit 3, at 0349442 and 0349484

cells I saw. Each contains a metal desk and stool or chair and many were double-bunked (even though only a single prisoner was housed in them).[131] In contrast to the shower stalls I saw at the other the previous IDOC facilities I visited, those in the Dixon segregation unit were clean. There were a number of empty cells in the wings. However, although it was not an oppressively hot day outside, the temperature inside the housing unit was warm, bordering on uncomfortable.

142.    The prisoners I spoke to cell-front complained mostly about the process by which they were placed there and reasons used to justify their segregation. One (M.F.) told me that he had been the victim of an attack and, because it was not his "fault," he should not have been punished for the encounter. He said that he had "a very long psychiatric history, took lots of psych meds," and has "lots of problems." He complained that, although the "mental health lady" comes around once a week, and he asks her for mental health care, "nothing happens." Other prisoners also complained about the lack of mental health care in the unit. One (P.H.) told me he thought he was on SMI status, took psychotropic medications, and had been on crisis watch for several days, yet had not been given meaningful mental health care.

143.    I next toured and inspected the infirmary area, and went to the second floor, where several crisis cells were located.[132] One of them was occupied by a prisoner (Mr.

---

[131] Photographs of the interior and exterior of some of cells in the unit where mainline restrictive housing prisoners are confined at Dixon are contained in Exhibit 3, at 0349447, 0349453, 134668, 134669, and 134670.

[132] A "crisis cell" (or "watch cell" or "suicide watch cell") is the term commonly given to special prison cells where prisoners who are in a state of psychiatric crisis (acute psychiatric distress that often includes suicidality) are taken, for what are intended to be brief periods of heightened observation. They are typically specially designed, barren cells from which materials and fixtures that might be used for self-harm or suicide have been removed. The special precautions that are supposed to be taken with prisoners in these cells include greater (sometimes constant) levels of careful, periodic monitoring, restrictions on or

P.) who seemed to be very disturbed. He told me had been in a crisis cell for approximately two weeks. He also said that he was diagnosed as having schizoaffective disorder, and was taking a number of psychoactive medications. As he explained to me that he had been trying to harm himself, and had been cutting on his arms and legs (which, as he showed me, were full of cuts), he began to cry. He said he was going home in 23 days and was afraid that he was going to be released directly out of a suicide watch cell. He seemed especially fragile and his concerns well-justified. He expressed an interest in talking with me further, under more confidential conditions, and I promised I would attempt to arrange that. However, later, when I asked to confidentially interview him— something that he not only agreed to but seemed eager to do—I was denied permission to do so.

144.    The main segregation unit—X House—is located at the far end of the prison grounds. X House holds just over 200 prisoners is segregation. It is a separate unit, with an additional fence built around it. The facility is newer than the other parts of the Dixon complex I toured. It is divided into wings, two of which (A and B Wings) are intended for maximum security mentally ill prisoners, two (C and D Wings) for severely mentally ill prisoners of all security levels with segregation time.[133] B Wing also contains the crisis cells, where segregated prisoners and prisoners from A or B wings are placed. [134] Of the 11 prisoners occupying crisis cells, nine of them were from the segregation units.  One of

---

prohibition of personal property, and sometimes special clothing that prisoners are required to wear that is designed to minimize the risk of self-harm (such as suicide smocks).

[133] Photographs of the three different X House wings generally are contained in Exhibit 3, at 0349437, 0349456, 0349458, 0349460, 0349501, 0349507, and 0349509.

[134] Photographs of the crisis area on B wing X House at Dixon are contained in Exhibit 3, at 034978, 0349481, 0349952, and 0349533.

the segregation prisoners in a crisis cell (P.A.) told me that he had been on crisis watch

for some 45 days. He had two years left to do in segregation, and he was feeling suicidal.

145.    The atmosphere inside one of the restrictive housing units, C Wing was

notable. It was very clearly a locked-down unit and the tension inside was palpable. The

cells are barren and bleak, and many were disheveled.[135] One of the prisoners

(M.B.) to whom I spoke cell-front voiced numerous complaints about the filthy cells,

and showed me where he had cut himself. He said: "They don't give us any help.

I'm desperate. I haven't been to one group in nine months. I came here for treatment and

been through a lot of trauma. I keep hurting myself and they don't care." He told me

that he was prescribed psychotropic medications and had a history of multiple

placements in suicide watch cells—he estimated some 20 times in the nine months

he had been at Dixon—yet was unable to get meaningful treatment or contact with

mental health staff.

146.    D Wing is a "mixed" unit, with some segregation prisoners housed along a

row in the back of the unit, several suicide watch cells, and the rest of the cells occupied

by general population mentally ill prisoners. It was a little quieter and less tense than C

Wing. Here, too, however, prisoners complained about conditions and the lack of

treatment. One prisoner (Mr. F.) told me that "there's no real program" in D Wing, the

"groups are bad [because] the CO's are right there," indicating that the officers stand

where they can hear what is being said between the prisoners and the counselors.[136]

---

[135] Photograph of the inside of one of the C Wing, X House cells at Dixon are contained in Exhibit 3, at 134675 and 134676.

[136] A photograph depicting a C Wing group counseling session in progress in C Wing in X House with a correctional officer sitting immediately outside the group session, watching and within earshot of the conversation, is contained in Exhibit 3, at 134673.

68

147.    Although X House is supposedly a dedicated treatment facility, I was struck by how counter-therapeutic the environment inside the various wings appeared to be,[137] and also by the overall apparent lack of appropriate treatment space. In addition to the areas that Mr. F. had complained to me allowed correctional officers to overhear potentially very personal, sensitive psychological information, one of the rooms that I was told by staff was used for individual one-on-one counseling did not appear to have been used for this purpose for quite some time (and, in any event, seemed ill-suited for the task).[138]

148.    Another X House prisoner (S.L.) said he had just come to segregation but was doing badly in the unit. Although he had been in treatment in his previous unit, and thought he was doing well there, he had not yet been seen by a doctor since coming to restrictive housing and was very concerned. Another prisoner (J.T.) also complained about the lack of treatment and said that he was "giving up hope" of ever being able to stabilize while he was housed there. The same concerns were voiced by another prisoner (J.J.). He told me that he had a history of mental health problems and, although he had been in this restrictive housing unit for four months, he said that he had yet to receive any meaningful mental health treatment.

149.    The individual, confidential interviews that I conducted at Dixon were all with prisoners housed in the STC. Here, too, I was struck by how profoundly mentally ill they all appeared to be. Each one recounted very long and significant psychiatric histories, and reported deteriorating significantly in the course of lengthy periods of time they had

---

[137] For example, see Exhibit 3, at 134673.

[138] Photographs of the inside of the room I was told was used for one-on-one counseling sessions in an X House wing at Dixon are contained in Exhibit 3, at 134679 and 134680.

spent in restrictive housing. As in the other facilities in which I interviewed mentally ill prisoners who were housed in restrictive housing, the STC prisoners, too, reported that they were suffering because of the social isolation and other deprivations to which they were subjected. They also voiced serious complaints about what they said was the minimal or non-existent mental health care that they received.

150.    For example, one Dixon prisoner (K.M.), who was just 20 years-old, told me that he had been hospitalized some 200 times for his psychiatric problems in the freeworld, dating back to the age of eight. He said that when he came into the prison system "I cut up really bad" and was sent to Dixon. He told me that being in X House has not helped his mental condition – "the groups are pointless, the crisis team requests are ignored unless you cut up" and even if you do, "you get no real treatment, just a security smock, blanket, mattress." He complained about physical and other forms of abuse that he said occurred at the hands of the officers who, he said "are physically abusive, use shields, hit us, then walk out and act like it never happened." He reported that he suffered from nearly constant anxiety and feelings of an impending breakdown, as well as frequent bouts of anger, depression, ruminations, and suicidality. In fact, he told me of two very serious suicide attempts, including one time when he attempted to hang himself and officers chemically sprayed him when they came into his cell to cut him down.

151.    Another prisoner (J.B.) had recently come to Dixon. He told me that he, too, was hospitalized on the streets for psychiatric problems, starting at around the age of 10 or 12. He said he had been on psychotropic medications since coming into the prison system, but that he could not get the mental health staff to address his problems— not at the other prisons where he was housed nor at Dixon: "nothing good

happens here. You just get worse and the staff doesn't care. When you ask people for something in seg, they just ignore you." He also described what he feels like in restrictive housing: "You're in a cell almost 24 hours a day—all that cell time gets to you. All you have to do is to get at each other, then the resentments build up, so when you can get to them on yard, you do whatever you can." He reported being adversely affected by his time in solitary/restrictive housing, including hearing voices, constantly feeling anxious, having difficulty concentrating, experiencing ruminations and being depressed. He said he very often thinks of suicide and, in fact, has made five separate suicide attempts since being in prison.

152.    One Dixon prisoner (P . A.) with whom I conducted a confidential interview was brought to me from the suicide watch cell where he was housed. He explained that he had been identified as SMI and was prescribed a number of psychotropic medications in prison, including Haldol. His psychiatric problems have continued at Dixon where, he said, he was getting little or no help: "All we get is group—it's just conversation, talk about whatever you want, two hours a day, but it's just sports, current events—nothing therapeutic. They haven't been doing one-on-one [therapy]. If you ask for it, they say, 'we'll put you on the list' but there's no people who have been seen for years." He told me that the pressure from restrictive housing had built up and he felt he needed to go on suicide watch. Earlier, he said, "I started cutting myself" and showed me cuts all over both arms. "I was getting upset because of the way I was being treated. When I saw blood, it released my stress. But I also wanted to bleed out." He reported suffering a variety of psychological symptoms, including massive headaches, troubled sleep, constant feelings of anxiety, ruminations, anger, depression, and thoughts of suicide. He reported

that the officers in X House often brutalize the prisoners and that, in fact, he had been chemically sprayed by them a few days prior, when he was on suicide watch.

153.    The above paragraphs provide illustrative examples of the numerous complaints voiced, suffering described, and very serious psychological symptoms acknowledged by the sample of the Dixon prisoners whom I confidentially interviewed.

154.    <u>Menard Correctional Center</u>. The Menard Correctional Center is the largest prison in Illinois. It is a maximum-security prison located in the southern part of the state that holds over 3000 prisoners, including approximately 280 of whom are in restrictive housing. Menard is an extremely old prison that first opened in the late 1870s. The buildings are large, and a number of them (or parts of them) appear to be in various states of disrepair. Overall, terrible physical conditions prevailed throughout the units that I toured. In addition to being worn and dilapidated, there was poor ventilation, and frequently filthy conditions.

155.    Disciplinary segregation prisoners at Menard are housed in North House (North 1 and 2) and there is a small unit for prisoners in administrative detention, known as the North Annex. Prisoners in North House are housed in extremely small cells and are mostly double-celled; in fact, there is so little open floor space inside some of the cells that prisoners can hardly move around in them.[139] A large number of mentally ill prisoners were housed throughout the restrictive housing units at the prison. They reported getting very little mental health monitoring or treatment, although some are getting opportunities to attend groups in open rooms where they are chained to benches in large caged pens.

---

[139] Photographs illustrating the kind of restrictive housing cells in use in North House are contained in Exhibit 3, at 0349219, 0349220, 0349233, 0349923, and 0349224.

Although prisoners reported getting very little or no one-on-one therapy at Menard, individual treatment cages are interspersed throughout the restrictive housing units that I toured. There are also several individual treatment rooms near the group "cage." While they appear to be configured for one-on-one counseling sessions, none were in use during the time that I was present, and I could not tell how often they were actually being used.[140]

156.   As I began my tour of the prison, I spoke with two prisoners (A.D.; D.D.) who were out in one of the yards. They voiced a variety of complaints, including telling me that prisoners were being treated badly at the prison. They also said that the mixing of mentally ill and non-mentally ill prisoners in restrictive housing was causing problems for both groups (in part because of the former group's acting out and also because mentally ill prisoners supposedly have access to group programming that the non-mentally ill do not). Both of them complained about the lack of meaningful out-of-cell time—just a few hours two days a week in a barren outdoor recreation "yard" like the one they were in. Both said that mental health staff come into the unit no more than once a week, and then only for quickly done "drive-bys." Other prisoners also reported that the mental health staff do not more than these kind of perfunctory "drive-bys"[141]

---

[140] Photographs of Menard's treatment spaces are contained in Exhibit 3, at 0349248, 0349249, 034925, 034252, 0349258, 0349260, 0349263, 0349267, 0349268.

[141] "Drive-bys" is the derisive term that prisoners give to very brief, routinized cell-front encounters that occur when prison mental health staff members come through units, sometimes doing little more than announcing their presence (e.g., "mental health on the unit") as they rush through, other times very briefly pausing at individual cell-fronts with perfunctory, superficial inquiries (e.g., "how are you doing? "any problems?"), ostensibly checking on a prisoner's well-being. The cell-front nature of the contact requires mental health staff to converse with prisoner through the bars, doors, or windows of their cell, typically within earshot of other prisoners and correctional staff. Given the potentially sensitive nature of the information that might be exchanged, "drive bys" impede candor.

157.    Another prisoner (M.W.) told me that he came into the Illinois prison system three years ago at age 19, and that he was now on the mental health caseload. He said that he had been in restrictive housing, on indeterminate status, for most of the three years he had been in prison. He told me that was worried that he would not be able to tolerate it much longer because "I'm breaking." A prisoner (A.H.) told me that he had threatened to cut himself just the day before but that the prison staff ignored him. He showed me a long gash on his arm and said "I'm feeling hopeless." Another prisoner (L.L.) told me that it was "horrible" in the restrictive housing unit at Menard. He said he was beginning to hear voices again.

158.    The first restrictive housing unit I saw was what I believe was referred to as North 2. It was filthy and dilapidated. [142] The cells themselves are extremely small and cramped, dank and dirty, with almost no place in them for prisoners to even stand. The suicide watch cells on the unit are dark inside and, because they are covered with thick glass that has a dirty film build-up on it, are almost impossible to see into from the outside (making it extremely difficult for someone "on watch" to actually be watched). [143]This of course defeats the entire purpose of placing someone on crisis watch[144] I spoke to one of the prisoners (O.J.) in a crisis cell on the unit. He told me that he had been in the crisis cell for 24 days and that there are feces in the crisis cell walls. Despite being

---

[142] A photograph looking down the crisis cell area of North 2 is contained in Exhibit 3, at 0349243.

[143] Photographs of crisis cells in Menard's North House are contained in Exhibit 3 at 0349242, 0349243, 0349244, and 0349256.

[144] A prisoner who has been placed "on watch" is, by definition, at high risk of self-harm and/or suicide. Obviously, prisoners are placed "on watch" to be watched—carefully monitored to make sure that they do not deteriorate further and, especially, that they do not harm themselves. "Watch cells" that are difficult if not impossible to see into defeat the very purpose of placing a prisoner in them and are extremely dangerous.

74

prescribed psychotropic medication and serious past suicidality, and being in a crisis cell, he complained that he was not getting adequate mental health care.

159.    On 6 gallery, I spoke with another prisoner on suicide watch (D. C.) who told me that he was seriously mentally ill, had been prescribed various psychotropic medications for his psychiatric condition, and had attempted suicide just the day before.

160.    The cells in 6 Gallery (like all of the cells in North House) look out onto the unit floor, toward the building wall (whose windows are screened over), creating an extremely enclosed feeling. [145] There was a great deal of noise in the unit the day I toured, with prisoners screaming and doors banging. A prisoner in the unit (D.D.) told me he had done approximately five years in restrictive housing, and feared for his life there – "they want to kill me back here." In fact, he said that believes that the correctional staff has purposely put him in danger as retaliation for talking to the lawyers on this case several months ago. Another prisoner (K.L.) said he was designated as SMI, was on psychotropic medications, but nonetheless had been kept in some form of restrictive housing since 2001. He said he was told he would not get out of isolation until 2030. One prisoner (J.A.) on the unit was in particular distress. He told me that: "I can't take it here. I keep asking for mental health but they ignore me [and] just tell me, you are on the waiting list… But I can't take it. It's overwhelming."

161.    On 4 Gallery, some of the cells were also extremely disheveled and filthy, indicative of a deteriorating mental state on the part of the prisoners housed in them, and some of the cell doors are covered over. A prisoner (H.M.) in the unit

---

[145] Photographs looking down a North House Gallery are contained in Exhibit 3, at 0349221and 0349227.

told me that he was on the mental health caseload and was currently taking a variety of psychotropic medications for his psychiatric condition. Despite this, and despite having a history of prior suicide attempts, he complained that he was not getting adequate mental health care, suggesting that the mental health staff was sometimes <u>more</u> punitive than the correctional officers. He also said "I've been locked up 12 years and I'm losing it. I can't be around people anymore. That's why I'm worried." On 2 Gallery, the cell doors are all solid and the feeling inside the cells is more closed-in. A prisoner (R.T.) in a suicide watch cell said he had been prescribed psychotropic medications and wanted to be released from watch – "I can't hardly breathe in here." It was virtually impossible to see inside the cell as I conversed with him. Other prisoners (e.g., K.W.) complained about the lights and also said that it was impossible to hear people speaking at cell-front when the large fans were turned on to lower the temperature in the unit.

162.    Next, I was shown the "high escape risk yards" which consisted of several cages looked over by an officer armed with a rifle. "E Yard" is larger, with one rusted and dirty metal table, a basketball hoop and ball, and a porta-potty. There were other nearby yards, also larger than the individual cages.[146] Prisoners (e.g., D.W.) who are designated "elevated security risk" are kept in leg shackles while they are out on the yard.

163.    The "group treatment" area at Menard is in an air-conditioned part of the prison. The therapy appears to take place in cage-like setting, so that "group" consists of several prisoners at a time, who are either put in the cages or handcuffed to a wooden bench and allowed to converse with each other and a counselor. Several prisoners who were

---

[146] Photographs of yards used by restrictive housing prisoners at Menard are contained in Exhibit 3, at 0349272, 0349273, 0349276, 039279, 0349281, 034289, 0349290, and 0349303.

waiting in the cages told me that SMI prisoners could go to group several times a week, but that few of them did.

164.     In the administrative detention unit, C Wing, the cells are also small and difficult to see into. [147] I spoke with a prisoner (T.R.) who told me he was designated SMI, was taking psychotropic medication, and had been in restrictive housing for 13 months. He said that administrative detention prisoners used to have groups, but they were discontinued and are now available only to prisoners in disciplinary segregation. In B Wing, a prisoner (P.S.) told me that he suffers from depression, but that he does not have access to groups because he is in administrative detention.

165.     I also toured the portion of the Health Care Unit at Menard where a few prisoners are placed on watch. I spoke with a prisoner (D.L.) in a suicide watch cell in the health care unit. When I first looked into the cell, it was almost impossible to see inside to determine whether the cell was occupied, where the prisoner was, or what condition he was in. When he saw me at the door and got up, he told me that he suffers from serious, lifelong mental health problems, that he was currently on psychotropic medications, and that he had multiple suicide attempts and acts of self-mutilation. He said that he had been in the STU at Dixon earlier in the year, and that he had come here from there.

166.     I conducted individual, confidential interviews at Menard with prisoners who were from different restrictive housing units at the prison. Many of them acknowledged having long and serious psychiatric histories. As with the prisoners I confidentially interviewed at the prisons I previously toured, all of the Menard prisoners

---

[147] Photographs of the cells in the administrative detention unit at Menard are contained in Exhibit 3, at 0349234, 0349235, 0349236

voiced complaints about their treatment and expressed deep concerns about their own well-being. Whether they were on the mental health caseload or not (and most were), they reported suffering from the extreme social isolation to which they were subjected, and acknowledged numerous symptoms of psychological trauma and the psychopathological effects associated with this kind of severe social and environmental deprivation.

167.    For example, one prisoner (A.W.) whom I confidentially interviewed told me that he had an extremely troubled and traumatic upbringing that resulted in serious mental health problems and hospitalizations as a child. He has been diagnosed as having bi-polar disorder with psychotic features, and been prescribed multiple psychotropic medications. He said that while housed in North House at Pontiac, he had been very close to being released from prison (with five months to go on his sentence) when he felt intolerably trapped in his restrictive housing cell and tried to escape, resulting in an additional 30-year prison sentence. He called North House at Pontiac, where he was housed at the time, "a madhouse" where urine and feces are being thrown all the time and "I couldn't take it." He was sent from Pontiac to Tamms and, when Tamms closed, to Menard. He told me that he has been in restrictive housing for ten years now (most of the time he has been in prison) and is "still struggling." He described various forms of decompensation and deterioration as a result of his experiences in isolation, explaining "I cut myself really bad. I have bad depression, panic attacks, and anger problems." He said he desperately needs a television, which was taken away from him years ago: "It is a window into the world. I walk around in my cell and act like I am talking to the characters" to feel better. He recounted placement in a number of facilities where he was supposed to receive treatment (Tamms, Pontiac, Dixon, and Menard), but has gotten little or none,

despite his severe problems. He acknowledged very serious symptoms of psychological trauma, including constantly feeling anxious and being on the verge of breaking down, as well as constantly experiencing almost all of the psychopathological symptoms that are associated with severe forms of isolated confinement, including depression and suicidality. He said: "I keep trying to kill myself, and they keep putting me back in my same seg cell. The whole cell has been made into a solid metal cell. The heat is overwhelming. It is supposed to be a watch cell but it is just unbearable."

168.    I confidentially interviewed another prisoner (K.L.) at Menard who told me that his mental health problems started in childhood, and that he was placed in a psychiatric hospital before being incarcerated. He said that serious mental health problems run in his family and that he has been diagnosed as schizophrenic. He told me he had taken a number of different psychotropic medications over the years, and is currently prescribed several. He said that he has visual hallucinations (spirits) that sometimes tell him what to do and that he cuts himself to relieve the pain that builds up inside. Even so, he said, the mental health staff refuses to put him on watch and have refused to send him to a residential treatment unit. He reported that the mental health staff members at Menard are harsh and uncaring. He said that a mental health person comes by weekly, "comes by your cell, 'are you okay?' they don't want to know—usually they ignore you no matter what you say." He said that the stress builds up so much when he is in restrictive housing that he cuts himself or wants to die. He reported frequently feeling anxious, on the verge of breaking down, and that he very often suffered nearly all of the pathological symptoms of isolated confinement.

169.    Another Menard prisoner (J.H.) also recounted a serious psychiatric history that began in childhood, and included hospitalization, being diagnosed as bi-polar and schizophrenic, and shooting himself in a suicide attempt at age 16. He is on the mental health caseload in the IDOC but is not getting meaningful treatment and said that he does not think it is possible to get it at Menard. He said it took eight months and several suicide attempts before he got any mental health attention, and then it consisted mostly of groups – but "the group isn't really therapy. It's just passing time. I've been in groups on the street, and they aren't really professional here." He said that his therapist told him "everybody hears voices, it's a normal thing" and dismisses the seriousness of his problems, as do the correctional officers, who, he said, just throw away your request slips. He reported that he frequently experiences nearly all of the symptoms of stress-related psychological trauma and the psychopathological symptoms that are associated with isolation, including nearly constant feelings of anger, disordered thinking, and depression, as well as social withdrawal and often thinking about suicide ("if I was dead I wouldn't be around anybody").

170.    I interviewed another Menard prisoner (B.B.), who told me that he had just come off suicide watch. He said that he was hospitalized for psychiatric problems starting at age 12, was placed on SSI because of his mental illness,[148] and that he has been diagnosed with bi-polar disorder, PTSD, and schizophrenia. He believes that his mental illness became much worse in prison, largely as a result of being housed in restrictive housing, first at Pontiac and then, eventually, at Menard. His problems worsened

---

[148] "SSI" or Supplemental Security Income is provided after an evaluation process by the Social Security Administration to determine the severity of an applicant's disability or impairment. In cases where it is awarded on the basis of a psychiatric condition, it is indicative of serious, diagnosed mental illness that is disabling enough to preclude a person from financially providing adequately for him- or herself.

at Menard. He told me he "wanted to kill myself many times, [was] many times on watch, I swallowed pills, put staples in my eyelids" and had just come back from the hospital as a result of these things. Yet "nobody cares at Menard, they don't care." He said he does go to groups when they are offered ("the groups are just something to do, they aren't really therapeutic") and the one-on-one sessions he has last "for only 10 minutes and then they stop"). He said there is no programming and no school in restrictive housing, "you just sit." He acknowledged constantly feeling anxious and on the verge of a breakdown, as well as suffering most of the psychopathological symptoms of isolation all the time, including anger, depression, and suicidality.

171.    The above paragraphs provide illustrative examples of the numerous complaints voiced, suffering described, and very serious psychological symptoms acknowledged by the sample of the Menard prisoners whom I confidentially interviewed.

172.    Lawrence Correctional Center. The Lawrence Correctional Center is a large medium-security prison that holds approximately 2000 prisoners, including nearly 100 who are housed in administrative detention. It is a newer design that the other prisons I toured and inspected, having opened in 2001. The restrictive housing units were much cleaner overall and the watch cells were much more functional and clean than in the other IDOC facilities I had seen.

173.    I first toured the visiting room at Lawrence. It is a very large and relatively modern (but very sterile room) used for the prisoners' contact visits. Non-contact visits are held in smaller rooms off the main visiting room, where prisoners speak to their visitors by phone, separated from them by a glass partition. [149]There are warning signs visible to all

---

[149] Photographs of Lawrence's non-contact visiting room are contained in Exhibit 3 at 0349405 and 0349407.

that "all calls are subject to monitoring and recording!" From this area, I went out past the yard to the Infirmary, where suicide watch cells are located. In contrast to some of the other facilities, this was a reasonably well-lit area, and it was possible to see clearly inside the cells where suicidal prisoners were housed.[150] A prisoner (T.J.) in one of the cells told me that he suffers from multiple psychiatric disorders from many traumas experienced over the course of his life. He had tried to take his own life four days earlier, after spending about two months in restrictive housing.

174.    The building where the Lawrence restrictive housing units at Lawrence are located in a large, non-descript building with slotted fixtures on the windows that prevent prisoners from looking out of their cells. Inside, there are three separate wings or pods—A and B are disciplinary segregation and C is administrative detention.[151] I was told that SMI prisoners are co-mingled in the disciplinary segregation units without the correctional staff knowing exactly who is, and who is not, on the mental health caseload. I entered one of the cells in B Wing, and observed that, because of the screen and partition on the door, it was difficult to see out of the cell. Many of the Lawrence prisoners with whom I spoke complained about the lack of access to meaningful mental health care. I did see a large, antiseptic room with benches along the wall and bolts on the floor to restrain prisoners' during group therapy, but it was unclear how often the room was actually used.[152]

---

[150] A photograph of the interior and exterior of a Lawrence watch cell in the Health Care Unit is contained in Exhibit 3, at 03494243 and 0349424.

[151] A photograph of the view looking into C Wing at Lawrence where restrictive housing prisoners are confined is contained in Exhibit 3, at 0349379 and 0349416.

[152] A photograph of the group treatment space for restrictive housing prisoners at Lawrence is contained in Exhibit 3, at 0349373.

175.    A prisoner with whom I spoke (Mr. S.) told me that he had an extensive mental health history that predated his time in prison. He complained of a lack of mental health attention ("unless you say you are going to kill yourself, they ignore you"), and said that his cell "is full of insects and spiders, and I'm being bitten."

176.    Among the other prisoners I spoke with cell-front, one (M. A.) was especially distressed. He told me that he had previously been housed at Menard, where he became certain that an electronic device had been implanted in him that "gives me thoughts, gives me dreams, and can change my memories." He cried as he told me that he was not getting any real help for his problems; instead "all they want to do is give me medication."

177.    Another prisoner (W.M.) said he had been diagnosed with several very serious psychiatric conditions. He also told me that it was impossible to get meaningful mental health care at the prison, even if you are placed on suicide watch: "[T]hey don't help you back here. [They] just try to get you off crisis by persuading you to get off." Despite the severity of his problems, he said: "I haven't been in a group for two years, since I got here. [I] don't have any treatment—no one-on-one therapy [and] maybe one contact every month or two" from mental health.

178.    I spoke to another prisoner (A.D.) who told me much the same thing. He said he had suffered from mental health problems since he was two years-old, including multiple suicide attempts that he engaged in "because I am in pain and this is torture." He said: "I ask for help and I can't get any." He went on to explain that mentally ill prisoners like himself "are unstable and of course we lash out, and then we pile up tickets and seg time that makes us worse." He told me that he had become so desperate that he

was cutting himself and eating his own feces. Part of what was so difficult for him in restrictive housing, he said, was the idleness: "All I do all day is look at the walls and think about my fuck ups and feel hopeless and it makes me want to die." As he put it, "there are no programs for us back here, so this is torture."

179.     In the administrative detention "yard" – which consists of long, thin pens or "dog runs" – I spoke with a group of prisoners who told me that they had virtually nothing to do in restrictive housing. One said "they have no program for us—just sit in your cell and read." Another prisoner (Mr. Davis, R42348) told me he had been in administrative detention for five years, since 2013. A confidential informant supposedly said he was a gang leader, but he said that he has no other tickets. Another prisoner (C.W.) said he was stabbed nine times at Menard and sent to Lawrence, where he was placed in isolation pending investigation and then put in administrative detention, where he has remained for two years. He told me: "I keep asking for mental health. I want to get the problems fixed before I need meds."

180.     In C Wing, I was told that there was one prisoner (D.D.) who was eligible to come out to yard declined, so I went into the unit to speak with him. He told me that of the ten or more years he had been in prison, approximately nine years were spent in some form of restrictive housing. He told me that he never goes to yard "because there is nothing in it." In fact, he said: "I've been in my cell around-the-clock for six months." He also said that he stays in his cell to avoid getting any more tickets. In restrictive housing, "the anger builds up and you can blow."

181.     In 5B, which is the crisis unit for the entire prison at Lawrence (other than the couple of cells in the Health Care Unit), I spoke to a prisoner (N.E.)

84

who was on administrative detention status and had been on suicide watch for three weeks. He told me that he had a variety of serious psychiatric diagnoses that dated back to when he was on the streets, including bi-polar disorder and schizophrenia. He explained: "A normal person doesn't play with their own feces, so I know I'm not normal." He was very critical of the mental health care at Lawrence, saying that, despite his serious psychiatric history and the fact that he had prior mental hospitalizations, "they don't do anything for you here." One of the things that he believes deters him and others from participating in the little mental health care that is offered is the fact that the correctional officers are present during all of the sessions and "we don't want to talk about anything sensitive" in front of them.

182.    Even though Lawrence is a medium-security prison (in contrast to the maximum-security IDOC prisons where I previously toured and conducted interviews), the restrictive housing units appear to be run as maximum security units, no different than the restrictive housing units at Menard, Pontiac, and Stateville. The information I obtained from individual, confidential interviews I conducted at Lawrence was consistent with what I learned from the interviews at the other IDOC facilities. The prisoners at Lawrence acknowledged having long and serious psychiatric histories, voiced complaints about their treatment, and expressed deep concerns about their own well-being. Even those who were not on the mental health caseload reported suffering from the extreme social isolation to which they were subjected, and acknowledged numerous symptoms of psychological trauma and the psychopathological effects associated with this kind of severe social and environmental deprivation.

85

183.   For example, one prisoner (Mr. Fillmore, B63343) told me that he had psychiatric problems that dated back to childhood, and that they had intensified in prison. He said he had spent time at Tamms and that he was very much affected by it: "I freaked out whenever I was around people." But when he told staff, "I'm terrible, depressed," they would just "move on, same as here." He said that he did not want to take psychotropic medication and, when he told the mental health staff that, instead, "I need human interaction," she said, "we can't help you with that." He complained that the *Rasho* settlement only applies to prisoners on psychotropic medication, and that "as long as you are not throwing shit and cutting yourself, you are fine." But he acknowledged that he was not fine. In fact, he said, the eight hours of out-of-cell time to which he was limited was getting to him. He feels anxious very often, is irritable and ruminates and has a hard time concentrating and feels depressed all the time. He also has come to self-isolate: "It's more normal to be alone. Even in the yard, I walk away from people. I can get a little hug from [my] family but I'm uncomfortable with the touch. It feels unnatural, even with my dad."

184.   One Lawrence prisoner (Mr. Gardner, K77282) whom I confidentially interviewed was escorted to me by staff who had him on a dog-leash type restraint behind his back; he was kept in restraints throughout the interview, despite my request that the restraints be taken off. He complained that he suffers from a host of mental health problems but that, despite making numerous requests for help, "I have gotten nothing. It appears they don't even document my requests or the psych problems or complaints I have voiced." Even though he acknowledged having serious mental health issues of his own, he expressed concerns about living in such close proximity to other very seriously mentally prisoners: "We live among the mentally ill. They are out of control. Noise, filth, trauma, we were in

86

the same yards with them. Feces, blood, urine in the cages. Stress all the time, even in the

yards." He said that, despite repeated requests for help with his psychological problems,

"I've gotten no mental treatment since I've been in seg. I don't know who I am or who I

am able to be around, in case I ever get out, given what I have been through." He said he

has pictures of his family displayed around his cell that he talks to, as if they were really

there. He acknowledged being stressed and anxious all the time, constantly ruminating,

being angry, and feeling that he was deteriorating overall as a result of his time in restrictive

housing.

185.    <u>Logan Correctional Center</u>. Logan Correctional Center is the largest

women's prison in the state, holding approximately 1700 women prisoners, including 65

cells that are used for restrictive housing. The prison is newer than the very oldest IDOC

prisons that I toured but still somewhat dated in design, having opened in the late 1970s.

The buildings are smaller than at most of the other facilities I toured and the housing units

are somewhat cleaner, especially in comparison to Pontiac and Menard.[153]

186.    Building 41 contains the suicide watch cells and also some treatment areas.

The one "group room" I saw was in use at the time I toured, consisted of a large "tether

table" with about eight stations where women could be handcuffed or tethered, so that they

could not freely move.[154] The "group" I observed consisted of the prisoners sitting with an

officer and watching a Hallmark television show. I went next to the medical building,

where some restrictive housing prisoners are also kept. I was told that an effort was made

---

[153] For example, a photograph of Building 41 at Logan, which houses watch cells and treatment space, is contained in Exhibit 3, at 135067.

[154] A photograph of one of the tether tables used for group therapy at Logan is contained in Exhibit 3, at 135047.

to house prisoners with a history of self-harm here, closer to medical care. The unit was clean and hospital-like. As I went from the medical building to the building where most restrictive housing prisoners are housed—Building 15—I passed the segregation yards. They consisted on long, fenced-in, grassy pens with nothing in them but a couple of plastic chairs.[155]

187.    In C Wing in Building 15, there are 65 restrictive housing cells, 43 of which were in use the day I was there.[156] The cells are relatively small, have solid doors with a window that looks out to the unit floor, and a barred window in the back of the cell.[157] Although the unit floors were relatively clean and well maintained, the showers used by restrictive housing prisoners were not.[158] In addition, there are three treatment rooms on the unit, one for individual contact and two that can be used for groups. The "group rooms" were fitted with metal desks in which prisoners were restrained during the group sessions.[159] None of them were in use the day I was there.

188.    I was told by staff that prisoners are supposed to move through three "phases" in this unit. The stated goals for the phases (written in large letters on the wall) are "reflect" for Phase I, "inspire" for Phase II, and "motivate" for Phase III. I was unable

---

[155] A photograph of the outdoor yards for restrictive housing prisoners at Logan is contained in Exhibit 3, at 135021.

[156] Photograph of the interior of the upper and lower tiers of the Building 15 restrictive housing unit at Logan are contained in Exhibit 3, at 135116, 135109, and 135112.

[157] Photograph of some of the restrictive housing cells in Building 15 at Logan is contained in Exhibit 3, at 135022, 135023, 135026, 135027.

[158] A photograph of the exterior of the showers used by restrictive housing prisoners at Logan is contained in Exhibit 3, at 135153.

[159] A photograph of the metal desks in which prisoners are restrained during group therapy at Logan is contained in Exhibit 3, at 135047.

to determine how these goals were achieved or when staff knew it was time to move a prisoner to the next phase. Prisoners seemed uncertain about whether the phase program was actually in operation or how it was supposed to work.

189.    The visiting area for general population prisoner at Logan is a relatively pleasant, open area with vending machines, tables, and chairs. In contrast, restrictive housing prisoners at Logan are limited to only non-contact visits that are conducted in a special cubicle and through a glass partition.[160]

190.    It was approximately 10 AM when I toured the restrictive housing unit in Building 15, and most women were asleep. One prisoner (A.W.) told me that she was on the mental health caseload and was taking psychotropic medications for her mental illness, but was not given access to any mental health groups. In fact, she said, despite her PTSD and anxiety disorder diagnoses, the only mental health treatment she got was medication and a "telepsych" session once a month. She complained that not only is there "nothing to do" on the unit, and no real property that she has access to ("no TV, music, etc."), the correctional officers "act like they don't care, so girls go to crisis watch. Sometimes I've called 'crisis' and they just ignore you."

191.    Another prisoner (D . C.) told me that the unit was "horrible," and said that she and the other women were neglected there. In fact, she explained, that there was no real "phases" program—it was just something that was being talked about and promised to the prisoners (to the point of putting signs about individual phase themes on the unit walls), but nothing had actually been implemented yet.

---

[160] The contrast between the visiting environment for general population and restrictive housing prisoners at Logan is illustrated in photographs contained in Exhibit 3, at 135029 and 135033.

192.    One prisoner (T . H.) in the unit was sitting on her bunk, shivering, with a blanket wrapped around her, when I came to her cell door. She told me "they don't care, we have to beg for everything." She said that she "hates" the groups, which are now offered every other day, because "they handcuff us to the dayroom table." She said that the women in the unit are allowed out of their cells only eight hours a week and that even when they go to yard "we just sit on chairs." Otherwise, she said, "we are in our cells with nothing to do."

193.    Another prisoner (L.L.) explained that she was SMI and on psychotropic medications. When I approached her cell, I saw that there was a filthy mattress on the floor outside the cell door. She explained that it was so dirty that she was refusing to allow it to be placed in her cell. While talking with L.L., I was told that there was another prisoner (A.F.) who had been in restrictive housing continuously for five years.

194.    In the individual, confidential interviews that I conducted at Logan, women prisoners reported that the harsh conditions and extreme deprivations I observed there were having significantly adverse effects on them, similar to those that were reported to me by other prisoners at different facilities. Literally all of the women prisoners at Logan recounted extensive psychiatric histories that predated their incarceration. Many voiced concerns that their serious mental health problems were exacerbated by the time that they served in restrictive housing. Those who were currently housed in isolation and the two who were no longer in the unit[161] spoke at length about the painfulness of the isolation to which they were subjected, and acknowledged numerous symptoms of psychological

---

[161] One of the Logan interviewees had recently been released into general population and another, who was pregnant, was being housed in the medical unit at the time I interviewed her.

trauma and the psychopathological effects associated with this kind of severe social and environmental deprivation.

195.    A prisoner who reported having an especially tragic life history (M.L.), had been moved to general population at Logan at the time I interviewed her. She told me that she had lived in some 32 foster care placements as a child and adolescent, had been physically and sexually abused, and suffered serious psychiatric problems that led to her being civilly committed before she was incarcerated. She told me that she had spent a very long time in restrictive housing at Logan—most of the five years that she had spent in prison—and that the experience was truly traumatizing. She felt that it greatly exacerbated her already significant, pre-existing mental health problems.  She said, "In seg, I begged for human contact. It changed me, it took me and twisted and burned me inside." She showed me gruesome scars all over her body from where she had mutilated herself. She told me that these multiple acts of self-mutilation were largely the result of her time in restrictive housing: "Before prison, [I had] only a few cuts on my body. But in seg, that's all I thought about, and I cut myself over and over. I swallowed razor blades, hung myself from light fixtures in seg, and swallowed light bulbs."

196.    Another Logan prisoner (M.M.), was brought to me from a suicide watch cell. She told me that she, too, suffered from psychiatric problems before coming to prison and had tried to take her own life on multiple occasions. She was now diagnosed as suffering from schizoaffective disorder and had been prescribed a number of psychotropic medications in prison. Despite these well-documented mental health problems, she said that she had spent about a third of her nine years in prison in restrictive housing. She reported frequently suffering from nearly all of the symptoms of

91

psychological trauma and the psychopathological reactions to isolation, including ruminations, depression, and thoughts of suicide as well as visually hallucinating spiders on her arms and blood on her cell walls.

197.    One Logan prisoner (T.C.) whom I interviewed was in the medical unit. She explained to me that she was pregnant and was being kept there until the prison doctors induced her labor, which she said was due to occur in about a month. She recounted a terribly troubled life that included severe physical abuse and prior mental hospitalizations. Although she had only a short prison sentence to serve, and despite being a pregnant woman with a long psychiatric history, she had been housed in restrictive housing and deteriorated as a result. She told me that she was in such deep depression and despair in isolation that she had tried to hang herself twice in just the last several months (including one time in which she lost consciousness). She said that she had been told that after she gave birth she would be promptly returned to restrictive housing to serve the rest of her sentence.

198.    The above paragraphs provide illustrative examples of the numerous complaints voiced, suffering described, and very serious psychological symptoms acknowledged by the sample of the Logan prisoners whom I confidentially interviewed.

199.    In summary, the tours and inspections and cell-front and confidential interviews that I conducted collectively revealed very serious problems in IDOC restrictive housing units. The problems are widespread and shocking and place the well-being of all of the prisoners exposed to them at significant risk of serious harm. The degraded conditions of confinement, extreme social isolation, severe forms of material and other

deprivations, and other severely restrictive practices and procedures in the IDOC facilities that I toured represent nothing short of a system-wide crisis.

200.     All of the IDOC restrictive housing units I inspected were extremely similar to one another in the numerous ways I have described above. They are uniform in policy and practice, and they all appear capable of having truly harmful—even devastating and fatal—impacts on the prisoners housed in them. Although the facilities vary somewhat in terms of their age and level of deterioration and disrepair, all of the restrictive housing units operate in essentially the same way and subject prisoners to essentially the same draconian levels of isolation, idleness, and deprivation.

201.     Virtually all of the prisoners with whom I spoke – cell-front and on an individual, confidential basis – reported that they were suffering and deteriorating as a result of these conditions and the way they were being treated. The prisoners whom I confidentially interviewed all acknowledged experiencing a range of very serious symptoms—indices of psychological trauma that are associated with severe forms of isolated confinement. These prisoners are all at significant risk of serious psychological harm. Indeed, most of them could point to harm that they had already experienced in the course of their extreme isolation and severe deprivation that, in many instances, included incidents of self-harm and suicide attempts. Many voiced concerns over whether their impaired and deteriorated mental health would ever improve, if and when they were released from restrictive housing.

202.     The shockingly high number of prisoners who are on the IDOC's mental health caseload and nonetheless housed in these draconian units is frankly unconscionable. For reasons I have previously stated, mentally ill prisoners are more vulnerable to the

painfulness and harmfulness of isolated confinement. Numerous courts, human rights organizations, and even many correctional organizations that have considered the question have prohibited the placement of mentally ill prisoners in solitary confinement outright. The IDOC restrictive housing units that I saw were more draconian than most and the mentally ill prisoners who are confined in them are predictably being harmed as a result.

203.    I should also note that the placement of seriously mentally ill prisoners in restrictive housing is not only harmful to them, but also increases the risks and harmfulness of isolated confinement for other prisoners (and to staff) as well. Out-of-control mentally ill prisoners whose conditions often worsen in this kind of confinement may become assaultive to staff and other prisoners, may engage in loud and otherwise noxious behavior (e.g., smearing themselves in feces), and precipitate forceful interventions (e.g., the use of chemical agents) that adversely affect the well-being of everyone in the housing unit.

### D.    Prisoner File Review and Individual Cases

204.    My review of the prisoners' institutional files,[162] including those of named plaintiffs and non-named plaintiff prisoners and included the files of individuals with whom I spoke as well as individuals whom I had not previously met. The file reviews added even greater weight to the consistent set of complaints that prisoners repeatedly voiced during my cell-front and confidential interviews at each of the six facilities that I toured. The file reviews also documented the plights of prisoners with long histories of very serious mental illnesses, some of whom had multiple instances of suicidality or extreme acting out. The prisoners were nonetheless kept in—or routinely returned to—restrictive housing

---

[162] *See* Exhibit 2 for a list of all prisoner files reviewed. These files included both the prisoner's disciplinary records and their medical and mental health treatment records.

units, where they were once again placed at an especially significant risk of serious psychological harm. In a number of cases, the prisoners' repeated pleas to mental health staff to the effect that they were being harmed by—and decompensating in response to— the severe of the conditions to which they were subjected were duly noted, but to no avail.

205.    The prisoner master files were replete with corroboration of what prisoners had told me when I interviewed them, as well as additional information that underscored the nature of their complaints, their adverse reactions to the harsh conditions and extreme deprivations to which they were being exposed in restrictive housing, the apparent indifference of staff to their suffering, and the callous practices to which they were subjected in isolation. Below I summarize just a sample of the file reviews that provide evidence of these widespread and serious problems.

206.    For example, M.B. is a Logan prisoner whom I did not confidentially interview but whose records I reviewed. She was in restrictive housing in June, 2018, during which time she was on crisis watch (from June 21 to June 28). She was returned from crisis watch to restrictive housing with no apparent change in her mental health treatment.[163]

207.    T.C., the pregnant woman whom I interviewed in the medical unit at Logan, had several serious, documented suicide attempts in the months before I interviewed her.[164] She repeatedly told staff that she could not handle being in restrictive housing. For example, it was noted in her file that she "continues to report an inability to keep herself safe if she was to return [to] restrictive housing... This is due to

---

[163] Files of M.B., 0217776-021812.

[164] Files of T.C., 024504, 028708, 0248926.

the patient not enjoying restrictive housing."[165] Yet she was retained in restrictive housing. In fact, even after she told her mental health counselor – after a lengthy history of multiple suicide attempts and in the course of a current hunger strike because "she does not want to live in seg,"[166]—she was apparently kept there.

208.    Another Logan prisoner, A. F., whom I did not personally interview, but whose master file I reviewed, had an extraordinary number of documented suicide attempts and multiple, lengthy stays in suicide watch cells. A.F. had been given numerous very serious mental health diagnoses by the IDOC, and was prescribed numerous psychotropic medications.[167] Instead of moving her out of restrictive housing and into a higher level of psychiatric care, her mental health progress notes simply acknowledged that her "[l]ong-term suicide risk factors include maximum custody classification"[168]; she continued to be retained in restrictive housing. Moreover, despite her repeated suicide attempts, the multiple instances of other kinds of bizarre behavior (including reported hallucinations), her pleas to be sent to Elgin State Hospital because she was certain that the Logan Correctional Center "could not fix her brain,"[169]

A.F.'s acting out behavior simply resulted in her receiving more punishment— punishment in the form of extending her stay in the very restrictive housing unit she told IDOC staff was tormenting her. In fact, disciplinary infractions and added time in isolation

---

[165] *Id*. at 0248766.

[166] *Id*. at 0249880.

[167] Files of A.F. 0208473. [168] *Id*. at 0208773.

[169] *Id*. at 0209147.

continued to be signed off on by mental health staff who repeatedly stated: "No indication that patient's mental illness affected patient's behavior related to charges."[170]

209.    I also reviewed the records of an inmate who is now housed in restrictive housing in Pontiac, P.A. I first encountered P.A. in a crisis cell during my tour of  the Dixon Correctional Institution and personally interviewed him there. [See paragraphs 144 and 152 *infra*.] P.A.'s records indicated that he had engaged in multiple documented suicide attempts and acts of self-harm, was repeatedly diagnosed by IDOC mental health personnel as suffering from very serious psychiatric conditions, complained that he was suffering in isolation and could not tolerate it, and was acknowledged by mental health staff to be adversely affected by placement in restrictive housing, yet was repeatedly placed there. For example, documented instances of suicidality or self-harm were recorded on October 31, 2017, November 30, 2017, December 6, 2017, April 4, 2018, May 3, 2018, May 31, 2018, July 16, 2018, and September 1, 2018.[171] He was described by mental health staff as having a history of depression,[172] and various previous diagnoses were recorded, including bipolar disorder and schizophrenia.[173] Staff reported symptoms of psychosis,[174] and P.A. himself voiced complaints that staff were trying to kill him,[175] that he had been raped by a correctional officer,[176] and that he

---

[170] *Id*. at 0209501.

[171] Files of P.A., 0164410-12, 0164572, 0161794, 0162929, 0162914, 0162655, 0162481-0162508, 0162082 respectively.

[172] *Id*. at 0164472.

[173] *Id*. at 0164466.

[174] *Id*. at 0163415, 0163422.

[175] *Id*. at 0163113.

[176] *Id*. at 01637

suffered auditory hallucinations that included "the devil" telling him to kill himself.[177] P.A. was aware that he was being adversely affected by his time in restrictive housing. For example, he told staff on December 9, 2017 that "I'm not getting help I need here. Something is going to happen if I don't get out of seg."[178] Although mental health staff acknowledged the fact that P.A.'s severe psychiatric problems contributed to the behavior that led to his disciplinary infractions and that his placement in restrictive housing was likely to significantly negatively affect his mental state, he nonetheless was routinely retained in restrictive housing.[179]

210.   I reviewed the records of B.B., who was at Menard when I confidentially interviewed him. He was diagnosed with schizoaffective bipolar and PTSD.[180] Nonetheless, when he used fecal matter to cover his cell window, it was determined (in August 2017) that his mental health condition did *not* contribute to his behavior.[181] Even though he was on suicide watch, mental health opined that segregation time would *not* impact his mental health.[182] On March 8, 2018, mental health staff approved his adjustment ticket to be heard while he was on crisis watch.[183] B.B. repeatedly stated that the "voices" make him engage in staff assaults.[184] In May 2018, he

---

[177] *Id.* at 0164410-12.

[178] *Id.* at 0164552.

[179] *Id.* 0164391-92, 0164375-76.

[180] Files of B.B., at 015958.

[181] *Id.* at 0157064.

[182] *Id.* at 0157347.

[183] *Id.* at 0156406.

[184] *Id.* at 0156744, 0156786.

received 2 months of segregation for disobeying a direct order, even though the adjustment report stated that he was unable to participate in the hearing due to his mental health status.[185]

211.    I reviewed the records of Henry Davis (R42348), a prisoner whom I confidentially interviewed at Lawrence. Mr. Davis was placed in restrictive housing in November, 2013. His records reflect that he has experienced many problems there. They also reflect that he has vocalized some of the ways that he has been adversely affected and expressed a need and desire for treatment. For example, in Sept 2014 he asked for a mental health referral during segregation rounds.[186] In April 2015, he reported increased stress due to the fact that he had been locked up 23 hours a day and was only able to walk back and forth on the yard.[187] In March 2016, Mr. Davis reported to mental health staff that he was having chest pain and headaches from stress and from the inability to get proper exercise in yard.[188] In December 2016 he was reported as "genuinely agitated" about his segregation status, per mental health.[189]

212.    A Dixon prisoner whose records I reviewed, NOD. was not someone whom I personally encountered or interviewed at the facility. NOD. had a significant psychiatric history that should have precluded his placement in restrictive housing. According to his mental health records, NOD. has been prescribed multiple

---

[185] *Id.* at 0156478.

[186] Files of Henry Davis, at 237000.

[187] *Id.* at 237579.

[188] *Id.* at 237094.

[189] *Id.* at 237082.

psychotropic medications for his mental health problems in the IDOC, including Trazadone, Remeron, Olanzapine/Zyprexa, and Klonopin.[190] There was evidence available to IDOC that restrictive housing was harming him, yet he was retained there. His records indicated that L.D. was on crisis watch from February 5 to February 11, 2018, because of suicidal ideation.[191] Less than a month later, in a psychological evaluation conducted on March 6, 2018, he was described as having a persistent depressive disorder, with mood swings and feelings of hopelessness.[192] L.D. was so upset about being placed in restrictive housing that he commenced a hunger strike.[193] He was again placed in restrictive housing on June 7, 2019 and, after about a month, was placed on suicide crisis watch.[194] During this time, on June 17, 2018 he was diagnosed with bi-polar disorder and described as having pressured speech, racing thoughts, paranoia, and impaired thinking as well as suicidal thoughts.[195] Just three days after these diagnoses and impressions were recorded, L.D. took a broken piece of a segregation dietary tray from the ground and began making cutting motions on his arm. Instead of receiving counseling or being placed on suicide watch, he was given additional segregation time.[196]

213. Although he was not someone whom I confidentially interviewed at Lawrence, I reviewed the records C.K. who has been in restrictive

---

[190] Files of L.D., at 0306997, 0307129, 0307267, and 0307303.

[191] *Id.* at 0307927.

[192] *Id.* at 0307385.

[193] *Id.* at 0307399, 0307409.

[194] *Id.* at 0307631.

[195] *Id.* at 0307571.

[196] *Id.* at 0305273.

housing (on administrative detention status), since 2012.[197] In October, 2016, he complained that he was having nightmares and was tired of being in segregation for so long.[198] 8/30/17 In August, 2017, he expressed anger about being given new disciplinary segregation time, stated that he was feeling paranoid, was noted to not be competent and decompensating while he was on a hunger strike.[199] Shortly after, in September, 2017, he stated that it was fortunate that he was already on crisis watch because he had planned to overdose in reaction to the long duration of segregation that he had experienced and the lack of yard time.[200] In October, 39, 2018, mental health staff commented on C.K.'s depressed state, which they suggested might be due to his lack of human contact.[201]

214.    Another Dixon prisoner whose files I reviewed, K.P. was diagnosed with bipolar depressive disorder.[202] In April, 2017, he reported being paranoid around people and hearing voices, after having spent some three years in restrictive housing (starting in 2014), and also having experienced visual hallucinations since 2016.[203] In August, 2017, he was recommended for placement in the Special Treatment Center (STU), due to his multiple suicidal gestures and serious self-injurious behavior. K.P. was

---

[197] Files of C.K., at 0142647. [198] *Id.* at 01410904.

[199] *Id.* at 0142304.

[200] *Id.* at 0142338.

[201] *Id.* at 01423158.

[202] Files of K.P., at 0143727.

[203] *Id.* at 014664.

placed in the STU in October, 2017.[204] However, in November, 2017, he was placed in restrictive housing due to fighting.[205] A few months later, in February, 2018, he damaged the sink and window in his cell and received two months additional segregation time.[206] Just a month later, in March, 2018, his mental state had deteriorated and he was placed on crisis watch.[207] By May, 2018, K.P. reported that he felt hopeless every day in restrictive housing, and that he had not been to yard in three months.[208]

215.    I also reviewed the files of Dixon prisoner J.T., who has been in restrictive housing more or less continuously since 2000. He appears to have additional segregation time added every few weeks, most of the time for smearing feces or disobeying a direct order. In March, 2017, he attempted suicide by hanging[209] He was placed on crisis watch in December, 2018, after an assault of staff in which his mental illness was determined *not* to be a contributing factor. However, mental health staff recommended reduced segregation time,[210] and he received 45 days of segregation.[211] Although J.T. appears to deteriorate in isolated confinement, he is retained there nonetheless.

---

[204] *Id.* at 0144643, 0145081.

[205] *Id.* at 0145907.

[206] *Id.* at 0145814.

[207] *Id.* at 0146539.

[208] *Id.* at 0143600.

[209] Files of J.T., at 035643.

[210] *Id.* at 0306777.

[211] *Id.* at 038261-7.

216.     Although I did not confidentially interview him, I reviewed the records of Menard prisoner D. W. D . W. has been diagnosed with schizoaffective disorder and has a history of many (10+) suicide attempts.[212] He was placed in long-term restrictive housing in July 2015, due to staff assaults and being found with contraband. [213] In addition to his many suicide attempts, D.W. has spent many weeks on suicide watch. His desperate attempts to receive therapeutic attention are sometimes met with additional segregation time. For example, in October 2016, he received six months of segregation for covering his window and not responding, which he explained that he did because he wanted to talk to a crisis team.[214]

217.     Finally, I reviewed the file of Big Muddy River prisoner B.Y., a prisoner whom I did not confidentially interview. His file contained an entry that was both accurate and revealing. Staff noted that "his mental state appears to have deteriorated significantly… [H]e has 1 more year in seg. [It will be] difficult rehabilitating him if he still has seg time."[215]

218.     Consistent with my own direct observations, the cell-front contacts that I had with prisoners in the various facilities I toured, and the confidential interviews that I conducted, this brief summary of a sample of the larger number of IDOC prisoner files that I reviewed provides further evidence that numerous, very seriously mentally ill prisoners are not only housed throughout the IDOC but they are also retained for long periods of

---

[212] Files of D.W., at 0180221.

[213] *Id.* at 0181370-1.

[214] *Id.* at 0181049.

[215] Files of B.Y., at 0298942.

time in draconian restrictive housing units. They often deteriorate and engage in acts of suicidality and self-harm. Rather than receiving meaningful treatment under conditions where their mental health is likely to improve, or being exempted from further confinement inside harsh and debilitating restrictive housing units, they are cycled back and forth from crisis watch cells to segregation, where their mental health and well-being are placed at grave risk of even further harm.

**VII.  Longstanding Awareness of the Significant Risk of Serious Harm to IDOC Prisoners in Restrictive Housing**

219.    The IDOC restrictive housing units that I toured and inspected and in which I conducted cell-front and confidential interviews clearly constitute what is meant in correctional practice and in the scientific literature as "solitary confinement." The IDOC prisoners who are housed in these units are thus being subjected to what has been long-considered a very dangerous form of isolation. This means that the research I discussed in the preceding section of this Declaration about the significant risk of serious psychological harm not only is directly applicable to these IDOC units, but that IDOC officials knew about the dangerous conditions to which they were subjecting the prisoners under their supervision and control, or willfully failed to review the relevant literature or even the medical records of their own prisoners.

220.    In fact, officials in the IDOC have been made directly aware of these deficiencies on <u>multiple</u> occasions, beginning years ago and continuing into the year in which I conducted my tours and inspections of the facilities discussed in this Declaration. Thus, nearly a decade ago, system-wide analyses – invited by and paid for by the IDOC itself – were conducted by groups of respected outside experts who have carefully examined the conditions of confinement in the IDOC, including its treatment of prisoners

104

in restrictive housing. Those experts made many of the very same observations and reached many of the very same conclusions that I have in this Declaration about the dire state of the IDOC's restrictive housing units. They shared these observations and conclusions directly with IDOC officials and made sweeping recommendations to them about the dire nature of these widespread problems and the urgency of addressing them. Yet these egregious conditions and practices persist.

221.    For example, highly respected prison legal scholar Fred Cohen was hired to conduct a system-wide review of the IDOC's treatment of its mentally ill prisoners in 2011. He assembled a well-known team of experts who reached damning conclusions about the IDOC in general and restrictive housing in particular. In October, 2011, Cohen briefed IDOC officials on his highly critical preliminary findings, and he and his team filed their final report a short time later, in March, 2012. Although the report itself was embargoed to the public,[216] Cohen nonetheless "provided a properly bleak, interim report to counsel [for the IDOC] and Illinois officials…" Here is how Cohen recently characterized his team's findings: "I found… the suffering of the inmates was extensive and palpable… [S]uicide and isolation protocols were designed to humiliate the bewildered and isolated inmates into stating, 'All better now, please let me out!' Segregation – solitary confinement – for the mentally ill was, in my view, inflicted as a form of torture and unconstitutional on its face."[217]

---

[216] I obtained a copy of the report by consent of the parties during my work as an expert for the plaintiffs in the *Rasho* case.

[217] Fred Cohen, Illinois and *Rasho v. Walker*: A Permanent Injunction Issues, <u>Correctional Mental Health Report</u>, July/August, 19-20, 24-27 (2019), p. 19.

222.     During approximately the same time period, a study of restrictive housing conditions, practices, and procedures was commissioned by the IDOC. A team of researchers from the Vera Institute of Justice, led by nationally known corrections expert Dr. James Austin, was tasked with conducting the study and reporting recommendations to the IDOC.[218] In fact, the Vera team did report their findings directly to the IDOC.[219] The researchers found that the Illinois prison system's use of restrictive housing was based on a punishment rather than rehabilitation-focused framework that was intended to "deter" prisoner misconduct.[220] In order to do this, the IDOC restrictive housing units subjected prisoners to "degraded" conditions of confinement that the Vera team judged to be "not acceptable with respect to recreation, showers, mental health treatment, or contacts with clinical-services staff and are not in line with best or standard practices in other systems."[221]

223.     Among other things, Vera also found that the IDOC practices and procedures by which prisoners were placed in restrictive housing and the lengths of time they remained there resulted in placements whose nature and duration were not

---

[218] See 010946 "IDOC Segregation Study Major Findings" (1 page, undated).

[219] At least one such briefing took place on August 23, 2011, and was attended by high ranking officials of the IDOC, including then IDOC Director Godinez. See 010975-010978 "Vera-IDOC Meeting Segregation Project" (August 23, 2011), 1-4.

[220] There is no evidence that this "deterrence" model is effective in reducing individual infractions ("specific deterrence") or systemwide levels of infractions ("general deterrence"). In fact, research suggests either that it has no effect on problematic prisoner behavior or, in fact, may be counterproductive (i.e., increase subsequent problematic behavior). For example, see: Briggs C, Sundt J, Castellano, T., The effect of supermax security prisons on aggregate levels of institutional violence. Criminology, 41, 1341-1376 2003; Colvin M., The penitentiary in crisis: From accommodation to riot in New Mexico. Albany, NY: State University of New York Press (1992); Morris, R., Exploring the effect of exposure to short-term solitary confinement among violent prison inmates. Journal of Quantitative Criminology, 32, 1-22 (2016); Reiter, K., Parole, snitch, or die: California's supermax prisons and prisoners, 1997-2007. Punishment & Society, 14, 530-563 (2012); Shalev, S., Supermax: Controlling risk through solitary confinement. Cullompton, UK: Willan Publishing (2009); and Sundt, J., Castellano, T., & Briggs, C., The sociopolitical context of prison violence and its effect in Illinois. Prison Journal, 88, 94-122 (2008).

[221] See 010946 "IDOC Segregation Study Major Findings" (1 page, undated).

proportionate to the past and present negative behavior of the prisoners who subjected to them.[222] They found that the IDOC's restrictive housing population could be significantly reduced in scale without appreciable increases in disciplinary infractions, and recommended that prison officials take steps to do so.

224.   All of these events occurred well in advance of the tours and inspections that I conducted in July and September 2018. In December 2017 and February and March, 2018, also before the tours and inspections I conducted, evidentiary hearings were held in the *Rasho v. Walker* case on a motion to enforce the settlement agreement. District Judge Mihm issued his opinion on this issue on May 5, 2018. There was extensive evidence presented at the hearings and relied on by Judge Mihm in his opinion that foreshadowed many of the observations made and conclusions reached in this Declaration about the significant risk of serious harm IDOC prisoners were subjected to in restrictive housing (or what is referred to as "segregation" in the *Rasho* proceedings).

225.   For example, on the basis of the evidence presented in the *Rasho* hearings, the court found that the IDOC was failing provide mentally ill prisoners with constitutionally adequate mental health care in segregation (and elsewhere in the system) that placed them at risk of irreparable harm.[223] Dr. Melvin Hinton, the IDOC's Chief of Mental Health Services and Addiction Recovery Services, testified in the hearings that "there is nothing that is a good thing about being in segregation" in the IDOC, and agreed

---

[222] See 010946 "IDOC Segregation Study Major Findings" (1 page undated).

[223] *Rasho v. Walker*, 2018 WL 2392847 (C.D. Ill. 2018), p. 6. The court wrote further that "[t]he failure to properly treat these inmates – particularly those in segregation - is making them worse 'across the board' according to Dr. Hinton." At p. 7. The court further found that the treatment plans "requirements related to inmates who in segregation are simply not being met" (p. 14) and the IDOC was in "non-compliance with the out-of-cell time required for mentally ill inmates placed in segregation" (p. 14).

that the mentally ill prisoners in their restricted housing were "not getting the right kind of psychiatric care." As a result of this deficient care, he acknowledged that the prisoners' mental health conditions would worsen "across the board."[224]

226.    Dr. Pablo Stewart, who serves as the court-appointed monitor in the *Rasho* settlement, also testified at the hearing and was quoted in the *Rasho* opinion to the effect that the IDOC's failure to provide proper mental health care in segregation was resulting in "psychiatric decompensation," that is, "[p]eople are getting worse in segregation."[225]

227.    On the basis of the evidence presented, the judge ruled that the plight of prisoners in segregation units, who spent "sometimes staggering" amounts of time there, was "an emergency situation," one that was "extremely dangerous."[226] In light of the fact that IDOC officials "have been aware of these deficiencies" in segregation "for an unreasonable period of time," he found that their "failure to adequately address these deficiencies amounts to deliberate indifference."[227] Yet, despite the evidence presented and the court's unequivocal notice to IDOC officials, the extremely dangerous emergency situation in the restrictive housing units persisted and was apparent at the time I toured and inspected them many months later.

228.    In October, 2018 then Acting Director Baldwin acknowledged in his sworn deposition testimony that there is no cap or limit on the amount of time prisoners can spend

---

[224] *Rasho v. Walker*, 2018 WL 2392847 (C.D. Ill. 2018), p. 7-8.

[225] *Rasho v. Walker*, 2018 WL 2392847 (C.D. Ill. 2018), p. 15.

[226] *Rasho v. Walker*, 2018 WL 2392847 (C.D. Ill. 2018), p. 15.

[227] *Rasho v. Walker*, 2018 WL 2392847 (C.D. Ill. 2018), p. 15.

in segregation or be cycled back and forth between administrative and disciplinary segregation.[228]

229.    In depositions given in the present case, IDOC officials expressed varying degrees of direct knowledge of the significant risk of serious harm to which prisoners in restrictive housing were being subjected. For example, former IDOC Deputy Chief and Chief of Operations Atchison (who was in that position from 2013 until he retired in 2017), testified that the Vera-inspired changes that he had been involved in trying to make at Menard and perhaps elsewhere in the IDOC were discontinued, not because they were not working or necessary, but rather because: "a lot of other things came in front of us. Our population exploded. Tamms was closing. We had fewer beds and more inmates, and I think it was the crisis mode…"[229] He expressed awareness of the harmfulness of isolated confinement, especially under cramped conditions, acknowledging that even beyond the negative consequences incurred by the prison experience itself, "going to segregation has negative consequences" and, "[i]f it's a small cell, absolutely."[230] Yet he was aware that many prisoners in restrictive housing were double-celled in Menard, in cells are less than 50 square feet in dimension, and that these conditions could be harmful to them.[231]

230.    Also in deposition testimony in the present case, then Acting Director Baldwin testified that he believed that the ASCA/Liman reports on restrictive housing

---

[228] Deposition of John Baldwin, p. 66-67.

[229] Deposition of Michael Atchison, October 22, 2018, p. 24.

[230] Atchison Deposition, p. 103.

[231] Atchison Deposition, p. 102. And: "So negative consequences is a very – is something that could apply to a lot of things. But detrimental, I think in certain unique situations, I think they could be detrimental." At p. 103-104.

(which the IDOC contributed data to) were "authoritative."[232] He said later in his testimony that he "liked the Liman Report,"[233] and later still that "I think the Liman is a much better corrections document than anything I've seen about restrictive housing."[234] However, here is what the 2015 ASCA/Liman Report had to say about the use of restrictive housing:

> [D]ozens of initiatives are underway to reduce the degree and duration of isolation or to ban it outright, and to develop alternatives to protect the safety and well-being of the people living and working in prisons. The harms of such confinement for prisoners, staff, and the communities to which prisoners return upon release are more than well-documented. In some jurisdictions, isolated confinement has been limited or abolished for especially vulnerable groups (the mentally ill, juveniles, and pregnant women), and across the country, correctional directors are working on system-wide reforms for all prisoners.[235]

231. In my opinion, then Acting Director Baldwin and current Acting Director Rob Jeffreys oversee an IDOC whose restrictive housing units clearly violate the spirit of the ASCA/Liman recommendations that Baldwin acknowledged being aware of and appeared to endorse. Mr. Baldwin also testified that he was aware of "quite a bit of correctional literature out there citing potential serious consequences to the mental health and physical health of someone who is detained on more or less an indeterminate basis in isolation, in restrictive housing."[236] Yet, despite this awareness, then Acting Director Baldwin and current Acting Director Rob Jeffreys operate and oversee an IDOC whose

---

[232] Deposition of John Baldwin, October 17, 2018, p. 23.

[233] Baldwin Deposition, p. 190.

[234] Baldwin Deposition, p. 209.

[235] Liman Program Yale Law School & Association of State Correctional Administrators, Time In Cell: ASCA-Liman 2014 National Survey of Administrative Segregation in Prison (August, 2015), p. 7.

[236] Baldwin Deposition, p. 88.

restrictive housing units continue to inflict precisely the kind of "serious consequences" on Illinois prisoners that the correctional literature indicates that severe isolation incurs.

## VIII.   <u>Conclusion</u>

232.    As I noted at length above, there is a robust scientific literature that establishes the adverse psychological effects of solitary confinement/restrictive housing and the significant risk of serious harm that it represents for all prisoners who are subjected to it. The IDOC restrictive housing units are similar if not identical to the type of isolated confinement to which this literature refers. Those units thus expose Illinois prisoners who are housed in them to significant risk of serious harm.

233.    I reach this conclusion based on my own observations of the units themselves, my interviews with staff and with prisoners housed in the units, and my review of IDOC documents containing policies, procedures, and directives, as well as the numerous individual prisoner files that I examined.

234.    It is my opinion that these conditions of extreme social isolation and social deprivation are similar if not identical to those I have seen and studied in other correctional institutions. These harsh, severe conditions of confinement are precisely the kind that create a significant risk of serious harm for all the prisoners who are subjected to them. And, as I noted earlier, a large and stable number of IDOC prisoners are being subjected to these kinds of conditions, some for very long durations.

235.    In addition, as I have repeatedly noted in the above paragraphs, an extraordinarily high percentage of persons housed in one or another IDOC restrictive housing unit are mentally ill. Many have long psychiatric histories that date to early childhood. The have been diagnosed with very serious psychiatric conditions by IDOC mental health staff and prescribed psychotropic medications to manage their fragile mental

health. In many instances, their psychiatric disorders are repeatedly manifested in the outward behavior, including multiple acts of suicidality and self harm. Yet it appears that little or no effort is made to ensure that individuals with SMI are excluded from the IDOC's dangerous restrictive housing conditions.

236.    Indeed, numerous prisoners whom I encountered on my facility tours corroborated these facts, as did the mental health files that I reviewed. The IDOC restrictive housing units I inspected are filled with mentally ill prisoners, obviously suffering from precisely the kinds of psychiatric problems that are likely to be exacerbated by the deprivations and degradations of restrictive housing.  Some of them reported being there for very long periods of time. They consistently complained that they received very little if any regular, meaningful mental health care despite, as they reported, having repeatedly requested it.

237.    For a variety of previously stated reasons, mentally ill prisoners are particularly vulnerable to the painful stressors of isolated confinement and the risk of harm from their placement in such units is especially grave. Placing seriously mentally ill prisoners in restrictive housing is thus contrary to sound correctional and clinical practice, the weight of psychological and psychiatric opinion, and a violation of international human rights standards. In fact, many prison systems voluntarily refrain from placing them there and, in other jurisdictions, courts have prohibited correctional officials from housing mentally ill prisoners in isolation. In my professional opinion prisoners with a diagnosis of severe mental illness should be categorically excluded from isolation housing, because they face a substantial risk of very serious harm in that setting.

238.    However, the significant risk of serious harm inflicted in these units is not limited to the large numbers of mentally ill prisoners housed in them. Based on my inspections of IDOC facilities, the information provided by prisoners and staff members in the course of my tours, and the documents that I have reviewed, I have concluded that restrictive housing in the IDOC represents an extremely harsh form of prison isolation. The restrictive housing units that I inspected in the IDOC are similar if not identical to those I have studied elsewhere and identified as capable causing serious harmful effects for all persons subjected to them. These are precisely the kind of units in which a range of adverse, long-lasting, and potentially fatal have been documented in the scientific literature. That is, the harms that prisoners in these units are at risk of are extremely serious and sometimes irreversible, including loss of psychological stability, impaired mental functioning, self-mutilation, and even death.

239.    Based on many years of experience working with correctional systems and the federal courts to address these issues in different states across the country, I am confident that the problems I have identified in the restrictive housing conditions, policies, and practices can be effectively addressed through system-wide relief that is ordered by the courts.

I declare under penalty of perjury that the foregoing is true and correct.

_Craig Haney, Ph.D, J.D._
Craig Haney, Ph.D., J.D.

Executed on:         _September 6, 2019_

113

# CRAIG HANEY EXPERT REPORT

# EXHIBIT 1

CURRICULUM VITAE

Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064

Co-Director,
UC Consortium on Criminal Justice Healthcare

Co-Director,
JUSTInnovate: US-Norway Correctional Change/Exchange Program

home address:        317 Ocean View Ave.
                     Santa Cruz, California 95062
phone:               (831) 459-2153
fax:                 (831) 425-3664
email:               psylaw@ucsc.edu

PREVIOUS EMPLOYMENT

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

1

EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

HONORS AWARDS GRANTS

| | |
|---|---|
| 2018 | Emerald Literati Award for "Outstanding Paper" (for "Reducing the Use and Impact of Solitary Confinement in Corrections"). |
| 2016 | Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council. |
| | Psychology Department "Most Inspiring Lecturer" |
| 2015 | University of California Presidential Chair (2015-2018 Term) |
| | Martin F. Chemers Award for Outstanding Research in Social Science |
| | Excellence in Teaching Award (Academic Senate Committee on Teaching). |
| | President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen). |
| | Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council. |
| | Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof] |
| 2014 | Distinguished Faculty Research Lecturer, University of California, Santa Cruz. |
| 2013 | Distinguished Plenary Speaker, American Psychological Association Annual Convention. |

2012    Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States.

Invited Expert Witness, United States Senate, Judiciary Committee.

2011    Edward G. Donnelly Memorial Speaker, University of West Virginia Law School.

2009    Nominated as American Psychological Foundation William Bevan Distinguished Lecturer.

Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors).

2006    Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for Death by Design).

Nominated for National Book Award (by American Psychological Association Books, for Reforming Punishment: Psychological Limits to the Pains of Imprisonment).

"Dream course" instructor in psychology and law, University of Oklahoma.

2005    Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz.

Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient).

Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley).

2004    "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz.

National Science Foundation Grant to Study Capital Jury Decision-making

2002    Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz.

United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project.

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000    Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999    American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997    National Science Foundation Grant to Study Capital Jury Decision-making.

1996    Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995    Gordon Allport Intergroup Relations Prize (Honorable Mention)

Excellence in Teaching Convocation, Social Sciences Division

1994    Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice.

1992    Psychology Undergraduate Student Association Teaching Award

SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities

1991    Alumni Association Teaching Award ("Favorite Professor")

1990    Prison Law Office Award for Contributions to Prison Litigation

1989    UC Mexus Award for Comparative Research on Mexican Prisons

| | |
|---|---|
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |


UNIVERSITY SERVICE AND ADMINISTRATION

| | |
|---|---|
| 2010-2016 | Director, Legal Studies Program |
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |
| 1990-1992 | Committee on Academic Personnel |
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |

1984-1986          Chair, Committee on Privilege and Tenure

WRITINGS AND OTHER CREATIVE ACTIVITIES <u>IN PROGRESS</u>

Books:

<u>Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace</u> (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

<u>Books</u>

2020          <u>Criminality in Context: The Psychological Foundations of Criminal Justice Reform</u>. APA Books, in press.

2014          <u>The Growth of Incarceration in the United States: Exploring the Causes and Consequences</u> (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press.

2006          <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>, Washington, DC: American Psychological Association Books.

2005          <u>Death by Design: Capital Punishment as a Social Psychological System</u>. New York: Oxford University Press.

<u>Monographs and Technical Reports</u>

1989          <u>Employment Testing and Employment Discrimination</u> (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation.

6

Articles in Professional Journals and Book Chapters

2019    "Afterword," in Robert Johnson, <u>Condemned to Die: Life Under Sentence of Death</u> (pp. 136-141). Second Edition. New York: Routledge.

"Solitary Confinement, Loneliness, and Psychological Harm," in Jules Lobel and Peter Scharff Smith (Eds.), <u>Solitary Confinement: Effects, Practices, and Pathways to Reform</u>. New York: Oxford University Press, in press.

2018    "Restricting the Use of Solitary Confinement," <u>Annual Review of Criminology</u>, <u>1</u>, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), <u>Law & Policy</u>, in press.

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. <u>Journal of General Internal Medicine</u>, 33(22). DOI: 10.1007/s11606-018-4318-9.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.), <u>The Criminalization of Mental Illness</u> (pp. 163-180). Durham, NC: Carolina Academic Press.

"The Psychological Effects of Solitary Confinement: A Systematic Critique," <u>Crime and Justice</u>, <u>47</u>, 365-416.

"The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases (with Shirin Bakhshay), <u>Psychology, Public Policy, and Law</u>, <u>24</u>, 326-346.

2017    "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). <u>Analyses of Social Issues and Public Policy</u>, <u>17</u>, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," <u>Punishment and Society</u>, <u>19</u>, 310-326.

7

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), Torture and Its Definition in International Law: An Interdisciplinary Approach (pp.139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, International Journal of Prisoner Health, 13, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), International Journal of Prisoner Health, 13, 41-48.

2016    "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), The Prison Journal, 96, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book Moral Disengagement: How People Do Harm and Live With Themselves, by A. Bandura], PsycCRITIQUES, 61(8).

2015    "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at: http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), Law & Social Inquiry, 40, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), APA Handbook of Forensic Psychology (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), APA Handbook of Forensic Psychology (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), Routledge Studies in

<u>Education and Neoliberalism: Female Students and Cultures of Violence in the City</u> (pp. 113-134). Florence, KY: Routledge.

2014    "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), <u>Health Affairs</u>, <u>33:3</u> (March), 1-6.

2013    "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books (in press).

       "Foreword," for J. Ashford & M. Kupferberg, <u>Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers</u>. New York: Oxford University Press.

2012    "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" <u>West Virginia Law Review</u>, <u>114</u>, 373-414.

       "Prison Effects in the Age of Mass Incarceration," <u>Prison Journal</u>, <u>92</u>, 1-24.

       "The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), <u>Oxford Handbook of Sentencing and Corrections</u> (pp. 584-605). New York: Oxford University Press.

2011    "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

       "Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

       "Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), <u>Law and Human Behavior</u>, <u>35</u>, 339-350.

       "Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.),

Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), Michigan State Law Review, 2011, 573-608.

2010        "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" Connecticut Public Interest Law Review, 9, 139-196.

"Hiding From the Death Penalty," Huffington Post, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in Sentencing and Justice Reform Advocate, 2, 3 (February, 2011).

2009        "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), Law and Human Behavior, 33, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," Prison Service Journal UK (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: California Prison Focus, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), Encyclopedia of Group Processes and Intergroup Relations. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," DePaul Law Review, 58, 689-740. (Reprinted: Capital Litigation Update, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," University of Missouri-Kansas City Law Review, 77, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), Personality and Social Psychology Bulletin, 35, 807-814.

2008        "Counting Casualties in the War on Prisoners," University of San Francisco Law Review, 43, 87-138.

10

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," Hofstra Law Review, 36, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," Criminal Justice and Behavior, 35, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), Dictionary of Prisons (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006    "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," Washington University Journal of Law & Policy, 22, 265-293. [Reprinted in: N. Berlatsky, Opposing Viewpoints: America's Prisons. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," Golden Gate Law Review, 37, 131-173.

"Preface," D. Jones (Ed.), Humane Prisons. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of

11

Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), <u>The Effects of Imprisonment</u> (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), <u>Harvard Journal of Hispanic Policy</u>, <u>17</u>, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), <u>Report on Asylum Seekers in Expedited Removal</u>. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," <u>DePaul Law Review</u>, <u>53</u>, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), <u>Analyses of Social Issues and Public Policy (ASAP)</u>, <u>4</u>, 1-22.

"Abu Ghraib and the American Prison System," <u>The Commonwealth</u>, <u>98 (#16)</u>, 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," <u>Crime & Delinquency</u> (special issue on mental health and the criminal justice system), <u>49</u>, 124-156. [Reprinted in:

Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), <u>Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities</u> (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," <u>Capital University Law Review</u>.

2002    "Making Law Modern: Toward a Contextual Model of Justice, <u>Psychology, Public  Policy, and Law</u>, <u>7</u>, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), <u>Taking Psychology and Law into the Twenty-First Century</u> (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The <u>Daubert</u> Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001    "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000    "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999    "Reflections on the Stanford Prison Experiment: Genesis,

Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998          "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997          "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), <u>New York University Review of Law and Social Change</u>, <u>23</u>, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," <u>Stanford Law Review</u>, <u>49</u>, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm,

and Charles Lanier, <u>America's Experiment with Capital Punishment</u>: <u>Reflections on the Past, Present, and Future of the Ultimate Penal Sanction</u>. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), <u>Law and Human Behavior</u>, <u>21</u>, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" <u>Studies in Law, Politics, and Society</u>, <u>16</u>, 3-69.

1995    "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," <u>Santa Clara Law Review</u>, <u>35</u>, 547-609. [Reprinted in part in David Papke (Ed.), <u>Law and Popular Culture</u>, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," <u>Indiana Law Journal</u>, <u>70</u>, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," <u>California Criminal Defense Practice Reporter</u>, <u>1995(1)</u>, 1-7.

1994    "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), <u>Law and Human Behavior</u>, <u>18</u>, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), <u>Law and Human Behavior</u>, <u>18</u>, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), Law and Human Behavior, 18, 619-633.

"Processing the Mad, Badly," Contemporary Psychology, 39, 898-899.

"Language is Power," Contemporary Psychology, 39, 1039-1040.

1993    "Infamous Punishment: The Psychological Effects of Isolation," National Prison Project Journal, 8, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), Correctional Contexts: Contemporary and Classical Readings (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), Correctional Perspectives: Views from Academics, Practitioners, and Prisoners (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," Law and Human Behavior, 17, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

1992    "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). Forum, 19, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. Behavioral Science and Law, 10, 179-195.

1991    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," Law and Human Behavior, 15, 183-204.

1988    "In Defense of the Jury," Contemporary Psychology, 33, 653-655.

1986    "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), Journal of Community Psychology, 14, 267-277.

1984      "Editor's Introduction.  Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

"On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

"Examining Death Qualification:  Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

"Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

"Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

"Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983      "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>.  Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.:  Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982      "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and American History: Cases and Materials</u>. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) <u>Introduction to Criminal Justice: A Sociological Perspective</u>. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), <u>The Analysis of Judicial Reform</u>.  Lexington, Mass.:  D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," Industrial Relations Law Journal, 5, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), Polygraph, 11, 185-199.

1981        "Death Qualification as a Biasing Legal Process," The Death Penalty Reporter, 1 (10), pp. 1-5. [Reprinted in Augustus: A Journal of Progressive Human Sciences, 9(3), 9-13 (1986).]

1980        "Juries and the Death Penalty:  Readdressing the Witherspoon Question," Crime and Delinquency, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," Law and Human Behavior, 6, 191-235. [Reprinted in Loh, Wallace (Ed.), Social Research and the Judicial Process. New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), The People's Law Review. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), Readings on the Social Animal. San Francisco, W.H. Freeman, pp. 125-136.

1979        "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), Challenges and Alternatives to the Criminal Justice System. Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), Social Psychology and Modern Life. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), Law and Society Review, 13, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), Criminal Law and Its Processes. Boston: Little, Brown, 1983.]

1977   "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

      "The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976   "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975   "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

      "Implementing Research Results in Criminal Justice Settings," Proceedings, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

      "The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), Theory and Research in Abnormal Psychology.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) Contemporary Issues in Social Psychology.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, Revisita de Psicologia Social, 1, 95-105 (1986).]

1973   "Social Roles, Role-Playing, and Education" (with P. Zimbardo), The Behavioral and Social Science Teacher, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) Psychology For Our Times. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E. and Hunt, R. (Eds.) Current Perspectives in Social Psychology. Third Edition. New York: Oxford University Press, 1978.]

      "The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), The New York Times Magazine,

19

April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.),
Psychology Is Social:  Readings and Conversations in Social
Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and
P. Zimbardo), International Journal of Criminology and Penology,
1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry,
Robert (Eds.) Examining Deviance Experimentally. New York:
Alfred Publishing, 1975; Golden, P. (Ed.) The Research Experience.
Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) The Sociology of
Corrections. New York:  John Wiley, 1977; A kiserleti tarsadalom-
lelektan foarma. Budapest, Hungary: Gondolat Konyvkiado, 1977;
Johnston, Norman, and Savitz, L. Justice and Corrections. New
York: John Wiley, 1978; Research Methods in Education and Social
Sciences. The Open University, 1979; Goldstein, J. (Ed.), Modern
Sociology. British Columbia:  Open Learning Institute, 1980; Ross,
Robert R. (Ed.), Prison Guard/ Correctional Officer: The Use and
Abuse of Human Resources of Prison. Toronto:  Butterworth's 1981;
Monahan, John, and Walker, Laurens (Eds.), Social Science in Law:
Cases, Materials, and Problems. Foundation Press, 1985: Siuta,
Jerzy (Ed.), The Context of Human Behavior. Jagiellonian
University Press, 2001; Ferguson, Susan (Ed.), Mapping the Social
Landscape: Readings in Sociology. St. Enumclaw, WA: Mayfield
Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), Menschenversuche
(Experiments with Humans). Frankfurt, Germany: Suhrkamp
Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P.
Zimbardo).  Naval Research Reviews, 1-17. [Reprinted in Aronson,
E. (Ed.) Readings About the Social Animal. San Francisco: W.H.
Freeman, 1980; Gross, R. (Ed.) Key Studies in Psychology. Third
Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), Basic
Themes in Law and Jurisprudence. Anderson Publishing, 2000.]


MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC
MEETINGS AND RELATED SETTINGS (SELECTED)

2016    "The Culture of Punishment," American Justice Summit, New York, January.

"Mental Illness and Prison Confinement," Conference on Race, Class, Gender and Ethnicity (CRCGE), University of North Carolina Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners: Coleman and Beyond," Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of Criminal Justice Reform," UC Santa Cruz Alumni Association "Original Thinkers" Series, San Jose, CA (March), and Museum of Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of Prisoners" (with Joanna Weill), Conference of the Society for the Study of Social Issues, Minneapolis, June.

2015    "Reforming the Criminal Justice System," Bipartisan Summit on Criminal Justice Reform, American Civil Liberties Union/Koch Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons, Impacted Prisoners, and Changed American Society," Distinguished Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture, UC Santa Cruz 50th Anniversary Alumni Reunion, April.

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S., National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014    "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

22

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013   "Isolation and Mental Health," Michigan Journal of Race and Law Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

2012        "The Psychological Consequences of Long-term Solitary
            Confinement," Joint Yale/Columbia Law School Conference on
            Incarceration and Isolation, New York, April.

            "The Creation of the Penal State in America," Managing Social
            Vulnerability: The Welfare and Penal System in Comparative
            Perspective, Central European University, Budapest, Hungary, July.

2011        "Tensions Between Psychology and the Criminal Justice System: On
            the Persistence of Injustice," opening presentation, "A Critical Eye
            on Criminal Justice" lecture series, Golden Gate University Law
            School, San Francisco, CA, January.

            "The Decline in Death Penalty Verdicts and Executions: The Death
            of Capital Punishment?" Presentation at "A Legacy of Justice" week,
            at the University of California, Davis King Hall Law School, Davis,
            CA, January.

            "Invited Keynote Address: The Nature and Consequences of Prison
            Overcrowding—Urgency and Implications," West Virginia School of
            Law, Morgantown, West Virginia, March.

            "Symposium: The Stanford Prison Experiment—Enduring Lessons
            40 Years Later," American Psychological Association Annual
            Convention, Washington, DC, August.

            "The Dangerous Overuse of Solitary Confinement: Pervasive
            Human Rights Violations in Prisons, Jails, and Other Places of
            Detention" Panel, United Nations, New York, New York, October.

            "Criminal Justice Reform: Issues and Recommendation," United
            States Congress, Washington, DC, November.

2010        "The Hardening of Prison Conditions," Opening Address, "The
            Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale
            Law School, New Haven, CN, March.

            "Desensitization to Inhumane Treatment: The Pitfalls of Prison
            Work," panel presentation at "The Imprisoned" Arthur Liman
            Colloquium Public Interest Series, Yale Law School, New Haven,
            CN, March.

            "Mental Ill Health in Immigration Detention," Department of
            Homeland Security/DOJ Office for Civil Rights and Civil Liberties,
            Washington, DC, September.

24

2009        "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008        "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007        "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006      "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005      "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004  "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003    "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

       "Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

       "Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

       "Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

       "Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

       "Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

       "Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

       "On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

       "Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001    "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000      "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

29

| 1999 | "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August. |
|------|---------------------------------------------------------------------------------------------------------------------------------------|
|      | "Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July. |
| 1998 | "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September. |
|      | "The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August. |
|      | "Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August. |
|      | "The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August. |
|      | "Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March. |
| 1997 | "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October. |
|      | "Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August. |
| 1996 | "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August. |
| 1995 | "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April. |

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994    "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992    "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991    "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August.

1990    "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA.

1989    "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August.

"Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June.

"The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June.

1987    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August.

"The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July.

1986    Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August.

"Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985    "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

"The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983    "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982    "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982    "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982    "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980    "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975    "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.

SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2016-present    Editorial Consultant, Translational Issues in Psychological Science.

2015-present    Editorial Consultant, Criminal Justice Review.

2014-present    Editorial Board Member, Law and Social Inquiry.

2013-present    Editorial Consultant, Criminal Justice and Behavior.

2012-present    Editorial Consultant, Law and Society Review.

2011-present    Editorial Consultant, Social Psychological and Personality Science.

2008-present    Editorial Consultant, New England Journal of Medicine.

2007-present    Editorial Board Member, Correctional Mental Health Reporter.

2007-present    Editorial Consultant, Journal of Offender Rehabilitation.

2004-present    Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

2000-2003    Reviewer, Society for the Study of Social Issues Grants-in-Aid Program.

| | |
|---|---|
| 2000-present | Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues) |
| 1997-present | Editorial Board Member (until 2004), Consultant, <u>Psychology, Public Policy, and Law</u> |
| 1991 | Editorial Consultant, Brooks/Cole Publishing |
| 1989 | Editorial Consultant, <u>Journal of Personality and Social Psychology</u> |
| 1988- | Editorial Consultant, <u>American Psychologist</u> |
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985 | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-1985 | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |
| 1993-present | <u>Psychology, Public Policy, and Law</u>, Editorial Consultant |

<u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard  training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCRIF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-present.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of undocumented persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety, August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and Consequences of the High Rate of Incarceration in the United States, 2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public officials at Pew Research Center, Congressional staff, and White House staff concerning policy implications of <u>The Growth of Incarceration in the United States: Exploring the Causes and Consequences</u> (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy Council on formulation of federal policy concerning use of segregation confinement, 2015.

<u>PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION</u>

Hoptowit v. Ray  [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of

37

conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown  (Marin Country Superior Court; September, 1982, Justice Burke).  Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy  [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest  (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle  [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital  (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock  (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey  (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson  (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy  [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya  (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)].

Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities.

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

# CRAIG HANEY EXPERT REPORT

# EXHIBIT 2

| NO. | DOCUMENT |
|---|---|
| **Document Productions and Documents** | |
| 1. | All documents produced by Defendants (000001-0349458) |
| 2. | Documents acquired by Plaintiffs from the Vera Institute and produced in this case |
| 3. | IDOC February, 2019 Assignment History File |
| 4. | Segregation Programming Policy - Lawrence Correctional Facility (January 25, 2017) |
| 5. | Stateville Correctional Center's Warden's Bulletin #2016-49 (March 18, 2016) |
| 6. | Adjustments to DR 504 Disciplinary Procedures (undated) |
| **Articles and Textbooks** | |
| 7. | Agha, S., James Austin, & Angela Browne, Quantitative findings on use and outcomes of segregation in IL DOC. New York: Vera Institute of Justice, September 11, 2011 |
| 8. | Arrigo, B. & J. Bullock, The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change, International Journal of Offender Therapy and Comparative Criminology, 52, 622-640 (2008) |
| 9. | Barte, H., L'Isolement Carceral, Perspectives Psychiatriques, 28, 252 (1989) |
| 10. | Bastian, B., & Haslam, N. (2010). Excluded from Humanity: The Dehumanizing Effects of Social Ostracism. Journal of Experimental Social Psychology, 46, 107-113 |
| 11. | Bauer, M., Stefan Priebe, Bettina Haring & Kerstin Adamczak, Long-Term Mental Sequelae of Political Imprisonment in East Germany, Journal of Nervous & Mental Disease, 181, 257-262 (1993) |
| 12. | Baumeister, R., & Leary, M. (1995). The need to belong: Desire for interpersonal attachments as a fundamental human motivation. Psychological Bulletin, 117, 497-529 |
| 13. | Beller, J., & Wagner, A. (2018). Loneliness, social isolation, their synergistic interaction, and mortality. Health Psychology, 37(9), 808-813 |
| 14. | Bidna, H., Effects of Increased Security on Prison Violence, Journal of Criminal Justice, 3, 33-46 (1975) |
| 15. | Briggs C., Sundt, J., Castellano, T., The effect of supermax security prisons on aggregate levels of institutional violence. Criminology, 41, 1341-1376 2003 |
| 16. | Brodsky, S. & Forrest Scogin, Inmates in Protective Custody: First Data on Emotional Effects, *Forensic Reports*, *1(4)*: 267-289 (1988) |

| NO. | DOCUMENT |
|-----|----------|
| 17. | Butter, S., Murphy, J., Shelvin, M., & Houston, J. (2017). Social isolation and psychosis-like experiences: A UK general population analysis. <u>Psychosis: Psychological, Social and Integrative Approaches</u>, <u>9(4)</u>, 291-300 |
| 18. | Cascio, C., Somatosensory Processes in Neurodevelopmental Disorders, <u>Journal of Neurodevelopmental Disorders</u>, <u>2</u>, 62-69 (2010) |
| 19. | Cloyes, K., David Lovell, David Allen & Lorna Rhodes, Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample, <u>Criminal Justice and Behavior</u>, <u>33</u>, 760-781 (2006) |
| 20. | Cohen, F., Illinois and *Rasho v. Walker*: A Permanent Injunction Issues, <u>Correctional Mental Health Report</u>, July/August, 19-20, 24-27 (2019) |
| 21. | Colvin, M., <u>The penitentiary in crisis: From accommodation to riot in New Mexico.</u>  Albany, NY: State University of New York Press (1992) |
| 22. | Cooke, M. & Jeffrey Goldstein, Social Isolation and Violent Behavior, <u>Forensic Reports</u>, <u>2</u>, 287-294 (1989) |
| 23. | Cormier, B. & Paul Williams, Excessive Deprivation of Liberty, <u>Canadian Psychiatric Association Journal</u>, <u>11</u>, 470-484 (1966) |
| 24. | Coyle, & Dugan, (2012); and Elovainio, M., Hakulinen, C., Pulkki-Raback, L., et al. (2017). Contribution of risk factors to excess mortality in isolated and lonely individuals: An analysis of data from the U.K. Biobank cohort study. <u>The Lancet Public Health</u>, 2, e260-e266 |
| 25. | Dean, K., Wentworth, G., & LeCompte, N. (2016). Social exclusion and perceived vulnerability to physical harm. <u>Self and Identity</u>, <u>18(1)</u>, 87-102 |
| 26. | DeNiro, D. (1995). Perceived alienation in individuals with residual-type schizophrenia. <u>Issues in Mental Health Nursing</u>, <u>16(3)</u>, 185-200 |
| 27. | DeWall, C., et al. (2011). Belongingness as a Core Personality Trait: How Social Exclusion Influences Social Functioning and Personality Expression, <u>Journal of Personality</u>, <u>79</u>, 979-1012 |
| 28. | DeWall, C., Looking Back and Forward: Lessons Learned and Moving Forward, in C. DeWall (Ed.), <u>The Oxford Handbook of Social Exclusion</u> (pp. 301-03). New York: Oxford University Press (2013) |
| 29. | Dobson, S., Upadhyaya, S., Conyers, I., & Raghavan, R., Touch in the Care of People with Profound and Complex Needs, <u>Journal of Learning Disabilities</u>, <u>6</u>, 351-362 (2002) |
| 30. | Edwards, K., Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital, <u>Behavioral Sciences and the Law, 6</u>, 131-137 (1988) |

| NO. | DOCUMENT |
|---|---|
| 31. | Field, S., Touch Deprivation and Aggression Against Self Among Adolescents, in Stoff, D. & Susman, E. (Ed.), <u>Developmental psychobiology of aggression</u> (117-140). New York: Cambridge (2005) |
| 32. | Field, T., Deprivation and Aggression Against Self Among Adolescents. In D. Stoff & E. Susman (Eds.), <u>Developmental Psychobiology of Aggression</u> (pp. 117-40). New York: Cambridge (2005) |
| 33. | Field, T., Violence and Touch Deprivation in Adolescents, <u>Adolescence</u>, <u>37</u>, 735-749 (2002) |
| 34. | Fiorillo, D., & Fabio Sabatini, F. (2011). Quality and Quantity: The Role of Social Interactions in Self-Reported Individual Health. <u>Social Science & Medicine</u>, <u>73</u>, 1644-1652 |
| 35. | Fischer, A. Manstead, & R. Zaalberg, Social Influences on the Emotion Process, in M. Hewstone & W. Stroebe (Eds.), <u>European Review of Social Psychology</u> (pp. 171-202). Volume 14. Wiley Press (2004) |
| 36. | Foster, D., <u>Detention & Torture in South Africa: Psychological, Legal & Historical Studies,</u> Cape Town: David Philip (1987) |
| 37. | Fratiglioni, L., Wang, H., Ericsson, K., Maytan, M., & Winblad, B. (2000). Influence of social network on occurrence of dementia: A community-based longitudinal study. <u>Lancet</u>, <u>355</u>, 1315-1319 |
| 38. | Frietas, B., Antoniazzi, V., dos Santos, C., et al. (2019). Social isolation and social support at adulthood affect epigenetic mechanisms, brain-derived neurotrophic factor levels and behavior of chronically stressed rats. *Behavioural Brain Research, 366*, 36-44 |
| 39. | Garety, P., Kuipers, E., Fowler, D., Freeman, D., & Bebbington, P. (2001). A cognitive model of the positive symptoms of psychosis. <u>Psychological Medicine</u>, <u>31(2)</u>, 189-195 |
| 40. | Ge, L., Chun, W., Ong, R., & Heng, B. (2017). Social isolation, loneliness and their relationship with depressive symptoms: A population-based study. <u>PLoS ONE</u>, <u>12(8)</u>, e0182145 https://doi.org/10.1371/journal.pone.0182145 |
| 41. | Gendreau, P., N. Freedman, G. Wilde, & George Scott, Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement, <u>Journal of Abnormal Psychology</u>, <u>79</u>, 54-59 (1972) |
| 42. | Goetz, J., Keltner, D., & Simon-Thomas, E., Compassion: An Evolutionary Analysis and Empirical Review, <u>Psychological Bulletin</u>, <u>136</u>, 351-374 (2010) |
| 43. | Goldsmith, S., Pellmar, T., Kleinman, A., & Bunney, W. (2002). <u>Reducing suicide: A national imperative.</u> Washington, DC: National Academy Press |
| 44. | Gong, Y., Tong, L., Yang, R., et al. (2018). Dynamic changes in hippocampal microglia contribute to depressive behavior induced by early social isolation. <u>Neuropharmacology</u>, <u>135</u>, 223-233 |

| NO. | DOCUMENT |
|---|---|
| 45. | Grassian, S., Psychiatric Effects of Solitary Confinement, <u>Washington University Journal of Law & Policy</u>, <u>22</u>, 325-383 (2006) |
| 46. | Hafner, S., et al., Association Between Social Isolation and Inflammatory Markers in Depressed and Non-depressed Individuals: Results from the MONICA/KORA Study, <u>Brain, Behavior, and Immunity</u>, <u>25</u>, 1701-1707 (2011) |
| 47. | Haney, C. & Mona Lynch, Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement, <u>New York Review of Law & Social Change</u>, <u>23</u>, 477-570 (1997) |
| 48. | Haney, C. & Philip Zimbardo, Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse, <u>Personality and Social Psychology Bulletin</u>, <u>35</u>, 807-814 (2009) |
| 49. | Haney, C. & Philip Zimbardo, The Socialization into Criminality:  On Becoming a Prisoner and a Guard, in <u>Law, Justice, and the Individual in Society:  Psychological and Legal Issues</u>. (J. Tapp and F. Levine, eds., 1977) |
| 50. | Haney, C., Curtis Banks & Philip Zimbardo, Interpersonal Dynamics in a Simulated Prison, 1 <u>International Journal of Criminology and Penology</u> 69 (1973) |
| 51. | Haney, C., Demonizing the "Enemy": The Role of Science in Declaring the "War on Prisoners," <u>Connecticut Public Interest Law Review</u>, <u>9</u>, 139-196 (2010) |
| 52. | Haney, C., Infamous Punishment: The Psychological Effects of Isolation, 8 <u>National Prison Project Journal</u> 3 (1993); Craig Haney, Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law, <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 499-588 (1997) |
| 53. | Haney, C., Mental Health Issues in Long-Term Solitary and "Supermax" Confinement. <u>Crime & Delinquency</u>, <u>49</u>, 124-156 (2003) |
| 54. | Haney, C., On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence, <u>University of Missouri-Kansas City Law Review</u>, <u>77</u>, 911-946 (2009) |
| 55. | Haney, C., Prison Effects in the Age of Mass Imprisonment, <u>The Prison Journal</u>, <u>92</u>, 1-24 (2012) |
| 56. | Haney, C., Restricting the Use of Solitary Confinement, <u>Annual Review of Criminology</u>, <u>1</u>, 285-310 (2018) |
| 57. | Haney, C., The Consequences of Prison Life: Notes on the New Psychology of Prison Effects, in D. Canter & R. Zukauskiene (Eds.), <u>Psychology and Law: Bridging the Gap</u> (pp. 143-165). Burlington, VT: Ashgate Publishing (2008) |
| 58. | Haney, C., The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement, <u>American Criminal Law Review</u>, <u>48</u>, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Ethnicity, Gender and Class</u>. Sage Publications (2012)] |

| <u>NO.</u> | <u>DOCUMENT</u> |
|---|---|
| 59. | Haney, C., The Psychological Effects of Solitary Confinement: A Systematic Critique, <u>Crime and Justice</u>, <u>47</u>, 365-416 (2018) |
| 60. | Hawkley, L., & Cacioppo, J. (2010). Loneliness matters: A theoretical and empirical review of consequences and mechanisms. <u>Annals of Behavioral Medicine</u>, <u>40</u>, 218-227 |
| 61. | Hayes, L., National Study of Jail Suicides: Seven Years Later. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, <u>Psychiatric Quarterly</u>, <u>60</u>, 7 (1989) |
| 62. | Heinrich, L., & Gullone, E. (2006). The clinical significance of loneliness: A literature review. <u>Clinical Psychology Review</u>, <u>26</u>, 695-718 |
| 63. | Hertenstein, M., & Weiss, S. (Eds.), <u>The Handbook of Touch: Neuroscience, Behavioral, and Health Perspectives</u>. New York: Springer (2011) |
| 64. | Hertenstein, M., Keltner, D., App, B., Bulleit, B, & Jaskolka, A., Touch Communicates Distinct Emotions. <u>Emotion</u>, <u>6</u>, 528-533 (2006) |
| 65. | Holt-Lunstad, J., Smith, T. B., & Layton, B. (2010). Social relationships and mortality risk: A meta-analytic review. <u>PLoS Medicine</u>, <u>7</u>, 1–20 |
| 66. | Holt-Lunstad, J., Smith, T. B., Baker, M., Harris, T., & Stephenson, D. (2015). Loneliness and social isolation as risk factors for mortality: A meta-analytic review. <u>Perspectives on Psychological Science</u>, <u>10</u>, 227–237 |
| 67. | Environmental Enrichment for Nonhuman Primates at <u>http://www.iacuc.emory.edu/documents/policies/360_Environmental_\ Enrichment_for_Nonhuman_Primates.pdf</u> |
| 68. | Johnson, E., Felon Self-Mutilation: Correlate of Stress in Prison, in Bruce L. Danto (Ed.) <u>Jail House Blues</u>. Michigan: Epic Publications (1973) |
| 69. | Jones, A., Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators, <u>Criminal Justice and Behavior</u>, <u>13</u>, 286-296 (1986) |
| 70. | Karremans, J., et al. (2011). Secure Attachment Partners Attenuate Neural Responses to Social Exclusion: An fMRI Investigation. <u>International Journal of Psychophysiology</u>, <u>81</u>, 44-50 (2011) |
| 71. | Kelman, H., Violence Without Restraint: Reflections on the Dehumanization of Victims and Victimizers. In G. Kren & L. Rappaport (Eds.), <u>Varieties of Psychohistory</u> (pp. 282-314). New York: Springer (1976) |
| 72. | Koch, I., Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in <u>The Expansion of European Prison Systems, Working Papers in European Criminology</u>, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) |

| NO. | DOCUMENT |
|---|---|
| 73. | Kratcoski, P., The Implications of Research Explaining Prison Violence and Disruption, Federal Probation, 52, 27-32 (1988) |
| 74. | Leigh-Hunt, N., Bagguley, D., Bash, K., et al. (2017). An overview of systematic reviews on the public health consequences of social isolation and loneliness. Public Health, 152, 157-171 |
| 75. | Lieberman, M., Social: Why Our Brains Are Wired to Connect. New York: Random House (2013) |
| 76. | Liebling, A., Prison Suicide and Prisoner Coping, Crime and Justice, 26, 283-359 (1999) |
| 77. | Liebling, A., Vulnerability and Prison Suicide, British Journal of Criminology, 36, 173-187 (1995) |
| 78. | Lippman, M., The Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 27 Boston College International & Comparative Law Review, 27, 275 (1994) |
| 79. | Marcus, A., Illescas, A., Hohl, B., & Llanos, A. (2017). Relationships between social isolation, neighborhood poverty, and cancer mortality in a population-based study of US adults. PLoS ONE, 12(3), e0173370. doi: 10.1371/journal.pone.0173370 |
| 80. | Mgutshini, T. (2010). Risk factors for psychiatric re-hospitalization: An exploration. International Journal of Mental Health Nursing, 19(4), 257-267 |
| 81. | Moore, E., A Prison Environment: Its Effect on Health Care Utilization, Dissertation Abstracts, Ann Arbor, Michigan (1980) |
| 82. | Morris, R., Exploring the effect of exposure to short-term solitary confinement among violent prison inmates. Journal of Quantitative Criminology, 32, 1-22 (2016) |
| 83. | National Seniors Council. (2014). Report on the social isolation of seniors 2013-2014. Retrieved from http://www.seniorscouncil.gc.ca/eng/research_publications/social_isolation/page00.html |
| 84. | National Seniors Council. (2017). Who's at risk and what can be done about it? A review of the literature on the social isolation of different groups of seniors. Retrieved from https://www.canada.ca/en/national-seniors-council/programs/publications-reports/2017/review-social-isola tion-seniors.html |
| 85. | Pantell, M., Rehkopf, D., Jutte, D., et al. (2013). Social isolation: A predictor of mortality comparable to traditional clinical risk factors. American Journal of Public Health, 30, 241-256 |
| 86. | Patterson, R., & Kerry Hughes, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004, Psychiatric Services, 59, 676-682 (2008) |
| 87. | Porporino, F., Managing Violent Individuals in Correctional Settings, Journal of Interpersonal Violence, 1, 213-237 (1986) |

| NO. | DOCUMENT |
|---|---|
| 88. | Pressman, S., Cohen, S., Miller, G., et al., (2005). Loneliness, social network size, and immune response to influenza vaccination in college freshmen. Health Psychology, 24, 297-306 |
| 89. | Reiter, K., Parole, snitch, or die: California's supermax prisons and prisoners, 1997-2007. Punishment & Society, 14, 530-563 (2012) |
| 90. | Reiter-Scheidl, K., Poapousek, I., Lackner, H., et al. (2018). Aggressive behavior after social exclusion is linked with the spontaneous initiation of more action-oriented coping immediately following the exclusion episode. Physiology & Behavior, 195, 142-150 |
| 91. | Richardson, C., Oar, E., Fardouly, J. et al. (2019). The moderating role of sleep in the relationship between social isolation and internalising problems in early adolescence. Child Psychiatry & Human Development, 1-10 https://doi.org/10.1007/s10578-019-00901-9 |
| 92. | Saarni, C., The Development of Emotional Competence. New York: Guilford Press (1999) |
| 93. | Sarnoff, I. & Philip Zimbardo, Anxiety, Fear, and Social Affiliation, Journal of Abnormal Social Psychology, 62, 356-363 (1961) |
| 94. | Schachter, S. & Jerome Singer, Cognitive, Social, and Physiological Determinants of Emotional State, Psychological Review, 69, 379-399 (1962) |
| 95. | Schachter, S., The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness. Stanford, CA: Stanford University Press (1959) |
| 96. | Scott, G. & Paul Gendreau, Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison, Canadian Psychiatric Association Journal, 12, 337-341 (1969) |
| 97. | Shalev, S., Supermax: Controlling risk through solitary confinement. Cullompton, UK: Willan Publishing (2009) |
| 98. | Shallice, T., Solitary Confinement—A Torture Revived? New Scientist, November 28, 1974 |
| 99. | Shankar, A., Hamer, M., McMunn, A., & Steptoe, A. (2013). Social isolation and loneliness: Relationships with cognitive function during 4 years of follow-up in the English Longitudinal Study of Ageing. Psychosomatic Medicine, 75, 161-170 |
| 100. | Smith, P., The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006) |
| 101. | Somnier, F.E. & I.K. Genefke, Psychotherapy for Victims of Torture, British Journal of Psychiatry, 149, 323-329 (1986) |
| 102. | Steinke, P., Using Situational Factors to Predict Types of Prison Violence, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991) |

| NO. | DOCUMENT |
|---|---|
| 103. | Stellar, J., & Keltner, D., Compassion, in Tugade, M., Shiota, M., & Kirby, L. (Eds.), <u>Handbook of Positive Emotions</u> (pp. 329-41). New York: Guilford (2014) |
| 104. | Stevenson, J., McMahon, E., Boner, W., & Haussmann, M. (2019). Oxytocin administration prevents cellular aging caused by social isolation. <u>Psychoneuroendocrinology</u>, <u>103</u>, <u>52-60</u> |
| 105. | Stewart, P., <u>Second Annual report of Monitor Pablo Stewart, M.D.</u>, *Rasho v. Baldwin*, No. 1-07-CV-1298-MMM-JEH, June 8, 2018. |
| 106. | Stiglitz, J., Sen, A., Fitoussi, J., et al. (2008). <u>Report by the Commission on the Measurement of Economic Performance and Social Progress</u>. Paris, France: The Commission <u>http://ec.europa.eu/eurostat/documents/118025/118123/Fitoussi+Commission+report</u> |
| 107. | Sullivan, H., The Illusion of Personal Individuality, <u>Psychiatry</u>, <u>12</u>, 317-332 (1971) |
| 108. | Sundt, J., Castellano, T., & Briggs, C., The sociopolitical context of prison violence and its effect in Illinois. <u>Prison Journal</u>, <u>88</u>, 94-122 (2008) |
| 109. | Syrjamaki, A., & Hietanen, J., (2018). The effects of social exclusion on processing of social information—A cognitive psychology perspective. <u>British Journal of Social Psychology</u>, DOI:10.1111/bjso.12299 |
| 110. | Tanskanen, J., & Anttila, T. (2016). A prospective study of social isolation, loneliness, and mortality in Finland. <u>American</u> <u>Journal of Public Health</u>, <u>106(11)</u>, 2042-2048 |
| 111. | Thornicroft, G. (1991). Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, <u>British Journal of Psychiatry</u>, <u>158</u>, 475-484 |
| 112. | Tiedens, L. & C. Leach (Eds.), <u>The Social Life of Emotions</u>. New York: Cambridge University Press (2004); and S. Truax, Determinants of Emotion Attributions: A Unifying View, <u>Motivation and Emotion</u>, <u>8</u>, 33-54 (1984) |
| 113. | Toch, H., <u>Men in Crisis: Human Breakdowns in Prisons</u>. Aldine Publishing Co.: Chicago (1975) |
| 114. | Twenge, J., Catanese, K., & Baumeister, R. (2003). Social Exclusion and the Deconstructed State: Time Perception, Meaninglessness, Lethargy, Lack of Emotion, and Self Awareness. <u>Journal of Personality and Social Psychology</u>, <u>85</u>, 409-423 (2003) |
| 115. | van Beljouw, I. M., van Exel, E., de Jong Gierveld, J., Comijs, H. C., Heerings, M., Stek, M.L., et al. (2014). "Being all alone makes me sad": Loneliness in older adults with depressive symptoms. <u>International Psychogeriatrics</u>, 9, <u>https://doi.org/10.1017/S1041610214000581 1-11.1</u> |

| <u>NO.</u> | <u>**DOCUMENT**</u> |
|---|---|
| 116. | Volkart, R., Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft (A controlled investigation on psychopathological effects of solitary confinement), <u>Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen</u>, <u>42</u>, 25-46 (1983) |
| 117. | Volkart, R., Einzelhaft: Eine Literaturubersicht (Solitary confinement: A literature survey), <u>Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen</u>, <u>42</u>, 1-24 (1983) |
| 118. | Volkart, R., et al., Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung (Solitary confinement as a risk for psychiatric hospitalization), <u>Psychiatria Clinica</u>, <u>16</u>, 365-377 (1983) |
| 119. | Waligora, B., Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej (How men function in conditions of penitentiary isolation), <u>Seria Psychologia I Pedagogika</u> NR 34, Poland (1974) |
| 120. | Walters, R., John E. Callagan & Albert F. Newman, Effect of Solitary Confinement on Prisoners, <u>American Journal of Psychiatry</u>, <u>119</u>, 771-773 (1963) |
| 121. | Wang, J., Lloyd-Evans, B., Giacco, D. et al. (2017). Social isolation and mental health: A conceptual and methodological review. *Social* <u>Psychiatry and Psychiatric Epidemiology</u>, <u>52</u>, 1451-1461 |
| 122. | Weiss, R., The Attachment Bond in Childhood and Adulthood, in C. Parkes, J. Stevenson-Hinde, & P. Marris (Eds.), <u>Attachment Across the Life Cycle</u> (66-76). London: Routledge (1995) |
| 123. | White, R., Bebbington, P., Person, J., Johnson, S., & Ellis, D. (2000). The social context of insight in schizophrenia. <u>Social Psychiatry and Psychiatric Epidemiology</u>, <u>35(11)</u>, 500-507 |
| 124. | Whittaker, S., Counseling Torture Victims, <u>The Counseling Psychologist</u>, 16, 272-278 (1988) |
| 125. | Wooldredge, J., Inmate Experiences and Psychological Well-Being, <u>Criminal Justice and Behavior</u>, <u>26</u>, 235-250 (1999) |
| 126. | Wu, W., Yamaura, T., Murakami, K., et al. (2000). Social isolation stress enhances liver metastasis of murine colon 26-L5 carcinoma cells by suppressing immune response in mice. <u>Life Sciences</u>, <u>66</u>, 1827-1838 |
| 127. | Zimbardo. P. & Robert Formica, Emotional Comparison and Self-Esteem as Determinants of Affiliation, <u>Journal of Personality</u>, <u>31</u>, 141-162 (1963) |
| 128. | Zorzo, C., Mendez-Lopez, M., Mendez, M., & Arias, J. (2018). Adult social isolation leads to anxiety and spatial memory impairment: Brain activity pattern of $COx$ and c-Fos. <u>Behavioural Brain Research</u>, <u>365</u>, 170-177 |
| **Case Law** | |
| 129. | *Brown v. Plata*, 563 U.S. 493 (2011) |

9

| <u>NO.</u> | <u>**DOCUMENT**</u> |
|---|---|
| 130. | *Ind. Protection and Advocacy Comm'n v. Comm'r, Ind. Dep't of Corr.*, No. 1:08-CV-01317-TWP, 2012 WL 6738517 (S.D. Ind. 2012) |
| 131. | *Jones'El v. Berge*, 164 F. Supp.2d 1096 (W.D. Wisc. 2001) |
| 132. | *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D. Cal. 1995) |
| 133. | *Rasho v. Walker*, 2018 WL 2392847 (C.D. Ill. 2018) |
| 134. | *Ruiz v. Johnson*, 37 F.Supp.2d 855 (S.D. Tex. 1999) |
| | **Codes** |
| 135. | 20 Ill. Admin. Code §§ 504.130, 504.620(i) |
| 136. | 20 Ill. Admin. Code Sec. 504, Table A, online at:<br>http://www.ilga.gov/commission/jcar/admincode/020/02000504ZZ9998aR.html |
| 137. | 20 Ill. Admin. Code Sec. 504.130(a)(3), available on line here:<br>http://www.ilga.gov/commission/jcar/admincode/020/020005040A01300R.html |
| 138. | 20 Ill. Admin. Code Sec. 504.670(a) |
| 139. | 20 Ill. Admin. Code Sec. 504.690 |
| | **Declarations** |
| 140. | Declaration of Matthew R. DalSanto |
| | **Depositions** |
| 141. | Deposition of Mike Atchison with exhibits (October 22, 2018) |
| 142. | Deposition of James Austin, Ph.D. with exhibits (October 2, 2017) |
| 143. | Deposition of John Baldwin with exhibits (October 17, 2018) |
| 144. | Deposition of Kimberly Butler with exhibits (October 15, 2018) |
| 145. | Deposition of Douglas Coleman with exhibits (June 27, 2018) |
| 146. | Deposition of Percell Dansberry with exhibits (June 27, 2018) |
| 147. | Deposition of Henry Davis with exhibits (June 26, 2018) |
| 148. | Deposition of Aaron Fillmore with exhibits (June 26, 2018) |

| <u>NO.</u> | <u>**DOCUMENT**</u> |
|---|---|
| 149. | Deposition of Sandra Funk with exhibits (October 12, 2018) |
| 150. | Deposition of DeShawn Gardner with exhibits (June 26, 2018) |
| 151. | Deposition of Randy Pfister with exhibits (October 23, 2018) |
| 152. | Deposition of Kilsey Shearrill with exhibits (January 26, 2018) |
| 153. | Deposition of Sara Sullivan with exhibits (September 15, 2017) |
| 154. | Deposition of Gladyse Taylor with exhibits (October 18, 2018) |
| **Discovery Responses** | |
| 155. | Aaron Fillmore's Responses to Defendant's First Set of Interrogatories (December 12, 2016) |
| 156. | DeShawn Gardner's Responses to Defendant's First Set of Interrogatories (December 12, 2016) |
| 157. | Douglas Coleman's Responses to Defendant's First Set of Interrogatories (December 12, 2016) |
| 158. | Henry Davis's Responses to Defendant's First Set of Interrogatories (December 12, 2016) |
| 159. | Jerome Jones's Responses to Defendant's First Set of Interrogatories (December 12, 2016) |
| 160. | Percell Dansberry's  Responses to Defendant's First Set of Interrogatories (December 12, 2016) |
| 161. | Plaintiffs' Objections to Defendant Interrogatories (December 12, 2016) |
| 162. | Defendant's Objections to Plaintiffs' First Set of Interrogatories (January 13, 2017) |
| 163. | Defendant's Answers to Plaintiffs' First Interrogatories (February 17, 2017) |
| 164. | Defendant's First Supplemental Answers to First Set of Interrogatories (March 7, 2017) |
| 165. | Defendant's Second Supplemental Answers to Plaintiffs' First Set of Interrogatories (April 11, 2017) |
| 166. | Supplemental Interrogatory Responses of Aaron Fillmore (June 20, 2017) |
| 167. | Supplemental Interrogatory Responses of Jerome Jones (June 20, 2017) |

| <u>NO.</u> | <u>DOCUMENT</u> |
|------|-----------------|
| 168. | Defendant's Third Supplemental Responses to Plaintiffs' First Set of Interrogatories (January 24, 2018) |
| 169. | Defendant's Supplemental Responses to Plaintiffs' First Set of Interrogatories (January 30, 2018) |
| 170. | 2018.02.26 Defendants' Answers to Plaintiffs' First Set of Requests for Admission (February 26, 2018) |
| **Master Files of Listed Prisoners** | |
| 171. | P.A. |
| 172. | A.A. |
| 173. | F.A. |
| 174. | G.A. |
| 175. | J.B. |
| 176. | M.B. |
| 177. | D.B. |
| 178. | B.B. |
| 179. | A.B. |
| 180. | T.B. |
| 181. | H.B. |
| 182. | D.B. |
| 183. | E.B. |
| 184. | H.B. |
| 185. | C.B. |
| 186. | W.B. |
| 187. | T.B. |
| 188. | D.B. |
| 189. | G.C. |
| 190. | J.C. |
| 191. | D.C. |
| 192. | M.C. |
| 193. | M.C. |
| 194. | A.C. |
| 195. | V.C. |
| 196. | C.C. |
| 197. | T.C. |
| 198. | D.C. |
| 199. | D.D. |
| 200. | B.D. |
| 201. | HENRY DAVIS |
| 202. | D.D. |
| 203. | C.D. |

| NO. | DOCUMENT |
|---|---|
| 204. | T.D. |
| 205. | A.D. |
| 206. | L.D. |
| 207. | D.D. |
| 208. | M.E. |
| 209. | A.F. |
| 210. | AARON P. FILLMORE |
| 211. | G.F. |
| 212. | A.F. |
| 213. | M.F. |
| 214. | C.F. |
| 215. | A.F. |
| 216. | DESHAWN GARDNER |
| 217. | T.G. |
| 218. | D.G. |
| 219. | C.G. |
| 220. | D.G. |
| 221. | S.G. |
| 222. | T.H. |
| 223. | D.H. |
| 224. | M.H. |
| 225. | A.H. |
| 226. | T.H. |
| 227. | C.H. |
| 228. | D.H. |
| 229. | M.H. |
| 230. | A.H. |
| 231. | C.H. |
| 232. | J.H. |
| 233. | R.I. |
| 234. | J.J. |
| 235. | L.J. |
| 236. | K.J. |
| 237. | R.J. |
| 238. | D.J. |
| 239. | R.J. |
| 240. | J.J. |
| 241. | C.K. |
| 242. | C.K. |
| 243. | S.K. |
| 244. | C.K. |
| 245. | M.L. |

| <u>NO.</u> | **DOCUMENT** |
|------------|--------------|
| 246. | L.L. |
| 247. | J.L. |
| 248. | K.L. |
| 249. | M.M. |
| 250. | C.M. |
| 251. | M.M. |
| 252. | M.M. |
| 253. | L.M. |
| 254. | M.M. |
| 255. | M.M. |
| 256. | J.M. |
| 257. | Q.N. |
| 258. | C.N. |
| 259. | E.P. |
| 260. | C.P. |
| 261. | N.P. |
| 262. | L.P. |
| 263. | A.P. |
| 264. | H.P. |
| 265. | K.P. |
| 266. | J.R. |
| 267. | A.R. |
| 268. | C.R. |
| 269. | F.R. |
| 270. | P.R. |
| 271. | W.S. |
| 272. | P.S, |
| 273. | G.S. |
| 274. | C.S. |
| 275. | M.S. |
| 276. | J.S. |
| 277. | H.S. |
| 278. | T.S. |
| 279. | E.S. |
| 280. | M.S. |
| 281. | M.D.S. |
| 282. | D.S. |
| 283. | L.S. |
| 284. | Q.S. |
| 285. | L.S. |
| 286. | E.S. |
| 287. | A.S. |

| <u>NO.</u> | <u>DOCUMENT</u> |
|------|----------|
| 288. | S.T. |
| 289. | R.T. |
| 290. | A.T. |
| 291. | D.T. |
| 292. | J.T. |
| 293. | R.T. |
| 294. | C.T. |
| 295. | P.T. |
| 296. | M.T. |
| 297. | J.T. |
| 298. | P.U. |
| 299. | J.W. |
| 300. | D.W. |
| 301. | K.W. |
| 302. | A.W. |
| 303. | J.W. |
| 304. | M.W. |
| 305. | T.W. |
| 306. | C.W. |
| 307. | Z.W. |
| 308. | J.W. |
| 309. | H.W. |
| 310. | H.W. |
| 311. | B.Y. |
| 312. | E.Z. |

# CRAIG HANEY EXPERT REPORT

# EXHIBIT 3

# Stateville Correctional Center Pictures

Stateville Correctional Center - Picture of open barred cell in Stateville's X House



134920

Stateville Correctional Center - Picture of open barred cell in Stateville's X House



134931

Stateville Correctional Center - Picture of open barred cell in Stateville's X House



134947

Stateville Correctional Center - Picture of open barred cell in Stateville's X House



134965

Stateville Correctional Center - Picture of cell door covered completely with Plexiglass



134919

Stateville Correctional Center - Picture of X House showers



134930

Stateville Correctional Center - Picture of X House showers



134952

Stateville Correctional Center - Picture of X House showers



134955

Stateville Correctional Center - Picture of barred treatment space



Attorney's Eyes Only   Davis v. Baldwin USDC-SD IL 16-600 Stateville   134972

134972

Stateville Correctional Center - Picture of barred treatment space



134973

Stateville Correctional Center - Picture of group room in X House



134936

Stateville Correctional Center - Picture of group room in X House



134939

Stateville Correctional Center - Line movement



134693

Stateville Correctional Center - Picture of restrictive housing yard



134898

Stateville Correctional Center - Picture of Health Care Unit crisis watch cells



134890

Stateville Correctional Center - Picture of Health Care Unit crisis watch cells



134993

Stateville Correctional Center - Restricted housing visiting room



135002

Stateville Correctional Center - Restricted housing visiting room



135004

Stateville Correctional Center - Restricted housing visiting room



135007

# Pontiac Correctional Center Pictures

Pontiac Correctional Center - Exterior view of West House cells



134761

Pontiac Correctional Center - Exterior view of West House cells



134762

Pontiac Correctional Center - Exterior view of West House cells



134771

Pontiac Correctional Center - West House One Gallery cell



134689

Pontiac Correctional Center - West House One Gallery cell



134692

Pontiac Correctional Center - West House One Gallery cell



134693

Pontiac Correctional Center - West House One Gallery cell



134768

Pontiac Correctional Center - Upper tier view of West House gallery



134773

Pontiac Correctional Center - West House therapy rooms



134695

Pontiac Correctional Center - West House therapy rooms



134996

Pontiac Correctional Center - Telepsych rooms in West House



134743

Pontiac Correctional Center - Telepsych rooms in West House



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600 Pontiac     134745

134745

Pontiac Correctional Center - Telepsych rooms in West House



134747

Pontiac Correctional Center - West House Group Therapy rooms



134732

Pontiac Correctional Center - West House Group Therapy rooms



134740

Pontiac Correctional Center - West House Group Therapy rooms



134739

Pontiac Correctional Center - Exterior of North House galleries



134778

Pontiac Correctional Center - North House cell door



134792

Pontiac Correctional Center - North House cell door



134797

Pontiac Correctional Center - North House treatment rooms



134819

Pontiac Correctional Center - North House treatment rooms



134823

Pontiac Correctional Center - North House showers



134810

Pontiac Correctional Center - North House showers



134811

Pontiac Correctional Center - North House cell interiors



134797

Pontiac Correctional Center - North House cell interiors



134833

Pontiac Correctional Center - North House group therapy cages



Attorney's Eyes Only          Davis v. Baldwin USDC-SD IL 16-600 Pontiac     134820

134820

Pontiac Correctional Center - North House exercise cages



134836

Pontiac Correctional Center - North House exercise cages



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600 Pontiac    134838

134838

Pontiac Correctional Center - South Mental, first floor



134853

Pontiac Correctional Center - South Mental, first floor



134854

Pontiac Correctional Center - South Mental, first floor cell interiors



134860

Pontiac Correctional Center - South Mental, first floor cell interiors



134864

Pontiac Correctional Center - South Mental second floor gallery



134868

Pontiac Correctional Center - "Group therapy" configurations that are used for restrictive housing prisoners in South House



134875

Pontiac Correctional Center - "Group therapy" configurations that are used for restrictive housing prisoners in South House



134876

Pontiac Correctional Center - "Group therapy" configurations that are used for restrictive housing prisoners in South House



134886

Pontiac Correctional Center - "Group therapy" configurations that are used for restrictive housing prisoners in South House



134887

# Dixon Correctional Center Pictures

Dixon Correctional Center - Hallways to cells in mainline restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349463

0349463

Dixon Correctional Center -Hallways to cells in mainline restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349465

0349465

Dixon Correctional Center - Hallways to cells in mainline restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349486

0349486

Dixon Correctional Center - Mainline restrictive housing yard



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349422

0349422

Dixon Correctional Center - Mainline restrictive housing yard



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349484

0349484

Dixon Correctional Center - Cell in mainline restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349447

0349447

Dixon Correctional Center - Cell in mainline restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349453

0349453

Dixon Correctional Center - Cell in mainline restrictive housing unit



134668

Dixon Correctional Center - Cell in mainline restrictive housing unit



134669

Dixon Correctional Center - Cell in mainline restrictive housing unit



134670

Dixon Correctional Center - X House restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349437

0349437

Dixon Correctional Center - X House restrictive housing unit, crisis unit on B Wing



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349456

0349456

Dixon Correctional Center - X House restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349458

0349458

Dixon Correctional Center - X House restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349460

0349460

Dixon Correctional Center - A wing in X House restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   0349501

0349501

Dixon Correctional Center - C wing in X House restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349507

0349507

Dixon Correctional Center - D wing in X House restrictive housing unit



Attorney's Eyes Only                                                                 Davis v. Baldwin USDC-SD IL 16-600   0349509

0349509

Dixon Correctional Center - X House restrictive housing unit, crisis area on B Wing



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349478

0349478

Dixon Correctional Center - X House restrictive housing unit, crisis area on B Wing



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349481

0349481

Dixon Correctional Center - X House restrictive housing unit, crisis area on B Wing



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349532

0349532

Dixon Correctional Center - X House restrictive housing unit, crisis area on B Wing



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349533

0349533

Dixon Correctional Center - Photograph of the inside of one of the C Wing, X House cells



Dixon Correctional Center - Photograph of the inside of one of the C Wing, X House cells



Dixon Correctional Center - A C Wing group counseling session in progress in C Wing in X House with a correctional officer sitting immediately outside the group session, watching and within earshot of the conversation



Dixon Correctional Center - One-on-one treatment space in Dixon X House



Dixon Correctional Center - One-on-one treatment space in Dixon X House



# Menard Correctional Center Pictures

Menard Correctional Center - Cell with solid door with feed box



0349219

Menard Correctional Center - Interior of cell with solid door



0349220

Menard Correctional Center - Looking out of a solid door cell



Davis v. Baldwin USDC-SD IL 16-3900
0349233

Attorney's Eyes Only

0349233

Menard Correctional Center - Looking into a solid door cell with its door open from hallway



Davis v. Baldwin USDC-SD IL 16-600
0349223

Attorney's Eyes Only

0349223

Menard Correctional Center - Double celled open bar restrictive housing cell



Davis v. Baldwin USDC-SD IL 16-600
0349224

Attorney's Eyes Only

0349224

Menard Correctional Center - One-on-one treatment space on North 5 Gallery



Davis v. Baldwin USDC-SD IL 1/6-900
0349248

Attorney's Eyes Only

0349248

Menard Correctional Center - One-on-one treatment room on North 5 Gallery



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349249

0349249

Menard Correctional Center - Interior looking out of one-on-one treatment space on North 5 Gallery



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349250

0349250

Menard Correctional Center - Close-up of seat for prisoner in one-on-one treatment space in North 5 Gallery



Attorney's Eyes Only                                        Davis v. Baldwin USDC-SD IL 16-000   C349252

0349252

Menard Correctional Center - Treatment space in Health Care Unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349258

0349258

Menard Correctional Center - Exam room in Health Care Unit



Attorney's Eyes Only

Menard Correctional Center - Group treatment room on North Gallery 7



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349263

0349263

Menard Correctional Center - Group treatment area on North Gallery 7



Attorney's Eyes Only                Davis v. Baldwin USDC-SD IL 16-600   C349267

0349267

Menard Correctional Center - Group treatment area on North Gallery 7



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349268

0349268

Menard Correctional Center - Crisis gallery of North 2



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349243

0349243

Menard Correctional Center - Crisis cell in North Gallery 5



0349242

Menard Correctional Center - Crisis cell in North 2



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   0349244

0349244

Menard Correctional Center - Interior of crisis cell on North 2



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349256

0349256

Menard Correctional Center - Looking down North House galleries



Davis v. Baldwin USDC-SD IL 16-300
0349221

Attorney's Eyes Only

0349221

Menard Correctional Center - Looking down North House galleries



Davis v. Baldwin USDC–SD IL 16-300
0349227

Attorney's Eyes Only

0349227

Menard Correctional Center - E-Yard



Attorney's Eyes Only

Menard Correctional Center - E-Yard



Attorney's Eyes Only

0349273

Menard Correctional Center - High escape yard



Attorney's Eyes Only

Menard Correctional Center - Cages for no-contact yard



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349279
0349279

Menard Correctional Center - Overview of restrictive housing yard area



Attorney's Eyes Only

Menard Correctional Center - Cage for no-contact yard



Attorney's Eyes Only

Menard Correctional Center - Overview of restrictive housing yard area



Attorney's Eyes Only

Menard Correctional Center - Non-congregate and group yard



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349303

0349303

Menard Correctional Center - Administrative detention cells



0349234

Menard Correctional Center - Administrative detention cells



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349235

0349235

Menard Correctional Center - Administrative detention cells



Davis v. Baldwin USDC-SD IL 14-800
0349236

Attorney's Eyes Only

0349236

# Lawrence Correctional Center Pictures

Lawrence Correctional Center - Non-contact visiting area



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   0349405

0349405

Lawrence Correctional Center -Non-contact vising area



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600    0349407

0349407

Lawrence Correctional Center -Health Care Unit crisis watch cell



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349423

0349423

Lawrence Correctional Center -Health Care Unit crisis watch cell



Attorney's Eyes Only

Lawrence Correctional Center -C Wing of restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-000   C349379

0349379

Lawrence Correctional Center - C Wing of restrictive housing unit



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   C349416

0349416

Lawrence Correctional Center - Group treatment space for restrictive housing prisoners



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   0349373

0349373

# Logan Correctional Center Pictures

Logan Correctional Center - Building 41 at Logan, which houses watch cells and treatment space



135067

Logan Correctional Center - Photograph of one of the tether tables used for group therapy



135047

Logan Correctional Center - A photograph of the outdoor yards for restrictive housing prisoners



135021

Logan Correctional Center - Interior of the upper and lower tiers of the Building 15 restrictive housing unit



135109

Logan Correctional Center - Interior of the upper and lower tiers of the Building 15 restrictive housing unit.



135112

Logan Correctional Center - Interior of the upper and lower tiers of the Building 15 restrictive housing unit



135116

Logan Correctional Center - Restrictive housing cells in Building 15



135022

Logan Correctional Center - Restrictive housing cells in Building 15



135023

Logan Correctional Center - Restrictive housing cells in Building 15



135026

Logan Correctional Center - Restrictive housing cells in Building 15



135027

Logan Correctional Center - Exterior of the showers used by restrictive housing



135153

Logan Correctional Center - A photograph of the metal desks in which prisoners are restrained during group therapy in restrictive housing



135047

Logan Correctional Center - Visiting area



135029

Logan Correctional Center - Visiting area



135033