## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| HENRY DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 3:16-CV-600-MAB |
| | ) | |
| LATOYA HUGHES, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

**BEATTY, Magistrate Judge:**

This suit for declaratory and injunctive relief was filed by six inmates in the Illinois Department of Corrections (IDOC) challenging the IDOC's use of restrictive housing, which they claim is tantamount to "extreme isolation" and violates the Eighth Amendment's proscription against cruel and unusual punishment and the Fourteenth Amendment's proscription against deprivation of liberty without due process of law (Doc. 1). The Court previously certified a class of "[a]ll prisoners who are now or will be incarcerated in adult correctional facilities by the Illinois Department of Corrections and thus who are at risk of being subjected to extreme isolation or who are currently subjected to extreme isolation." (Doc. 230).

Currently before the Court is Defendant LaToya Hugh's motion for summary judgment (Doc. 370 (original sealed version); Doc. 435 (redacted, publicly available version)). The motion has been fully briefed (*see* Docs. 394 through 397 (original sealed version of Plaintiffs' response); Docs. 437, 440, 441 (redacted, publicly available version);

Docs. 403, 404 (original sealed version of Defendant's reply); Docs. 438, 439 (redacted, publicly available version)).[1] The briefing was extensive, and the evidence submitted to the Court was even more extensive. A hearing on the motion was held in July 2024 (Doc. 417). After reviewing and carefully considering the parties' materials and their arguments, Defendant's motion is denied for the reasons explained below.

**EVIDENTIARY MATTERS & PROCEDURAL OBJECTIONS**

The local rules of this district require parties seeking summary judgment to file a Statement of Material Facts, "set[ting] forth each relevant, material fact in a separately numbered paragraph." SDIL-LR 56.1(a). The opposing party must then respond to each paragraph in the Statement of Material Facts and may also include their own Statement of *Additional* Material Facts. SDIL-LR 56.1(b), (c). The moving party must then respond to each paragraph in the Statement of Additional Material Facts. SDIL-LR 56.1(d).

Defendant filed a 23-page, 97-paragraph, statement of facts (Doc. 435, pp. 7–30).[2] Many of the numbered paragraphs contain multiple sentences—in fact, some are as long as half a page (*e.g., id.* at para. 18, 24, 46). Had Defendant set forth only one fact per paragraph, as directed by the Local Rules, the Court has little doubt her Statement of Material Facts would have contained at least three or four times as many paragraphs as it does now. Additionally, very few of Defendant's asserted facts were actually

---

[1] Throughout this Order, the Court will cite to the versions of the briefing and evidence on the public docket.

[2] Unless otherwise noted, page numbers in citations to the record throughout this Order refer to the page number imprinted by CM/ECF at the top of documents, and not to page numbering, if any, at the bottom of the underlying document.

undisputed. As a result, Plaintiffs filed extensive responses—15 pages, *single spaced*—to Defendant's Statement of Material Facts, not only disputing the asserted facts but raising objections to the propriety and admissibility of the statements and the exhibits supporting those statements (*see* Doc. 437, pp. 10–25). Plaintiffs then set forth their own lengthy Statement of Additional Material Facts (Doc. 437, pp. 25–37), although the length is undoubtedly due in part to Plaintiffs' strict adherence to the Local Rule's requirement of only one fact per paragraph. Defendant responded to those additional facts, admitting a vast majority of them but also raising objections, the primary ones being that the asserted facts are immaterial or unsupported hearsay (Doc. 438, pp. 5–15).

Suffice it to say there are dozens upon dozens of objections (Doc. 437, pp. 39–42; *see also id.* at pp. 15–25; Doc. 438, pp. 4–15). Some strike the Court as unnecessary.[3] Some seem technical simply for the sake of being technical.[4] And yet there are many others that

---

[3] For example, Plaintiffs take issue with Defendant "cit[ing] docket entries, instead of exhibits attached to the brief." (Doc. 437, p. 40; *see also* Doc. 436, pp. 3–4 (Defendant's Exhibit List)). Plaintiffs are, in other words, essentially arguing that Defendant needed to refile several dozen documents that already exist on the docket in this case. But neither Rule 56 nor the undersigned require such duplicative filings. Rather, Rule 56 requires a party to support its factual positions by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The Rule does not say citations must be "to particular parts of materials attached to each party's own respective brief." The Court does not see why "the record" would not include documents already filed on the docket. The undersigned has always been of the mind that there is almost never a need to file the same document twice. The parties can simply cite to the document that is already part of the record by referencing the docket number where the document can be found and including a pin cite to the relevant page.

[4] For example, Plaintiffs object to many of Defendant's exhibits as not properly authenticated or lacking foundation. A number of those exhibits consist of prison records, including documents related to Administrative Detention placements, such as Notices of an upcoming Review (Doc. 435-17), Review decisions (Doc. 435-17), memorandums to the prisoner relaying the decisions (Doc. 435-18), disciplinary records, etc. These documents were all bate-stamped and produced to Plaintiffs during discovery. The Court is skeptical there is any genuine concern about the authenticity of these documents. Furthermore, the failure to authenticate is a defect that can be easily cured. *See Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020) ("Parties often submit documents on summary judgment without authenticating them with affidavits thorough enough to overcome all potential objections: 'When that happens . . . it is also not

are potentially meritorious. But none of them require a ruling at this juncture. In particular, the Court declines to provide individual rulings on either parties' objections to materiality; it would be far too time-consuming to do so and is simply unnecessary. The facts deemed material by the Court—which are far fewer than what was advanced by either side—are set forth in the discussion below. It will be clear from the analysis which facts are relevant to the issues. The Court also finds that it cannot and/or need not rule on some of Defendant's objections because either Plaintiffs did not have a chance to respond as the objections were raised in Defendant's reply brief or the Court did not rely on the contested portions of the evidence in ruling on the motion for summary judgment. As for Plaintiffs' remaining objections, the Court need not rule on them because even if Defendant's contested evidence was admitted, it would not affect the summary judgment outcome. In other words, even if every ruling went in Defendant's favor and all of her objected-to exhibits were admitted, it still would not change that Defendant has failed to show she is entitled to judgment as a matter of law.

## MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R.

---

unusual for opposing lawyers to choose to overlook available evidentiary or other procedural objections,'" especially when "'many such defects in summary judgment evidence could be cured quickly with a supplemental affidavit or two.'") (citation omitted); *Elghanmi v. Franklin Coll. of Indiana, Inc.,* No. IP-99-879-CH/G, 2000 WL 1707934, at *1 (S.D. Ind. Oct. 2, 2000) ("[D]ocuments submitted as evidence to support or oppose a motion for summary judgment must be authenticated . . . [but] [a]s a practical matter, counsel often do not bother to include such authentication or to object to its absence when there is no real dispute about the authenticity of [the evidence].").

Civ. P. 56(a). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court is to view the record and draw all reasonable inferences in the light most favorable to the non-moving party and decide if there is genuine dispute of material fact that requires a trial. *Id.*; *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (citation omitted). *See also Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) ("Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law.") (citation and internal quotation marks omitted).

## A.  RES JUDICATA

Defendant argues that res judicata precludes inmates who were members of the class in *Rasho v. Walker*, CDIL case no. 07-cv-1298-MMM,[5] from participating in this action as well as inmates who have previously filed individual lawsuits regarding their time in restrictive housing (Doc. 435, pp. 6, 30–32; Doc. 438, pp. 15–17). Plaintiffs counter that res judicata does not apply in either instance (Doc. 437, pp. 42–46).

---

[5] *See also Rasho v. Jeffreys*, 22 F.4th 703 (7th Cir. 2022) (hereinafter "*Rasho* appeal")

Generally speaking, res judicata, or claim preclusion, "prevents a party from repeatedly litigating the same cause of action against the same party."[6] *Creation Supply, Inc. v. Selective Ins. Co. of Se.*, 51 F.4th 759, 763 (7th Cir. 2022). *Accord Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (claim preclusion "forecloses successive litigation of the very same claim[.]"). Under both the federal law and Illinois law of claim preclusion,[7] three requirements must be met for claim preclusion to apply: (1) the litigants in the two suits must be same, (2) the claims (or causes of action) in the two suits must be the same, and (3) a final judgment on the merits must have been issued in the first suit. *Creation Supply*, 51 F.4th at 763 (citing *Cooney v. Rossiter*, 986 N.E.2d 618, 621 (Ill. 2012)) (Illinois law); *Daza v. State*, 2 F.4th 681, 683 (7th Cir. 2021) (citation omitted) (federal law); *Czarniecki v. City of Chicago*, 633 F.3d 545, 548 (7th Cir. 2011) (citation omitted) (federal law). If these three elements are satisfied, then claim preclusion "bars not only those issues actually decided in the prior suit, but all other issues which could have been brought." *Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011) (citation omitted) (federal law). *See also Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405,

---

[6] In their briefs the parties use the term "res judicata" (*see* Doc. 435, pp. 30–32; Doc. 437, pp. 42–46), which can refer either to claim preclusion or issue preclusion. *Brownback v. King*, 592 U.S. 209, 215 n.3 (2021); *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). It is clear from the language used by the parties and the legal citations they provided that claim preclusion is what is at issue here (*see* Doc. 435, p. 30; Doc. 437, p. 43). To avoid confusion, the Court uses the more precise term "claim preclusion."

[7] When the first suit was adjudicated in federal court, the federal law of claim preclusion applies. *Daza v. State*, 2 F.4th 681, 683 (7th Cir. 2021) ("Federal courts apply the federal common law of claim preclusion when the earlier decision was rendered by a federal court.") (citing *Taylor*, 553 U.S. at 891). But when a state court rendered the judgment on which the application of res judicata is based, then the state law of claim preclusion applies. *Baek v. Clausen*, 886 F.3d 652, 660 (7th Cir. 2018) (citation omitted); *CIGNA HealthCare of St. Louis, Inc. v. Kaiser*, 294 F.3d 849, 856 (7th Cir. 2002). Defendant contends there is no significant difference between the federal and Illinois law that is relevant to the issues decided in this Order (Doc. 435, p. 30 n.3). The Court agrees.

412 (2020) ("[C]laim preclusion prevents parties from raising issues that could have been raised and decided in a prior action—even if they were not actually litigated."); *White v. Illinois State Police*, 15 F.4th 801, 809 (7th Cir. 2021) (citing *Hudson v. City of Chi.*, 889 N.E.2d 210, 217 (Ill. 2008)) (Illinois law).

### 1. *Rasho*

The Court previously gave an overview of the *Rasho* case in the class certification order (Doc. 230, pp. 36–37), which it will not repeat in full here. It suffices to say that *Rasho* is a class action that was initiated in 2007, challenging the adequacy of mental health services provided to mentally ill prisoners in the IDOC (Doc. 435, para. 1).[8]

Defendant's argument that inmates who were members of the class in *Rasho* are barred by res judicata from participating in this case (Doc. 435, p. 30), is a variation of the same argument she made at the class certification stage—she is once again trying to eliminate mentally ill inmates from being part of the class, but this time she is expressly invoking the doctrine of res judicata (*see* Doc. 230, pp. 36–39). By way of background, Defendant argued at the class certification stage that certification should be denied because this action was largely duplicative of *Rasho* in that all of the mentally ill inmates in restrictive housing were already members of the *Rasho* class, and because portions of the *Rasho* settlement agreement regarding mental health treatment in restrictive housing overlap with the relief requested by Plaintiff here (Doc. 190, pp. 9, 31–39). Defendant cited

---

[8] *See also* Doc. 230, p. 40 ("Broadly speaking, *Rasho* is about inadequate mental health treatment."); *Rasho v. Jeffreys*, 22 F.4th 703, 706 (7th Cir. 2022) (characterizing *Rasho* as a class action against IDOC officials "for failing to provide constitutionally adequate mental-health care" and seeking "declaratory and injunctive relief compelling IDOC to overhaul its system of mental-health care").

to the rule against duplicative litigation to support her argument (Doc. 190, pp. 31–32; Doc. 220). She did not invoke res judicata because she apparently believed the settlement agreement in *Rasho* did not have preclusive effect. Defendant argued, in the alternative, that even if the class was certified, it should expressly exclude *Rasho* class members (Doc. 190, p. 39).

Plaintiffs countered that the rule against duplicative litigation did not apply because *Rasho* was *not* still pending and a final judgment had been entered (Doc. 224, pp. 10, 11–12; *see also* Doc. 220).[9] Plaintiffs argued that the proper doctrine, if anything, would be res judicata (claim preclusion) but that doctrine was also inapplicable because even though *Rasho* had gone to final judgment, neither the parties nor the claims were the same between the two lawsuits (Doc. 224, pp. 18–19; *see also* Doc. 220).

At the class certification hearing, defense counsel clarified that she did not believe either the rule against duplicative litigation or res judicata applied but was instead making a general argument—not based on any specific legal doctrine—that it did not make sense to proceed with the class here given the significant overlap with *Rasho* (Doc. 230, pp. 38–39 (citing Doc. 220, pp. 40, 47–51)). The Court rejected Defendant's arguments, ruling in relevant part, and without deciding the procedural posture of *Rasho,* that "neither the rule against duplicative litigation nor res judicata apply" because "the proposed class here and the *Rasho* class are clearly different" and "the claims in the instant case are not the same as the claims in *Rasho.*" (Doc. 230, pp. 40, 41). The Court also

---

[9] *See McReynolds v. Merrill Lynch & Co.,* 694 F.3d 873, 888 (7th Cir. 2012) (rule of duplicative litigation can apply when there are two cases simultaneously pending in federal courts) (citation omitted).

held that Defendant's argument came much too late in the proceedings and should have been made from the outset, before "the Court and the parties had already dedicated a truly massive amount of work to this case." (*Id.* at p. 42).

Thereafter, the Seventh Circuit stated its belief that the agreement reached between the parties in *Rasho* was "more accurately described as a consent decree rather than a private settlement." *Rasho appeal*, 22 F.4th at 707 n. 2. The district court subsequently determined that the settlement agreement was in fact a consent decree, which expired on July 21, 2022. *Rasho*, CDIL Case No. 07-cv-1298-MMM, Minute Entry (May 4, 2022) (ruling on the record); Doc. 3597, pp. 4, 5–7 (Jul. 21, 2022) (subsequent written order). Defendant now contends in this case that, because a consent decree is a final adjudication on the merits, res judicata can come into play (Doc. 435, p. 31). Plaintiffs disagree for multiple reasons (Doc. 437, pp. 36-42).

a.  Waiver

Plaintiffs argue that Defendant has waived res judicata as an affirmative defense (Doc. 437, pp. 45–46), and the Court agrees. Res judicata is an affirmative defense and Rule 8(c) requires it to be pled in the answer. FED. R. CIV. P. 8(C)(1); *Marcus v. Sullivan*, 926 F.3d 604, 615 (7th Cir. 1991). "A defendant's failure to plead an affirmative defense may result in a waiver of the defense if the defendant has relinquished it knowingly and intelligently, or forfeiture if the defendant merely failed to preserve the defense by pleading it." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 478 (7th Cir. 2019) (citing *Wood v. Milyard*, 566 U.S. 463, 470 & n.4 (2012)).

Here, Defendant asserted res judicata in her answer to the complaint but it was only with respect to claims that were, or could have been, raised in *Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012) "or similar cases" (Doc. 76, p. 88).[10] Defendant seems to think that is sufficient to also cover her argument that res judicata bars the *Rasho* class members from participating in this case (Doc. 438, p. 15). Defendant did not, however, elaborate or expound on this assertion nor did she cite any legal authority to support it (*see id.*). As the Court sees it, pleading res judicata with respect to *Westefer* in no way gives Plaintiffs fair notice that they would eventually need to address whether res judicata precludes the *Rasho* class members from participating in this case.

The Court acknowledges that given the confusion over the nature of the settlement agreement in *Rasho*, Defendant might not have thought res judicata as to *Rasho* was available as an affirmative defense at the time she filed her answer in March 2017. But it should have been clear at the very latest by mid-2022, when the court in *Rasho* ruled that the settlement agreement was a consent decree. At no point following that ruling did Defendant ever seek to amend her answer in this case to include res judicata as to *Rasho* in her affirmative defenses. She said nothing for well over a year, until she finally raised the defense in her summary judgment motion filed on October 31, 2023 (Doc. 435, pp. 30).

---

[10] Defendant's affirmative defense asserts in full: "The doctrine of res judicata precludes parties from relitigating issues that were or could have been raised in a prior action in which there was a final judgment. In *Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012), a class of inmates incarcerated in IDOC sued for injunctive and declaratory relief. There has been a final judgment in that case. Some of the claims at issue in this suit were or could have been raised in *Westefer* or similar cases and are, therefore, barred *by* res judicata." (Doc. 76, p. 88, section C).

As the Seventh Circuit has previously explained, when a new affirmative defense becomes available, "the defendant . . . [is] obligated to act in a timely fashion." *Reed*, 915 F.3d at 478 (quoting *Venters v. City of Delphi*, 123 F.3d 956, 967–68 (7th Cir. 1997)).

> Once the availability of an affirmative defense is reasonably apparent, the defendant must alert the parties and the court to his intent to pursue that defense. A defendant should not be permitted to "lie behind a log" and ambush a plaintiff with an unexpected defense. The appropriate thing for the defendant to do, of course, is to promptly seek the court's leave to amend his answer. His failure to do so risks a finding that he has waived the defense.

*Reed*, 915 F.3d at 478 (quoting *Venters*, 123 F.3d at 967–68).

Here, Defendant offered no explanation as to why she did not move to amend her answer to assert res judicata as to *Rasho* once it became apparent that there was a final judgment in that case (*see* Doc. 435, pp. 30–32; Doc. 438, pp. 15–17). Moreover, Plaintiffs seemingly had no reason to suspect Defendant would be advancing that argument given the Court's ruling over two years prior that any argument about duplicative or overlapping litigation was too late, and furthermore, there was no identity of parties or identity of claims between *Rasho* and the instant suit (Doc. 230, pp. 36–43). By the time Defendant moved for summary judgment, the parties had invested an extraordinary amount of time and resources conducting discovery in this case on the reasonable expectation that they knew what the issues were and who the class members were. Defendant is now trying to cleave away a significant portion of the class, which would render the discovery and other work done as to those individuals a complete waste. The harm to Plaintiffs in allowing Defendant to assert this untimely defense is obvious and

significant. *See Reed*, 915 F.3d at 482 (courts "must not countenance attempts to invoke [affirmative] defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff."); *see also Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 785 (7th Cir. 2016) (holding plaintiff's claims were not barred where defendant had "acquiesced" to case by waiting over 18 months to raise res judicata as potential affirmative defense and gave no reason for the delay or why its inaction should not be viewed as acquiescence).

Accordingly, the Court finds that Defendant has waived the right to argue res judicata with respect to the *Rasho* class members at summary judgment.

### b. Elements Not Satisfied[11]

While the finding of waiver obviates the need to address whether the elements of res judicata have been met, the Court nevertheless opts to do so in order to put this issue to bed. Specifically, the Court will address the element of claim identity because it is the element Defendant has most notably failed to establish. Two suits involve the same claim (or "cause of action"), when they "aris[e] from the same transaction" or "involve a common nucleus of operative facts." *Lucky Brand*, 590 U.S. at 412 (citations omitted). *See also Bernstein v. Bankert*, 733 F.3d 190, 226 (7th Cir. 2013) (quoting *Matrix IV*, 649 F.3d at 547). That means "they are based on the same, or nearly the same, factual allegations." *Manicki v. Zeilmann*, 443 F.3d 922, 925 (7th Cir. 2006) (citation omitted).

As the Court already said in the class certification order, "the claims in the instant case are *not the same* as the claims in *Rasho*" (Doc. 230, p. 40) (emphasis added). *Rasho*, as

---

[11] The federal law of claim preclusion governs because *Rasho* was adjudicated in federal court. *See Daza*, 2 F.4th at 683.

Defendant herself said, is a class action that "challeng[ed] the adequacy of mental health services provided to mentally ill IDOC prisoners" (Doc. 435, para. 1). In contrast, this case is a class action challenging the IDOC's use of restrictive housing (*see* Doc. 1; *accord* Doc. 230, pp. 40–41). In short, these two cases were brought for fundamentally different reasons. While there is some overlap in the allegations between the two cases (which is not surprising given that mentally ill inmates in the IDOC are often subjected to restrictive housing), the claims simply are not identical. As the Court previously explained,

> *Rasho* did not ask, litigate, or resolve whether the IDOC's policies, and/or the purported systemic failure to adhere to those policies, creates inhumane conditions of confinement in restrictive housing for inmates. Nor did *Rasho* ask, litigate, or resolve whether the process that inmates are provided before and after placement in restrictive housing is constitutionally insufficient.

(Doc. 230, p. 41). Like the Ninth Circuit cautioned nearly three decades ago, "res judicata must be applied carefully in the class action context." *Hiser v. Franklin*, 94 F.3d 1287, 1293 (9th Cir. 1996). A claim cannot be defined in the first action as "everything related to prison life" because "[a]fter one prisoner class action had been filed, no 'related' claims could ever be filed." *Id.*

The Court finds that its previous ruling established the law of the case and a presumption that the ruling would be adhered to throughout the remainder of the lawsuit unless a "good reason" arises to depart from it. *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 701 (7th Cir. 2024); *see also Protect Our Parks, Inc. v. Buttigieg*, 97 F.4th 1077, 1090 (7th Cir. 2024) (citation omitted). In arguing for summary judgment,

Defendant failed to identify a good reason to reconsider the issue of claim identity; in fact, Defendant did not even acknowledge the Court's prior ruling (*see* Doc. 435, pp. 30–32). Moreover, her argument, which is only three sentences long, is devoid of any meaningful legal analysis or citations to legal authority (*Id.* at p. 32). Defendant does nothing more than point out that some of the allegations in *Rasho* essentially mirror some of the allegations here (*see id.*). But she makes no effort to explain how that overlap—which the Court notes is a relatively minor aspect of the total allegations in *Rasho*[12]—means that the claims are identical and the Court previously erred in ruling otherwise (*see id.*). Given Defendant's deficient argument, the Court need not say anything more on the issue of claim identity.[13] Defendant's motion for summary judgment on the issue of claim preclusion as to the *Rasho* class members is denied.

### 2. Individual Class Members[14]

---

[12] *See Rasho*, CDIL case no. 07-cv-1298-MMM, Doc. 95 (Second Amended Complaint). This was the operative complaint in *Rasho* at the time the instant case was filed in 2016.

[13] *E.g., Bank of Am., N.A. v. Veluchamy,* 643 F.3d 185, 190 (7th Cir. 2011) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (citation omitted); *United States v. Courtright,* 632 F.3d 363, 370 (7th Cir. 2011) ("[Courts] are not in the business of formulating arguments for the parties."); *Mahaffey v. Ramos,* 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."); *White Eagle Coop. Ass'n v. Conner,* 553 F.3d 467, 476 n. 6 (7th Cir. 2009) ("[I]t is not the province of the courts to complete litigants' thoughts for them . . . . "); *Tyler v. Runyon,* 70 F.3d 458, 465 (7th Cir. 1995) ("[I]f an appellant fails to make a minimally complete and comprehensible argument for each of his claims, he [or she] loses regardless of the merits of those claims as they might have appeared on a fuller presentation.").

[14] Some of these lawsuits were adjudicated in federal court, others in Illinois state courts. Therefore, it seems that state law governs the issue of *res judicata* for some of these lawsuits, while federal law governs as to others. But, as previously noted, both the state and federal law are the same for all purposes necessary to decide the issues presented here.

Defendant argues that any named Plaintiff or class member who previously filed an individual suit regarding their placement in restrictive housing or the conditions therein and received a final judgment on the merits is barred by res judicata from participating in this suit (Doc. 435, pp. 32–33). Specifically, Defendant points to "at least" three named Plaintiffs and eight non-Plaintiff class members who previously filed lawsuits in which they alleged that they were denied due process when they were sent to segregation, they were subjected to inhumane conditions of confinement in segregation, or both (Doc. 435, pp. 8–12, UMF 8–18).[15] Defendant makes a one-sentence argument that "[t]hese individuals cannot proceed in this class action, which also challenges the due process to be received in disciplinary proceedings and conditions of confinement in restrictive housing" (*Id.* at pp. 32–33). She reiterates in her reply brief, "how can this Court enter an order finding a constitutional violation for individuals who have already had courts rule against them?" (Doc. 438, p. 17).

Defendant's argument is not only too perfunctory to entitle her to summary judgment, but it also misses the mark. As the Court has already explained, Plaintiffs are not seeking—and the Court will not be making—determinations that a constitutional violation occurred with respect to any one individual inmate on any one occasion (Doc. 230, p. 45). Rather, the question for the Court is whether the IDOC has statewide and systemic practices regarding the use of restrictive housing that are so deficient they expose all inmates who are presently in segregation, or may in the future be placed in

---

[15] The Court has no doubt that the eleven inmates Defendant identified barely scratches the surface of the actual number of inmates currently in IDOC custody who have previously filed a lawsuit challenging the process they received in being sent to segregation and/or the conditions they experienced in segregation.

segregation, to a risk of constitutional harm. That question will be answered either "yes"
or "no" *as to the whole class.* Either the IDOC's policies and practices pose an unreasonable
risk of harm to all inmates, or they do not. *See Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir.
2014) (discussing the difference between a systemic, future-oriented Eighth Amendment
claim and claim based on a past instance of mistreatment).

The fact that some inmates lost previous lawsuits regarding their placement in
restrictive housing, or the conditions therein, does not mean they are never again allowed
to sue the IDOC for issues related to the use of restrictive housing. Similarly, the lack of
a past violation on a particular occasion does not somehow mean that those inmates are
prevented from later claiming they are exposed to a risk of harm by the current
conditions. *See Daza*, 2 F.4th at 685 ("[C]laim preclusion does not prevent parties from
bringing a suit involving actions that 'occurred after the conclusion' of the previous
suit.") (quoting *Lucky Brand*, 590 U.S. at 414). *Accord Smith v. Potter*, 513 F.3d 781, 783 (7th
Cir. 2008). In other words, it is entirely possible for the Court to find that there are
ongoing systemic issues without in any way contradicting the earlier decisions rendered
against individual inmates.

Moreover, in considering the nature of a Rule 23(b)(2) class action, it makes sense
that previous individual suits would not precludes those inmates from being a part of
this action. A Rule 23(b)(2) class action, like this one, is "reserved for cases where broad,
class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." 1
McLaughlin on Class Actions § 5:15 (21st ed.). For that reason, a (b)(2) class is
mandatory, meaning there is no opportunity for class members to opt out and the district

court is not even obliged to afford them notice of the action. *Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338, 361–62 (2011). The class here includes *all* current and future inmates who
are at risk of being subjected to restrictive housing. Any declaratory or injunctive relief
that might be ordered would apply to every current and future inmate in the IDOC,
regardless of whether they had filed a previous lawsuit or not. *Id.* at 361–62 ("[T]he relief
sought must perforce affect the entire class at once[.]"). The Court cannot carve certain
inmates out of the class and make any relief ordered inapplicable to them. A hypothetical
can best illustrate this point. Say, for example, the Court were to issue an injunction that
prisoners in restrictive housing must be given the opportunity to leave their cell every
day for some kind of unstructured, recreation time in the presence of others. That relief
applies to all prisoners in restrictive housing regardless of their litigation history. It is not
inapplicable and unavailable to certain inmates because some number of years ago a
court found that their Eighth Amendment rights were not violated when they were held
in restrictive housing for three months without any opportunity to go to yard. In short,
the former does not preclude the latter.

For these reasons, Defendant's motion for summary judgment on the issue of claim
preclusion as to individual class members is denied.

## B.  EIGHTH AMENDMENT VIOLATION (COUNT 1)

As the Court understands it, Plaintiffs are alleging that the conditions in restrictive
housing violate the Eighth Amendment because they deprive inmates of basic human
needs and inflict serious psychological and physical injury, to which Defendant has been
deliberately indifferent (Doc. 1, pp. 61–62). Plaintiffs are likewise claiming that extreme

isolation violates the Eighth Amendment because it is a punishment disproportionate to any infraction they have committed and serves no legitimate penological objective (*Id.*).

The Eighth Amendment's proscription against cruel and unusual punishment protects against conditions of confinement that "involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification." *Meriwether v. Faulkner*, 821 F.2d 408, 415 (7th Cir. 1987) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Prison officials are thus required to "provide humane conditions of confinement" and to ensure that inmates' "basic human needs" are met, such as food, clothing, shelter, medical care, sanitation, and physical safety. *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)); *James v. Milwaukee Cnty.*, 956 F.2d 696, 699 (7th Cir. 1992) (citing *Rhodes*, 452 U.S. at 346). Whether conditions amount to cruel and unusual punishment "must be judged in accordance with contemporary standards of decency." *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).[16] "[C]onditions which may have been acceptable long ago may be considered unnecessarily cruel in light of our growing

---

[16] *See also Rhodes*, 452 U.S. at 346 ("No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.") (citation and internal quotation marks omitted).

understanding of human needs and the changing norms of our society." *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001).[17]

The Seventh Circuit has explicitly recognized that confinement in segregation may constitute an Eighth Amendment violation. *Giles*, 914 F.3d at 1051; *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017) (quoting *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012). *See also Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974) ("There is a line where solitary confinement conditions become so severe that its use is converted from a viable . . . tool to cruel and unusual punishment."). Like other Eighth Amendment claims, a conditions of confinement claim requires the plaintiff to show two things: one objective and one subjective. *Giles*, 914 F.3d at 1051. First, the inmate must show that the conditions were "sufficiently serious as an objective matter, meaning that they denied the inmate 'the minimal civilized measure of life's necessities,' creating an excessive risk to the inmate's health and safety." *Thomas*, 2 F.4th at 719 (quoting *Isby*, 856 F.3d at 521). Second, the inmate must establish "a subjective showing of a defendant's culpable state of mind," meaning that the defendant was deliberately indifferent. *Giles*, 914 F.3d at 1051. A prison official is deliberately indifferent if he has "actual knowledge that [the inmate] faced 'a substantial risk of serious harm'" yet "'disregard[s] that risk by failing to take reasonable measures to abate it.'" *Jones v. Anderson*, 116 F.4th 669, 679 (7th Cir. 2024) (quoting *Farmer*, 511 U.S. at 847). *Accord Hunter v. Mueske,* 73 F.4th 561, 566 (7th Cir. 2023) ("[T]he defendant must 'know' of the risk (put differently, he must possess subjective awareness

---

[17] *See also Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (1988) ("The conditions in which prisoners are housed, like the poverty line, is a function of a society's standard of living. As that standard rises, the standard of minimum decency of prison conditions, like the poverty line, rises too.").

that the risk exists); and . . . the defendant's response to the risk must be so inadequate as to constitute 'disregard' of (or deliberate indifference toward) the risk.") (alterations in original).

Defendant asserts that Plaintiffs' Eighth Amendment claim for inhumane conditions of confinement "fail[s] on the merits" (Doc. 435, p. 45). But Defendant's arguments, which essentially ignore the substantial evidence adduced by Plaintiffs, are unpersuasive. Plaintiffs have submitted expert reports from four retained experts, including two corrections experts: Eldon Vail and Dan Pacholke, and a psychology expert, Craig Haney, Ph.D., J.D. It is important to note and emphasize that these expert opinions are *completely uncontested*. Defendant never designated an expert at the class certification stage (*see* Doc. 230, p. 33), and is likewise without an expert now.[18] Plaintiffs' unrebutted expert opinions—which are based on the experts' experience and observations, conversations with inmates, and review of inmate files—are alone sufficient to survive summary judgment. But Plaintiffs also submitted their own sworn statements, along with many more from other class members, about their experiences in IDOC

---

[18] While it is true that Defendant sought to designate a rebuttal expert, her effort came far too late in the proceedings. Defendant said *nothing* about an expert until September 2023 when she indicated that she had selected an expert and asked to extend her expert disclosure deadline by 90 days (Doc. 357; *see also* Doc. 353). This request was made on the deadline for Defendant's expert disclosures; after the post-certification scheduling order had already been amended numerous times, allowing for more than two years of post-certification discovery; and seven years after this suit was first commenced (*see* Docs. 1, 230, 235, 340, 353). Additionally, the Court could not fathom how Defendant's expert could actually complete their report in 90 days. At that time, Defendant had not even formally retained her expert and was still waiting on the necessary bureaucratic approvals to retain the expert. Additionally, the expert had not yet even *begun* to work on the case and authoring a report was presumably going to be a considerable undertaking given on the scope of the case and the staggering amount of discovery that had been conducted. Accordingly, the Court denied Defendant's request to further extend the Scheduling Order to allow her more time for an expert that she still had not actually received approval to retain (*See* Doc. 357).

restrictive housing. Collectively, Plaintiffs evidence is more than sufficient to clear the hurdle of summary judgment and allow this case to go to trial on their Eighth Amendment claim.

To begin with, numerous courts have recognized that solitary confinement poses a substantial risk of serious psychological and physical harm.[19] In the class certification order in this case, the undersigned provided a summary of the research offered by Plaintiffs on the harms of solitary confinement (which the Court declines to repeat in full here) (Doc. 230, pp. 9–12). Since then, according to Dr. Haney, the already ample body of research has continued to grow and extend the widespread scientific consensus that solitary confinement poses a significant risk of serious psychological and/or physical harm for all prisoners subjected to it (Doc. 441-5, para. 87, 371).

In particular, Dr. Haney stated the extensive scientific literature "carefully document[s]" that meaningful social contact and "caring human touch" are both "fundamental human need[s]" integral to humans' well-being. (Doc. 441-5, para. 47, 61;

---

[19] *E.g., Davenport,* 844 F.2d at 1313, 1316 ("[T]here is plenty of medical and psychological literature concerning the ill effects of solitary confinement (of which segregation is a variant)" and noting the record showed "what anyway seems pretty obvious, that isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage, even if the isolation is not total."). *See also Grissom v. Roberts*, 902 F.3d 1162, 1177 (10th Cir. 2018) ("[S]olitary confinement, even over relatively short periods, renders prisoners physically sick and mentally ill. It destroys any ability they may once have had to relate positively to others. These harms, which are persistent and may become permanent, become more severe the longer a person is exposed to solitary confinement. . . ."); *Williams v. Sec'y Pennsylvania. Dep't of Corr.,* 848 F.3d 549, 569 (3d Cir. 2017) (reviewing literature on solitary confinement within and outside of prison and stating, "[t]he empirical record compels an unmistakable conclusion: this experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage." ) (quoting Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. L. & SOC. CHANGE 477, 500 (1997)); *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015) ("Prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized.").

*see also id.* para. 46–60). They are perhaps "as essential to a person's psychological well-being as adequate food, clothing, and shelter are to [their] physical well-being" (*Id.* at para. 100). However, Dr. Haney opines that restrictive housing as utilized by the IDOC subjects prisoners to extreme levels of social isolation and social deprivation (*Id.* at para. 35, 115–17, 119–120, 123, 129–132, 134; *see also, e.g., id.* at para. 134, 144, 148, 157, 165, 269, 334; Docs. 441-8 through -41 (inmate declarations; Doc. 435-34 (Jones Supp. Interrog. Response # 2)). He reiterated his opinion that "restrictive housing" as it is practiced in the IDOC "clearly constitute[s] what is meant by 'solitary confinement' in the scientific, legal, and human rights literature as well [as] in common correctional parlance," (Doc. 441-5, para. 27; Doc. 222-3, pp. 11, 15), and is "precisely the kind" that research shows "create[s] a significant risk of serious harm for all the prisoners who are subjected to [it]." (Doc. 441-5, para. 371–73; *see also id.* at para. 21, 27, 35, 115, 116, 360). According to Dr. Haney, the harms "are extremely serious and sometimes irreversible" and include "loss of psychological stability, impaired mental functioning, self-mutilation, and even death." (*Id.* at para. 375). And for mentally ill inmates, the risk of harm is even greater (*Id.* at para. 36; *see also id.* at para. 26, 89–90, 92–97, 137, 169, 374).

Dr. Haney opines that while the isolation and social deprivation aspect of restrictive housing "seemingly accounts for [the] most intense psychological pain and the greatest risk of harm" (Doc. 441-5, para. 81), other conditions in the IDOC's restrictive housing units exacerbate the harmful effects of social isolation (*Id.* at para. 81–83, *see also id.* at para. 35, 37, 116–24, 128–29, 134, 137–38, 333). For example, inmates in restrictive housing are subjected to "profound levels of idleness and inactivity" and "prolonged

periods of monotony" (*Id.* at para. 37, 83, 124, 137; *see also, e.g., id.* at para. 144, 161–62,

170, 180, 181, 184, 186, 198, 236, 245, 270, 333; Docs. 441-8 through -41 (inmate

declarations) Doc. 435-34 (Jones Supp. Interrog. Response # 2)). Religious, educational,

and vocational programming is sparse to non-existent (*e.g.*, Doc. 441-5, para. 124, 134, 138,

162, 182, 255 (Haney report); Docs. 441-8 through -41 (inmate declarations)).

Additionally, the evidence indicates that the cells are small and allow the prisoners

little to no ability to move around, despite the fact that inmates are confined in them

nearly around-the-clock (Doc. 441-5, para. 118, 121, 122, 218, (Haney Report); Doc. 441-4,

para. 74 (Pacholke Report); Doc. 391-9, para. 39, 40 (Vail Report); Docs. 441-8 through -41

(inmate declarations)). Some inmates are double-celled, which Plaintiffs' experts opine

can significantly exacerbate the psychological impact of segregation and also increase the

likelihood of violence (Doc. 441-5, para. 118, 122 (Haney Report); Doc. 391-9, para. 41–45

(Vail Report)). Recreational areas are, almost without exception, concrete-floored, fenced-

in cages with nothing inside of them (*e.g.*, Doc. 441-5, para. 118, 134, 138, 146, 163 (Haney

Report); Doc. 391-9, pp. 35–45 (photos in Vail Report)). Many are single-person cages that

the inmates refer to as "dog runs" (Doc. 441-5, para. 118, 255 (Haney Report); *see* Doc.

391-9, pp. 35–45 (photos in Vail Report)).

Plaintiffs' experts opine that inmates in disciplinary segregation also face "onerous

restrictions" on property (*e.g.*, no television, radio, or tablet) and privileges (*e.g.*, very

limited or no access to commissary, yard time, dayroom, visits, etc.) (Doc. 441-5, para. 128

(Haney Report); *see, also, e.g., id.* at para. 132, 144, 148, 150, 181, 269; Docs. 441-8 through

-41 (inmate declarations)). Inmates report that they do not receive consistent, meaningful

mental health care (*e.g.,* Doc. 441-5, para. 137, 199, 207, 213, 220 (Haney report); *see also,
e.g, id.* at para. 145, 153, 161, 167, 168, 170, 177, 179, 181, 186, 187, 193, 194, 206, 207, 210,
212; Docs. 441-8 through -41 (inmate declarations)). And complaints about the physical
conditions of the cells abound, such as filthy cells and a lack of cleaning supplies; poor
ventilation; excessively hot or excessively cold temperatures; plumbing issues; insect and
rodent infestations; inadequate lighting; and unsafe fixtures (Docs. 441-8 through -41
(inmate declarations); Doc. 176-27 (Coleman depo.); Doc. 190-6 (Gardner depo.); Doc. 191-
3 (Dansberry depo.); Doc. 441-4, pp. 71, 72 (Pacholke depo.); Doc. 441-4, para. 45
(Pacholke report); Doc. 441-5, para. 33, 118, 119, 121, 217 (Haney Report); *see also, e.g., id.*
at para. 125, 143, 155, 157, 160, 174, 178, 186, 188, 192, 195, 197, 200, 217; Doc. 391-9, para.
39–40, 46–55 (Vail Report)).

Plaintiffs' experts have opined that the conditions of confinement in the IDOC's
restrictive housing units are "well below current national norms," and do not serve any
legitimate penological objective (Doc. 441-4, para. 9, 10 (Pacholke Report); Doc. 391-9,
para. 20 (Vail Report)). Plaintiff's experts also unanimously opined that the IDOC was
well-aware years before this lawsuit was ever initiated that its restrictive housing causes
harm to inmates and does not improve their behavior, but the IDOC has made no real
effort at reform or done anything meaningful to address the ongoing issues (*E.g.,* Doc.
441-5, para. 22, 30–35, 40, 139 (Haney Report); Doc. 441-4, para. 9–12, 71, 258–59 (Pacholke
Report); Doc. 391-9, para. 75, 170–73 (Vail Report)). Plaintiffs' evidence demonstrates that
many inmates are still subjected to long periods of time in segregation—months and even
years— sometimes for relatively minor infractions that pose no direct threat to the safety

or operations of IDOC facilities, and sometimes in spite of severe psychiatric problems and deterioration in restrictive housing (Doc. 441-2 (King Report); Doc. 391-9, para. 78, 92, 102, (Vail Report); Doc. 441-4, para. 134–42 (Pacholke Report); Doc. 441-4, p. 135 (Pacholke depo.); Doc. 441-5, para. 103–04, 110, 127, 343–59 (Haney report).

Furthermore, Dr. Haney provided a multitude of examples of inmates "manifesting serious mental health problems" and "in dire crisis and distress," as voiced by the prisoners themselves, recorded by staff members with whom they interacted, and observed by him (*e.g.*, Doc. 441-5, para. 38, 102–13, 155 ("many prisoners . . . in obvious distress . . . staring vacantly"), 158 (prisoner in restraint cage and suicide smock was "nearly incoherent"), 161 (inmate "appeared to be very psychologically disturbed," had scars from self-mutilating), 167 (inmate appeared to be "extremely unstable and distressed"), 169 ("I was struck by how many of the restrictive housing prisoners appeared to be profoundly mentally ill"), 194 (inmate who lit himself on fire), 196–205, 209, 344–59).

In sum, Plaintiffs' evidence regarding their Eighth Amendment claim is more than sufficient to move past the summary judgment stage and send this case to trial. Therefore, Defendant's request for summary judgment as to Count 1 is denied.

## C. FOURTEENTH AMENDMENT VIOLATION (COUNT 2)

In Count 2, Plaintiffs allege that inmates have a protected liberty interest in avoiding extreme isolation, but the IDOC's policies and practices deprive them of that liberty interest without due process of law (Doc. 1, pp. 63–64). As the Court understands it, Plaintiffs are alleging that inmates have been denied meaningful notice of the potential

sentencing ranges and the types of offenses that may result in more or less severe classifications and punishments (*Id.* at p. 63). Additionally, Plaintiffs are alleging that inmates are denied adequate and meaningful hearings upon their placement in restrictive housing and denied subsequent reviews of their long-term and often indefinite isolation. (*Id.* at p. 64).

The Due Process Clause of the Fourteenth Amendment prohibits the deprivation "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To succeed on a due process claim, an inmate must establish two things. First, the inmate must show that he was deprived of a protected interest in life, liberty, or property. *Prude v. Meli*, 76 F.4th 648, 656 (7th Cir. 2023) (citing *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007)). Second, the inmate must show that "the procedures he was afforded upon that deprivation were constitutionally deficient." *Prude,* 76 F.4th at 656 (quoting *Scruggs*, 485 F.3d at 939). In other words, the question is "whether a protected liberty interest exists, and if so, whether [the prisoner] received adequate process to protect it." *Ealy v. Watson*, 109 F.4th 958, 964 (7th Cir. 2024).

### 1.  Existence of a Protected Interest

Here, the parties agree that a liberty interest is what is at stake (*see* Doc. 435, pp. 33–39; Doc. 437, p. 47). And Defendant conceded that, for purposes of this analysis, there is no need to distinguish between disciplinary segregation and other non-punitive forms of restrictive housing (Doc. 435, p. 35). The Court will thus follow suit and evaluate the existence of a protected liberty interest in avoiding restrictive housing in general.

Placement in segregation, whether punitive or non-punitive, can implicate a protected liberty interest when segregation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (speaking of segregation generally) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).[20] The Supreme Court has interpreted that language to mean the inmate must show that confinement in segregation is "a major disruption" or "a dramatic departure" from the "ordinary" and "basic conditions" of the inmate's sentence. *Sandin*, 515 U.S. at 485–87. In other words, the segregation regime to which the inmates are subjected is something outside "the range of confinement to be normally expected[.]" *Id.* at 487. *See also Perry v. Spencer,* 94 F.4th 136, 153 (1st Cir. 2024) ("*Sandin* shows that segregation will constitute an 'ordinary incident of prison life' within a prison system if such confinement (accounting for its specific nature and duration) would be 'normally expected' by such an inmate in the general prison population of that prison system.") (alteration in original); *Lisle v. Welborn*, 933 F.3d 705, 721 (7th Cir. 2019) (inmate needed to show conditions in segregation "deviated substantially" from, or were "substantially wors[e]" than, the ordinary conditions of prison life") (citation omitted). Determining what is atypical and significant requires courts to analyze "the combined

---

[20] *See Miller v. Dobier*, 634 F.3d 412, 415 (7th Cir. 2011) (explaining that when there is a deprivation of liberty or property, the "constitutional duty to provide due process . . . attaches regardless of the motive for the deprivation," *e.g.*, a motive to punish versus a non-punitive disorder *See also, e.g., Ealy*, 109 F.4th at 964 (explaining that disciplinary segregation can give rise to a protected liberty interest); *Isby*, 856 F.3d at 524 (holding prisoner's time in administrative segregation implicated protected liberty interest); *Earl v. Racine Cnty. Jail*, 718 F.3d 689, 691 (7th Cir. 2013) (implicitly finding without discussion that placement in protective segregation like suicide watch or discretionary administrative segregation could give rise to a protected liberty interest).

import of the duration of the segregative confinement *and* the conditions endured by the prisoner during that period." *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697 (7th Cir. 2009) (emphasis in original).

    a.  <u>Duration</u>

Defendant states that "no due process is required for short stays in restrictive housing" (Doc. 435, p. 33). More specifically, Defendant claims that "[g]enerally speaking, being placed in disciplinary segregation continuously for only three months is not long enough to trigger due process protections." (Doc. 435, p. 35). Defendant goes on to argue that inmates who spent a total of 89 days or less in restrictive housing each year could not state an individual claim for a due process violation. (Doc. 435, p. 35).

Based on Defendant's arguments, it appears that she is looking for the Court to rule, as a matter of law, that three months is the presumptive minimum amount of time that an inmate must spend in restrictive housing before they can bring a due process claim. In other words, less than 90 days in segregation can never trigger a liberty interest regardless of the conditions that the inmate is exposed to. The Court disagrees.

Defendant did not cite to, and the Court is unaware of, any Seventh Circuit case law that explicitly holds a three-month period of confinement in restrictive housing is a condition precedent to establishing a constitutionally protected liberty interest (*see* Doc. 435, pp. 33–35). *Contra Hardaway*, 734 F.3d at 745 ("Although the district court would benefit from a bright-line rule on the types of conditions and duration of segregation [that] give rise to a prisoner's liberty interest, no such guidance has yet to be specifically addressed by this Court."); *see also Perry*, 94 F.4th at 154 (explaining that prolonged

segregation "may make that confinement an 'atypical and significant hardship' based on the length alone" but clarifying "we do not identify a minimum length of confinement to which a plaintiff must have been subjected"); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) ("[W]e have explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process.") (citing cases).

In fact, the Seventh Circuit has previously eschewed the notion that a presumptive minimum duration is required to bring a due process claim. In *Kervin v. Barnes*, the Seventh Circuit held that it was an error to suggest that a prisoner must spend at least six months in segregation before he can complain about having been deprived of liberty without due process of law. 787 F.3d 833, 836 (7th Cir. 2015). "A considerably shorter period of segregation may, depending on the conditions of confinement and on any additional punishments, establish a violation[.]" *Id.* (collecting cases that held periods of segregation between 75 and 90 days could, depending on the conditions of confinement, establish a violation of due process).[21] And in a very recent opinion, the Seventh Circuit reiterated in *Ealy v. Watson* that duration is not the only relevant consideration when deciding whether a protected liberty interest exists; rather, duration *and* conditions of confinement must be considered in combination. 109 F.4th at 964-65; *see also Marion*, 559

---

[21] *See also Earl*, 718 F.3d at 691 (considering the conditions of confinement for inmate who was on suicide watch for only five days); *Younger v. Hulick*, 482 Fed. App'x 157, 159 (7th Cir. 2012) (finding that 90 days in segregation required inquiry into conditions of confinement); *Palmer*, 364 F.3d at 65–67 (holding that although 77 days in segregation "was not long enough to constitute an atypical and significant deprivation by itself," it could "if the conditions of confinement were severe enough"); *Mitchell v. Horn,* 318 F.3d 523, 527, 532–33 (3d Cir. 2003) (remanding the dismissal of a claim of 90 days' segregation "given the 'fact-intensive inquiry' implied by *Sandin"); Gaines v. Stenseng,* 292 F.3d 1222, 1225–26 (10th Cir. 2002) (reversing dismissal of a claim involving 75 days' segregation where district court failed to examine conditions of confinement).

F.3d at 697 ("we must make the necessary determination by analyzing the combined import of the duration of the segregative confinement and the conditions endured by the prisoner during that period"). The Seventh Circuit explicitly held that "[f]ewer than six months in segregation . . . may still establish a liberty interest 'depending on the conditions of confinement.'" *Ealy,* 109 F.4th at 964-65 (quoting *Kervin,* 787 F.3d at 836).

Indeed, in *Kervin* the Seventh Circuit cautioned that "[s]ix months is not an apt presumptive minimum for establishing a violation" and "[j]udges who lean toward such a presumption may be unfamiliar with the nature of modern prison segregation and the psychological damage that it can inflict." *Kervin,* 787 F.3d at 837. Similarly, Defendant's push for a three-month presumptive minimum was not tied to any scientific research on segregation (*see* Doc. 435, pp. 33–35).[22]

---

[22] Dr. Haney's report and materials attached thereto contained numerous passages indicating that even brief periods of isolation can have damaging psychological effects. *See, e.g.,* Doc. 441-5, p. 29 para. 53 (discussing that even laboratory animals are prohibited from being put in completely isolated conditions for prolonged periods due to the well-documented damaging effects of social isolation); *Id.* at p. 610 (summarizing study finding that stays in solitary confinement averaging a "relatively modest" 21.15 days negatively affected mental health status and had other deleterious effects); *Id.* at pp. 650–51 (discussing article in which authors recommended that "people with SMI do not spend time in segregation" because "even short stays in segregation have lasting impacts on mental health."). *See also Id.* at 742 (citing the National Commission on Correctional Health Care's position that placement in solitary confinement for longer than 15 days represents "cruel, inhumane, and degrading treatment" that is "harmful to an individual's health"); *Id.* at 757 (mentioning that the United Nations' adopted the "Mandela Rules" prohibiting "prolonged solitary confinement," which was defined as "a time period in excess of 15 consecutive days"); *Id.* at 641, para. 32 (citing to report that discussed 2020 statement from United Nations Special Rapporteur on Torture reaffirming the U.N.'s earlier conclusion that "subjecting prisoners to solitary confinement for more than fifteen days is regarded as a form of 'psychological torture,'" and "voicing alarm at the excessive use of solitary confinement by correctional facilities in the United States."). *See also* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J.L. & POL'Y 325, 330–31 (2006) ("[E]ven a few days of solitary confinement will predictably shift the [brain's] electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium."), *cited by Williams.* 848 F.3d at 562; *Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019) (reviewing academic research that stated, "[T]here is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement

In sum, the Seventh Circuit has never drawn a bright line rule like Defendant asks this Court to do and, in fact, has made clear on a number of occasions that courts must consider both the duration and the conditions of segregation in assessing whether a liberty interest is at stake. Accordingly, the portion of Defendant's motion for summary judgment arguing that no due process is required for restrictive housing stays under 90 days is denied because it has no basis in case law or scientific research.

> b.  Conditions

Defendant next argues that Plaintiffs cannot establish conditions in restrictive housing are an atypical and significant hardship when compared to normal prison life in the IDOC, and thus cannot show inmates have a protected liberty interest in avoiding restrictive housing (Doc. 435, p. 36). According to Defendant, the conditions may be "undesirable," but they are not grim enough and do not deviate substantially from conditions in general population, to rise to the level of atypical and significant hardship (*Id.* at pp. 37–39).

Plaintiffs responded by characterizing Defendant's position as an "ostrich-like approach . . . [that] ignores the substantial evidence Plaintiffs have compiled over years of litigation" (Doc. 437, pp. 52–53). The Court agrees; Defendant's argument is based on an extremely limited and cherry-picked selection of evidence related to the experience of just two of the named Plaintiffs (*see* Doc. 435, p. 37).

---

last[ing] for longer than 10 days . . . failed to result in negative psychological effects.") (quoting Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124, 132 (2003)).

Furthermore, the Court's previous conclusion that there is a disputed issue of material fact as to whether the conditions of confinement in restrictive housing deny inmates life's necessities and create an excessive risk to their health and safety necessarily means there is also a disputed issue of fact as to whether those conditions impose an atypical and significant hardship. *See Gillis v. Litscher*, 468 F.3d 488, 493-95 (7th Cir. 2006) (noting the "inevitable conclusion" that conditions violating the Eighth Amendment may also impose an atypical and significant hardship under the Fourteenth Amendment and give rise to a constitutionally protected liberty interest). *See also Grissom v. Roberts*, 902 F.3d 1162, 1177 (10th Cir. 2018) ("Given our society's present understanding that prolonged solitary confinement inflicts progressive brain injury, we cannot consider such prolonged, unjustified confinement as anything other than extreme and atypical.") (citations omitted); *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 569 (3d Cir. 2017) (noting inmate "was subject to isolating conditions that researchers agree cause deep and long-term psychic harm" and holding that "[s]uch harm is the essence of the atypical and significant hardship inquiry required under *Sandin* and *Wilkinson*.").

This aspect of Defendant's motion for summary judgment is accordingly denied.

### 2. Process Due

Even if the Court assumes that the conditions in restrictive housing impose an atypical and significant hardship on inmates, summary judgment may still be appropriate if inmates receive all of the process they are due. The process to which inmates are entitled varies depending on the nature of the segregation. *Adams v. Reagle*, 91 F.4th 880, 889 (7th Cir. 2024) (Rovner, J., dissenting) ("The process owed to a prisoner

depends on the particular circumstances and what rights of the prisoner are at stake."). *See Wilkinson v. Austin*, 545 U.S. 209, 228–29 (2005) (explaining some situations—like revocation of parole and revocation of good-time credits—call for formal, adversarial process, whereas other situations—such as release on parole or transfer to administrative segregation—call for informal, nonadversarial process).

Based on the three-factor framework of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the Supreme Court held that informal, non-adversarial procedures are sufficient for prisoners held on what the IDOC refers to as investigative status. *Hewitt v. Helms*, 459 U.S. 460, 476 (1983) ("We think an informal, nonadversary evidentiary review sufficient . . . [for] the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him.") With respect to administrative detention, the Supreme Court held and the parties here agree, that inmates are also entitled to informal, non-adversarial procedures (Doc. 435, pp. 40–41; Doc. 437, p. 56). *See Hewitt*, 459 U.S. at 476 ("We think an informal, nonadversary evidentiary review sufficient . . . for the decision that an inmate represents a security threat . . . ."). *See also Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017); *Westefer v. Neal*, 682 F.3d 679, 684–86 (7th Cir. 2012); *Alston v. DeBruyn*, 13 F.3d 1036, 1042 (7th Cir. 1994).[23]

---

[23] Defendant seems to argue that inmates are entitled to periodic reviews of their continued placement in administrative detention but are not entitled to any process regarding the initial placement (Doc. 435, p. 40) ("For initial placement in AD, individuals do not face a deprivation sufficient to implicate the due process clause. However, the duration and conditions in AD may require meaningful, non-pre-textual periodic reviews of that placement.") (citations omitted). To the extent that is Defendant's argument, that is simply not the case and the citations Defendant provided to support her argument—*Sandin v. Conner*, 515 U.S. 472, 480 (1995) and *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017)— say no such thing. *Contra Felton v. Brown*, 129 F.4th 999, 1008 (7th Cir. 2025) ("In the context of continued administrative confinement, inmates are entitled to 'periodic review,' which—*like the initial placement decision—may be 'an informal and*

As for disciplinary segregation, the Court previously stated that an inmate facing disciplinary segregation was entitled to the formal, adversarial procedures set forth in *Wolff v. McDonnell,* which include (1) advance written notice of the charges, (2) a hearing before an impartial decision-maker, (3) an opportunity to present testimony and documentary evidence (when consistent with institutional safety), and (4) a written explanation for the discipline, that is supported by "some evidence" in the record. (Doc. 230, p. 52). *See Love v. Vanihel,* 73 F.4th 439, 451 (7th Cir. 2023), *cert. denied sub nom. Love v. Neal*, 145 S. Ct. 138 (2024) (citing *Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 454–55 (1985); *Wolff v. McDonnell*, 418 U.S. 539, 563–67 (1974)). The parties asserted the same in their initial summary judgment briefing (Doc. 435, pp. 39–40; Doc. 437, p. 50). However, after the briefing in this case was completed, the Seventh Circuit issued two opinions holding otherwise: *Adams v. Reagle*, 91 F.4th 880 (7th Cir. 2024), followed by *Ealy v. Watson*, 109 F.4th 958 (7th Cir. 2024). The decisions in *Adams* and *Ealy* "crystallized" that only inmates facing disciplinary action affecting the length of their carceral sentence, like a reduction in good-time credit, are entitled to the formal, adversarial process set forth in *Wolff*; inmates facing disciplinary action that will *not* extend the length of their sentence, like segregation, are "entitled only to 'informal, nonadversarial due process."

---

*nonadversary' process*.") (emphasis added) (citing *Westefer*, 682 F.3d at 686). *Accord Hewitt*, 459 U.S. at 472, 476 ("within a reasonable time of being placed in administrative segregation," inmate must receive "some notice of the charges against him and an opportunity to present his views"); *Proctor*, 846 F.3d at 609 ("Before confining an inmate in Ad Seg, prison officials must provide 'some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to [Ad Seg],' although not necessarily a full hearing.") (citing *Hewitt*, 459 U.S. at 476).

*Ealy*, 109 F.4th at 965; *Adams*, 91 F.4th at 895, 896.[24] *See also Scruggs*, 485 F.3d at 939 (formal,

adversarial process of *Wolff* required for inmate subjected to loss of good time as well as

segregation).

But regardless of whether formal or informal process is at issue,[25] notice of the

factual basis for the placement decision and a fair opportunity for rebuttal are always

required. *See Wilkinson*, 545 U.S. at 226, 229 (required for transfer to supermax); *Hewitt*,

459 U.S. at 476 (required for transfer to administrative segregation); *Ealy*, 109 F.4th at 966

(required for inmate facing disciplinary action that does not affect length of their carceral

sentence); *Scruggs*, 485 F.3d at 939 (required for inmate subjected to loss of good time as

well as segregation) (citing *Wolff*, 418 U.S. 539).[26] Plaintiffs have put forth evidence

---

[24] The Court's research shows that prior to *Adams* and *Ealy*, there were numerous Seventh Circuit opinions from the last several decades that dealt with prison disciplinary proceedings in which there was *no* mention of good-time credits, yet the court cited to *Wolff* as the governing standard for what process was required and/or stated that the inmate was entitled to the procedural requirements set forth in *Wolff*. *E.g., Prude v. Meli*, 76 F.4th 648, 657 (7th Cir. 2023) (*Wolff* procedural requirements applied where inmate faced 180 days in segregation and forfeiture of $10,000); *Williams v. Brown*, 849 Fed. App'x 154, 157 (7th Cir. 2021) (inmate punished with eight months in segregation adequately pleaded deficient process by alleging, in part, that defendants refused to call or interview his witnesses); *Rasheed-Bey v. Duckworth*, 969 F.2d 357, 361 (7th Cir. 1992) (*Wolff* procedural requirements applied for inmate given three years segregation). *But see James v. Pfister*, 708 Fed. App'x 876, 879 (7th Cir. 2017) (indicating that "a transfer to disciplinary segregation for an extended period under particularly harsh conditions may constitute a deprivation of liberty sufficient to require constitutionally minimal process. That process, though informal, would include enough notice to prepare a defense to the charge . . . .") (citations omitted). There has even been one decision that came after *Adams* and *Ealy* in which the court cited the *Wolff* procedural requirements as the applicable process due to an inmate punished with three months in segregation. *Sims v. Jester*, No. 23-1779, 2024 WL 3965887, at *3 (7th Cir. Aug. 28, 2024).

[25] Plaintiffs contested the application of *Adams* to the facts of this case (Doc. 407), but did not raise a similar challenge after *Ealy* came out. It is therefore unclear whether Plaintiffs are still contending that inmates facing segregation but not a loss of good time are entitled to the formal, adversarial process of *Wolff*.

[26] *See also Pugel v. Bd. of Tr. of Univ. of Ill.*, 378 F.3d 659, 662–63 (7th Cir. 2004) ("The hallmarks of procedural due process are notice and an opportunity to be heard.") (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)); *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) ("It is a fundamental tenet of due process that, when the government deprives an individual of a protected

demonstrating that the IDOC has a practice of not providing inmates with these basic and fundamental guarantees of due process.

For example, there is evidence that inmates do not receive notice of the factual basis for their placement in restrictive housing. There are declarations from inmates stating they were put in restrictive housing on investigative status but not told why (Docs. 441-23 (investigative ticket stated only that he was "being investigated"), -32 (never received investigative ticket), -34 (never received ticket); *see also* Doc. 441-70, p. 2 (IDOC could not confirm investigative report was served on Henry Davis)). Many inmates stated that the ticket they received did not include any specific factual allegations about what they had supposedly done wrong (Docs. 441-11, -15, -16, -20, -23, -24, -26, -27, -28, -29, -30, -31, –32; *see also* Doc. 441-70 (ticket expunged because it lacked "specific information . . . to substantiate the charge"). Other inmates said they spent over a week in segregation before receiving a ticket (Docs. 441-18 (nine days); -24 (14 days), -28 (seven to 12 days), -29 (seven days) -30 (13 days); -31 (eight to 11 days); -32 (26 days); -34 (never received ticket); -35 (30 days); -37 (ten to 14 days); -39 (18 days). *See* 20 ILL. ADMIN. CODE § 504.30 ("In no event shall" an investigative report or a disciplinary report "be served upon an offender more than eight calendar days after the suspected commission of an offense or the discovery of an offense"). The vast majority of inmates who submitted declarations indicated that they were *not* given any notice of their disciplinary hearing

---

liberty interest, that individual must be afforded not only adequate notice but also a reasonable opportunity to be heard.") (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)); *Moses v. City of Evanston*, 97 F.3d 1454 (7th Cir. 1996) ("The fundamental requirements of due process are notice and an opportunity to be heard, at a meaningful time and in a meaningful manner.") (citation omitted).

(Docs. 437-8 through -40; *see also* Doc. 437-13 (inmate did not receive ticket until "right before" hearing and no advance notice of hearing)). *See Westefer*, 682 F.3d at 684, 685 (informal due process requires that the inmate be given an "opportunity to present his views" and if prison chooses to hold hearings, inmate must be given "enough time to 'prepare adequately'").

Similarly, there is evidence that inmates were placed in administrative detention without being told why (*see, e.g.,* Doc. 441-71, -72 (Davis AD docs.); Doc. 435-20, response #6 (Gardner Interrog. responses); Doc. 435-34 (Jones Supp. Interrog. Response # 2)). There is also evidence that the reasons given for continuing inmates' placement in administrative detention were meaningless or boilerplate—*e.g.,* there were times where the same one-line justification was recycled over and over for years—and failed to provide the inmate with any helpful information as to how he could get out of administrative detention (*see, e.g.,* Doc. 441-72 through 76 (Davis AD docs.); Doc. 435-20, response #6 (Gardner Interrog. responses); Docs. 435-25 and -26 (Gardner AD docs.); Doc. 435-34 (Jones Supp. Interrog. Response # 2); *see also* Doc. 441-5, para. 163 (Haney report); (Doc. 222-4, para. 127 (Vail report) ("I interviewed several prisoners in AD. It was universal that these prisoners could not articulate what they needed to do to get out of restrictive housing placement, and many were being held for reasons that were never fully articulated to them.")); (Doc. 441-4, para. 207, 209, 213, 219, 220) (Pacholke report). There is evidence that inmates were denied administrative detention reviews (*e.g.,* Doc. 441-4, para. 185, 214, 216) (Pacholke report). And there is evidence that administrative detention reviews were meaningless, and sometimes administrative detention was

continued despite admissions that there had been no issues with the inmate or the discipline underlying their placement had been expunged (*see, e.g.,* Doc. 435-17 (Davis AD docs.); Doc. 435-27, p. 3; Doc. 391-9, para. 104, 114 (Vail report); *see also id.* at para. 107, 110, 111, 113; Doc. 441-4, para. 213 (Pacholke report)). *See Isby*, 856 F.3d at 527 (criticizing these same type of issues).

The cited evidence, which is simply representative and by no means intended to be an exhaustive list of all the evidence Plaintiffs have amassed, is more than enough to raise a triable issue of fact as to whether inmates sent to restrictive housing receive sufficient, meaningful process. Accordingly, this aspect of Defendant's motion for summary judgment is denied.

## D. PLAINTIFFS' REQUESTED RELIEF

Defendant makes a number of arguments regarding the injunctive relief requested by Plaintiffs (Doc. 435, pp. 48–65). She claims a suggestion made by Plaintiffs' experts to audio record disciplinary hearings exceeds the protections required by *Wolff* and is therefore "inappropriate" (Doc. 435, p. 48). Defendant argues that Plaintiffs are not entitled to a permanent injunction because they cannot satisfy the elements needed to impose injunctive relief (Doc. 435, pp. 49–50). Defendant also argues that Plaintiffs' requested injunctive relief does not comply with the Prison Litigation Reform Act's requirements that prospective injunctive relief in a civil action with respect to prison conditions must be "narrowly drawn, exten[d] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." (Doc. 435, pp. 50–60). Defendant also argues that Plaintiffs'

requested injunctive relief is barred by the Eleventh Amendment because they cannot show a clear, ongoing violation of constitutional law (Doc. 435, pp. 60–65).

All of these arguments are premature. As set forth above, there are disputed issues of fact as to each of Plaintiffs' claims that must be tried. If the Court determines Defendant is liable on Plaintiffs' claims, then it will have to address whether a permanent injunction is the appropriate remedy and the proper scope of the injunction. But those questions need not be addressed now before there has even been a finding of liability. Accordingly, these portions of Defendant's motion for summary judgment are denied without prejudice to being reasserted in the event Defendant is found liable at trial.

## CONCLUSION

Defendant LaToya Hugh's motion for summary judgment (Doc. 370 (original sealed version); Doc. 435 (redacted, publicly available version)) is **DENIED**. This case will proceed to trial on Plaintiffs' Eighth Amendment claim (Count 1) and on Plaintiffs' Fourteenth Amendment claim (Count 2).

A status conference will be set by separate notice to discuss, what the Court imagines, will be a multitude of issues necessary for preparing this case for trial. Further instructions and potential topics that the Court will want to discuss at this upcoming status conference will be forthcoming.

**IT IS SO ORDERED.**

**DATED: March 28, 2025**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**
