**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **HENRY DAVIS, et al.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:16-cv-600-MAB** |
| | ) | |
| **LATOYA HUGHES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

This matter is before the Court on Plaintiffs' Renewed Emergency Motion for Protective Relief and Sanctions ("Renewed Emergency Motion") (Doc. 623), and a related motion to re-open discovery (Doc. 624), both filed in March 2026. Also before the Court are multiple, subsequently-filed motions to submit supplemental declarations (Docs. 661, 672, 673, 674, 676, 683), as well as an Emergency Motion for Evidentiary Hearing (Doc. 665).

**BACKGROUND**

Plaintiffs asserted in their original Emergency Motion, as well as this Renewed Emergency Motion, that since testifying at the trial in this matter, certain Menard inmates—Ray Tate, Lamar Hardy, Anthony Williams, and Kevin Norman—have been subjected to a retaliatory campaign of harassment and abuse from prison staff at Menard (Doc. 623, p. 1; *see also* Doc. 613, p. 1). Plaintiffs' original emergency motion was denied because they did not provide any evidence to support their allegations of retaliation (Doc.

622, pp. 4–7). They quickly renewed their motion with declarations from some of their attorneys, attesting to harassment and abuse that has been reported to them by Tate, Hardy, Williams, and Norman (Docs. 623-1, 623-2, 623-3).

In the Renewed Emergency Motion, Plaintiffs claim that Tate, Hardy, Williams, and Norman have been subjected to various forms of retaliation since they testified at trial, including but not limited to violent physical assaults; being placed in inhospitable cells; having their legal papers confiscated; having their cells frequently shaken down; having their utilities tampered with (*e.g.,* water temperature in cell suddenly scalding hot, water running continuously, water turned off, toilet inoperable); having their property seized, withheld, or destroyed (*e.g.*, the mattress in their cell, tablets, chargers, headphones, fans, prison ID); having appointments and phone calls canceled or abruptly terminated; being deprived of food; being deprived of privileges (*e.g.,* access to showers, access to the commissary); receiving bogus disciplinary tickets; and/or receiving verbal threats to their safety (*e.g.,* being called a "rat" or a "snitch" loudly in front of other inmates) (Doc. 623, p. 2; *see also* Docs. 623-1, 623-2, 623-3, 625-1). Plaintiffs claim that they know Tate, Hardy, Williams, and Norman are being targeted for their participation in this case because the adverse actions began occurring shortly after they testified and they have been taunted for testifying (*see* Docs. 623-1, 623-2, 623-3, 625-1).

Plaintiffs ask the Court to set the matter for an immediate evidentiary hearing, and assuming that the evidence substantiates the alleged retaliation, to enter a protective order prohibiting all forms of retaliation (Doc. 623, p. 5). Plaintiffs further ask the Court to require Defendant Hughes to report to the Court and Plaintiffs' counsel every thirty

days, in writing, on all disciplinary charges or other disciplinary actions directed at Plaintiffs' testifying witnesses; to hold Defendant Hughes in contempt for allowing witness retaliation; and to enter an award of fees and costs (*Id.* at pp. 5–6).

After the renewed emergency motion was fully briefed (*see* Doc. 623 (Pls.' motion), Doc. 628 (Def.'s response), and Doc. 630 (Pls.' reply)), the undersigned held a hearing to discuss preliminary issues and concerns with the parties (Docs. 635, 639). That discussion prompted the Court to refer the matter to mediation with Magistrate Judge Gilbert Sison to see if the parties could negotiate some kind of relief for Tate, Hardy, Williams, and Norman regarding their allegations of retaliation (Doc. 640). Judge Sison held an all-day, in-person mediation session on May 12, 2026 (Doc. 656), which was unsuccessful. A second mediation session was held via Zoom on June 4, 2026 (Doc. 662), which was also unsuccessful. Judge Sison, however, did not terminate the referral or indicate on the docket that the parties had reached impasse, which the Court took to mean that negotiations remained ongoing. Indeed, Plaintiffs indicated as much in a motion filed June 17, 2026 (Doc. 665, p. 2) ("[S]ettlement discussions between the parties continue as to three of the four prisoners: Lamar Hardy, Anthony Williams, and Kevin Norman" but "[s]ettlement discussions as to the fourth prisoner, Ray Tate, are at an impasse.").

Meanwhile, Plaintiffs continued to file motions seeking to supplement their Renewed Emergency Motion with additional declarations. The first was filed just seven days after the Renewed Emergency Motion (Doc. 625), and before Defendant had even had a chance to respond. Plaintiffs filed a couple more amidst the mediation talks with Judge Sison (Docs. 661, 665). And they filed four more during the month of July 2026,

some in rapid succession (Docs. 672, 673, 674, 676).[1] Plaintiffs' counsel repeatedly represented in each of these motions that the parties had reached an impasse at mediation (Docs. 672, 672-1, 673, 673-1, 674, 674-1, 676, 676-1). Yet, Judge Sison did not terminate the referral or indicate on the docket that the parties were irretrievably deadlocked, which, again, signaled to the Court that negotiations remained ongoing.

Judge Sison reported on September 10, 2026, that his settlement talks with the parties over the prior four months had resulted in a resolution on the Motion for Protective Relief and Sanctions as it related to Hardy and Norman (*see* Doc. 682). However, the parties remain at impasse as it relates to Ray Tate and Anthony Williams (*id.*), and therefore the Renewed Emergency Motion is now ripe for disposition as it relates to Tate and Williams. Just yesterday, Plaintiffs filed yet another motion to supplement their Renewed Emergency Motion with an additional declaration (Doc. 683).

## DISCUSSION

As an initial matter, the undersigned wishes to make clear that peppering the Court with filings, as Plaintiffs have done, is simply not the way to get the undersigned's attention or prompt a hearing. This case is not the undersigned's only responsibility. In fact, the undersigned is currently responsible for over 170 civil cases aside from this one, plus a large number of criminal matters during criminal duty months, and other miscellaneous tasks, such as settlement conferences. Suffice it to say, the undersigned is busy. The Court understands that one of the key principles it should adhere to is to

[1] Defendant has opposed each of Plaintiffs' motions (Docs. 627, 628, 631, 663, 669, 675, 677, 679). And Plaintiffs have often followed with a reply brief (Docs. 630, 671, 678).

resolve cases in a just, speedy, and inexpensive fashion. *See* FED. R. CIV. P. 1. It is not hyperbole to say the undersigned does everything possible to manage his caseload as efficiently and quickly as possible. The Court also recognizes the serious and time-sensitive nature of the issues at play in this case and has always endeavored to issue rulings in a timely manner (although its intentions have often been frustrated by the sheer volume of briefing and evidence it must consider). But the Court's capacity is finite. While Plaintiffs file more and more motions, the undersigned does not get more hours in his day. And, so long as the settlement talks were ongoing, the Court was not inclined to intervene and dedicate the Court's limited time and resources to deciding issues that the parties were still trying to resolve on their own. It was a simple matter of judicial economy.

The Court is also troubled by some of the language used by Plaintiffs' counsel in their submissions and the pace at which those submissions were filed. It appears to the Court that Plaintiffs were intentionally trying to maximize the drama and incite fear, if not overwhelm the Court, so that emotion would override reason and the Court would impulsively give in to Plaintiffs' frantic demands and overlook the unconventional nature of the relief they sought and the valid arguments in opposition. For example, Plaintiffs repeatedly titled their motions as "Emergencies" (Docs. 613, 616, 623, 624, 665), talked of unprovoked and violent beatings from guards (Docs. 613, 623-1), said things like they need "immediate intervention by the Court" (Doc. 613, p. 1), and "urgently request swift relief" (Doc. 678, p. 2), because the situation at Menard is "grave," "dire," and "exigent" (Doc. 630, p. 5; Doc. 665, p. 2). They said "Defendant Hughes and her subordinates are

operating a lawless torture chamber" (Doc. 683-1, para. 9), and the "*Court should intervene before somebody gets killed*." (Doc. 630, p. 5) (emphasis added).

Other times, Plaintiffs' counsel made statements disparaging and almost chastising opposing counsel, sometimes with a melodramatic flair (*see, e.g.*, Doc. 630, p. 3 (accusing Defendant of resorting to her "unfortunate practice of attacking opposing counsel when she has nothing else good to say about the merits of the issue" and decrying "[b]aseless attacks on opposing counsel" as "the lowest form of advocacy"); *Id.* at p. 10 (calling "Defendant's protestations about engaging in discovery . . . tired and unpersuasive"); Doc. 678, pp. 1–2 (criticizing Defendant for "adopt[ing] a shameful litigation tactic" by "threatening to overload the proceedings with her own witnesses . . . ." in order to manufacture a reason for the Court to deny Plaintiffs' motions).

As other courts have said, "there are good reasons not to disparage your opponent, especially in court filings." *Bearden v. Ballad Health*, 967 F.3d 513, 515 (6th Cir. 2020) (quoting *Bennett v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 584, 585 (6th Cir. 2013)). For one, civility matters. *Bennett,* 731 F.3d at 585. *See also Bearden*, 967 F.3d at 519 (reminding counsel that, "as an officer of the court, he is expected to treat other parties in the case (as well as their counsel) with courtesy and professionalism."); *Big Dipper Ent., L.L.C. v. City of Warren*, 641 F.3d 715, 719 (6th Cir. 2011) (advising parties to "think twice" about "casually impugn[ing] the motives" or "questioning . . . the integrity" of opposing counsel); *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1, 6 n.2 (1st Cir. 1988) ("Careful research and cogent reasoning, not aspersions, are the proper tools of our trade."). For another, it is a "near-certainty that overstatement will only push the reader away."

*Bennett,* 731 F.3d at 585. And perhaps the biggest reason is that the opponent's argument might actually be correct. *Bennett,* 731 F.3d at 585.

The Court does not levy these criticisms lightly, and in fact does so reluctantly, but finds it necessary. The Court emphasizes that, moving forward, the parties should take care to ensure their submissions to the Court are more measured in volume and in tone.

## RENEWED EMERGENCY MOTION FOR PROTECTIVE RELIEF AND SANCTIONS

The Court begins its discussion of Plaintiffs' motions with the Renewed Emergency Motion for Protective Relief and Sanctions ("Renewed Emergency Motion") because it is the foundational motion upon which all of Plaintiffs' subsequent motions are premised.

Plaintiffs have repeatedly insisted that they are entitled to an evidentiary hearing on the Renewed Emergency Motion. The Court, however, finds that no hearing is necessary because the motion is denied for reasons that do not require the Court to resolve the issues of fact that exist between the parties.

**Request for Protective Order**

Plaintiffs first ask the Court to enter a protective order prohibiting all forms of retaliation. As the Court stated in the previous Order, "its ability to prohibit retaliation against witnesses after trial has concluded, but before final judgment has been rendered, predominantly originates from the Court's inherent equitable powers." (Doc. 622, p. 7). Specifically, in *Ben David v. Travisono*, the First Circuit affirmed that district courts have inherent equitable power to issue a protective order prohibiting prison officials from retaliating against prisoners who were plaintiffs in a class action filed against the prison

officials. 495 F.2d 562, 564 (1st Cir. 1974). The court explained that this type of protective order is meant to "reassure fearful witnesses and thereby assist the court's fact-finding" rather than decide "the actual likelihood" or "objective probability" of official misconduct. *Id.* In other words, the purpose of such a protective order is to safeguard the integrity of the judicial process by ensuring that fact gathering and/or the presentation of evidence at trial is unhindered by witnesses' refusal to participate out of fear that they would be mistreated if they did. *See id.* at 563 (noting that district court had "found that such an order was essential to guarantee a 'fair and meaningful evidentiary hearing' and an 'adequate inquiry' into plaintiffs' claims."). In holding that courts have the inherent power to issue such a protective order, the First Circuit established a relatively low standard for doing so: "[t]he findings necessary to support such a protective order are simply that the plaintiffs reasonably fear retaliation and that the court's fact-finding may be materially impaired unless there is provided the tangible protection of a suitable court order." *Id.* at 564.

A number of district courts around the country have since relied on *Ben David* in agreeing that they have the power to issue an order protecting witnesses from reprisal for participating in a lawsuit based on a showing that the witnesses "reasonably fear retaliation" and the court's fact-finding may be materially impaired absent a protective order. *See Disability Rts. New Jersey, Inc. v. Velez*, No. CIV. 10-3950 DRD, 2011 WL 2937355, at *4 (D.N.J. July 19, 2011) (relying on *Ben David* in holding that protective orders pursuant to the court's inherent equitable powers are "an appropriate vehicle to prevent interference with potential witnesses"); *Rissman, Hendricks & Oliverio, LLP v. MIV*

*Therapeutics, Inc.*, No. CIV.A. 11-10791-MLW, 2011 WL 5025206, at *5 (D. Mass. Oct. 20, 2011) (same); *Adams v. NaphCare, Inc.*, No. 2:16-CV-229, 2016 WL 10492102, at *10 (E.D. Va. July 25, 2016) (same); *Goninan v. Washington Dep't of Corr.*, No. 317CV05714BHSJRC, 2018 WL 4630205, at *2 (W.D. Wash. Sept. 26, 2018) (same); *Teller v. Helbrans*, No. 19-CV-3172-SJB, 2019 WL 3975555, at *5 (E.D.N.Y. Aug. 21, 2019) (same); *Tyner v. Cain*, No. 3:22-CV-257-KHJ-BWR, 2024 WL 578775, at *3 (S.D. Miss. Feb. 13, 2024) (evaluating plaintiff's motion for protective order under the *Ben David* standard). *But see Memphis Inv., GP v. Waite*, No. 2:13-CV-01282-JAD-NJ, 2014 WL 547962, at *5 (D. Nev. Feb. 11, 2014) (rejecting the court's authority to issue a protective order to prevent witness harassment under a "reasonable fear of retaliation" standard and instead applying the Rule 65 preliminary injunction standard).

In this instance, even if the Court assumes that Plaintiffs can credibly establish that Tate and Williams reasonably fear retaliation, Plaintiffs have simply not convinced the Court that their fear of retaliation may materially impair the Court's fact-finding. In all of the above-cited cases, the protective order was issued during the discovery phase (or at least prior to trial) as a pretrial tool to ensure the merits of the case could be fairly and fully developed. Here, the trial on the merits has already occurred. The record is closed. And the case is under advisement awaiting the Court's decision. All of the alleged retaliatory conduct post-dates the presentation of evidence to the Court, and it is impossible for post-trial events to materially interfere with the Court's fact-finding.

In an effort to avoid this result, Plaintiffs contend that class members, including Tate and Williams, may be called to testify again in this matter or to speak to a court-

appointed monitor, depending on the nature of the relief ordered by the Court (Doc. 623, pp. 4–5). Plaintiffs further contend that, even if Tate and Williams' future testimony is not necessary, it is "certain" that "Defendant's retaliation and harassment of any testifying witness will chill the willingness of other class members to come forward and speak truth to power about Defendant's unlawful policies and practices." (Doc. 630, para. 4; *see also* Doc. 623, para. 5). At this point, however, Plaintiffs' argument is just speculation given that the Court has not yet issued its decision in the bench trial. Ultimately, the Court's fact-finding could only be materially impaired if (1) the Court issued a bench trial ruling favorable to Plaintiffs *and* (2) the relief ordered required some kind of ongoing monitoring. As of now, the Court has not yet issued its decision, so it is not clear what trajectory this case will take or whether the Court will have any continuing involvement. Accordingly, at this time, there is simply no fact-finding that could be impaired post-trial. Plaintiffs' request for a protective order is denied.

**Request for Monitoring**

Plaintiffs' second requested form of relief is for the Court to "require Defendant to report in writing to the Court and Plaintiffs' counsel every thirty days on all disciplinary charges or actions directed at Plaintiffs' testifying witnesses" (Doc. 623, p. 5). In other words, Plaintiffs want to involve their attorneys and the Court in ongoing monitoring of the day-to-day prison life of Tate and Williams.

The Court questions the propriety of this request and its ability to act as a monitor on an issue—which is unrelated to the underlying claims in this case and involves only a minute number of individual members of the class—when the Court has yet to issue a

trial decision on those claims. The Court need not dwell or expound on this concern, however, because there is another fundamental reason to deny this request for relief: this type of ongoing reporting or monitoring is not the type of relief that can be ordered as part of a protective order.

A protective order only serves to tell the targets of the order "precisely what conduct is outlawed." *Ben David*, 495 F.2d at 564. *See also Adams,* 2016 WL 10492102, at *12 (protective order would "discus[s] the 'dos and don't's' of conduct towards the inmate witnesses"); *Protective Order*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A court order prohibiting or restricting a party from engaging in conduct . . . that unduly annoys or burdens the opposing party or a third-party witness."). Monitoring is typically sought as a form of injunctive relief. *Adams*, 2016 WL 10492102, at *12 (citing Halderman *v. Pennhurst State Sch. & Hosp.*, 545 F. Supp. 410, 416 (E.D. Pa. Aug. 12, 1982)). *See also, cf., Rasho v. Jeffreys,* 22 F.4th 703, 707 (7th Cir. 2022) (in class action against IDOC, parties agreed to entry of consent decree, which required the appointment of a monitor to assess IDOC's compliance); *Lippert v. Hughes*, 171 F.4th 992, 996 (7th Cir. 2026) (same). But, here, Plaintiffs could never obtain injunctive relief based on the alleged retaliation because there is no retaliation claim pending in this action. *See Chicago Reg'l Council of Carpenters v. Vill. of Schaumburg,* 644 F.3d 353, 356 (7th Cir. 2011) ("A person seeking injunctive relief must . . . ground its right to relief on events described in the complaint, not on matters that arise later."). *See also Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) ("[T]here must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint.");

*Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (holding plaintiff "had no grounds to seek an injunction pertaining to allegedly impermissible conduct not mentioned in his original complaint."); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 489–90 (3d Cir. 2000) ("[H]arm . . . insufficiently related to the complaint . . . does not deserve the benefits of protective measures that a preliminary injunction affords."); *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action."); *Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997) ("A district court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit."); *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir. 1994) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.").

To the extent that Plaintiffs are requesting monitoring in conjunction with their request to hold Latoya Hughes in contempt and/or sanction her, it is denied for these reasons.

**Request for Contempt**

Plaintiffs' third requested form of relief is to hold Defendant Latyoa Hughes in contempt (Doc. 623, p. 5). "To hold [a person] in civil contempt, the district court 'must be able to point to a decree from the court which sets forth in specific detail an unequivocal command which the party in contempt violated.'" *Manez v. Bridgestone Firestone N. Am. Tire, LLC,* 533 F.3d 578, 591 (7th Cir. 2008) (quoting *Grove Fresh Distribs.*,

*Inc. v. John Labatt, Ltd.*, 299 F.3d 635, 642 (7th Cir. 2002)).

Here, there is nothing in any of Plaintiffs' motions or declarations that references a *specific* and *definite* command from the Court that Defendant Latoya Hughes, as Director of the IDOC, supposedly violated (*see* Docs. 623, 630). Furthermore, it appears that Plaintiffs do not even know what Hughes specifically, or even generally, did or did not do that could be deemed contempt. Their motion is conspicuously silent as to what Hughes' actions (or inactions) were or how they provide a legal basis for holding *her* in contempt for retaliatory acts committed by others (*see* Doc. 623). It seems that all Plaintiffs know right now is that they told Director Hughes about their claims of retaliation, and the alleged retaliation has not stopped. But the fact that some officials directly or indirectly under Director Hughes' command are allegedly violating the law by retaliating against Tate and Williams is not, in and of itself, grounds for holding Director Hughes in contempt.

It seems that Plaintiffs want to engage in discovery in order to ascertain whether Director Hughes has in fact violated some unspecified Court order (*see* Doc. 624-1, para. 8 (requesting "All communications to and from Director Latoya Hughes, from October 1, 2025, to present, referring or relating to reports of retaliation against Menard prisoners Tate, Hardy, Williams, or Norman"). This type of vague conjecture is not enough to open contempt proceedings. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.,* No. 17-CV-01973, 2024 WL 1254127, at *10 (N.D. Ill. Mar. 25, 2024) (collecting cases requiring a "prima facie" showing of a violation of a court order, or "a showing of 'significant questions' as to the violation of a court order, in order to warrant contempt-related

discovery); *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, No. 09CIV6148VMMHD, 2012 WL 12932049, at *58 (S.D.N.Y. July 17, 2012) ("Filing a motion for sanctions should not lead to free rein for a fishing expedition. A party should first be required to make a *prima facie* showing that a violation has occurred.") .

Contempt is simply not the proper course of action here at this time, and therefore Plaintiffs' request to hold Defendant Hughes in contempt is denied.

**Request for Sanctions**

Plaintiffs also ask the Court to sanction Defendant Hughes (Doc. 623). "[A] court has the inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it, and pursuant to that authority, may impose appropriate sanctions to penalize and discourage misconduct." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776, 782 (7th Cir. 2016) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46–50 (1991)). Sanctionable misconduct includes witness tampering, which the Seventh Circuit has said is "among the most grave abuses of the judicial process[.]" *Ramirez*, 845 F.3d at 782. That being said, the Court has become convinced throughout the course of its research on this matter that, under the circumstances here, a request for sanctions is simply not a good fit to seek relief from the alleged retaliation Tate and Williams claim to face after they testified at trial.

To begin with, the alleged retaliatory acts are not being committed by Defendant Latoya Hughes; they are being committed by non-party prison officials at Menard. And Plaintiffs have not offered evidence of any type that Hughes is orchestrating the retaliation or otherwise condoning it. Plaintiffs also have not made a convincing

argument that the alleged retaliation directly impairs their ability to continue prosecuting this case on a class-wide basis. Normally, in these circumstances, courts within the Seventh Circuit do not allow a plaintiff to seek relief for retaliation within the same lawsuit that supposedly provoked the retaliation. Instead, they require the plaintiff to raise the retaliation claim in a new lawsuit.[2] As one court put it, "The fact that a civil action has been permitted to proceed against a defendant on certain claims is not an invitation to an inmate to seek relief for any and all wrongs, whether real or imagined, involving that defendant, for the entire duration of the civil action." *Nau v. Papoosha*, No. 3:21CV00019(SALM), 2022 WL 267472, at *1 (D. Conn. Jan. 27, 2022).

Moreover, in this instance, entertaining Plaintiffs' request to sanction Defendant

---

[2] *See, e.g., Perkins v. Koehler*, No. 22-CV-1125, 2023 WL 5211508, at *1 (E.D. Wis. Aug. 14, 2023) (explaining motion for sanctions was "not proper" way for plaintiff to seek relief from alleged retaliation that occurred after he filed lawsuit; instructing him to instead use the grievance procedure and then file separate lawsuit related to the retaliation); *Kessler v. Pass*, No. 18-CV-530-JPG-DGW, 2018 WL 6705683, at *2 (S.D. Ill. Dec. 20, 2018) (refusing to issue sanctions based on plaintiff's allegations that he was being retaliated against for filing the lawsuit; "If he wants to raise [a retaliation] claim, he must exhaust his administrative remedies and file a new lawsuit."); *Bakhtiari v. Walton*, No. 13-CV-906-JPG, 2013 WL 6405796, at *1 (S.D. Ill. Dec. 6, 2013) (denying plaintiff's motion for sanctions and/or injunctive relief based on alleged retaliation for filing the lawsuit; instructing plaintiff the proper avenue was to "file a new lawsuit—after exhausting his available administrative remedies—about the alleged retaliation . . . and . . . seek injunctive relief in that new case."); *McCormack v. Hamblin*, No. 12-CV-535-BBC, 2013 WL 4776523, at *2 (W.D. Wis. Sept. 5, 2013) (denying motion for contempt based on new allegations of retaliation when alleged retaliation did not impair the plaintiff's ability to litigate the case, "related only tenuously to any of the named defendants," and was unrelated to the underlying claims in the lawsuit). *See also, e.g., Troka v. McCown*, No. 3:24-CV-00082-KGB-JTK, 2025 WL 752495, at *5, 6 (E.D. Ark. Mar. 10, 2025) (finding plaintiff's motions for sanctions, a TRO, and a preliminary injunction, which were all based on new allegations that he was "being retaliated against by medical personnel for filing this lawsuit," were "not appropriate for this case"); *Nau v. Papoosha*, No. 3:21CV00019(SALM), 2022 WL 267472, at *2 (D. Conn. Jan. 27, 2022) ("a motion for sanctions 'is not the appropriate vehicle' for a plaintiff 'to introduce new allegations of retaliation[.]'") (quoting *Garvey v. Town of Clarkstown, N.Y.*, No. 13CV08305(KBF), 2018 WL 1026379, at *14 n.14 (S.D.N.Y. Feb. 22, 2018), *aff'd sub nom. Garvey v. Sullivan*, 773 F. App'x 634 (2d Cir. 2019)); *Murphy v. Rodriguez*, No. 119CV00206DADEPGPC, 2020 WL 4001143, at *1 (E.D. Cal. July 15, 2020) (finding plaintiff's requests to sanction, to admonish, and to monitor nonparties based on new allegations of retaliation were "not appropriate"; rather, he should file a separate lawsuit or move to amend/supplement his complaint in the instant action).

Hughes for the alleged retaliation would unduly complicate this litigation by introducing a secondary issue into the case. *See McCormack v. Hamblin,* No. 12-CV-535-BBC, 2012 WL 6707669, at *1 (W.D. Wis. Dec. 21, 2012) (requiring plaintiff to bring new allegations of retaliation in separate lawsuit "prevents the complication of issues that can result from the accumulation in one action of claims that are distinct from on[e] another . . . ."). It would also undoubtedly delay the resolution of this case. Discovery, which has been closed for nearly three years, (*see* Doc. 340), would have to be re-opened. An evidentiary hearing would have to be held. The Court is firmly convinced that any such evidentiary hearing would *not* be quick, and Plaintiffs' contentions to the contrary are simply not grounded in reality. The hearing would involve taking evidence from at least two different inmates and their interactions with numerous prison officials on numerous occasions over a series of months. It would essentially be two additional mini-trials. Additionally, Defendant has indicated that she intends to treat any hearing as though it were a full trial on the merits due to the potential consequences on future litigation (Doc. 627, pp. 17–18). There would almost certainly be dozens of witnesses and dozens more exhibits. The hearing would likely take at least a full week, if not multiple weeks, and would require a substantial time commitment and a substantial expenditure of the Court's resources.

The Court would also have to find facts and decide issues that have no bearing on the underlying claims in this case. In short, it would do nothing to advance the progress of this case and would instead divert the Court's time and resources from completing its bench trial decision.

Additionally, given the rate at which Plaintiffs' counsel has been coming to the Court with additional instances of alleged retaliation (*see* Docs. 625, 661, 665, 672, 673, 674, 676), the Court has reason to believe that Plaintiffs would continue filing a stream of motions for sanctions/contempt, for which there is no foreseeable stopping point so long as this litigation is ongoing. *See Atkinson v. Mackinnon*, No. 14-CV-736-BBC, 2015 WL 13658057, at *1 (W.D. Wis. Oct. 29, 2015) (declining to allow prisoner to add new claims that they had been retaliated against for filing the underlying lawsuit because "[t]hese types of retaliation claims risk delaying resolution of the case indefinitely while the parties litigate and conduct discovery on each discrete instance of retaliation that may occur while the lawsuit progresses."); *Fitzgerald v. Greer*, No. 07-cv-61, 2007 WL 5490138, at *1 (W.D. Wis. Apr. 2, 2007) ("[A]llowing ongoing claims of retaliation to be added to a lawsuit as the lawsuit progresses could result in a lawsuit's life being extended indefinitely.").

Deciding whether to sanction Defendant Hughes would also have the undesirable effect of requiring the Court to make findings that would presumably impact future retaliation claims brought by Tate and Williams. *See, e.g., Ashworth v. Arizona,* No. CV1902761PHXSPLJZB, 2022 WL 621740, at *6 (D. Ariz. Mar. 3, 2022) (considering whether protective order previously issued in class action had any preclusive effect on individual inmate's subsequent retaliation claim). The Court believes it imprudent to make such findings on an abbreviated record when the retaliation claims could be fairly and fully adjudicated if they were filed as a separate suit.

But Plaintiffs' counsel made clear at the hearing that they wanted to pursue relief

for the retaliation in *this* lawsuit because they feared relief would not come fast enough if they had to file a separate lawsuit, mainly because Tate and Williams would first have to exhaust their administrative remedies prior to filing suit. *See* 42 U.S.C. § 1997e(a). The Court is not persuaded. Tate and Williams claim that the grievance process has been made unavailable to them, (*see* Doc. 623-1, p. 24, para. 11; Doc. 665-1, para. 10; Doc. 672-1, para. 5; Doc. 673-1, para, 6; Doc. 683-1, para. 5), which if believed by a court, would excuse them from exhausting. *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006) ("If administrative remedies are not 'available' to an inmate, then the inmate cannot be required to exhaust."). *See also Ross v. Blake*, 578 U.S. 632, 644 (2016) (explaining that one of the circumstances in which administrative remedies are unavailable is "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."); *Hernandez v. Dart,* 814 F.3d 836, 842 (7th Cir. 2016) (citing examples of "affirmative misconduct" rendering grievance process unavailable, such as, when officials do not respond, tell the inmate they cannot file a grievance, refuse to provide grievance forms, threaten the inmate, etc.).

Additionally, a complaint can be accompanied by a request for a TRO/preliminary injunction. And Tate and Williams can seek a much fuller panoply of injunctive relief aimed at directly stopping the retaliation (as opposed to indirectly addressing it through sanctions) that are not available here through a motion for sanctions or contempt. So, while the Court understands Plaintiffs' concerns with filing a new lawsuit, it does not believe those concerns override the issues inherent in allowing Plaintiffs' to pursue relief for the alleged retaliation within this class action.

Accordingly, the request for sanctions is denied because the Court cannot allow the secondary issue of alleged post-trial retaliation, which now affects just two the tens of thousands of class members—a tiny fraction of one percent—to mushroom into a major focus of this class action litigation, thereby complicating and protracting the litigation, becoming a disproportionate drain on the Court's time and resources, and significantly hindering the Court's ability to finalize its trial decision in this case. To be clear, Plaintiffs' allegations, if true, are abhorrent. But the Court is not going to force a square peg into a round hole just because Plaintiffs' counsel continues to loudly insist that it can be done, and especially when Tate and Williams have another and better suited avenue of relief for the alleged retaliation they are facing: they can file a new lawsuit.

## CONCLUSION

Plaintiffs' Renewed Emergency Motion for Protective Relief and Sanctions (Doc. 623) is **DENIED**, which renders all other pending motions (Docs. 624, 661, 665, 672, 673, 674, 676, 683) **MOOT**.

**IT IS SO ORDERED.**

**DATED: September 15, 2026**

Mark A. Beatty

**MARK A. BEATTY**
**United States Magistrate Judge**